40 A.3d 514

**EXXON MOBIL CORPORATION**

v.

**Paul D. FORD, et al.**

**No. 1804, Sept. Term, 2009.**

Court of Special Appeals of Maryland.

Feb. 9, 2012.

2

4

8

Charles P. Scheeler, Baltimore, MD (John E. Griffith, Jr., Jeffrey D. Herschman, DLA Piper LLP (US), Baltimore, MD, James F. Sanders, Thomas H. Dundon, Neal & Harwell, PLC, Nashville, TN, C. Carey Deeley, Jr., Venable, LLP, Towson, MD), on the brief, for appellant.

Stephen L. Snyder, Baltimore, MD & Robert J. Weltchek, Lutherville, MD (Michael B. Snyder, Snyder & Snyder, Baltimore, MD, Kristopher A. Mallahan, Weltchek, Mallahan & Weltchek, LLC, Lutherville, MD), on the brief, for appellee.

Panel: EYLER, JAMES R., EYLER, DEBORAH S., MEREDITH, WOODWARD, ZARNOCH, WRIGHT, GRAEFF, HOTTEN and WATTS, JJ.

PER CURIAM.

In accordance with Md.Code (1973, 2006 Repl.Vol.), Courts and Judicial Proceedings Article, § 1–403(c), a majority of the incumbent judges of this Court ordered this appeal from the Circuit Court for Baltimore County by appellant Exxon Mobil Corporation to be reheard in banc.

The in banc panel unanimously concludes: that counsel for Exxon Mobil did not waive the appellant's right to challenge

the compensatory damage award; and that the circuit court did not err in admitting the testimony of appellees' expert witness on diminution in property values in Jacksonville as a result of the spill.

A majority of the panel determines that, with the exception of the property damage award to one family (the Grecos), the damage award for diminution in value shall be affirmed.

A majority finds that, under certain circumstances, Maryland law permits recovery for emotional distress related to reasonable fear of cancer. However, a different majority concludes that there was insufficient evidence of emotional distress for 53 Jacksonville residents. Thus, their judgment for this component of damages shall be reversed.

Although a majority of the panel determines that there was sufficient evidence of emotional distress to support a damage award for the remaining appellees, a different majority/plurality concludes that a faulty instruction on damages for emotional distress requires a new trial for these appellees.

A majority of the in banc panel would recognize a damage award for medical monitoring under certain circumstances. However, a different majority/plurality concludes that the evidence was insufficient to support such a remedy.

Therefore, the judgment of the Circuit Court for Baltimore County is affirmed in part and reversed in part and the case is remanded for proceedings consistent with this Court's mandate.

**JUDGMENT FOR DIMINUTION IN VALUE IN FAVOR OF ANDREA GRECO AND VERONICA GRECO REVERSED. JUDGMENTS FOR DIMINUTION IN VALUE IN FAVOR OF ALL OTHER APPELLEES AFFIRMED.**

**JUDGMENTS FOR EMOTIONAL DISTRESS IN FAVOR OF LUKE DEKOOMEN, SETH DEKOOMEN, THOMAS BENNEY, LISA BENNEY, BARTLETT COLGAN, PATRICIA COLGAN, ELAINE LINDSEY, TRESIA PARKS, WATER MERSKI, ANTHONY MONTONE, VALERIE MONTONE, LEON NICKEL, THERESA NICKEL,**

RICCI DEPASQUALE, JR., JOSEPH DEPASQUALE, ALICIA DEPASQUALE, WYATT DOBB, DAVID FRITZ, JR., BRENDAN FRITZ, AIDAN FRITZ, MELO DIE HEGGIE, ROBERT LIBERTINI, JR., NICHOLAS LIBERTINI, MICHELLE SHINDLEDECKER, ZACHARY VACOVSKY, BROOK VACOVSKY, CHRISTOPHER VOGLER, CARLI VOGLER, STEVEN STELMACK, AMTUL BAIG, JOSEPH BATEMAN, DENNIS BERLIN, ALEXIS BLAIR, SPENCER BLAIR, ALLISON CARROLL, STEPHANIE CARROLL, JASON CARROLL, JOHN DEPASQUALE, MADISON DOBB, EMILY FABER, ALEXANDER FABER, KATHERINE LIBERTINI, DAVID MAHONEY, ROSEMARIE MAHONEY, LAUREN McLEWEE, LINDA OBERLIN, AMY PETERS, LESLIE RUSH, MARIA CHAVEZ, EVAN TIZARD, EMMA TIZARD, MARLENA WITTELSBERGER, AND LAUREN WITTELSBERGER REVERSED.

JUDGMENTS FOR EMOTIONAL DISTRESS IN FAVOR OF ALL OTHER APPELLEES REVERSED AND CASES REMANDED TO THE CIRCUIT COURT FOR BALTIMORE COUNTY FOR A NEW TRIAL ON THAT CLAIM CONSISTENT WITH THE MAJORITY/PLURALITY VIEWS OF THIS COURT.

JUDGMENTS FOR MEDICAL MONITORING IN FAVOR OF ALL APPELLEES REVERSED.

COSTS TO BE PAID ONE–HALF BY APPELLANT AND ONE–HALF BY APPELLEES WHOSE JUDGMENTS FOR EMOTIONAL DISTRESS OR MEDICAL MONITORING ARE REVERSED, IN EQUAL SHARES.

KRAUSER, C.J., MATRICCIANI, J., and KEHOE, J. did not participate in the argument or the decision in this case.

ZARNOCH, J., concurring and dissenting, in which MEREDITH, J., WOODWARD, J. and WRIGHT, J., join.

This appeal challenges a jury verdict awarding compensatory damages totaling over $147 million to hundreds of plaintiffs who claimed that appellant, ExxonMobil, was responsible for

contaminating their groundwater with certain chemicals found in gasoline. Appellees, the plaintiffs, represent over 88 households in the Four Corners neighborhood of Jacksonville in Baltimore County, Maryland. It is undisputed that a leak at the Jacksonville Exxon station discharged over 700 gallons of gasoline per day for 37 days before it was discovered and shut down in February of 2007. The plaintiffs filed claims against ExxonMobil in the Circuit Court for Baltimore County alleging strict liability for an abnormally dangerous activity, private nuisance, trespass, negligence, and fraudulent concealment. ExxonMobil accepted liability for all of the claims except fraudulent concealment, disputing only causation and damages.

The trial began in October of 2008 and lasted for five months with the Hon. Maurice W. Baldwin presiding. The jury ultimately rejected the fraudulent concealment claim as well as the request for punitive damages. The $147 million compensatory award comprised both economic and non-economic damages, including diminution in value, emotional distress, fear of cancer, and the cost of medical monitoring. Appellant filed several post-trial motions requesting judgment notwithstanding the verdict, a new trial, or remittitur and asserted, inter alia, that the verdict was excessive and formulaic when compared to the evidence presented at trial. After a hearing, the circuit court ordered remittitur as to the diminution in value awards to four households that had sold their homes since the leak.[1] The court denied the remaining motions and upheld the verdict. Appellant noted this appeal.

## FACTS & LEGAL PROCEEDINGS

### The Leak

Because liability is not an issue in this appeal, I will discuss the events leading to the leak only briefly, in order to provide

---

1. The court also reduced the non-economic damages awards to four plaintiffs in order to comply with the statutory cap on non-economic damages. *See* Md.Code (1974, 2006 Repl.Vol.), Courts and Judicial Proceedings Article (CJP), §§ 11–108, 11–109(b).

context for the disputed issues. This case began on a truly unfortunate Friday the thirteenth in January 2007, when a contractor working on the fuel delivery system at the Jacksonville Exxon station accidentally drilled a hole in an underground gas line.[2] The punctured line carried regular grade gasoline from the underground storage tank to the fuel pump. As a result of the leak, the electronic line leak detector automatically shut down the line and sounded an alarm, which was received by both Storto Enterprises, the station operator,[3] and Gilbarco Veeder–Root, a central monitoring company. Gilbarco notified an independent service contractor who issued an emergency work order to Alger Electric Inc.

Alger technicians arrived at the Jacksonville Exxon station within a few hours of the alarm. The technicians found no evidence of a gas leak and believed the problem was being caused by a faulty pump motor. Upon replacing the motor, however, the Alger technicians did not properly recalibrate the leak detector. The alarm therefore failed to signal the continuing leak. It was later established that approximately 700 gallons of gasoline *per day* leaked from the underground line, beginning January 13 and continuing for 37 days until the leak was finally discovered on February 17, 2007. Storto's station operator, Andrea Loiero, testified that she and the station manager noticed a discrepancy in their daily inventory during the time of the leak. The parties dispute when and how often ExxonMobil was informed of this inventory discrepancy. It is clear, however, that on February 16, Loiero reported the large discrepancy to an ExxonMobil territory manager, who advised her to shut down all of the gas pumps. The territory manager arrived at the station within an hour. After examining the records and finding total unexplained

2. The station is located on the corner of Jarrettsville Pike and Paper Mill Rd. The contractor whose work damaged the underground line is not a party in this case.

3. ExxonMobil Corporation owned and maintained the property on which the Jacksonville station was located and all of the equipment. Storto Enterprises was the independent franchisee that operated the station and is also not a party.

losses of 25,000 gallons, he suspected a meter problem and arranged for a helium test to be performed on the gas line. The test, performed the following day, revealed the catastrophic gas leak. ExxonMobil reported the leak to the Maryland Department of the Environment ("MDE") and cleanup efforts began immediately.

### MTBE and Benzene

The primary concern, and the subject of this case, is the contamination of groundwater with two volatile organic compounds found in gasoline: methyl tertiary-butyl ether ("MTBE") and benzene. MTBE is a compound commonly added to gasoline to help it burn "cleaner," reducing emissions of air pollutants from automobile exhaust systems. Because MTBE is highly water soluble, it easily disperses through groundwater at higher concentrations than many other contaminants. At trial, the plaintiffs' toxicology expert, Dr. Kenneth Rudo, testified that MTBE is a known mutagen[4] and therefore, from a toxicological standpoint, "there is no safe level."[5] Some animal studies have indicated that MTBE is carcinogenic, but there have been no human studies linking MTBE to cancer.[6] He also testified that twenty-five states

---

4. Dr. Rudo explained that a "mutagen" is a chemical that can cause changes to the DNA of humans or animals exposed to it. These changes may be harmful, but are not necessarily so.

5. In its brief, ExxonMobil asserts generally that "chemicals that are toxic at one level may be harmless or medicinal at another." In other words, the dose makes the poison. For clarification, however, it is worth noting that appellant never presented any evidence of a medicinal benefit to the daily ingestion of low-levels of MTBE or benzene. To the contrary, appellant's expert testified at trial that he does not believe it is "a good thing" to have contamination from gasoline in your drinking water and he would not want his family exposed to water with such contaminants, despite his conclusion that the scientific evidence did not support classification of MTBE as a human carcinogen.

6. As the experts explained, MTBE was not used as a gasoline additive in the U.S. until 1979, and scientists did not begin to study its potential carcinogenicity until the late 1980s. Therefore, there are few studies on which to base contamination standards for MTBE. In contrast, there have been many human studies linking benzene exposure to cancer.

have banned the use of MTBE because of groundwater contamination concerns. The EPA has classified MTBE as a potential human carcinogen at large doses, but there is not enough data to classify it as a human carcinogen at low exposure levels in drinking water. Dr. Rudo described MTBE as a "probable human carcinogen." and he testified that the plaintiffs whose wells were contaminated with MTBE faced "an incremental risk of developing these cancers in the future."

Due to the lack of scientific consensus, the EPA has not set a maximum contaminant level ("MCL") for MTBE, only an aesthetic standard of 20–40 parts per billion ("ppb").[7] At concentrations exceeding 20–40 ppb, water contaminated with MTBE has an unpleasant odor and taste. The MDE has set an action level of 20 ppb for the State of Maryland, based largely on these aesthetic concerns, although it is also the position of the Department that the 20 ppb standard is "protective of human health and safety."[8] The EPA standards for both MTBE and benzene reflect the levels at which, based on the current science, a person could be exposed to the chemical every day for 70 years with only a negligibly increased risk of cancer.

Benzene, another gasoline additive, is the second contaminant of concern in this case. Unlike MTBE, benzene has been used industrially for many years and its potential carcinogenicity has been known since at least the 1940s. The EPA classifies benzene as a known human carcinogen. According to the expert testimony, benzene has been specifically linked

---

7. Herbert Meade from the Maryland Department of the Environment testified that "aesthetic standards," set by the EPA, do not require any evidence of a risk to human health and are meant only to ensure acceptable odor and taste.

8. The terms "action level" and "maximum contaminant level" were used interchangeably throughout the trial. For the sake of clarity, however, the action level is the State groundwater standard set by the Maryland Department of the Environment, while the maximum contaminant level is a federal standard set by the Environmental Protection Agency.

to an increased incidence of leukemia, as well as a variety of noncancer effects related to its hematopoietic toxicity, including anemia and lowered blood concentrations of leukocytes, lymphocytes, and platelets. The EPA has set the MCL for benzene at 5 ppb, a standard also used by the MDE. The MCL is an enforceable standard believed by the EPA to be technologically and economically reasonable; it does not necessarily reflect the amount below which no adverse health effects are possible. A certain amount of "background exposure" to both MTBE and benzene is incidental to everyday life, occurring when people refill their car fuel tanks, enter parking garages, or live in homes with attached garages.

The plaintiffs' toxicologist described the methods of potential exposure to MTBE and Benzene:

Q. Dr. Rudo, when someone is potentially at risk for being exposed to a contaminant and, particularly in this case, MTBE, and in the case of five of the plaintiffs, Benzene, what are the potential sources of exposure? In other words, drinking, eating, bathing and what are the formal ways of classifying them?

A. You have to—first of all, it depends on the chemical. Is the chemical a substance that can evaporate in the air, say if you are taking a shower, is it volatile, where it gets into the air and it can mix with the water vapor in the air and can you be exposed in that way. With MTBE, the answer is yes, it is a very volatile chemical, does evaporate in the air. As a result, one of the avenues of exposure obviously is from drinking the water, if it is—if you have contaminated water, you are drinking the water with it, so ingestion is one avenue. Also what we have found to be a very, very significant exposure route is bathing and showering in a bathroom because it does evaporate, it gets into the air. So you take a ten or 15–minute bath or shower and you are actually exposed to levels of the chemical in the air in your bathroom that may be equal to or greater than what you would drink over the course of a day. So those are the two main routes. There is also a minor,

more minor route would be what we can whole house exposure, where any kind of use, you use your washing machine, your dishwasher and dryer, it can get into the air that way, generally using the sink to clean dishes. So those would be lower levels than in a bathroom, but those are also avenues.

Q. What about dermal exposure?

A. There would also be in the bathroom, there is both what we would call inhalation exposure and dermal exposure through, dermal through the skin, the MTBE will, can be absorbed though the skin and it can be, you can take it in through the water vapor that is in. . . .

### Contamination of Wells on Appellees' Properties

The parties dispute how long it took ExxonMobil to notify the community surrounding the station of the gas leak and the potential contamination of potable wells.[9] At some point, prior to receiving any of the water sample test results, ExxonMobil began delivering free bottled water to residents within a certain radius of the station. Pursuant to its statutory powers, MDE required ExxonMobil to submit an Interim Remedial Measure Plan. *See* Md.Code (1982, 2007), Environmental Art., §§ 4–401–4–419. Part of the immediate response was to begin drilling wells for monitoring and recovery in different areas around the Exxon property. The monitoring wells were dug at various depths for the purpose of continuous water sampling to determine the presence and extent of the contamination plume (sometimes called the "strike zone"). The recovery wells were used to treat groundwater in hopes of preventing further expansion of the plume.

By October of 2007, there were 227 monitoring wells and MDE had ordered the drilling of an additional 30 wells for purposes of long term monitoring. Water samples have been

---

9. ExxonMobil contends that it notified Herbert Meade at the MDE of the spill on February 17 and he immediately contacted the president of the community association. Appellees claim they did not learn about the leak until local media reported the story four days later.

taken from both the monitoring wells and residential potable wells continuously since February 2006. Of the 88 properties at issue in this case, water testing revealed MTBE concentrations above the action level in only two potable wells, those on the Anderson and Fox properties. The highest concentrations of MTBE measured in those wells was 20.4 ppb and 40.7 ppb, respectively. ExxonMobil paid for the installation of point of entry treatment ("POET") systems to filter all water entering those homes. Traceable amounts of MTBE below the action level were found in samples from potable wells on an additional 66 properties.[10] At the time of trial, the most recent test results revealed no potable wells with MTBE concentrations exceeding the action level, while 40 wells had detectable amounts of MTBE below the action level.[11] Samples from five potable wells contained detectable amounts of benzene: Dobb (0.42 ppb); Fritz (0.096 ppb); Rush (0.10 ppb); Vacovsky (0.13 ppb); and Wiedey (0.10 ppb). None of the water samples taken from potable wells contained benzene in an amount exceeding the MCL. Dr. Harry Cohen, the plaintiffs' expert hydrogeologist, testified that some homes that were initially perceived to have a low probability of contamination did become contaminated because of changing plumes.

Monitoring wells were dug on at least 13 of the appellees' properties.[12] MTBE concentrations exceeding the action level were found in samples from monitoring wells on six properties: Anderson (76.7 ppb); Baig (317,000 ppb); Brady (754 ppb); Dobb (60.7 ppb); Libertini (156,000 ppb); and McLewee (37,200 ppb). Benzene levels exceeding the 5 ppb MCL were found in samples from monitoring wells on five properties: Baig (18,500 ppb); Brady (7.9 ppb); Libertini (5130 ppb); McLewee (324 ppb); and Tizard (11.8 ppb). Aside from the

---

**10.** The remaining 10 properties had undetectable levels of MTBE, meaning the concentration was below 0.05 ppb.

**11.** Current MTBE test results were not available for 11 wells.

**12.** The number of monitoring wells on each of these properties ranged from one, on the Tirocchi property, to nineteen, on the Baig property.

groundwater contamination, the noise, bright lights, and influx of work crews and heavy equipment necessary for the digging of monitoring wells and other remediation activities caused considerable disruption to nearby property owners.

## The Lawsuit

Appellees, representing 88 households, all lived less than a mile from the Exxon station in the "Four Corners" neighborhood of Jacksonville for some period of time after January 13, 2006. The first lawsuit was filed on October 17, 2007. One year later, 90 cases went to trial in the Circuit Court for Baltimore County on claims of strict liability for an abnormally dangerous activity, private nuisance, trespass, negligence, and fraudulent concealment. Regarding the first four claims, ExxonMobil accepted liability and disputed only causation and damages. The plaintiffs sought three types of compensatory damages: (1) diminution in the fair market value of their real property; (2) non-economic damages for their emotional distress, including fear of cancer; and (3) damages for the cost of future medical monitoring. The plaintiffs sought punitive damages for fraudulent concealment, the only claim for which ExxonMobil denied liability.

During trial, the jury heard testimony from 167 witnesses, including many of the plaintiffs and various experts in the areas of toxicology, hydrogeology, and real estate appraisal. After a five month trial, 88 of the cases ultimately went to the jury.[13] On March 12, 2009, the jury returned a verdict finding appellants not liable for fraud or any resulting punitive damages. As for compensatory damages, the jury awarded the owners of each home 100% of the pre-leak value of their real property. Most of the plaintiffs also received emotional distress damages totaling approximately $ 1,000,000 per household. Finally, most of the plaintiffs received damages for

---

13. The claims of the Roeterings and Mrs. Williams were dismissed during the trial. Additional claims were filed in the Circuit Court for Baltimore County. In June, 2011 in *Allison v. ExxonMobil Corp.* (Case No. 03–C–47–003809), a jury awarded more than $1.5 billion in damages. That judgment has been appealed.

medical monitoring, with the amount of the award equaling 100, 50, or 25 percent of their claimed costs, depending on the degree of contamination. Altogether, the jury awarded more than $150 million in damages.

ExxonMobil filed six postjudgment motions: (1) motion for judgment notwithstanding the verdict ("JNOV") on the damages for medical monitoring, claiming that Maryland does not recognize such a claim; (2) motion for JNOV regarding the claims of nineteen specific households; (3) motion for new trial or remittitur regarding property damage awards for those families whose properties did not have contamination at or above the State action level; (4) motion for new trial based on admission of prejudicial evidence, specifically Dr. Rudo's testimony that he believed MTBE to be a human carcinogen and, separately, an email written by a high ranking Exxon official, which was used by the plaintiffs during cross-examination; (5) motion for JNOV or new trial on the emotional distress claims; and, finally, (6) motion for new trial or remittitur on the claims for property damage.

The court denied the first four motions. As for the fifth, the court denied the motion for JNOV and new trial, but reduced the non-economic damages awards of four plaintiffs to the statutory cap of $665,000.[14] Finally, the court rejected the sixth motion for a new trial or remittitur as to the property damages awarded to 84 of the households. For the four families who had sold their properties since the leak, however, the court granted the remittitur as to the claims of diminution in value, reducing the award to an amount equal to the difference between the pre-leak adjusted value and the actual sales price.[15] The court also denied the plaintiffs' omnibus motion, which argued that ExxonMobil was estopped from pursuing its post-trial motions because it conceded liability

---

**14.** The plaintiffs whose awards were reduced pursuant to CJP, § 11–108, were: Amtul Baig, Mirza Baig, Robert Libertini, and Suzanne Libertini.

**15.** The property damage award was reduced for the following four households: Brady, Csicsek, Simms, and Murray.

and stated to the jury, during closing argument, that it would pay whatever the jury saw fit to award the plaintiffs. Exxon-Mobil filed a timely appeal to this Court.

The facts relevant to damages will be discussed in greater detail below.

## QUESTIONS PRESENTED

Appellant presents the following five issues for review, which I have reworded for brevity: [16]

1. Was there sufficient evidence to uphold the jury's verdict that all of the appellees' properties were worthless?

2. Did the court properly admit the appellees' expert witness's opinion testimony on diminution of property values?

3. Was there sufficient evidence to support the jury's emotional distress awards, including damages for fear of cancer?

---

**16.** The questions were presented in appellant's brief as follows:

1. May a jury's verdict that all of plaintiffs' properties were worthless be upheld where: (a) plaintiffs' and defendant's experts testified that the properties retained substantial value; (b) the properties were either sold for significant amounts or occupied by plaintiffs; and (c) many properties had no contamination and few had significant contamination?

2. Should plaintiffs' property damage expert's opinions have been admitted where he failed to use any generally accepted method of valuation and he failed to consider actual sales or forecast accurately those arm's length valuation?

3. Should emotional distress verdicts of over $70 million be overturned where: (a) the uniform awards ignored the substantial differences among plaintiffs; (b) evidence satisfying the *Hunt* standards for recovery of such demands was not presented; and (c) the jury instruction permitted recovery for fear of cancer without any evidence of exposure to the alleged carcinogen or that the exposure made it "reasonably probable" that a plaintiff would contract cancer?

4. Does Maryland law permit damages for medical monitoring and, if so, may such damages be awarded where: (a) no plaintiff claimed to have any current disease cause by MTBE; (b) there was no proof that any plaintiff had a *significantly* increased risk of contracting any disease; and (c) as to many plaintiffs there was no proof of exposure?

5. Is a new damages trial required when a jury awards similar compensatory damages to many plaintiffs with different alleged injuries?

4. Does Maryland law permit damages for medical monitoring and, if so, was the evidence in this case sufficient to support such an award?

5. Is a new damages trial required when a jury awards similar compensatory damages to many plaintiffs with different alleged injuries? [17]

In their brief, appellees raise the additional question of whether appellant has waived its right to raise each of the above issues. The in banc panel finds that it has not. As to the remaining questions, with the exception of one of the appellees, I would affirm the judgment of the circuit court.

## DISCUSSION

### I. Waiver

The in banc panel must first address appellees' contention that certain statements made by ExxonMobil's attorney during opening and closing arguments amounted to a waiver of appellant's right to appeal the compensatory damages award. Appellees argue that this appeal is precluded by appellant's strategic decision to seek a quid pro quo arrangement with the jury, premised on appellant's promise to pay any compensatory damages in exchange for the jury's decision not to award punitive damages. The following excerpts from appellant's closing argument are representative:

[W]e accept responsibility to pay for whatever damages you find occurred here, that's not blaming somebody else. That's saying it's us.... *We've taken responsibility. We*

---

17. Exxon asks this Court to:

(1) reverse the property damage awards for the 13 households that failed to prove present or future contamination; (2) reverse the property damage award to the Grecos; (3) remit all other property damage awards to the highest level permitted by the expert testimony of Mr. Lipman; (4) reverse all emotional distress awards to those Plaintiffs' whose proof was legally insufficient to support such an award; (5) reverse and remand all other emotional distress awards with an instruction that no Plaintiff may recover damages for fear of cancer; and (6) reverse all awards for medical monitoring.

*pay. You find that people were hurt here, you charge us. We pay.*

Now, are we blaming people for punitive damages. Of course, not. We spent a lot of time proving to you they couldn't be guilty of punitive conduct because they didn't know.

\* \* \*

[Appellees' attorney] argues to you that your verdict should send a message. . . . But his message can't be sent because he did not prove to you what he said he was going to prove to you about fraud. . . . I want you to send a message that when a company makes a mistake and then does what it ought to do, which is take responsibility, apologize and try to make it right, *that if a company stands up and does what it is supposed to do to make things right, that it will not be punished if all there is is an accident*. . . . So it is not a reward, it is a withholding of punishment in order to send the message we want you to behave like ExxonMobil behaved in this case. . . .

(Emphasis added).

With respect to the compensatory damages for diminution in property value, appellant's attorney told the jury:

I'm not going to put up a chart where I tried to tell you what are the suggested numbers for each household. My reasoning is this: I do not want you to award even a dollar less than the amount you think it takes to make it right for each plaintiff household that you determine is actually harmed.

That's your call. I want you to make that decision. Not [appellees' attorney]. Not somebody['s] expert. I want you to make that call.

\* \* \*

Now, obviously, some homes are not impacted and some are, and you know the difference. Those with nondetects, those that are now nondetect, there's no impact. Those that have detections . . . then it's a question of how much.

Relying on these statements, appellees argue that appellant forfeited its right to appeal by acquiescence. As the Court of Appeals has stated, "the right of appeal may be waived where there is acquiescence in the decision from which the appeal is taken or by otherwise taking a position inconsistent with the right to appeal." *Grandison v. State,* 305 Md. 685, 765, 506 A.2d 580 (1986). Waiver is "the intentional relinquishment of a known right, or such conduct as warrants an inference of the relinquishment of such right." *Gould v. Transamerican Assoc.,* 224 Md. 285, 294, 167 A.2d 905 (1961). It may be express or inferred from circumstances. *Id.* For instance, a party who reaps the benefit of a judgment generally waives the right to appeal that judgment. *See Downtown Brewing Co. v. Mayor & City Council of Ocean City,* 370 Md. 145, 150, 803 A.2d 545 (2002). Appellees' theory has been alternately called waiver, equitable estoppel, and estoppel by waiver. Regardless of the label, however, the essence of the rule is "that a voluntary act of a party which is inconsistent with the assignment of errors on appeal normally precludes that party from obtaining appellate review." *Franzen v. Dubinok,* 290 Md. 65, 69, 427 A.2d 1002 (1981). Because the consequences are severe, this rule is applied narrowly, only to conduct "necessarily inconsistent" with the later appeal. *See Downtown Brewing Co.,* 370 Md. at 149, 803 A.2d 545.

Here, appellees urge the Court to find that appellant's conduct during closing arguments, before the case was turned over to the jury, constituted acquiescence to the later judgment. The circuit court considered and rejected appellees' waiver argument before deciding the post trial motions. In a written opinion, the court concluded that "by saying 'we pay,' Exxon was not empowering the jury to ignore the Court's instructions on damages." As for appellees' argument that there was a quid pro quo bargain with the jury, whereby appellant would pay any compensatory damages in exchange for avoiding a punitive award, the court concluded that "a fair reading of the closing arguments" did not reveal such an arrangement. The in banc panel agrees with the circuit court that appellant did not waive its right to appeal the judgment.

 This Court addressed a similar contention in *Boyd v. Bowen*, 145 Md.App. 635, 806 A.2d 314 (2002). In that case, the appellee, representing herself pro se before the orphans court, said in her closing argument: "I will abide by whatever Order of the Court." *Id.* at 664, 806 A.2d 314. After deciding the case on other grounds, this Court observed that there were no cases applying the acquiescence rule to *pre*-judgment conduct where the party had not expressly consented to the entry of judgment. *Id.* at 666, 806 A.2d 314.[18] This is so because "to take actions that are necessarily inconsistent with challenging a judgment, a party must have knowledge of the nature and effect of the judgment" *Id.* A party ordinarily does not have knowledge of a judgment before it is entered, and this case is no exception.[19] Appellant told the jury that it would pay whatever compensatory damages the jury felt appropriate *based on the evidence presented at trial.* The essence of this appeal is that ExxonMobil believes that the damages awarded did not reflect the actual evidence on the questions of property values and emotional distress. There was certainly no express consent to the actual judgment, and appellant's conduct during closing argument was not inconsistent with this appeal.

## II. Admissibility Of Expert Testimony

 Appellant first argues that the trial court erroneously admitted the testimony of the appellees' expert witness,

---

**18.** Appellees rely heavily on *Grandison v. State*, 305 Md. 685, 506 A.2d 580 (1984), where the Court held that, by his "conduct" during closing arguments, a defendant waived his right to appeal the trial court's refusal to allow him to refer to the sentences received by his co-conspirators. The *Grandison* decision was based on defense counsel's abandonment of this argument by stating "I will drop that subject for the moment" and never raising it again. *Id.* at 764–65, 506 A.2d 580. In other words, the trial court never made a decision reviewable on appeal. *Grandison* does not hold, or even suggest, that a party's pre-judgment conduct may constitute acquiescence to a future jury verdict.

**19.** Appellant may have had an idea of the maximum possible compensatory damage verdict, but this knowledge is not specific enough to support knowing acquiescence.

Kenneth Acks, on the question of diminution in property values. Maryland Rule 5–702 sets forth three requirements for admitting expert testimony: (1) the witness must qualify as an expert on the topic about which he or she intends to testify; (2) the subject must be appropriate for expert testimony; and (3) there must be an adequate factual basis supporting the testimony. On appeal, ExxonMobil challenges the admission of Acks's testimony only under the third prong. Appellant raises two specific objections to Acks's testimony, alleging: (1) that the methodology underlying his diminution in value estimates was unreliable, and (2) that the estimates were not based on sufficient facts because he "ignored" actual sales. This Court reviews a trial court's decision to admit expert testimony for an abuse of discretion. *CSX Transp. Inc. v. Miller*, 159 Md.App. 123, 183, 858 A.2d 1025 (2004).[20] As the Court of Appeals has explained, "the admissibility of expert testimony is a matter largely within the discretion of the trial court and its action will seldom constitute a ground for reversal." *Radman v. Harold*, 279 Md. 167, 173, 367 A.2d 472 (1977).

Although Rule 5–702 provides simply that the court must determine "whether a sufficient factual basis exists to support the expert testimony," this Court has interpreted this factor to encompass two sub-issues: factual basis and method-

---

**20.** Relying on *Wilson v. State*, 370 Md. 191, 201 n. 5, 803 A.2d 1034 (2002), appellant states that an appellate court conducts de novo review of whether expert testimony is admissible. However, in Wilson, the Court of Appeals said only that the question of whether expert testimony meets the minimum threshold of the *Frye–Reed* test is subject to de novo review. *Id.* The Court went on to distinguish the *Frye–Reed* test for new or novel scientific techniques from the discretionary aspects of qualifying an expert. *Id. Frye–Reed* is not applicable to Acks's economic analysis in this case; therefore, this Court reviews the admission of his testimony under the standards set forth in Md. Rule 5–702 for an abuse of discretion. *See CSX Transp. Inc. v. Miller*, 159 Md.App. 123, 187, 858 A.2d 1025 (2004) (discussing what constitutes a "new and novel scientific technique" as contemplated by the *Frye–Reed* test); *Carter v. Shoppers Food Warehouse*, 126 Md.App. 147, 155, 727 A.2d 958 (1999) (*Frye–Reed* test not relevant where testimony involved an opinion on safety measures, not a new and novel scientific technique).

ology. *CSX Transp. Inc.,* 159 Md.App. at 189, 858 A.2d 1025. Appellant has challenged Acks's testimony on both fronts.

### A. Factual Basis

Rule 5–703(a) sets forth guidelines for evaluating the factual basis of an expert's testimony:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

 Acks identified the following facts or data on which his opinion was based: (1) the pre-leak appraised values of the homes; (2) the presence of actual potable well contamination; (3) the risk of future contamination, as determined by another expert; (4) whether people have been able to sell homes within a one mile radius of the Exxon station; and (5) peer-reviewed articles discussing diminution in property value in other contamination events. Appellant contends that Acks's testimony was inadmissible because he did not give weight to real estate market fluctuations or rely on comparable sales data, a factor widely-accepted as being generally useful to the jury's determination of fair market value. *See Bern–Shaw Ltd. P'ship v. Mayor & City Council,* 377 Md. 277, 289, 833 A.2d 502 (2003) (discussing use of comparable sales in condemnation cases).

Regarding the market fluctuations, it would be troubling if Acks had indeed completely failed to consider the presence or absence of these fluctuations. However, his testimony makes clear that this is not the case. On this topic, he testified that he looked at data from the Maryland Association of Realtors regarding the Baltimore County housing market in 2006, 2007, and 2008. He concluded that the market went up in 2006 and 2007, then dropped in 2008. Overall, he found that the fluctuations were more or less a wash. Therefore, he did not incorporate market fluctuations into his estimates. Appellant

essentially complains that Acks reached a different conclusion than its expert regarding the net market decline since 2006. This is a critique going to the weight, not the admissibility, of Acks's testimony. Appellant properly addressed it during cross-examination of Acks and in its direct examination of its own property value expert.

Appellant also argues that the factual basis for Acks's opinion was inadequate because he did not consider comparable sales. Evidence showed that 49 homes had been sold within a mile of the Jacksonville Exxon station between the time of the leak and the trial.[21] Five of those belonged to the plaintiffs. Acks testified that these initial sales were not necessarily indicative of the overall diminution in value, characterizing them as "low-hanging fruit," picked off by a first wave of the "most interested buyers" who are likely to ignore contamination. Acks testified that after this initial wave of sales, there would be fewer and fewer buyers willing to consider the properties for a reasonable price. Regarding the other 45 or so homes that had sold, those not belonging to plaintiffs, Acks explained that he could not use comparable sales data for these properties because there was no pre-spill appraisal available and it is impossible to determine the diminution in value based only on the sale price: "A home could sell for a million dollars, and that might sound like a lot, but if it's really a $3 million home, then there's a big diminution."

Although comparable sales data is a reliable measure of fair market value, as this Court has often recognized, it is clear that the trial court did not abuse its discretion by admitting Acks's testimony. He acknowledged the existence of other sales and explained his reasons for not relying on those sales in this case. While comparable sales are certainly the kind of data "reasonably relied upon by experts in the particular field," there is no support in Maryland case law for the

---

**21.** The map presented at trial was updated to reflect 52 sales, rather than 49. However, Acks testified based on the map showing 49 sales, the most current number at the time of his deposition.

proposition that a reasoned decision not to incorporate such data, due to the particular circumstances of the case, mandates the exclusion of the expert's testimony. The trial court did not abuse its discretion in finding that Acks's opinion was supported by an adequate factual basis.

### B. Methodology

As this Court recognized in *CSX Transportation v. Miller,* the questions of factual basis and reliable methodology often overlap and blur into each other. 159 Md.App. at 202, 858 A.2d 1025. Nevertheless, they present distinct issues. *Id.* To meet the threshold requirement of reliable methodology, "an expert opinion must provide a sound reasoning process for inducing its conclusion from the factual data." *Id.* at 203, 858 A.2d 1025. Again, the trial court's decision on this evidentiary question is reviewed for an abuse of discretion. Where the trial judge has admitted the testimony, the appellant must convince the appellate court that, as a matter of law, the expert's methodology "was not even *arguably* reliable and that any judge who could even think otherwise would be guilty, ipso facto, of an abuse of discretion." *Id.* at 208, 858 A.2d 1025.

This part of the Rule 5–702 inquiry focuses on whether there is "an adequate theory or rational explanation of how the factual data led to the expert's conclusion." *Id.* The explanation cannot be merely "because I say so." *Wood v. Toyota,* 134 Md.App. 512, 525, 760 A.2d 315 (2000) The *Wood* court explained that the trial judge had not erred in excluding an expert's opinion on this basis where:

> [The expert] never explained how the data upon which he relied led him to the conclusion that the size of the vent holes caused appellant's injuries. No trier of fact could conclude that vent holes in an air bag caused an injury merely because an expert said that they did. [The expert's] theory provided no rational explanation for why the size or

location of the vent holes had anything to do with the injuries that appellant sustained.

*Id.* at 523–24, 760 A.2d 315.

██ Here, appellant objects to Acks's use of "a combination of methods" rather than one single, commonly-accepted method of valuing contaminated real property. Acks testified that the Jacksonville leak presented a unique situation and, based on his experience, it was necessary to combine several methods in order to achieve the most accurate estimate. He explained that it is common for appraisers to use combined methods of valuation and cited a peer-reviewed article which recommended the use of a "variety of techniques" instead of any one method.[22] Acks testified that he derived his method for estimating diminution in value from this study, which concerned PCB contamination, but he had adjusted the diminution values to account for differences between MTBE and benzene contamination.

In addition to the PCB contamination study, Acks testified about several other articles that he had considered when formulating his appraisals. For example, he identified one study looking at the effect of an underground storage tank leak on residential properties, a situation similar to that in Jacksonville, by surveying potential buyers.[23] But Acks explained to the jury that those authors had discarded the survey results of potential buyers who said they would never bid on the property or would bid only one percent of the property value, a decision that Acks found "very conservative." Another article examined the effect of environmental disclosure requirements and suggested, according to Acks, that "a lot of people use data points to come up with relatively

---

**22.** Acks identified this study as: Robert Simons, *Estimating Proximate Property Damage for PCB Contamination in a Rural Market: A Multiple Techniques Approach*, LXX Appraisal J. 388 (October 2002).

**23.** The article cited by Acks was: Robert A. Simons & Kimberly Winson-Geideman, *Determining Market Perception on Contamination of Residential Property Buyers Using Contingent Valuation Surveys*, 27 J. Real Estate Research 193 (2005).

low value diminutions which really aren't very relevant because [potential buyers] don't know about the contamination or don't understand it."[24]

Upon review of Acks's testimony, the in banc panel does not believe that the trial court abused its discretion by finding that the expert's methodology was sufficiently reliable to be admitted under Rule 5–702. Although Acks did not identify a peer-reviewed article applying the precise combination of methods he had used in this case, he identified the articles and methods he had considered and explained how he had arrived at his figures. Real estate appraisal is not an exact science in the same way as automobile engineering or DNA comparison. Appellant raises legitimate concerns about Acks's methods, but these criticisms go to the weight, not the admissibility, of his testimony. *See Thomassen Lincoln–Mercury, Inc. v. Goldbaum*, 45 Md.App. 297, 305, 413 A.2d 218 (1980) (finding that "appellant's complaints about the manner in which [an expert witness] derived and stated his opinion as to value go to the weight to be accorded his testimony rather than to its admissibility.").

In sum, as to both the factual basis and methodology underlying Acks's expert testimony, it is clear that this case falls squarely in what Judge Moylan has aptly described as "that 80% bulge of the bell-shaped curve wherein the trial judge, within her discretion, could have gone either way and still been affirmed." *CSX Transp., Inc.*, 159 Md.App. at 198, 858 A.2d 1025.

### III. Property Values

Appellant next argues that the court erred in denying its motion for a new trial or, in the alternative, a remittitur on the basis of excessive compensatory damages. The plaintiffs,

---

**24.** Acks identified this article as: Robert Berrens et al., *The Effect of Environmental Disclosure Requirements on Willingness to Pay for Residential Properties in Borderlands Community*, 84 Social Sci. Q. 359 (2003) (examining diminution in value of uncontaminated properties near a "concrete products and chlorine site" in Texas).

comprising the owners of eighty-eight properties, sought damages for the diminution in their property values resulting from the leak. The jury ultimately concluded that the properties were all worthless and awarded each homeowner the full pre-leak value of their property. Appellant filed a post-trial motion challenging the award, and the circuit court ordered a remittitur as to four of the households who had sold their homes after the leak: the Bradys, Csicseks, Simmses, and Murrays. For these families, the court reduced the award from the full pre-leak value to the difference between the full pre-leak value and the actual sales price. The court denied the motion for a new trial or remittitur for owners of the remaining 84 households, whose property had not been sold since the leak. Appellant claims that those homeowners failed to produce sufficient evidence that their properties were worthless, and that the evidence only permits the conclusion that those properties retained substantial value post-leak.

## A. Standard of Review

On appeal, this Court reviews both the denial of a motion for new trial and the refusal to grant a remittitur under an abuse of discretion standard. *See Edsall v. Huffaker,* 159 Md.App. 337, 342, 859 A.2d 274 (2004)(motion for new trial); *Hebron Vol. Fire Dept., Inc. v. Whitelock,* 166 Md.App. 619, 642, 890 A.2d 899 (2006)(remittitur). "It is well settled that the trier of fact may believe or disbelieve, accredit or disregard, any evidence introduced," and this Court "may not decide on appeal how much weight should have been given to each item of evidence." *Edsall,* 159 Md.App. at 342, 859 A.2d 274 (internal quotations omitted). Moreover, "when results cannot be characterized as 'clearly unjust, we will not find an abuse of discretion whichever way the trial court may choose to exercise discretion.'" *Id.* (quoting *Holden v. Blevins,* 154 Md.App. 1, 8 n. 9, 837 A.2d 1053 (2003)). The breadth of a judge's discretion, and appellate deference, is greatest when "the exercise of that discretion depends upon the opportunity the trial judge had to feel the pulse of the trial and to rely on his own impressions in determining questions of fairness and

justice." *Buck v. Cam's Broadloom Rugs,* 328 Md. 51, 58–59, 612 A.2d 1294 (1992).

 Any evidence "however slight" is sufficient to carry the case to the jury and the "weight and value of such evidence will be left to the jury." *Cavacos v. Sarwar,* 313 Md. 248, 258, 545 A.2d 46 (1988). In passing upon the question of the legal sufficiency of the evidence to support the verdict, a reviewing court examines the testimony and all proper inferences in a light "most favorable to the plaintiff's case." *Bergeman v. State Roads Comm.,* 218 Md. 137, 144, 146 A.2d 48 (1958). The function of an appellate court in reviewing the denial of a motion for judgment NOV is a "narrow one." *Meyers v. Meagher,* 277 Md. 128, 132, 352 A.2d 827 (1976). The truth of all credible evidence and all inferences fairly deduced therefrom must be assumed in the light most favorable to the plaintiff. *Id.* Evidence is legally sufficient if there is some evidence, including all inferences, that may be permissibly drawn therefrom, that, if believed and if given maximum weight, could logically establish all the elements necessary to prove the plaintiff's case. *CR–RSC Tower I v. RSC Tower I,* 202 Md.App. 307, 346–47, 32 A.3d 456 (2011). Even inadmissible evidence, if not objected to, can support the sufficiency of the jury's verdict. The Court of Appeals (quoting from *McCormick on Evidence* ) has said:

> If the evidence is received without objection, it becomes part of the evidence in the case, and is usable as proof to the extent of whatever rational persuasive power it may have. The fact that it was inadmissible does not prevent its use as proof so far as it has probative value. Such incompetent evidence, unobjected to, may be relied on in argument, and alone or in part may support a verdict or finding. This principle is almost universally accepted, and it applies to any ground of incompetence under the exclusionary rules.

*Old v. Cooney Detective Agency,* 215 Md. 517, 526, 138 A.2d 889 (1958). *See also Schmitt v. State,* 140 Md.App. 1, 22–24, 779 A.2d 1004 (2001).

In the context of a trial judge deciding whether to order a remittitur or new trial based on the excessiveness of compensatory damages, this Court has observed that the trial judge's discretion is "virtually boundless." *John Crane, Inc. v. Puller*, 169 Md.App. 1, 52–53, 899 A.2d 879 (2006). As the Court of Appeals summarized in *Banegura v. Taylor*, the standard applied by the judge in exercising this discretion "has been variously stated as whether the verdict is 'grossly excessive,' or 'shocks the conscience of the court,' or is 'inordinate' or 'outrageously excessive,' or even simply 'excessive.'" 312 Md. 609, 624, 541 A.2d 969 (1988) (citations omitted). This Court has often emphasized that "it is not necessary that the trial court's view of the verdict be the *only* rational view" in order to be upheld on appeal. *Balt. Harbor Charters, Ltd. v. Ayd*, 134 Md.App. 188, 201, 759 A.2d 1091 (2000), *vacated in part on other grounds by Balt. Harbor Charters, Ltd. v. Ayd*, 365 Md. 366, 780 A.2d 303 (2001). It is necessary, however, that the trial judge " 'extend the fullest consideration possible' to the jury's verdict before determining that 'it shocked his conscience.'" *Owens Corning v. Bauman*, 125 Md.App. 454, 526, 726 A.2d 745 (1999) (quoting *Conklin v. Schillinger*, 255 Md. 50, 69, 257 A.2d 187 (1969)).

### B. The Compensatory Damages Award And Supporting Evidence

At trial, the parties stipulated to the pre-leak values of the properties and submitted the question of post-leak values to the jury. The jury ultimately concluded that the properties were all worthless and awarded each homeowner the full pre-leak value of their property.

### 1. Expert Testimony

Each party presented expert testimony regarding the property values. Acks, the plaintiffs' expert, was an economist with many years of experience appraising contaminated residential and commercial properties. He estimated the diminution in value of each home based on the current contamination or, for the properties whose wells were not yet contaminated,

the risk of future contamination.[25] Acks's estimates followed a specific formula: the value of contaminated properties diminished 60%, while the value of uncontaminated properties diminished 30% if risk of future contamination was low, 45% if risk of future contamination was medium, and 50% if there was a high risk of future contamination.[26] His final appraisal values reflected academic articles about appraising contaminated properties and actual data indicative of the local real estate market.

Acks testified that all appraisals assume a willing, fully informed buyer and a willing, fully informed seller. He also discussed the data, including selling price and days on the market, from homes put up for sale within a two mile radius of the Jacksonville gas station. Regarding the homes that had already been sold, he explained that those sales may not reflect the true market value of the homes:

> [T]he initial sales in any contamination event are sort of a low hanging fruit. You have the people, the most interested buyers that will be most likely to overlook the contamination ... pick up homes, but then as these low hanging fruit are gone, they have already purchased homes, then the potential market is reduced and potential buyers are a lot lower.[27]

Acks also proposed that the difference between actual sale price and the estimated diminution in value may be explained, at least in part, by a lack of information on behalf of the buyer. In addition to the potential lack of willing buyers,

---

**25.** Acks did not estimate the diminution in value for the three properties that had been sold since the leak because, in the words of plaintiffs' attorney, "the jury knows what those homes have sold for."

**26.** The classification of the properties into three groups based on the likelihood of future contamination was made by the plaintiffs' environmental expert.

**27.** Acks proffered this explanation for those sales that did occur in the area: 1) they were outliers; 2) those sales examined by Exxon's expert were too small to base an opinion; and 3) there was no evidence that they reflected an informed purchaser.

Acks also recognized that several plaintiffs had indicated an unwillingness to sell on moral grounds, believing that they would be passing their problems on to someone else. He said that he did not conclude that any of the homes were worthless. However, he added: "[I]f the seller is not willing to sell a contaminated property, then one could argue that the value is zero."

On cross-examination, appellant's counsel questioned the witness about the "life cycle" of contamination-related diminution in property values, with the highest diminution occurring after the spill but before cleanup. This life cycle was acknowledged by Acks, who then clarified that this cycle was incorporated into his estimates, which assumed that proper cleanup and remediation would take place. He stated that "if this was just a single point in time, the estimate would have been much higher." Overall, Acks described his estimates as "conservative." [28] Acks was asked by appellees' counsel:

Q. What if any effect would it have on the stigma to the neighborhood if Exxon is unable to get all of the contamination out of the ground?

A. That would be very significant.

Q. And why:

A. Because, as I stated, I have stated throughout, this report assumes that it will be cleaned in a timely manner. And I actually provided some estimates initially that would be significantly higher if the property were not cleaned sufficiently or in a timely manner. And my initial estimates assume that and my continued estimates assume that cleanup proceeds in an appropriate pace and that there aren't undiscovered new issues of a—a lot of contamination cases you find things that you think things are clean for awhile and then new

---

**28.** The estimates did not include more recent readings, including the new findings of benzene contamination, or the potential for increased stigma as a result of the publicity from the trial.

problems turn up. So it is not really clean. So that would definitely have a very significant impact.[29]

Appellant called Ronald Lipman as a property appraisal expert. The scope of Lipman's testimony was restricted by the trial court's exclusion of portions of his testimony that were either based on values from property tax assessments or not provided to the plaintiffs until two days before his testimony.[30] Therefore, Lipman generally did not offer his own estimate of the diminution in each plaintiff's property value that could be attributed to the leak.[31] Instead, he testified about trends in the national and local residential real estate market since 2005. According to Lipman, the number of houses sold in the plaintiffs' zip code had declined from a high of 93 in 2005 to 49 in 2008, while the average number of days on the market almost doubled over the same time period. Looking at the median prices of homes sold in the Jacksonville area, Lipman testified that the home prices have been declining since 2006. In 2007, the median price of a home sold in Jacksonville fell 10% compared to 2006. The median price declined another 8% in 2008. The stipulated pre-leak appraisal values of the plaintiffs' homes reflect the home values as of February 16, 2006, the day before the leak was discovered. Lipman conducted "matched pair analysis"[32] of homes sold over this time period and concluded that local real estate

---

29. According to the record, only 10,000 gallons of the leak were recovered.

30. As noted by the trial judge, it is well-established in Maryland that tax assessments are not admissible to establish a property's fair market value for any purpose other than taxation. *See Mayor and City Council of Baltimore v. Himmel,* 135 Md. 65, 76, 107 A. 522 (1919); *Gravenstine v. Gravenstine,* 58 Md.App. 158, 172, 472 A.2d 1001 (1984).

31. Lipman did testify that "the marketplace, if it found a monitoring well on a property, would have some negative reaction. And that results from my understanding that there is a plume ..."

32. Matched pair analysis involves examination of the sale and resale of the same home within a relative short time period—two to five years. None of the plaintiffs' homes sold after February 16, 2006 were used in this analysis.

market fluctuations, unrelated to the leak, resulted in approximately a 12% decline in Jacksonville home values since February 2006.[33]

Lipman testified that none of the Jacksonville homes are worthless. Limiting his testimony to the plaintiffs' homes that had been sold since February of 2006, Lipman examined the pre-leak value and selling price of those six homes, adjusted for the general decline in the housing market. He concluded the sold homes had diminished in value by an average of 10% as a result of the leak. Lipman testified that he believed these homes to be comparable to the plaintiffs' homes which had not been sold.[34]

Lipman also told the jury that he did a survey of 75 real estate brokers and agents and asked them whether the spill had affected their sales. Eighty percent of those surveyed said "no" and 20 percent said "yes." Some brokers and agents blamed the spill for bad sales four or five miles away from the spill, he testified. However, Lipman said in his opinion the decline in sales was due to a downturn in the market and that "those brokers were becoming somewhat defensive about why they couldn't sell the house and they were latching onto the notion that the spill had affected them."

### 2. Evidence Of Other Lawsuit

During Acks's testimony, appellees' attorney asked him if he was aware that one family who had purchased a Jacksonville home after the leak had since filed a lawsuit against the realtor, alleging that the contamination was not disclosed to them. The court permitted this line of questioning over appellant's objection that it was not relevant and unfairly prejudicial. In their brief, appellants allege that the court erred in permitting the jury to hear about this other lawsuit.

---

**33.** Acks disagreed with this assessment, testifying that the appreciation and depreciation of the Jacksonville housing market since 2006 were essentially "a wash."

**34.** Lipman also admitted that of 41 homes offered for sale within one mile of Jacksonville, 21 were taken off the market.

This is incorrect. Appellants presented evidence that a number of homes in the Jacksonville area had sold since the leak, including properties at issue in the lawsuit. The court permitted the testimony on the condition that appellees' attorney make it clear to the witness that the suit was still pending and the allegations had not been resolved. Acks used the lawsuit to support two points: (1) that the actual sales were not necessarily useful indicators of fair market value because the buyers may not have been fully informed, and (2) that "even the mere fact that they're being sued does have an influence on property value" because lawsuits are expensive and stressful, even if frivolous and ultimately dismissed. The court did not abuse its discretion by admitting this testimony for these relevant purposes, after making it clear to the jury that the allegations had not been proven.

### 3. Plaintiffs' Lay Testimony

In addition to the expert testimony, many plaintiffs without objection testified as to their own opinion of their property's value after the leak or of the marketability of other property in "the neighborhood." Jurors heard testimony from the owners of 73 of the 88 homes in dispute. The property owners' testimony on this point can be roughly divided into three categories: (1) those who testified that their property had diminished in value by some unspecified percentage; (2) those whose testified that they believed their properties to be worthless or were unwilling to sell for moral reasons; and (3) those who did not express any opinion on the value of their home.[35] At least five of the property owners were real estate agents or brokers.[36]

---

**35.** There is considerable overlap and a number of homeowners expressed conflicting opinions, either within their own testimony or when compared to a co-owner (i.e., husband and wife).

**36.** Gary Flora and his wife were real estate agents. He testified:

What we're saying is with the contamination in our well, and especially both of us being licensed real estate persons, we would have to disclose the contamination in our well. So how in good conscience

Thirty-nine homes fell within the first group, with owners testifying that they believed their homes had diminished in value by some unspecified amount, but not going so far as to suggest that the homes had no value.[37] The testimony of Mr. Faber seems to reflect the attitude of much of this group. He optimistically stated that the value of his home had "gone down just a huge amount," but not to zero, as "someone would buy my house for $10." Ms. Colgan testified that living in her house, without the use of her well water, was "like camping and better than a tent." These plaintiffs described their property value using terms like "greatly diminished" or "severely impacted." They also testified that they believed it would take a long time for their homes to sell. Some plaintiffs, like the Gregorys, had unsuccessfully tried to sell their homes,[38] while others reported that their neighbors could not sell their properties after the leak.[39] Nearly all of the plain-

---

could sell it to someone with the contamination levels we have in our well. So, therefore, yeah, it's, it's worthless.

37. At a minimum, the following 39 properties fell within this group: Alban, Albert, Anderson/Curtiss, Bateman, Benney, Berlin, Bieber, Brady, Cadigan, Coffay, Colgan, Copeland, Davis, DePasquale, Dobb, Faber, Fox, Fritz, Gottschalk, Gregory, Hourihan, Kukucka, Martin, McLewee, Merski, Montone, Mucha, Nickel, Oberlin, Osmeyer, Pfeiffer, Quinn, Rosch, Rush, Tolle, Twardzik, Vacovsky, Vogler, and Wiedey. The Bradys' compensatory damage award was reduced on remittitur to reflect the actual diminution realized when the home was sold.

38. Lisa Gregory reported a potential buyer's reaction to viewing her house:

We had another buyer come and she actually came twice. She came the first time with her husband and the second time with her parents and her husband and they had not looked in the garage yet. Once they opened the garage door and they saw the Deer Park water and the Deer Park gallons of water stacked to the ceiling which we used to hide because we didn't think it was fair to anybody, she flipped out. I was still there because it was an open house. They were the last couple to come. She said this is one of those houses that you can't drink the water in. You should have told me. And she like freaked out.

39. Another realtor-plaintiff, Carolyn Heggie in response to a question on whether she had seen any properties near her home which had been on the market for some time said:

tiffs testified that their neighborhood had a "stigma" from the news coverage of the leak. Mr. McLewee stated that he believed "98% of [potential buyers] wouldn't even consider" his property.[40] Several plaintiffs expressed a desire to sell, but felt that they could not do so because they would not be able to get enough to pay off their mortgage.

The second group of homeowners expressed, either explicitly or implicitly, that they believed their homes retained absolutely no market value. It would appear that at least 26 properties fell in this category.[41] Many of these homeowners specifically stated that their homes were "worthless," "had no value," or worth "absolutely negative, zero." Mr. Barone testified that his house was on the market for a year and did not sell; therefore at that time he was "starting to think that [he] can't even give the house away." Many of these plaintiffs testified that they wouldn't buy their own homes and couldn't imagine why anyone else would. In the words of Ms. Cremen, if she were looking to buy a $700,000 house and "found out there was a potential of carcinogenics being in my water, I would probably just say no, thank you, I have got other options." She went on to say that she "could not imagine anybody buying it for whatever the amount of money," a sentiment echoed by the other homeowners in this group. Although acknowledging that some of the leak-affected homes had sold, Mr. Jenkins observed "there [are] a limited number

---

I have. The house at the end of Whitesworth Road has been on the market for over a year, maybe two years, they have reduced it a hundred thousand dollars. They have moved out. The house has not sold.

40. The Baig property had 19 monitoring wells with equipment pumping 24 hours a day. In closing argument, appellees' counsel told the judge: "Who would buy his house? It is worthless ..."

41. The following 26 property owners offered some testimony that their homes were worthless: Babcock, Baig, Barone, Batton, Blair, Carroll, Cremen, DeBolt, DeDeo, DeKooman, Diedeman, Facinoli, Ford, Flora, Hannan, Heggie, Howe, Jenkins, Lanting, Lamos, Libertini, Peters, Schech, Thompson, Tirocchi, and Tizard.

of fools out there that will pay money for a property that is completely surrounded by . . . positive test results for gas."

A number of these homeowners also expressed an unwillingness to sell their homes for moral or ethical reasons. Mr. Facinoli testified that even if he and his wife could sell their home, they did not want "to put this problem, this burden on someone else." Ms. DeBolt similarly expressed her family's unwillingness to sell because they "can't put anyone else in this situation." Ms. DeDeo testified that she was "morally uncomfortable" with selling the house to a family with children. Mr. Blair elaborated: "I am not comfortable in my home right now. I could not in good conscience sell my home to a willing buyer who thinks they're getting a great deal on a beautiful home and have them live with the same stress, the same worry that we live with right now." Mr. Ford, a real estate agent, explained that he would not let a client buy a house like his: "As soon as . . . [the seller] disclosed the well was contaminated, I would tell my buyers to walk away . . . I wouldn't even entertain writing a contract." Mr. Lamos echoed that "any reasonable person would be very concerned about whether or not they should be moving into that house."

The eight remaining homeowners who testified either did not say anything about the value of their home or made statements that, while relevant, do not fit into either of the above two categories.[42] Ms. Shimp, for example, testified that she and her husband entered into a contract to build their home in October 2005. When they learned of the leak in February of 2006, the Shimps tried to get out of the construction contract, but it was too late as work had already begun. Ms. Shimp testified that she believed they would have difficulty selling the house. Ms. Elkinton reported that after a neighbor's unsuccessful attempt to sell their house, she feared that she would end up in the same situation. The Csicseks

---

**42.** This group included the following property owners: Csicsek, Dixon/Elkinton, Greco, Lindsay/Parks, Mahoney, Shultz/McDevitt, Shimp, and Wittelsberger. The Csicseks' compensatory damage award was reduced on remittitur to reflect the actual diminution realized when the home was sold.

sold their home after the leak. Ms. Csicsek testified that she "did not expect any offers" when they put the house on the market, and they were "stunned" when it sold.

Without objection, some of the homeowners testified in more global terms about the valuelessness or unmarketability of their neighbor's homes or homes "in Jacksonville" or in "the neighborhood" or "in the area." Others questioned the marketability of homes "close to the strike zone," those located "six-tenths of a mile from a remediation site," or those "completely surrounded by ... positive test results for gas." A number of witnesses emphasized "the neighborhood stigma." One homeowner stated that there was "an absolute stigma in the area about real estate in the area." Another testified that there was a stigma attached to his neighborhood, and that people make negative comments to him about the neighborhood at least once a week. One homeowner/real estate agent stated her belief that there was a negative stigma associated with the Jacksonville area.[43]

Most of the homeowners, from these groups, testified that their home value declined for three reasons: (1) safety and convenience concerns related to the actual contamination and risk of future contamination; (2) the stigma associated with the neighborhood due to the contamination; and (3) the inconvenient and unsightly remediation efforts. Regarding the remediation, homeowners described constant and loud noise, bright lights, and yards ruined from the digging and heavy equipment. For example, Mr. Libertini, whose property has been the site of extensive remediation, testified that the noise was so loud that his children had trouble sleeping at night and that they are unable to open their windows. He also stated that the children could not play in the yard anymore because of the dangerous equipment. Many plaintiffs reported that they could see and hear heavy equipment from their homes at

---

**43.** In *Criscuola v. Power Authority of the State of New York,* 81 N.Y.2d 649, 602 N.Y.S.2d 588, 589, 621 N.E.2d 1195 (1993), the New York Court of Appeals said that fear or perception of health risks from high voltage power lines could adversely affect market value of nearby property even if the public's fear was unreasonable.

all hours of the day and night. Ms. Heggie, whose property contains several ponds, testified that the remediation work caused the water in her ponds to dry up.

## C. Excessiveness/Sufficiency of the Evidence

As noted above, once this Court is satisfied that a trial judge fully and fairly considered a party's motion for a new trial or remittitur on the grounds of excessive compensatory damages, it will reverse a denial only in an extraordinary case where the verdict is " 'grossly excessive' or 'shocks the conscience of the court.' " *See Banegura v. Taylor,* 312 Md. 609, 624, 541 A.2d 969 (1988). In addition, once this Court finds some evidence, however slight, to support the jury verdict, its task has ended. Here, it is clear that the circuit court thoroughly examined appellant's contention that the property damage verdict was excessive. The court granted the request for remittitur as to the four properties sold since the leak. As for the rest, the trial judge noted that the jury clearly discounted both experts' opinions that the properties retained some value and gave significant weight to the belief of some homeowner's that nobody would buy their homes. In his written opinion, the circuit judge concluded:

> This writer is very tempted to substitute my view of the evidence for that of the jury and grant post trial relief. I will decline that strong temptation by keeping in mind that the jury's view of the admitted evidence should be respected unless the verdict is against the weight of the evidence, shocks the conscience, is grossly excessive, or is excessive. It is not, but is a millimeter shy of those standards.

Without gauging the precision of the court's measurement, I agree with the trial judge's assessment of the jury verdict. Even if I did not, however, I see no reason to substitute this Court's judgment for that of the judge who personally viewed all of evidence presented in a five month trial. The decision to deny a new trial was well within the broad discretion Maryland law affords trial judges in this situation. *See John Crane, Inc. v. Puller,* 169 Md.App. 1, 52–53, 899 A.2d 879

(2006) (observing that the trial judge's discretion in this area is "virtually boundless").

 As noted above, owners of twenty-six properties offered some testimony that they believed their homes to be worthless and unmarketable.[44] For at least another thirty-nine properties, the owners testified that they believed their homes had significantly decreased in value and would be difficult to sell. Some of these homeowners made comments like "someone would buy my home for $10" or the home is "better than a tent." Eight more homeowners testified in a manner that could not be classified as above, expressing general fears about trying to sell their homes without fully addressing whether the home retained value. An additional fifteen homeowners did not testify at all.[45]

Valuation of real property is one of the few areas of the law where lay opinion testimony is admissible. "Unlike an expert witness, the owner of the property is presumptively competent to express his opinion of its value. This presumption is based upon the owner's familiarity with the land, that 'merely by virtue of his ownership ... he may be presumed to have sufficient knowledge of the price paid, the rents or other income received, and the possibilities of the land for use, [so as] to have a reasonably good idea of what it is worth.' " *Brannon v. State Roads Commission*, 305 Md. 793, 801–2, 506 A.2d 634 (1986) (a takings case) (quoting *Baltimore City v. Schreiber*, 243 Md. 546, 553, 221 A.2d 663 (1966)). In *Bran-*

---

**44.** In its brief, appellant identifies seven plaintiffs who testified that their homes were "worthless." Appellees' brief identified 23 plaintiffs who so testified. The testimony of 26 homeowners could be fairly categorized as suggesting their belief that their homes were worthless This disparity is indicative of the highly subjective nature of this issue, and the reason that it is generally unwise for an appellate court, far removed from the live witnesses at trial, to substitute its judgment for that of the trial judge and jury.

**45.** This number includes two non-testifying property owners (Murray and Simms) whose compensatory damage awards were reduced on remittitur to reflect actual diminution from home sales. The remittitur was not challenged.

*non,* 305 Md. at 802, 506 A.2d 634, the Court of Appeals quoted the following passage from the U.S. Court of Appeals for the District of Columbia on the subject of owner testimony:

> The owner does not testify as just another expert, but from his unique position as the individual who stands to gain or lose the most from the tribunal's determination of the value of his property. The owner is draped with no cloak of expertise; the jury is free to evaluate his testimony, even to discard it altogether, in weighing the evidence.

*District of Columbia Redevelopment Land Agency v. Thirteen Parcels of Land et al.,* 534 F.2d 337, 340 (D.C.Cir.1976).

Appellant's brief emphasizes that a property owner's lay opinion testimony is only admissible to establish the value of his own property, with which he is presumptively familiar. Absent an objection, a property owner cannot testify about the value of a neighboring property without qualifying as an expert witness. Under Maryland law, the converse is true. Unobjected to, inadmissible and incompetent testimony can support the legal sufficiency of the jury's verdict. *Old, supra,* 215 Md. at 526, 138 A.2d 889. There was probative testimony here by some appellees about the valuelessness or unmarketability of neighborhood properties. Whether such testimony should have been admitted is not an issue here. It came in, and the jury was entitled to rely upon such statements, even as to those properties whose homeowners did not testify about the diminution of value of their property. On the basis of this and other evidence, the jury could have found that as a result of the spill, a home in Jacksonville would be "an unmarketable pariah for years to come." *SCA Services of Indiana, Inc. v. Thomas,* 634 F.Supp. 1355, 1364 (N.D.Ind.1986). The plume was a moving target, even endangering homes with a low detect. *See* pp. 18–20, 40 A.3d at 524–25, *supra.* It would not have been irrational for the jury to conclude that the location of a low-detect or non-detect property near a contaminated one or near a site in remediation would result in the same stigma. The jurors could have simply found that if 26 properties scattered throughout the area were worthless, so too

would neighboring properties. Lay testimony aside, there was other evidence to support the jury's finding of worthlessness. Plaintiffs' expert, Acks, emphasized that his diminution estimates assumed a willing, fully informed buyer and seller. He testified that "theoretically if you have a seller that's just unwilling to sell this property, the value could be zero rather than what I had estimated, but I don't know of any real discussion in the literature about such a situation." Even Exxon's property value expert told the jury that 20 percent of brokers and agents he had surveyed blamed the spill for bad sales, even four or five miles away from the location of the leak. While the expert did not believe the 20 percent, the jury could have. Further, the jury heard that the buyers in one of the comparable sales relied on by appellant had since sued the realtor for fraud, although the allegations were not yet proven. It was possible for the jury to have concluded that no fully informed buyer would buy any of the plaintiffs' properties at any price. In sum, although the jury's finding of worthlessness may appear unusual, I agree with the trial court that it falls short of shocking the conscience or of utterly lacking in sufficiency.

■■■ Appellant also contends that a group of 13 property owners who had no current contamination and a low risk of future contamination, according to the plaintiffs' expert, were not entitled to any recovery for diminution in property value.[46] In support of this argument, appellant relies on *Exxon Corp. v. Yarema*, 69 Md.App. 124, 516 A.2d 990 (1986), for the proposition that, in the absence of physical impact, property damages may only be recovered where the plaintiff suffers "substantial, albeit intangible, interference with the reasonable use and enjoyment of their properties in the form of govern-

---

**46.** These plaintiffs had "nondetect" results when their potable well water was tested for contaminants and are classified as having a low probability of future contamination. As identified by appellant, this group consists of the following households: Badders/Shoemaker; Barnett/Lindsey; Butler; Colgan; Cormier/Healey; Fulco; Gollihue; Hahn; Lindsay/Parks; Merski; Montone; Pertee; and Simms.

mental restrictions on the use of water and the sale of those properties." [47]

 In *Yarema*, however, this Court held that physical impact is not an essential element of the tort of nuisance. *Id.* at 151, 516 A.2d 990. "The tort of nuisance should be viewed as a disturbance of some right or interest in land which may or may not involve physical invasion of the plaintiff's property." *Id.* Relying on two out-of-state cases, this Court emphasized that the plaintiffs must still prove harm to their property, not mere diminution in value, but "harm to property should be construed broadly to include intangible tortious interferences of plaintiffs' use and enjoyment of their properties." *Id.* at 151–52, 516 A.2d 990 (*citing McCaw v. Harrison*, 259 S.W.2d 457, 458 (Ky.1953) [48]; *Gray v. Southern Facilities*, 256

---

47. *Exxon Corp. v. Yarema* presented a factual scenario remarkably similar to the present case. 69 Md.App. 124, 516 A.2d 990 (1986). In *Yarema*, gasoline leaked from underground storage tanks located at three gas stations, owned by Amoco Oil Company, Gulf Oil Company, and Exxon Corporation, respectively. *Id.* at 130, 516 A.2d 990. As in this case, the leaked gasoline contaminated groundwater in Jacksonville, leading to several lawsuits. *Id.* Amoco Oil and Gulf Oil settled the lawsuits against them, while the claims against Exxon went to trial. *Id.* at 131, 516 A.2d 990. The *Yarema* plaintiffs claimed that Exxon tortiously interfered with their use and enjoyment of their property, for which they sought compensatory and punitive damages. *Id.* at 133, 516 A.2d 990. The jury ordered Exxon to pay both compensatory and punitive damages, although the judge ultimately ordered the compensatory awards to be "deemed satisfied" under the Uniform Contribution Among Tortfeasors Act ("UCATA"), CJP, §§ 3–1401–3–1409. *Id.* at 131, 516 A.2d 990. On appeal, this Court upheld the application of UCATA to compensatory damages and rejected Exxon's argument that it should also have applied to the punitive damages award. *Id.* at 137, 516 A.2d 990. The Court also held that, under UCATA, the settlements between the plaintiffs and Exxon's co-defendants did not operate to discharge Exxon's liability for punitive damages, despite the general rule that punitive damages cannot be recovered in the absence of recoverable compensatory damages. *Id.* at 139, 516 A.2d 990. It should also be noted that *Yarema* was a case, unlike this one, where liability was contested. The elements of the torts present in this case are assumed to have been met, including physical invasion of the appellees' property.

48. This Court emphasized language from *McCaw* that proof of contamination is not required if location to the contaminate endangers the

S.C. 558, 183 S.E.2d 438, 443 (1971)). The plaintiffs in this group all had wells drawing from the contaminated aquifer, with some risk of future contamination depending on how the plume moved, and they suffered the same stigma and remediation-related intrusions as the other plaintiffs. *Yarema* does not preclude recovery in the absence of either current well contamination or government restrictions on the land.[49] Thus, the circuit court did not err or abuse its discretion in denying appellant's post-trial motions with respect to the property damage awards.[50]

## IV. Emotional Distress And Fear Of Cancer

Appellant also challenges the trial court's denial of its motion for JNOV or a new trial on the issue of non-economic damages. The jury awarded the plaintiffs over $70 million total in compensation for non-economic damages, including emotional distress and fear of cancer. According to appellant, the emotional distress award must be set aside because: (1)

---

public health by corrupting the "surrounding" atmosphere, or water wells or springs. *Exxon*, 69 Md.App. at 152, 516 A.2d 990. *Exxon* also holds that the fact that the "reputation of the plaintiffs' land is inextricably interwoven in the assessment of damages is not reason to avoid an award." *Id.* at 153, 516 A.2d 990.

49. In *Yommer v. McKenzie*, 255 Md. 220, 257 A.2d 138 (1969), another case involving a leak from an underground gasoline tank, the Court of Appeals upheld a jury verdict imposing liability without proof that the plaintiffs' well had been contaminated by the leak and despite the fact that the leak occurred more than a mile away and was separated from the plaintiffs' property by a river.

50. One family, the Grecos, did not request damages for diminution in property value and yet received an award of $367,500. The circuit court denied the appellant's motion for judgment notwithstanding the verdict on this issue, without explanation. Presumably, this was a mere oversight considering the number of motions and verdicts the court had to review. In any event, this isolated case demonstrates the limit of the trial judge's broad discretion: the judge does not have discretion to uphold an award for damages that the plaintiff never asked for. The circuit court erred by not striking the property damage award to the Grecos. Therefore, pursuant to Md. Rule 8-604, the in banc panel unanimously directs modification of the Grecos' order of judgment by reducing the award by $367,500.

the plaintiffs did not prove any physical manifestation of their mental distress; (2) only eleven plaintiffs provided evidence satisfying the standards set by *Hunt v. Mercy Medical Center*, 121 Md.App. 516, 710 A.2d 362 (1998), for the award of emotional distress damages; and (3) the plaintiffs could not recover for fear of cancer because they failed to prove that there is a reasonable probability that they will develop cancer due to the leak. The verdict sheet did not require the jury to itemize the different types of non-economic damages awarded, so it is impossible to tell which aspects of emotional distress the award is based on.[51] Thus, the question before the Court is whether the evidence in this case, viewed in the light most favorable to appellees, was sufficient to support the jury's non-economic damages verdict under any of the theories of recovery on which the jury was instructed.

## A. Introduction

The jury in this case was instructed: "Because ExxonMobil has accepted responsibility for injuries and dangers actually caused by this spill, you need not take the time in your deliberations to determine if ExxonMobil is responsible under the four legal claims [strict liability, private nuisance, trespass and negligence]." Although Exxon contested causation and damages, it did not otherwise question the elements of these torts.[52]

## B. Fear of Cancer

Appellant argues that the jury was erroneously instructed on the standard of recovery for fear of cancer. On appeal, this Court will not disturb the ruling below as long as the jury

---

**51.** The cap contemplates a single award for non-economic damages and is applied accordingly. CJP, § 11–108 and § 11–109(b). *See Oaks v. Connors*, 339 Md. 24, 36, 660 A.2d 423 (1995).

**52.** By conceding the elements of such torts as nuisance, Exxon has admitted that it substantially interfered with the use of the appellees' property and their personal comfort and health. *See* MPJI–Cv. 20:3. Exxon cannot take back such a concession under the guise of challenging the sufficiency of evidence supporting causation and damages.

instructions fairly cover the applicable law. *Univ. of Md. Med. Sys. Corp. v. Malory*, 143 Md.App. 327, 337, 795 A.2d 107 (2001). Appellant has the burden of showing both prejudice and error. *Id.* Under the circumstances of this case, where the fear of cancer damages cannot be separated from the emotional distress damages, a finding of error in the fear of cancer instruction would merit reversal of all of the noneconomic damages verdicts. *See id.; Oaks v. Connors*, 339 Md. 24, 36, 660 A.2d 423 (1995).

Neither this Court nor the Court of Appeals has directly addressed whether Maryland law allows a plaintiff to recover for fear of cancer after tortious exposure to a carcinogen. However, the Court of Appeals's opinion in *Faya v. Almaraz*, 329 Md. 435, 620 A.2d 327 (1993), suggests that such recovery would be permissible. In *Faya*, the plaintiffs sued their surgeon for negligently failing to inform them that he was HIV positive prior to the operation. *Id.* at 450, 620 A.2d 327. They claimed that the surgeon's negligence put them in fear of contracting HIV, causing severe emotional distress. *Id.* at 451, 620 A.2d 327. The Court of Appeals held that the plaintiffs could recover for mental anguish caused by a *reasonable* fear of contracting HIV. *Id.* at 455, 620 A.2d 327. It was not necessary that the plaintiffs prove actual transmission, only that the defendant's conduct had created circumstances such that the plaintiff's fear of contracting the disease was reasonable. *Id.* The Court noted that requiring plaintiffs to prove actual transmission "would unfairly punish them for lacking the requisite information to do so." *Id.* The *Faya* plaintiffs tested negative for HIV approximately one year after the surgery, and the evidence showed that there was a 95% certainty that a person who has contracted the virus would test positive, if at all, within six months after exposure. *Id.* The Court also noted that this 95% figure may be conservative, citing a Centers for Disease Control statement advising that patients be tested 6 months after last exposure in order to "be sure" that they have not contracted the disease. *Id.* at 456 n. 9, 620 A.2d 327. Under these circumstances, the Court held that it would be unreasonable as a matter of law for the

plaintiffs to continue to fear contracting HIV after the negative test. *Id.* at 455, 620 A.2d 327. Therefore, they could only recover for the mental anguish suffered from the time they learned of the surgeon's HIV-positive status until their subsequent negative blood test. *Id.* at 456, 620 A.2d 327.

The *Faya* Court repeatedly cited to fear of cancer cases from other jurisdictions as analogous to the fear of HIV/AIDS context. *Id.* at 452 n. 7, 8, 620 A.2d 327. Although there are clear factual differences between this case and *Faya*, it is apparent that the principles espoused by the *Faya* Court fairly apply to all cases involving fear of future disease.[53] This conclusion is further supported by *Buck v. Brady*, 110 Md. 568, 73 A. 277 (1909), where the Court of Appeals held that a plaintiff who had been bitten by a rabid dog was properly permitted to testify about her continuing fear of developing rabies, although she did not currently have the disease and had undergone immediate treatment to prevent her from contracting it in the future. *Id.* at 572–73, 73 A. 277 (citing *Godeau v. Blood*, 52 Vt. 251, 254 (1880) ("[T]he apprehension of poison from the bite of the dog, and the fear and solicitude as to evil results therefrom—all pain, anguish, solicitude, occasioned by the bite—were proper matters for consideration by the jury in estimating damages.")).

 Having decided that Maryland law permits recovery for emotional distress related to a reasonable fear of cancer, I turn to a tougher question: when is a plaintiff's fear of cancer objectively reasonable? *Faya* did not address this issue directly, except to say that when there is a 95% certainty, at least, that the plaintiff had not contracted HIV, it is unreasonable for the plaintiff to continue to fear the disease. 329 Md. at 455, 620 A.2d 327. HIV differs in many important ways

---

**53.** Appellant alleges that the Court of Appeals's opinion in *McQuitty v. Spangler*, 410 Md. 1, 30, 976 A.2d 1020 (2009), "suggested that *Faya* should be viewed only as an informed consent case, not a fear of cancer case." I disagree with this reading of *McQuitty*, which cited *Faya* in order to emphasize that informed consent actions are based on theories of negligence, rather than assault or battery. *McQuitty*, 410 Md. at 30, 976 A.2d 1020.

from chemical carcinogens, particularly in that there is no dispute that HIV more likely than not causes AIDS. Moreover, HIV positive status is itself an injury. Therefore, *Faya* did not have occasion to directly address this issue and I am aware of no other Maryland case that has done so.

Courts around the country have considered this and similar issues with divergent results. *See* Annot.: *Future Disease or Condition, or Anxiety Relating Thereto, as Element of Recovery,* 50 A.L.R.4th 13 (1986). The variety of the state laws on the issue only compounds the confusion. For instance, some jurisdictions distinguish between physical damages for increased risk of developing cancer and emotional distress damages for fear of cancer, *see Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1200 (6th Cir.1988)(applying Tennessee law), while others permit no recovery at all, *Temple–Inland Forest Prods. Corp. v. Carter,* 993 S.W.2d 88, 93 (Texas 1999). Several courts have stressed that the fear must be genuine, *see, e.g., Ferrara et al. v. Galluchio et al.,* 5 N.Y.2d 16, 21, 176 N.Y.S.2d 996, 152 N.E.2d 249 (1958), and a foreseeable result of the tortious conduct, *see, e.g., Bennett v. Mallinckrodt, Inc.,* 698 S.W.2d 854, 867 (Mo.App.1985). Most jurisdictions require proof of actual exposure. *See Reynolds v. Highland Manor,* 24 Kan.App.2d 859, 866, 954 P.2d 11 (1998) (surveying different states' exposure requirements in the context of fear of HIV claims).

Appellant argues that the plaintiffs' fear is unreasonable as a matter of law unless they can prove that it is *more likely than not* that MTBE exposure will cause cancer. Some jurisdictions have followed this more-likely-than-not standard. *See, e.g., Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, 816 (1993). However, Maryland courts have not addressed it, although *Faya* suggests that there is some point where the likelihood of contracting future disease is so slim that the fear is objectively unreasonable. Appellant places significant weight on *Lohrmann v. Pittsburgh Corning Corp.,* 782 F.2d 1156 (4th Cir.1986), a Fourth Circuit case interpreting Maryland law prior to *Faya.* In *Lohrmann,* a steelworker sued his employer for

negligently exposing him to asbestos continuously over the course of his 39 year employment, ultimately causing him to develop asbestosis. *Id.* at 1158. At trial, it was disputed whether the plaintiff actually had asbestosis or, in fact, had other chronic lung conditions attributable to a decades-long cigarette habit. *Id.* The trial court granted summary judgment to the defendants, and plaintiff appealed, challenging, inter alia, the trial judge's limitations on the mention of the risk of cancer due to asbestos exposure. *Id.* at 1160.[54]

The Fourth Circuit upheld the district court's exclusion of the cancer testimony because it was unfairly prejudicial on the issue of liability. *Id.* The Court concluded that "Maryland law is clear that such evidence is not admissible to prove damages where there is less than a reasonable probability that the cancer will develop." *Id.* For Maryland law, the Court relied on the following passage from *Pierce v. Johns–Manville Sales Corp.:*

> In Maryland, recovery of damages based on future consequences of an injury may be had only if such consequences are reasonably probable or reasonably certain. Such damages cannot be recovered if future consequences are 'mere possibilities.' Probability exists when there is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur). Mere possibility exists when the evidence is anything less.

296 Md. 656, 666, 464 A.2d 1020 (1983) (citing *Davidson v. Miller*, 276 Md. 54, 62, 344 A.2d 422, 427–28 (1975)). *Pierce* considered when the statute of limitations began to toll on the negligence claim of a plaintiff who was exposed to asbestos in his line of work and diagnosed with asbestosis in 1973 and lung cancer in 1979. 296 Md. at 658, 464 A.2d 1020. Following the patient's death in 1980, his widow filed survival and wrongful death actions against the asbestos manufacturer.

---

**54.** The *Lohrmann* plaintiff was permitted to testify that he was afraid of developing cancer, but it is not clear if he sought emotional distress damages on this issue and the case never reached the damages phase. 782 F.2d 1156,

*Id.* at 661, 464 A.2d 1020. Applying the discovery rule, the Court held that because lung cancer and asbestosis were distinct and latent diseases, the plaintiff's claim for lung cancer did not accrue until he discovered, or reasonably should have discovered, the presence of the cancer. *Id.* at 667, 464 A.2d 1020. To hold otherwise, that the cause of action for the cancer accrued when he was diagnosed with asbestosis, would effectively nullify the plaintiff's right to recover for his lung cancer, because he could not have proved that it was more likely than not that he would develop lung cancer in the future. *Id.*

I have examined *Pierce* and *Lohrmann* in detail in order to illustrate why the more-likely-than-not standard was ignored by the Court in *Faya* and is equally inapplicable here: the plaintiffs' alleged fear of cancer is a *present* harm, not a future one. Fear of cancer is a particularized type of emotional distress, not an attempt to circumvent the limitations on recovering for disease that may or may not develop in the future. Thus, while the fear must be reasonable, I do not think reasonableness requires the plaintiff to show that it is more likely than not that he or she will develop cancer. In other words, I would be unwilling to say that a plaintiff's emotional distress related to fear of cancer is unreasonable *as a matter of law* if the defendant's tortious conduct has left them with only a 40% likelihood of developing cancer. A Federal District Court for the Northern District of Illinois rejected a similar argument that the feared disease must be "reasonably certain" to occur, observing that "such a stringent requirement would distort traditional notions of proximate cause. That concept's touchstone—reasonable foreseeability of the claimed injury (in this case emotional distress)—merely demands a reasonable fear, not a high degree of likelihood, that the feared contingency be likely to occur." *Wetherill v. Univ. of Chicago*, 565 F.Supp. 1553, 1559 (N.D.Ill.1983).[55]

---

**55.** In its brief, appellant cites *Wetherill* for the proposition that "recovery for fear of future injury under Illinois law requires a showing 'that

It is important to note that recovery for fear of cancer still requires the plaintiff to provide some objective evidence of his or her emotional distress; it is not enough to merely claim that the plaintiff is afraid of developing cancer, even if that fear is reasonable. *See Vance v. Vance,* 286 Md. 490, 501, 408 A.2d 728 (1979). It is enough that the fear be based on a substantial and medically verifiable possibility of contracting the disease. *See Doe v. Northwestern University,* 289 Ill. App.3d 39, 47, 224 Ill.Dec. 584, 682 N.E.2d 145 (1997) (plaintiffs must prove "that they knew facts that showed a substantial, medically verifiable possibility of contracting the feared disease"); *Tamplin v. Star Lumber & Supply Co.,* 251 Kan. 300, 308, 836 P.2d 1102 (1992) (it is not necessary to show medical certainty or probability of developing disease; it is enough that there is a substantial, as opposed to slight, possibility); *Leaf River Forest Prods. v. Ferguson,* 662 So.2d 648, 658 (Miss.1995) (recovery for emotional distress based on fear of future illness requires "substantial proof of exposure and medical evidence that would indicate possible future illness").

Employing this standard, I turn to the jury instructions in this case. Regarding fear of cancer, the jury was instructed:

A plaintiff may also recover non-economic damages for fear of contracting a particular disease such as cancer. To recover for such fear, however, the Plaintiff must demonstrate that *the fear genuinely exists and that his or her fear of contracting the disease in question is objectively reasonable.*

There can be no compensation for fear or anxiety that is objectively unreasonable. To be objectively reasonable, it is not enough that a [Plaintiff's] fear be genuine and sincere. *There must be reliable medical or scientific evidence that it is more likely than not that the substance can cause cancer.*

---

the feared contingency [is] likely to occur.'" In fact, as the longer excerpt above illustrates, *Wetherill* stands for exactly the opposite.

I think these instructions fairly cover the applicable law, and the appellant has not met its burden of proving prejudicial error. *See Univ. of Md. Med. Sys. Corp. v. Malory*, 143 Md.App. at 337, 795 A.2d 107.

## C. Sufficiency of the Evidence Supporting Non–Economic Damages

Appellant alleges that the trial court erred in denying its motion for JNOV or a new trial on the issue of non-economic damages. A party is entitled to judgment notwithstanding the verdict when the evidence presented at trial, even taken in the light most favorable to the nonmoving party, fails to support the verdict. *See Bartholomee v. Casey*, 103 Md.App. 34, 51, 651 A.2d 908 (1994). On appeal, a reviewing court must "assume the truth of all credible evidence and all inferences of fact reasonably deducible from it tending to sustain the decision of the trial court." *Id.* Review is highly deferential: "if the record discloses any legally relevant and competent evidence, however slight, from which the jury rationally could have found as it did, we must affirm the denial of [the motion for JNOV.]" *Id.* On the other hand, an appellate court must find that the trial court erred in denying the motion where "the evidence as a whole does not rise above speculation, hypothesis, and conjecture, and does not lead to the jury's conclusion with reasonable certainty." *Id.* As discussed above, the court's denial of appellant's motion for a new trial is also reviewed for an abuse of discretion. *See Buck v. Cam's Broadloom Rugs*, 328 Md. 51, 58, 612 A.2d 1294 (1992).

Appellant argues that the jury did not have objective evidence to rely upon in calculating compensation of the plaintiffs' mental distress, which should have been unique to each individual plaintiff. According to appellant, the lack of objective evidence resulted in formulaic awards.[56] Appellees argue

---

**56.** In its brief, appellant described the formula as follows: every child who received an award got $50,000, most adults received $500,000. In a two-parent household, each adult received $500,000 minus half of their children's awards. The net effect of this was that "virtually every"

that the non-economic damages award is supported by adequate evidence of: (1) emotional distress due to the leak, (2) related "discomfort, annoyance, and inconvenience," and (3) the additional distress specifically attributable to the plaintiffs' fear of cancer.[57]

Maryland long ago abandoned the physical impact requirement for recovery of emotional distress damages. Instead, the Court of Appeals adopted a more modern rule permitting recovery "if a physical injury *resulted from* the commission of the tort, regardless of impact." *Hoffman v. Stamper,* 385 Md. 1, 34, 867 A.2d 276 (2005). In the classic case of *Bowman v. Williams,* the Court held that this physical injury can be proved by: (1) an external condition, (2) symptoms of a resulting pathological, (3) physiological, or (4) mental state. 164 Md. 397, 404, 165 A. 182 (1933). The purpose of these four methods of proving physical injury is to "requir[e] objective evidence to guard against feigned claims." *Vance v. Vance,* 286 Md. 490, 500, 408 A.2d 728 (1979). Thus, the physical injury requirement does not rely on the dictionary definition of the term "physical." *Id.* Instead, it contemplates only that the injury be "capable of objective determination." *Id.*

The task here is therefore to determine whether the plaintiffs offered sufficient evidence of emotional distress so that the injury was capable of objective determination. *See Hunt*

---

two parent household received a total of $1,000,000 for emotional distress damages.

**57.** I agree with appellant that inconvenience and annoyance attributable to the remediation activities are not recoverable non-economic damages where they have been recovered as economic damages in the form of diminution in property value. *See Hall v. Lovell Regency Homes Ltd. Pshp.,* 121 Md.App. 1, 26, 708 A.2d 344 (1998). To do so would be to compensate the plaintiffs twice for the same injury. However, other "discomfort, annoyance, and inconvenience" not related to property value may be recovered. I see no evidence in this case of double recovery in connection with remediation activities. It was possible for the jurors to compartmentalize the impact of such activities on a reasonable purchaser and their effect on individuals who reside in the community.

*v. Mercy Med. Ctr.,* 121 Md.App. 516, 531, 710 A.2d 362 (1998). In *Hunt,* this Court summarized three general principles from the case law:

First, in order for an injury to be capable of objective determination, *the evidence must contain more than mere conclusory statements,* such as, 'He was afraid,'.... The evidence must be detailed enough to give the jury a basis upon which to quantify the injury. Second, *a claim of emotional injury is less likely to succeed if the victim is the sole source of all evidence of emotional injury* .... It need not be an absolute bar to recovery, however.... There is no reason why the victim's own testimony may not be sufficient, *as long as it otherwise provides the jury with enough information to render his or her injuries capable of objective determination.* Third, although minor emotional injuries may be less likely to produce the kind of evidence that renders an injury capable of objective determination, that does not mean that an emotional injury must reach a certain threshold level of severity before it becomes compensable. *There is no severity prong of the* Vance *test.* Our focus thus is properly on the evidence of mental anguish produced and not on the nature of the act causing the injury, the foreseeability of mental anguish therefrom, nor on the likely severity of such foreseeable anguish.

121 Md.App. at 531, 710 A.2d 362 (emphasis added).

In *Vance,* for example, a plaintiff was permitted to recover based on evidence that she was depressed, unable to sleep, embarrassed to socialize and prone to spontaneous crying, and that she had developed symptoms of an ulcer as well as a tired appearance with "unkempt hair, sunken cheeks, and dark eyes." 286 Md. at 493, 408 A.2d 728. Other cases have found compensable emotional distress where there was objective evidence of nausea, insomnia, and diarrhea. *See New Summit Assoc. v. Nistle,* 73 Md.App. 351, 362, 533 A.2d 1350 (1987). Similarly, the *Faya* Court held that the plaintiffs could recover damages for their "fear and mental and emotional distress [which] are accompanied by headache, sleeplessness, and the physical and financial sting of blood tests for the AIDS virus"

to the extent that they "can objectively demonstrate [the] existence" of these injuries. 329 Md. at 459, 620 A.2d 327. In contrast, this Court held in *Roebuck v. Steuart* that there was no compensable mental anguish where the plaintiff's sole evidence was her testimony that she went to see a psychiatrist six times. 76 Md.App. 298, 315, 544 A.2d 808 (1988). The psychiatrist never testified and there was no evidence of specific symptoms or treatment. *Id.*

Turning to this case, I find that the plaintiffs presented sufficient evidence to rationally support the non-economic damages awarded by the jury. A total of 180 individual plaintiffs, including 143 adults and 37 children, received awards for non-economic damages.[58] Appellant concedes that 11 of those plaintiffs provided sufficient evidence of compensable emotional distress. As for the remaining 167 plaintiffs, there was sufficient testimony from the plaintiffs themselves and/or an expert psychiatrist who had examined them all that they both (1) feared for their health and that of their families and suffered emotional distress due to the fear, and (2) suffered other symptoms of emotional distress, such as insomnia and irritability, related to their inability to use their water, fear of financial ruin, embarrassment, and a sense of invasion of the safety and sanctuary of their homes. In addition, the jury heard expert testimony that could support a finding that MTBE probably causes cancer, and benzene is a known carcinogen.[59]

---

**58.** Plaintiffs from 15 households did not testify. These plaintiffs did not request or receive non-economic damages.

**59.** In *Laxton v. Orkin Exterminating Co.*, 639 S.W.2d 431, 434 (Tenn. 1982), Tennessee's highest court reversed a lower court's rejection of damages for mental anguish in a contamination case, noting:

> The chemical which polluted [the plaintiffs'] spring was a *possible* carcinogen. Even though the tests proved negative, in our opinion a jury could find sufficient "injury" to this plaintiff to justify a recovery for their natural concern and anxiety for the welfare of themselves and of their infant children.

(Emphasis added).

Finally, it is important to note that the jury did not itemize damages for fear of cancer. The jury award could have been premised on other elements of non-economic damages, such as the physical manifestations accompanying emotional distress, including sleeplessness, anxiety, etc.

I have examined the trial testimony, taken from months of trial and over 20 volumes of transcripts, and am satisfied that there was sufficient evidence presented as to all of the plaintiffs to permit the non-economic damages award. Explaining his decision to deny a new trial, the circuit court judge stated:

> The fear generated by the prospect of cancer caused by the Defendant['s] admitted liability is potentially devastating where the stability, security and health of adult and children family members are at stake.

> * * *

> [S]erious non-economic consequences that threaten the stability, security, and health of the family [are] a world apart from the usual non-economic consequences that may result from a fender-bender auto accident or a slip and fall in a grocery store. While we were not privy to the deliberations, it is likely that the jury understood the difference.

In my view, the judge's decision to deny the motions for judgment notwithstanding the verdict or a new trial did not amount to an abuse of discretion.

## V. Medical Monitoring

Appellant also seeks reversal of the trial judge's denial of its motion for JNOV regarding damages for medical monitoring. Maryland appellate courts have not yet recognized a plaintiff's right to recover for damages for medical monitoring. The question was raised, but not answered, by the Court of Appeals in *Philip Morris v. Angeletti*, 358 Md. 689, 780, 752 A.2d 200 (2000). The Court declined to decide the issue, but observed the following regarding the history and purpose of permitting such recovery:

> This Court has never considered whether a demonstrated need for medical monitoring creates a valid cause of action

in Maryland or generates a permissible form of relief under this State's more traditional tort actions, although several courts around the country more than a decade and a half ago began to consider this type of claim and permitted it to proceed. *See, e.g., Friends for All Children, Inc. v. Lockheed Aircraft Corp.,* 241 U.S.App.D.C. 83, 746 F.2d 816 (D.C.Cir.1984); *Askey v. Occidental Chemical Corp.,* 102 A.D.2d 130, 477 N.Y.S.2d 242 (N.Y.App.Div.1984); *Laxton v. Orkin Exterminating Co.,* 639 S.W.2d 431 (Tenn.1982). Over the intervening years, several state appellate courts have followed suit in recognizing medical monitoring as a legitimate cause of action or form of relief under their respective tort law. *See, e.g., Burns v. Jaquays Mining Corp.,* 156 Ariz. 375, 752 P.2d 28 (Ariz.Ct.App.1987); *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965 [25 Cal. Rptr.2d 550], 863 P.2d 795 (Cal.1993); *Ayers v. Township of Jackson,* 106 N.J. 557, 525 A.2d 287 (N.J.1987); *Hansen,* 858 P.2d 970 (Utah 1993). Nonetheless, the embrace of medical monitoring as a viable claim has not been universal. *See, e.g., Metro–North Commuter Railroad Co. v. Buckley,* 521 U.S. 424, 439–440, 117 S.Ct. 2113, 2121–22, 138 L.Ed.2d 560 (1997) (rejecting particular plaintiffs medical monitoring claim because of lack of compensable injury under Federal Employers' Liability Act and because intermediate court's envisioned potential award of medical monitoring to asymptomatic plaintiff in form of lump sum damages went beyond bounds of "evolving common law" as it now stands); *Ball v. Joy Technologies, Inc.,* 958 F.2d 36, 39 (4th Cir.1991) (ruling that medical monitoring is not cognizable claim under tort law of Virginia or West Virginia absent manifestation of physical injury).

358 Md. at 779–780, 752 A.2d 200.

The Court added:

Medical monitoring has been defined as 'one of a growing number of non-traditional torts that have developed in the common law to compensate plaintiffs who have been exposed to various toxic substances.' [*In re Paoli R. Yard PCB Litigation,* 916 F.2d 829, 849 (3rd Cir.1990) (*Paoli I* ).]

*See also Recovery of Damages for Expense of Medical Monitoring to Detect or Prevent Future Disease or Condition,* 17 A.L.R.5th 327, § 3 (stating that courts have 'defined a medical monitoring claim as a claim for the costs of periodic medical examinations to detect latent diseases or disorders caused by a defendant's culpable conduct, the object of which is to facilitate early diagnosis and treatment of diseases or disorders'). In a claim for medical monitoring, the plaintiff seeks to recover only the quantifiable costs of periodic medical examinations necessary to monitor plaintiffs' health and to facilitate early diagnosis and treatment of disease(s) caused by exposure to chemicals, or as in the instant case, tobacco. See *Ayers,* 525 A.2d at 308; see also *Paoli I,* 916 F.2d at 849 and 850. The theory underlying the recognition of this claim is that the diseases or injuries caused by various toxic substances are often latent, leading to 'problems when the claims are analyzed under traditional common law tort doctrine because, traditionally, injury needed to be manifest before it could be compensable.' *Id.* at 850. Thus, some courts have recognized medical monitoring claims that permit relief even in the absence of present manifestations of physical injury. *See id.* The injury in a medical monitoring case not being a physical one, it is instead construed as "the 'costs of periodic medical examinations necessary to detect the onset of physical harm.'" *Barnes v. American Tobacco Co.,* 161 F.3d 127, 139 (3rd Cir.1998) (quoting *Redland Soccer Club v. Department of the Army,* 548 Pa. 178, 696 A.2d 137, 144 (Pa.1997)); see also *Hansen,* 858 P.2d at 977.

*Id.* at 780–81, 752 A.2d 200.

The Supreme Court considered medical monitoring damages in *Metro–North Commuter R.R. v. Buckley,* 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997), a case brought under the Federal Employers' Liability Act, 45 U.S.C.S. § 51 et seq. In *Buckley,* the Court recognized policy reasons in favor of allowing such awards, as well as the concerns which had prevented many state courts from permitting medical monitoring recoveries. 521 U.S. at 442–43, 117 S.Ct. 2113. The

primary concern is the inability to limit the potentially expansive class of plaintiffs, although the Court also recognized that medical monitoring may actually present less of a problem in this area than other common law torts, namely emotional distress. *Id.* The Court ultimately concluded that federal common law at the time did not permit an asymptomatic plaintiff to recover lump sum damages for medical monitoring. *Id.* at 444, 117 S.Ct. 2113. But the Court emphasized that it was merely evaluating the state of the common law at that time, not attempting to balance the competing considerations and policies. *Id.* The *Buckley* Court also left open the possibility that it might approve a more "finely tailored" medical monitoring recovery than that sought by the plaintiff in that case, and it suggested that a limited remedy, like a court-supervised fund to administer payments for medical costs, may be the best way to balance competing interests. *Id.* at 443–44, 117 S.Ct. 2113.

Although *Buckley* is instructive, there are several important differences between that case and this one.[60] Significantly, the Court noted that a federal statute, 29 C.F.R. § 1910.1001(1) (1996), already required employers to provide medical monitoring for workers who, like the *Buckley* plaintiff, had been exposed to asbestos. *Id.* at 443, 117 S.Ct. 2113. According to the Court, "where state and federal regulations already provide the relief that a plaintiff seeks, creating a fullblown tort remedy could entail systemic costs without corresponding benefits." *Id.* The Court was troubled because a "traditional" tort remedy would allow the plaintiff to recover irrespective of collateral payment. *Id.* As far as I am aware, no Maryland statute would otherwise entitle appellees to receive medical monitoring provided by Exxon. Hence, a monitoring remedy here does not provide excessive relief. In addition, from a factual perspective, the Court also observed

---

60. In any event, Maryland courts have not hesitated to reject the common law tort principles adopted by the Supreme Court. *See, e.g., Clea v. Mayor and City Council of Baltimore,* 312 Md. 662, 680–81, 541 A.2d 1303 (1988); *Erie Insurance v. Chops,* 322 Md. 79, 91, 585 A.2d 232 (1991).

that the *Buckley* plaintiff's claim for damages was amorphous and even his own medical expert was "equivocal" about whether he required *extra* medical monitoring above and beyond that recommended for the general population. *Id.* at 442. By contrast, the appellees here offered the testimony of a medical expert that a specific monitoring regime was necessary, as well as estimates of the specific costs of following the recommended program.

■ In the absence of further guidance from the Court of Appeals, I agree with the circuit court that Maryland common law permits a plaintiff to recover damages for the quantifiable costs associated with medical tests and examinations necessary to monitor the plaintiff's health and to facilitate early detection of future diseases made more likely by the defendant's tortious conduct. This holding brings the law in line with contemporary scientific understanding of subcellular injuries and latent diseases. It also equitably imposes the costs of medical monitoring, which can help mitigate future disease, on the negligent defendant rather than the victim. *See Metro–North Commuter R.R. v. Buckley*, 521 U.S. 424, 442–43, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997) (acknowledging the public policy considerations in favor of medical monitoring awards, including that "it is inequitable to place the economic burden of such care on the negligently exposed plaintiff rather than the negligent defendant."); *Ayers v. Jackson*, 106 N.J. 557, 609, 525 A.2d 287 (1987) ("mass exposure toxic-tort cases involve public interests not present in conventional tort litigation"); *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 1008, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993) (identifying the "important public health interest in fostering access to medical testing for individuals whose exposure to toxic chemicals creates an enhanced risk of disease, particularly in light of the value of early diagnosis and treatment for many cancer patients").

The trial judge gave the following instruction on the issue of medical monitoring damages:

The Plaintiffs also seek a form of relief called medical monitoring. This form of relief represents the quantifiable cost of periodic medical tests or examinations necessary to monitor a Plaintiff's health and to facilitate early diagnosis and treatment of a latent disease caused by exposure to a chemical.

In this case, all of the Plaintiffs seek medical monitoring for alleged exposure to [MTBE]. A few of the Plaintiffs also seek medical monitoring for alleged exposures to benzene. To recover such damages, a Plaintiff must establish each of the following by a preponderance of the evidence.

First, that he or she compared to the general population has been significantly exposed to MTBE or benzene. Second, that MTBE or benzene is proven hazardous to humans. Third, that ExxonMobil caused the Plaintiffs' exposure. Fourth, that as a result of the exposure, the Plaintiff has a significantly increased risk of contracting a serious latent disease.

Fifth, that diagnostic medical tests exist that make early detection of the disease possible. Sixth, that such medical monitoring procedures are different from those that would normally be recommended for persons who have not experienced Plaintiffs' level of exposure.

And seventh, that the increased risk of disease makes the proposed procedures reasonably medically necessary. If the Plaintiff fails to prove one or more of these considerations by a preponderance of the evidence, he or she is not entitled to medical monitoring.

If you find that a Plaintiff is entitled to medical monitoring, you must indicate so in your verdict, and you must also indicate the reasonable cost of this medical monitoring reduced to present cash value.

I would find that these instructions fairly and accurately state the elements which must be established in order for a plaintiff to recover damages for medical monitoring. Appellant says that this Court should require plaintiffs to prove either the existence of a present physical injury or a substan-

tial increased risk of harm before they may recover damages for medical monitoring. Reasons for declining this request are best illustrated by the following example, offered by the U.S. Court of Appeals for the D.C. Circuit:

> To aid our analysis of whether tort law should encompass a cause of action for diagnostic examinations without proof of actual injury, it is useful to step back from the complex, multi-party setting of the present case and hypothesize a simple, everyday accident involving two individuals, whom we shall identify simply as Smith and Jones:
>
>> Jones is knocked down by a motorbike which Smith is riding through a red light. Jones lands on his head with some force. Understandably shaken, Jones enters a hospital where doctors recommend that he undergo a battery of tests to determine whether he has suffered any internal head injuries. The tests prove negative, but Jones sues Smith solely for what turns out to be the substantial cost of the diagnostic examinations.
>
> From our example, it is clear that even in the absence of physical injury Jones ought to be able to recover the cost for the various diagnostic examinations proximately caused by Smith's negligent action. A cause of action allowing recovery for the expense of diagnostic examinations recommended by competent physicians will, in theory, deter misconduct, whether it be negligent motorbike riding or negligent aircraft manufacture. The cause of action also accords with commonly shared intuitions of normative justice which underlie the common law of tort. The motorbike rider, through his negligence, caused the plaintiff, in the opinion of medical experts, to need specific medical services—*a cost that is neither inconsequential nor of a kind the community generally accepts as part of the wear and tear of daily life.* Under these principles of tort law, the motorbiker should pay.

*Friends for All Children v. Lockheed Aircraft Corp.,* 746 F.2d 816, 825 (D.C.Cir.1984) (emphasis added).

For the reasons set forth by the D.C. Circuit, the rationale underlying medical monitoring damages is best reflected by the test formulated by the trial judge: (1) significant exposure to (2) a substance proven hazardous to humans (3) because of the defendant's negligence, (4) resulting in the plaintiff having a "significant increase in risk," compared to the general population, of a developing a serious latent disease for which (5) there are medical tests making early detection possible, and the tests (6) are not medically necessary for the general population, but (7) are medically necessary for the plaintiff due to the increased risk. To use an apt metaphor, the trial judge's test uses a scalpel to carve out the class of plaintiffs who may recover for medical monitoring, while appellant's proposed physical injury or substantial increased risk requirements would have us use a hatchet to lop off a class of plaintiffs, a method that is poorly designed and simultaneously over-and under-inclusive.

Turning now to the evidence presented by the appellees in support of medical monitoring damages, I note that the parties stipulated to the testimony of Dr. Brautbar, a physician, that all of the plaintiffs would require monitoring for testicular, kidney, liver, and blood/lymphatic cancers at an estimated cost of $2,000 per patient per year. Dr. Rudo, the plaintiffs' toxicology expert, testified that he recommended that all of the plaintiffs follow Dr. Brautbar's monitoring program with the goal of catching any developing cancer at an early stage. In my view, this and other testimony provides some basis for the conclusion that the Jacksonville residents have a significantly increased risk of contacting cancer or other latent disease as a result of exposure to MTBE or benzene. Dr. Jaynes, an economics expert, testified for the plaintiffs regarding the actual present value of the $2,000 per year medical monitoring costs, considering the life expectancy of the plaintiffs as well as economic factors such as inflation. Relying on his estimates, the plaintiffs requested medical monitoring damages ranging from $17,032 to $96,997.

Based on my review of the record, it appears that plaintiffs whose most recent well test results revealed the presence of

MTBE or benzene received the full amount of their requested medical monitoring damages. Plaintiffs received 50% of their claimed medical monitoring damages if their wells tested positive in the past, but had nondetectable levels of MTBE and benzene in most recent tests. Plaintiffs whose homes did not have any current contamination, but were at a "high risk" of future contamination, based on expert testimony, also received the full amount of the requested medical monitoring damages. The jury awarded only 25% of the requested medical monitoring costs to the remaining plaintiffs, those whose wells had never tested positive for MTBE or benzene and were classified as medium or low risk of future contamination. I cannot say that this result is wholly unsupported by the evidence, much less that the trial judge abused his wide discretion in denying the plaintiffs' request for judgment notwithstanding the verdict or a new trial. *See Bartholomee, supra,* 103 Md.App. at 51, 651 A.2d 908.

## VI. Similarity Of Awards To Different Plaintiffs

Finally, appellant argues that it is entitled to a new trial because the jury awarded damages formulaically, without regard to the individualized harms suffered by the plaintiffs. I have already discussed the economic and non-economic damages awards independently, finding both to be sufficiently supported by the evidence to justify denying appellant's request for a new trial. Viewing them now collectively, I have not changed my mind.

There are undoubtedly formulaic aspects of the jury's damages award, but that is not wholly unexpected in a trial of this size and complexity, where many of the plaintiffs suffered similar injuries. For example, the medical monitoring damages follow a certain general formula described above, with the award reflecting a certain percentage of the requested medical monitoring damages (which have already been adjusted to account for individual life expectancies), depending on the presence of current and/or past contamination and the risk of future contamination. These are relevant considerations, not arbitrary ones, and the resulting awards are in fact

individualized to each person's life expectancy and estimated degree of exposure. I am not propounding this formula as the most legally correct method of awarding medical monitoring damages, but it is a reasonable method that led to reasonable awards based on the evidence presented.

The out-of-state cases cited by appellant differ from this litigation in several respects. In each cited case, the court found that the resulting awards were not supported by the evidence. For example, in *Cain v. Armstrong World Indus.*, there were ten plaintiffs in an asbestos action whose cases were consolidated for trial. 785 F.Supp. 1448, 1452 (S.D.Ala. 1992). Seven of the plaintiffs proved medical monitoring expenses totaling $4,050 to $10,200 and no other future medical expenses. *Id.* They were nonetheless awarded $80,000 to $100,000 in future medical expenses, an amount equal to the damages proved by the remaining three plaintiffs. *Id.* The judge found that these awards, along with similarly excessive awards for fear of cancer and emotional distress, shocked the conscience and merited a new trial. *Id.* at 1454.

The most important thing about *Cain*, however, is that it is the decision of a *trial court judge* on the party's motion for a new trial. Motions for a new trial are the province of the trial judge. Nowhere is this more true than in a trial such as this, which lasted five months and included testimony from 167 witnesses, including all manner of experts and countless plaintiffs. It is apparent from his written decision that the trial judge carefully considered the merit of the verdicts and considered them in light of the weight of the evidence, as he witnessed firsthand. Based on a distant review of the paper record, I cannot say that he abused his discretion.

In *Buck v. Cam's Broadloom Rugs*, 328 Md. at 59–60, 612 A.2d 1294, the Court of Appeals quoted the following "salient observations" from the Superior Court of Pennsylvania regarding the deference owed by the appellate court to the trial judge and by the trial judge to the jury. I find it especially pertinent in this case:

> [A] jury's verdict should not be casually overturned. In our system of justice, the jury is sacrosanct and its importance

is unquestioned. The members of a jury see and hear the witnesses as they testify. They watch them as they sweat, stutter, or swagger under the pressure of cross-examination. This enables the jury to develop a feel for the case and its personal dynamics which cannot be conveyed by the cold printed page of a record reproduced for appellate review.... We must afford the judge great discretion in making this decision because he too is present in the courtroom as the evidence is presented. As does the jury, he develops a feel for the human pulse of the case. In short, our seemingly simple decision to uphold the grant of a new trial is actually the end result of a highly complex process involving the interaction of judge, jury, and attorneys. This process has developed over centuries and its complicated dynamics belie its surface simplicity. However, the greatest tribute to its success is probably the extent to which we take it for granted as the ultimate guarantor of justice.

*Boscia v. Massaro,* 365 Pa.Super. 271, 529 A.2d 504, 508 (1987).

This is an extremely unusual toxic tort case. Here, liability is generally conceded and potentially inadmissible, but unobjected to evidence on key issues made its way to the jury. These factors undoubtedly affected the assessment of the damages in this case. But they also caution this Court to respect its limited role in gauging the jury's verdict and to uphold that verdict even if there is the slightest evidentiary basis for doing so.

Because a majority of the in banc panel would uphold virtually all of the jury's award for diminution in property value, I join the Court's affirmance of that judgment. To the extent a majority of the panel would reverse the remaining damage award, I respectfully dissent.

I am authorized to say that Judges WOODWARD, MEREDITH and WRIGHT join this opinion in its entirety and the other members of the in banc panel join in this opinion in part, as explained in their opinions.

EYLER, JAMES R., J., concurring and dissenting, in which HOTTEN, J., joins.

These consolidated cases arise from the leakage of gasoline from a gasoline service station, located at the corner of Jarrettsville Pike and Paper Mill Road in the Jacksonville area of Baltimore County. The station was owned by Exxon-Mobil Corporation, appellant. The leak occurred, on January 13, 2006, when a contractor accidentally drilled a hole in an underground gas line leading from a storage tank to the dispensing pump. An electronic leak detector sounded an alarm. The contractor who responded to the alarm erroneously determined that a pump motor was the problem, and replaced it. As a result of the replacement, the leak detection system had to be recalibrated. This was done, but incorrectly. Consequently, the leak detection system did not detect the continuing leak. The problem was discovered on February 16, 2006, when the franchisee/service station operator reported an inventory discrepancy. The service station immediately was shut down. The existence of the leak was confirmed on February 17. Appellant immediately notified the Maryland Department of the Environment (MDE), and remediation efforts began. In the period between January 13 and February 16 or 17, approximately 700 gallons of gasoline per day leaked from the punctured underground line.

Appellees, residents of the Jacksonville area, filed lawsuits against appellant in the Circuit Court for Baltimore County alleging that their properties had decreased in value and their health was threatened because chemicals found in gasoline, specifically, methyl tertiary-butyl ether ("MTBE"), a possible carcinogen, and benzene, a known carcinogen, contaminated their properties. The bulk of the evidence related to MTBE because there was virtually no evidence that any appellee was exposed to benzene. The properties were serviced by potable wells; there was no public water system. As part of the remediation effort, appellant constructed monitoring and/or recovery wells, used to monitor and recover contaminants. None of the appellees used water from the monitoring and recovery wells. All references to use of water by appellees

are to the appellees' potable wells. None of the appellees claimed a physical injury in the traditional sense. None claimed sickness or disease or symptoms of a sickness or disease, caused by the leak. Appellees' emotional distress claims were based primarily on fear of contracting a latent disease. We note briefly and will explain in greater detail below that federal and state governments have set levels of maximum exposure to these chemicals. The evidence was uncontradicted that all people in this country are exposed to some amount of MTBE and benzene in their daily lives. These chemicals may enter a person's body through ingestion, dermal contact, or inhalation of vapors.

At some point prior to trial, appellees' suits were consolidated. Appellant admitted liability for compensatory damages on causes of action other than fraud, and the cases were tried on liability for fraud and punitive damages, and the amount of compensatory damages. By the time a jury returned a verdict, there were 302[1] appellee plaintiffs who owned and/or resided on 88 properties. Ninety five of the appellees were minors at the time of the leak. The jury found in favor of appellant with respect to the fraud and punitive damage claims and awarded compensatory damages totaling over 147 million dollars to the appellees. This damage award consisted of (1) the full pre-leak value of every property to the property's owner(s), (2) the present value of the future costs of medical monitoring to 300 appellees who made that claim, and (3) damages for emotional distress, which included fear of cancer or other latent disease, to 180 appellees who made that claim. Even though the evidence demonstrated substantial differences in the claims, the awards were remarkably the same for each property owner, each adult claiming damages for emotional distress and medical monitoring, and each minor claiming damages for emotional distress and medical monitoring.

---

1. It appears two appellees were named as plaintiffs solely because they were on the title to certain properties.

The cases were hotly contested, and not surprisingly, the parties filed numerous pre-trial motions, including motions in limine and motions for summary judgment. The trial lasted approximately five months, during which many motions and legal arguments were advanced, including motions for judgment by appellant. Post trial, appellant filed several motions. Pertinent to this appeal are appellant's motion for judgment notwithstanding the verdict ("JNOV") with respect to the emotional distress and medical monitoring claims and appellant's motion for new trial or remittitur with respect to the damage to appellees' properties.

The circuit court denied the motions except that (1) it reduced the non-economic damages awards of four appellees to the statutory cap, pursuant to Maryland Code (2006 Repl. Vol.), § 11–108 of the Courts and Judicial Proceedings Article (CJP),[2] and (2) as to the owners of four properties who sold their homes post leak, granted a remittitur lowering the jury's award of pre-leak value to an amount equal to the pre-leak value adjusted for the passage of time less the actual sales price.[3]

On appeal, appellant contends the court erred in permitting appellees' property damage expert to testify and in denying its motions. We conclude that the court did not err in permitting the expert to testify, but with the exceptions noted below, and as explained below, the court erred in denying the motions.

Preliminarily, we note that damages were awarded to three appellees who did not make claims. The jury awarded Andrea and Veronica Greco the pre-leak value of their property even though they sold their home post-leak for an amount in excess of the pre-leak value and, presumably as a result of the sale, withdrew their diminution in value claim prior to verdict. In addition, the jury awarded $50,000 to Luke DeKoomen and

---

**2.** The four appellees are Amtul and Mirza Baig and Robert and Suzanne Libertini.

**3.** The owners of the four properties are Martin Brady, John Csicsek, Ian Murray, and Nancy Simms.

$50,000 to Seth DeKoomen, minors, for emotional distress, even though they withdrew their emotional distress claims prior to verdict. The circuit court erred in not granting appellant's JNOV motion with respect to these claims by these appellees.

With respect to the remaining claims, clearly, the jury did not perform individualized assessments of the claims, based on the evidence. While a jury cannot commit reversible error, a judge can do so, and in some instances, the circuit court erred in not applying the correct legal standard and by not granting the motion for JNOV. In addition, the trial judge erred in not performing an individualized assessment of the verdicts in ruling on the motion for new trial or remittitur. Notwithstanding that the cases were consolidated, each claim in each case had to be analyzed as if tried separately. The parties do not dispute that that is the law. The jury was so instructed, and no exceptions were taken to that instruction.[4]

Before proceeding to a more detailed analysis, we note that these cases illustrate the danger of trying all issues in numerous disparate cases in a consolidated manner, presumably for judicial efficiency. The phenomenon is unprecedented in this State. The largest mass tort litigation in this State was and is asbestos exposure litigation. With respect to the thousands of asbestos cases in this State, common issues were tried in large consolidated trials, but plaintiff specific issues were and are being tried in small groups, with grouping determined by similarity of claims. Each plaintiff has to prove his or her own case.

In the cases before us, the propriety of the consolidation is not before us. Nevertheless, the mere size of the undertaking and the length of time consumed in arriving at judgments cannot be the basis for treating these cases as if they were a class action and ignoring reversible error. If, by virtue of

---

4. Prior to giving instructions on causation and damages, the court advised the jury that "[t]hese instructions apply to each Plaintiff unless otherwise indicated. The instructions which followed were all phrased in terms of what each plaintiff had to prove in order to recover.

massive consolidation of cases and claims, the consolidated cases have become too big to reverse, our system has failed.

For ease of reference, this opinion is divided into the following sections.

I. Overview of claims

II. Summary of contentions/arguments on appeal

III. Summary of evidence at trial

 A. Appellees' experts

 B. The appellees

 C. Appellees' liability witnesses

 D. Appellant's evidence

IV. Waiver

V. Admissibility of Acks testimony

VI. The law relating to emotional distress

 A. Personal injury versus property damage and compensable elements of each

 B. Emotional distress generally—physical manifestation requirement

 C. Fear of cancer or other latent disease

VII. Application of law of emotional distress to facts of each case

 A. Withdrawn claims and unchallenged claims

 B. No evidence of actual exposure or probable future exposure

 C. Emotional distress—no evidence of physical manifestation related to leak, assuming fear of a future disease is compensable

 D. Emotional distress—minimal evidence and clearly legally insufficient to show physical manifestation related to leak, assuming fear of future disease is compensable

 E. Emotional distress—some evidence of physical manifestation related to leak but legally insufficient, assuming fear of future disease is compensable

 F. Fear of cancer or other latent disease

VIII. Law relating to medical monitoring

IX. Application of law of medical monitoring to facts of each case

 A. No evidence of actual exposure or probable future exposure

 B. No evidence of physical manifestation

 C. All medical monitoring judgments

X. Law relating to property damage

 A. Owner testimony as to value of contaminated property

 B. Diminution in market value as a measure of property damage

 1. Permanent vs. temporary property damage under Maryland law

 2. Permanent vs. temporary property damage in other jurisdictions

XI. Application of property damage law to facts of each case

 A. Withdrawn claims and unchallenged claims

 B. Properties with owner testimony that property was worthless

 C. All properties

XII. Law applicable to new trials

XIII. Appendix

## I. Overview of claims

There is some conflict in the evidence as to when the residents of Jacksonville first learned of the leak. Most of the appellees testified that they received notice via newscasts on February 20 or 21, 2006, but there is some testimony that a representative of MDE notified some residents earlier. In any event, the residents thereafter held meetings to discuss the developing situation, including meetings with representatives of MDE and appellant. At some point in 2006, counsel began representing some or all of the appellees. In the fall of 2006, appellees filed their complaints. The record extract contains one complaint as a representative complaint only.

That complaint was filed on October 17, 2006. We have not determined the dates of the other filings.

In their complaints, appellees alleged fraudulent concealment, intentional infliction of emotional distress, strict liability, trespass, private nuisance, and negligence. They sought compensatory and punitive damages. The fraud counts were based on allegations that (1) the line leak detection system at the station was antiquated and unreliable, that appellant had concerns about the system, and that appellant failed to disclose those facts to the Jacksonville residents, and (2) appellant failed to immediately notify the residents when the leak was discovered and thereafter failed to keep them fully informed.

Eventually, appellees dismissed the intentional infliction of mental distress counts as to all appellees and dismissed the trespass counts as to some of the appellees. Appellant admitted conduct giving rise to liability for trespass, private nuisance, negligence, and strict liability, denied liability for fraud and punitive damages, and asserted that the compensatory damages claimed were, in large part, unavailable as a matter of law.

Trial began in October, 2008. On March 12, 2009, the jury returned completed verdict sheets, one for each of the 88 households. The occupants of each household were listed on the verdict sheet. The jury found in favor of appellant with respect to the fraudulent concealment and punitive damage claims. The jury returned a verdict for all appellees with respect to all other claims. The verdict sheets were in the same format, in essence, asking (A) do you find fraud by concealment? (B) do you find that appellant's admitted liability caused any injuries and damages? and (C) if the answer to (A) or (B) is yes, how much compensatory damages do you award? That question was followed by:

**Economic Damages**
**Damages to Property Owner [name of property owner]**
Diminution in Property Value $_____
**Medical Monitoring**

[names of plaintiffs] $_____

**Non–Economic Loss (Emotional Distress)**

[names of plaintiffs] $_____

**D. Punitive Damages**

If you answered to [question (1) ], should the plaintiffs be awarded punitive damages?

[names of plaintiffs] YES____ NO____

(Emphasis in original).

The properties in question were located at varying distances from the source of the leak. The presence of contamination and the extent of contamination, if found, between February 17, 2006 and the date of trial varied from property to property. Appellees' expert testimony as to likelihood of contamination in the future, or lack thereof, varied from property to property. The measures employed by residents and by others to protect residents from exposure to possibly contaminated well water varied from property to property. The remediation activities also varied by location. Much of the testimony turned on whether a property had ever been contaminated, and if so, its location vis a vis the dispersal area of the gasoline, known as the "plume" or "strike zone," and the extent of any contamination.

Each property owner received an award for the full pre-leak value of the property, *i.e.*, the jury found that each property was worthless. Each appellee received an award for medical monitoring. With rare exceptions, each adult received an award in the amount of $500,000 for emotional distress, and each minor received an award of $50,000 for the same. In households with children, generally speaking, the awards for the adults were reduced by the amount of the awards for the minors.

Before summarizing the positions of the parties, a review of additional basic information may be helpful. MTBE and benzene are two volatile organic compounds found in gasoline. MTBE is commonly added to gasoline to reduce emissions of air pollutants from exhaust systems. MTBE is water soluble.

MTBE is a possible carcinogen, but there are no human studies linking it to cancer. Because it was not used as a gasoline additive until 1979, there are few studies in existence, other than with respect to the effect of exposure on animals. The Environmental Protection Agency ("EPA") has classified MTBE as a potential human carcinogen at large doses, but not at low exposure levels. Because of the absence of a consensus on whether MTBE is a carcinogen, the EPA has not set a maximum contaminant level ("MCL") for it. Based on MTBE's bad taste and odor, the EPA has set a maximum MTBE level at 20–40 parts per billion ("ppb"). The MDE has set an "action level," a concept used interchangeably with MCL, at 20 ppb for MTBE and has taken the position that the standard is "protective of human health and safety."

The EPA classifies benzene as a carcinogen and has set the MCL at 5 ppb. The MDE uses the same standard for benzene.

The EPA standard for each chemical is the level at which a person could be exposed to the chemical every day for 70 years with only a negligible increased risk of cancer. Other states have adopted different standards for each chemical, and some are lower than those set by the EPA and MDE.

The remediation effort as a result of the leak included drilling monitoring wells at various locations and at various depths to determine the extent of the plume. These wells were used for periodic monitoring and, when contamination was found, for recovery of the gasoline and residuals.

## II. Summary of contentions/arguments on appeal

On appeal, appellant contends; (1) the finding that each property was worthless was formulaic in nature without individualized determination and was contrary to all of the evidence; (2) the court erred in admitting the testimony of Kenneth Acks, appellees' real estate expert, because he failed to use a generally accepted method of valuation and he ignored the post-leak sales; (3) as to fear of cancer or other latent disease, the awards were formulaic, the standard for

recovery for fear of cancer or other latent disease was incorrect, and in any event, the evidence was legally insufficient; (4) as to emotional distress generally, the awards were formulaic, appellees did not prove a physical injury sufficient to permit recovery, and in any event, the evidence was legally insufficient; and (5) medical monitoring is not a recognized tort or compensable type of damage, but if recognized, the standard employed was incorrect, and regardless, the evidence was legally insufficient to support an award.

Appellant observes the following. Forty-two appellees, from 12 households, did not testify. The 12 households are identified as the Acchione, Barnett, Butler, DiGalbo, Fulco, Gollihue, Greenblatt/Robertson, Hahn/Tamberino, Kropfelder, Pertee, Simms, and Sipes families. With the exception of Mildred Hahn, who dismissed her claim for medical monitoring, all 42 appellees who did not testify received medical monitoring awards and those who were owners received the full pre-leak value of their properties. Appellant asserts, based on sampling, that

> of the 88 properties involved in this appeal, 22 never had any contamination from the leak. By the time of trial, a total of 49 properties were without contamination. Benzene above the MCL was never found in any potable well and only two potable wells were ever found to have MTBE above Maryland's action level. Only eight properties ever had either a potable well or a monitoring well test for MTBE or Benzene at a level above the applicable action level or MCL.
>
> The vast majority of Plaintiffs' properties (66 of 88) were not within the strike zone. Only a small minority of Plaintiffs' properties (14 of 88) ever had a monitoring well or other remediation activity. As to certain of these households, the remediation process was and will continue to be a significant intrusion.

(Footnotes and references to record extract omitted.)

After and as a result of the leak, one appellee, Mae DeLeo, moved out of her house and into a condominium in Towson.

The remaining appellees continued to occupy their homes, except for those who sold them. The owners of 8 properties attempted to sell their homes after the leak; two were unsuccessful (Barone and Gregory families), and 6 were successful (Brady, Csicsek, Murray, Simms, Roeterings, and Williams families).[5] The owners of 10 other properties refinanced their homes after the leak. A total of 49 homes in the Jacksonville neighborhood were sold after the leak, at substantial prices.

Appellant contends that the court erroneously admitted the testimony of Kenneth Acks, who testified as an expert on the impact of the leak on the value of appellees's properties. Mr. Acks testified that each property had sustained a percentage loss in value, in varying amounts, primarily dependent upon its location and extent of contamination, if any. Appellant argues that Mr. Acks did not use a generally accepted methodology in formulating his opinions and ignored the 49 sales in the neighborhood.

During the course of the litigation, and prior to trial, appellees' counsel arranged for any appellee who wished to do so to consult with Abdul Malik, M.D., a psychiatrist. Eighty-seven appellees accepted the offer. Thirteen sought follow up treatment in Dr. Malik's office. According to appellant, "[e]motional distress awards were ... entered in favor of 47 non-testifying Plaintiffs." Appellant asserts that the "over-whelming majority of Plaintiffs either provided no evidence of any physical manifestations of their alleged distress and/or insufficient information about their pre-leak emotional health to allow for a before and after comparison."

With respect to medical monitoring, appellant observes:

With only a few variations, [damages for medical monitoring] also followed a formula. Each member of a household whose potable well ever had a MTBE reading above 0.5 ppb, received 100% of their claimed costs for future medical monitoring. Each member of a household whose potable

---

5. The Roeterings and Williams owners dismissed their claims during trial.

well ever had an MTBE reading of less than 0.5 ppb, received 50% of their claimed costs for future medical monitoring. Each member of a household whose potable well never tested positively for MTBE, received 25% of their claimed future medical monitoring costs.

(Extract references omitted.)

Thus, appellant argues:

(1) The jury's finding that each property was worthless was not supported by any evidence and was contrary to all the evidence. Appellant points to Mr. Acks' testimony that the decrease in value ranged from 30 to 60%; the post-leak sales for substantial prices; the refinancings and corresponding appraisals; the lack of restrictions on use of most properties; and the evidence that a certain number of properties—appellant says 13—were never contaminated and, according to appellees' expert, were not likely to become contaminated. Additionally, appellant acknowledges that a certain number of owners, (appellant says 7, appellees say 22), opined as lay witnesses that their properties were worthless, but appellant argues that the evidence had no probative value, or if it did, it was limited to the homes of those owners.

(2) Mr. Acks should not have been permitted to testify.

(3) Fear of cancer or other serious latent disease is not compensable absent evidence of exposure and evidence that the person has a reasonable probability of contracting such a disease. Not all appellees proved exposure. Moreover, while the testimony by appellees's expert was that an exposure increases the risk of cancer, there was no evidence that the risk was substantial or significant.

(4) With respect to emotional distress generally, in addition to the above, almost all appellees failed to prove any physical injury necessary to support a recovery.

(5) A medical monitoring claim is not recognized in Maryland, and for reasons similar to the emotional distress claims, the evidence was legally insufficient.

(6) The awards were formulaic, and the jury did not make individualized assessments.

Appellees observe:

The Plaintiffs all shared in the destruction of their property values, the disfigurement of the surrounding land, the noise, inconvenience and unsightliness of the equipment, the stadium lighting, the influx of hoards of remediation crews working 24/7, the exposure to gasoline and its constituents from their drinking water, and the emotional distress, anxiety and fear that results from having life as they knew it turned completely upside down.

Appellees also observe that Kenneth Rudo, Ph.D, a toxicologist who testified as an expert witness on their behalf, testified that MTBE is a mutagen that causes changes in DNA, and therefore, there is no safe level of exposure.

Appellees contend:

(1) Appellant waived all issues raised on appeal, by affirmative representation, acquiescence, consent, and concession. Appellees explain that appellant's counsel tried the cases by telling the jury that it would accept their decision on compensatory damages in exchange for not ruling against it on fraud and punitive damages.

(2) The evidence supported the jury's determination that the properties were worthless. Appellees assert that 22 appellees testified that their properties were worthless, there was substantial interference with the use of the properties, the well water was not drinkable, there was a stigma in the neighborhood, and there was noise, lighting, and other remediation efforts.

(3) Mr. Acks' testimony was properly admitted. He explained his methodology, and he took the post-leak sales into account.

(4) With respect to the non-economic damages, appellees support the instructions given and assert that the evidence was legally sufficient to support the awards. There was evidence of increased risk of cancer, of cellular mutation, and

of physical manifestations of distress. Appellees suffered intangible consequences such as inconvenience and embarrassment from the interference with the use of their properties in addition to the emotional distress, and that both was included in the non-economic loss awards.

(5) The awards were not formulaic, and the fact that the awards were similar was supported by the evidence.

(6) Damages for medical monitoring should be permitted in Maryland, and the evidence was sufficient to support the awards.

### III. Summary of evidence at trial

#### A. Appellees' experts

As mentioned above, some appellees consulted Dr. Malik, who was associated with Psych Associates of Maryland. At the beginning of trial, the parties stipulated, as to 57 appellees, that if a witness from Psych Associates were called to testify, the witness would testify that each appellee was diagnosed with a disorder, as identified in an attached exhibit, that was caused by, or exacerbated by, the leak. The stipulation (hereinafter "the Stipulation") included a recitation that appellant disagreed with the expected testimony and asserted that none of the appellees "have suffered permanent psychological injuries or long term emotional distress."

The evaluation by Psych Associates for each appellee consisted of an interview that lasted 45 minutes to an hour. The information that the evaluator had was the self-reported information by appellees. The evaluator did not have medical records for the appellees, that pre-existed February, 2006, and did not speak to any personal physicians of the appellees.

Eight of the appellees covered by the Stipulation had a preexisting psychological condition that, at some point, had required psychotherapy, counseling, or medication. With respect to appellees covered by the Stipulation, Dr. Malik did not recommend therapy or counseling for 36 appellees; recommended treatment for 21 appellees with no prior history of

treatment for emotional distress; and advised 4 appellees with preexisting conditions to continue therapy.

The Stipulation included the following.

(A) *Anxiety Disorders*—Anxiety disorders are described in the DSM [Diagnostic and Statistical Manual of Mental Disorders] and categorized by the severity of symptoms and length of time the symptoms are experienced by the patient. Acute Stress Disorder is characterized by symptoms similar to those of Post Traumatic Stress Disorder that occur immediately in the aftermath of an extremely traumatic event. Generalized Anxiety Disorder is characterized by at least 6 months of persistent and excessive anxiety and worry. "Anxiety Disorder, Not Otherwise Specified (NOS)" is included for coding disorders with prominent anxiety or phobic avoidance that do not meet criteria for any of the specific Anxiety Disorders defined in this section (or anxiety symptoms about which there is inadequate or contradictory information). This Diagnosis is used to describe individuals who experienced temporary anxiety with symptoms which subsided in less than six (6) months.

(B) *Adjustment Disorder*

An adjustment disorder is a psychological response to a stress that results in emotional or behavioral symptoms. Adjustment disorders can be Acute (less than 6 months) or Chronic (greater than 6 months). The essential feature of an **Adjustment Disorder** is a psychological response to an identifiable stressor or stressors that results in the development of clinically significant emotional or behavioral symptoms in response to an identifiable psychosocial stressor or stressors. The symptoms must develop within 3 months after the onset of the stressor(s) (Criterion A). The clinical significance of the reaction is indicated either by marked distress that is in excess of what would be expected given the nature of the stressor, or by significant impairment in social or occupational (academic) functioning (Criterion B). The stressor may be a single event (e.g., termination of a romantic relationship), or there may be multiple stressors (e.g., marked business difficulties and marital problems).

Stressors may be recurrent (e.g., associated with seasonal business crises) or continuous (e.g., living in a crime-ridden neighborhood). Stressors may affect a single individual, an entire family, or a larger group or community (e.g., as in a natural disaster). Some stressors may accompany specific developmental events (e.g., going to school, leaving the parental home, getting married, becoming a parent, failing to attain occupational goals, retirement).

(C) *Mood Disorder*

Depression disorders are described in DSM under the heading of "Mood Disorders" and are categorized by the severity of symptoms and the length of time the symptoms are experienced by the patient. **Major Depressive Disorder** is characterized by one or more Major Depressive Episodes (i.e., at least 2 weeks of depressed mood or loss if interest accompanied by at least four additional symptoms of depression). **Dysthymic Disorder** is characterized by at least 2 years of depressed mood or more days than not, accompanied by additional depressive symptoms that do not meet criteria for a Major Depressive Episode. When a patient's symptoms of depression do not persist for two (2) weeks or more they are diagnosed with **"Depression," "Depressive Disorder"** or **"Depressive Disorder Not Otherwise Specified (NOS)."**

Dr. Malik testified at trial with respect to certain appellees who were not the subject of the Stipulation. We will include Dr. Malik's diagnoses when we discuss each appellee, below (appendix).

The parties entered into a similar stipulation with respect to the testimony of Nachman Brautbar, M.D.[6] The parties agreed that, if called to testify, Dr. Brautbar would state that all appellees require medical monitoring. The stipulation provided: "[b]ased on the opinions of Kenneth Rudo and my understanding of the nature and extent of Plaintiffs' exposure to

_____

**6.** We have been unable to locate the witness's curriculum vitae, and we are unsure of the area of his expertise.

MTBE, I believe the following tests for examinations should be performed as part of an annual medical monitoring protocol." Dr. Brautbar recommended annual tests for testicular cancer, kidney cancer, liver cancer, and hematolymphatic cancers. He estimated the cost as $2,000 per appellee, per year.

The test results for both potable and monitoring wells for the time period post-leak and prior to trial were admitted into evidence. A chart showing the maximum detection levels for all wells was admitted into evidence.

Harvey Cohen, a geologist with a specialty in hydrogeology, testified as an expert for the appellees. In essence, he testified about the movement of ground water generally, the function of potable wells, his mapping of test results, and his opinion about future contamination. Through the use of exhibits, he described the location of appellees' properties and the wells. He opined that, at any given point in time post-leak through April, 2007, 66 properties had a detectable amount of MTBE, and 5 had a detectable amount of benzene. He also described the levels of contaminants found in monitoring wells in the same time period. His exhibits displayed the maximum concentrations, whenever recorded. They did not purport to depict the situation at a given point in time. Mr. Cohen testified that the plume, or area of contamination, is ever-changing because of the movement of ground water. He identified 24 properties with no detected contamination, and another 30 wells with a chemical detection level under 0.5 ppb. He described the potential for contamination in the 24 potable wells not previously contaminated. Two were described as having high potential, 5 as having medium potential, and 17 as having low potential. Mr. Cohen could not predict which well or wells might become contaminated in the future or when; he opined only as to probability.

The witness testified that no wells had been abandoned and none had been condemned. He acknowledged that MTBE and benzene degrade over time. He did not evaluate the remediation effort and did not assess its efficacy. Twenty-two potable wells were located inside the plume. Mr. Cohen

expressed no opinion as to whether chemical containing vapors were present in any of the homes.

Edward Sullivan, a geologist with a specialty in hydrogeology, employed by the Whitman Companies, also testified as an expert for the appellees. He described underground fractures, aquifers, and the movement of ground water generally. He testified that the chemicals in question are soluble, therefore, when the liquid gasoline is all gone, dissolved chemicals remain that can migrate in the ground water, through fractures in the rock formations. He opined that the detected levels of chemicals on the 66 properties mentioned above were likely caused by the leak. He opined that the Baigs' and Libertinis' potable wells likely would be contaminated in the future. He stated that the remediation effort was being conducted under the supervision of the MDE, but offered no opinion as to the amount of contamination being captured by the effort. He stated, however, that contamination forced down into the deeper bedrock would likely not be recovered, and it would be difficult to determine its movement.

Kenneth Rudo, a toxicologist, also testified as an expert witness for the appellees. Mr. Rudo was employed by the State of North Carolina. He stated there is a relatively small body of knowledge in existence relating to MTBE because it has been used in gasoline for only about 20 to 30 years. He opined that MTBE is a probable human carcinogen and a probable human mutagen. He explained that MTBE exposure can occur through ingestion, bathing or other skin contact, or breathing vapor containing MTBE. He stated that exposure produces an increased risk of cancer. The witness testified that he could not state that any of the appellees would, more likely than not, get cancer as a result of the leak.

On direct examination of Dr. Rudo, the following colloquy occurred:

Q. And now specifically, and I don't want to spend a lot of time on this, the jury will have and they have elaborate records of the levels of MTBE that the various plaintiffs were exposed to. There is a list of 66 plaintiffs, 66 families

comprising approximately two hundred or two hundred and fifty of our plaintiffs, but 66 families on Exhibit 8 and 8A and I'm not going to waste your time to show it to you, I would just remind the jury, that they have had contamination in their drinking water?

A. This is true.

Q. And while not yet in evidence because the expert hasn't testified yet, I will just mark it for identification as Plaintiff's Exhibit 88, you are aware of the fact that we have asked Dr. Whitman, an environmental engineer, to opine as to whether or not my clients were exposed to contamination in their drinking water before they knew about the spill. In other words, during the period of time when the leak occurred on January 13th, until it was publicly acknowledged on February 17th, February 18th, they would have gone about their life drinking the water, cooking, bathing, whatever, not knowing that there was this 26,000 gallon leak?

A. Yes.

Q. And those 40 people—I'm not going—it is 39. Those 39 people are identified and it will be explained in detail by Dr. Whitman later in the case, *but those 39 people* that would have been going about their life during those 37 days and consuming the water on Plaintiff's Exhibit Number 88, so the record is clear of what I'm talking about, you would agree that the exposures to the various plaintiffs vary from plaintiff to plaintiff?

A. Yes.

Q. And the amount of contamination in their wells varies not only from plaintiff to plaintiff but from test to test?

A. Yes, sir.

Q. Now, with that in mind, can you state to a reasonable degree of probability in your field as a toxicologist that *each of the plaintiffs that I have just described* is in fact at an increased risk for developing these cancers in the future?

A. Yes, they are.

Q. And what is it about the exposure of any kind? Because they do vary from levels that are below one part per billion to levels that I think the highest level, 47.7 parts per billion, explain to the jury the—how you parse through the levels of exposure, the levels of contamination that they were exposed to and how you were able to conclude that even at these low levels in some of the plaintiffs' wells they were exposed to a level that will likely put them at increased risks for cancers in the future?

A. Well, Number one, they were most certainly exposed. They had the positive [well] tests, you know, had exposure to a chemical that we consider more likely than not to be carcinogenic. Because we also consider it to be more likely than not a mutagenic chemical that can change DNA, that that implies that in essence there is no safe level; there is no safe level in terms of exposure time and there is no safe level in terms of the amount of chemical that is there. So in essence, the safe level would be considered zero. Anything over and above that would increase the risk.

(Emphasis added). Dr. Rudo did not offer opinion testimony as to increased risk of any specific appellee other than the 39 appellees referenced in the emphasized question.

Later, in Dr. Rudo's direct examination, the following occurred:

Q. So the exposure to MTBE causes mutations of the human cells?

A. Yes.

Q. Can you state to a reasonable—I know you couldn't state to a reasonable degree of scientific certainty that any one client was going to get cancer, so I want to juxtapose that with can you state to a reasonable degree of scientific certainty that the plaintiffs that have been exposed to contamination have in fact had mutations of their cells?

A. Yes, more likely than not they have.

Dr. Rudo also opined that all persons exposed to the chemicals in question should have medical monitoring. He was asked if he knew that appellant had provided five families

with point of entry carbon treatment systems for their wells. He replied in the affirmative and opined that all plaintiff families should be provided with a point of entry carbon treatment system. He stated that, to be effective, the system must be regularly maintained. He testified that the cost of such a system is approximately $7,000.[7]

On cross-examination, Dr. Rudo acknowledged that Americans routinely are exposed to MTBE and benzene in their everyday lives. The chemicals are in the ambient air. In addition, when a person operates and refuels a vehicle, he or she is exposed to these chemicals. Dr. Rudo acknowledged that in North Carolina the safety standard for MTBE was higher than the one he had just advocated as safe. He also acknowledged that he had proposed lowering the North Carolina standard to 11.6 ppb for MTBE, a standard that was not adopted and was also higher than what he opined was safe.

Dr. Rudo did not interview any of the appellees with respect to whether and to what extent they used potable well water. He did not conduct air sampling. He did not calculate how much chemical or for what period of time a chemical was in a well. He did not test appellees for evidence of exposure. He had no exposure information about any particular appellee and had no information about any symptoms experienced by any appellee. He could not quantify any appellee's exposure to either MTBE or benzene and he could not quantify any increased risk of cancer. He had no information about any exposure by any appellee to soil contamination, or to contaminated vapors, and no information about exposure to any contamination in monitoring wells.

Kenneth Acks testified for the appellees as an expert in "environmental economics" and real estate appraisal. The parties stipulated to the pre-leak value of each property. Relying on that stipulation and information prepared by other appellees' experts, Mr. Acks rendered an opinion as to the

---

7. Later in the trial, appellees expressly stated that they were not claiming the cost of installing such systems.

diminished value of each property involved. He utilized information which showed well readings taken after the leak and before trial on the various properties, and an exhibit prepared by Mr. Sullivan, reflecting Mr. Sullivan's opinion as to whether properties with no contamination had a low, medium, or high probability of becoming contaminated in the future. Mr. Acks concluded that properties with evidence of contamination had decreased in value by 60%; properties with a high chance of future contamination had decreased in value by 50%; properties with a medium chance of future contamination had decreased in value by 45%; and properties with a low chance of future contamination had decreased in value by 30%.

On cross-examination the following occurred:

Q. And in your analysis, you didn't conclude that any of the homes had been diminished in value 100 percent, am I correct?

A. Correct. But once again, the prior qualification I had if this assumes a willing buyer and willing seller, if the seller is not willing to sell a contaminated property, then one could argue that the value is zero.

\* \* \*

Q. And with respect to this case, as I understand it, you haven't actually quantified the diminution in any of the Plaintiffs' property values caused by stigma in this particular case?

A. Not separately, but effectively it's been included in my calculations.

Q. But you didn't quantify stigma and set it out and say to people here's what the lasting effect of contamination will be because of this incident?

A. I didn't see any need to.

Mr. Acks stated there is a recognized phenomena sometimes referred to as the "life cycle of the effect of contamination on property values." He testified that the maximum effect "occurs immediately after the incident but before cleanup takes place," and the impact decreases over time during

remediation and after the completion of remediation. The impact also lessens the farther the property is from the source of the contamination. He added that, because of "stigma" in a particular situation, the property value "doesn't necessarily come all the way back." Mr. Acks opinion estimating property values in these cases was as of February 16, 2006. He stated he was not hired to do an analysis of fluctuations in property values after that date or the effect of any lingering stigma. He did not do an individual analysis of value for any particular property. Rather, he performed an "estimate overall, and it's an expected probability."

On redirect, Mr. Acks testified that, if appellant is unable to remove all of the contamination from the ground, that would have a "very significant" effect on property values. He also stated that, after he finished his report, more properties showed evidence of contamination than existed when he was preparing his report. Thus, with respect to the life cycle, he stated:

> Well, it was implicitly—as I say, I did this preliminary estimate and then certain facts came to light that would have lowered the estimate, but more facts came to light that would have raised the estimate. So there were several factors considered and that was—that was—it counter-balanced the other life cycle effects talked about earlier.

Dr. Ira Whitman, Ph.D, a civil engineer, testified for the appellees as an expert in environmental engineering. He worked with Mr. Sullivan and Mr. Cohen, describing himself as the quarterback. He discussed exhibits showing the area of contamination and the readings. He noted that, as of the date of his report, 50 homes had shown some contamination at some point in time, and that number later rose to 66 homes. The exhibits showed the highest concentrations of a contaminant at the point in time when it was the highest, up until April, 2007. One of the exhibits reflected his opinion as to which potable wells likely were contaminated between January 13, 2006 and February 17, 2006, a total of 38 or 39. That opinion was based on estimates of time, distance, speed of travel of the contaminants, and other probability factors.

With respect to the remediation effort, Dr. Whitman stated that "they used appropriate method and appropriate equipment and so on," but because of the complexity of the geology, they could not know where all of the contaminants are, therefore, "they're never gonna get everything out...."

Dr. Whitman did not speak to any of the appellees prior to trial. His company performed air sampling in four homes but did not further pursue air sampling. He did not do a time series mapping of the effect of remediation activities. He acknowledged that gasoline attenuates naturally but stated that not all of it does. He did not conduct an attenuation study in these cases.

Jerold Jaynes, Ph.D, an economist, opined about the present value of the cost of future medical monitoring for the appellees. He multiplied the remaining years of life expectancy for each appellee by $2,000 per year, increased the cost per year assuming an inflation rate of 3.74%, and then reduced the total to present value, assuming an interest rate of 5.2%.

### B. The appellees

The questioning of most of the appellees who testified followed a similar format. Although all topics were not covered with each appellee, and not in the same depth, the subjects included: the nature, extent, and impact of remediation activities on a particular property; the extent to which residents' outside and/or inside activities were limited; the nature and extent of MTBE and/or benzene contamination on a property as reflected by well readings; whether harmful chemicals not attributable to gasoline were found in wells; the location of each property vis a vis the strike line; the nature and extent of use of well water; the impact of the leak on the value of each property; employment and other financial concerns of appellees; matters related to emotional distress; and appellees' perceived need for medical monitoring.

We have not included a recitation of the results of testing for the presence of MTBE or benzene on each property and have not included a detailed summary of remediation activities

on each property because the detailed information is unnecessary for the resolution of the issues before us. We have concentrated on testimony relating to the claims for emotional distress and diminution in property value, contained in the attached appendix.

All, or almost all, appellees testified that they bought their homes because the homes were in an attractive area and they bought them in reliance on the belief that appellant had a safe leak detection system at the station in question. The testimony revealed that the effect of remediation activities ranged from substantial impact to minor impact, depending on the property's location. The impact consisted of the location of monitoring wells, piping, and other equipment on certain properties, and the presence of noise, lighting, traffic, and workmen in the neighborhood. Some appellees used only bottled water for drinking prior to the leak, and some did not. Most appellees stopped using well water for drinking after the leak, and a few did not. Some appellees used well water for cooking after the leak, and some did not. Most, but not all, appellees used well water for bathing after the leak. None of the appellees had their well water tested at the faucet and none had water vapors tested inside of their houses. Some appellees testified that they would like to move if they could. Most appellees stated they did not intend to move. Most appellees testified that there was a "stigma" to the neighborhood. As noted above, several appellees testified that the impact of the leak caused their homes to have no value. Most appellees stated they experienced employment and other financial concerns. After the leak, some appellees installed whole house carbon filter systems, but most did not. All testifying appellees opined that they needed annual medical monitoring.

With respect to emotional distress, almost all appellees expressed fear of cancer, fear of other latent disease, fear of the unknown, and the litigation itself. It is necessary, because of the nature of the issues relating to legal sufficiency, to set forth appellees' testimony in some detail. We have a duty to

apply the law to each case and each party. We set forth the detail in the appendix.

At this point, we shall merely briefly summarize the nature of the complaints. Some appellees testified to none of the following complaints, and others testified to one or more of the following complaints. They were anxiety, sleeplessness, anger, worry about health and finances, headaches anxiousness, stress, frustration, embarrassment, depression, upset stomach, and panic attacks. Some appellees consulted with Dr. Malik, and others did not. Some appellees sought treatment, and others did not. The nature and extent of the distress varied. Some appellees testified that they experienced emotional/psychological issues prior to the leak and some had sought treatment. Some appellees testified to issues relating to their marriage or other relationships, concerns about their health or health of family members unrelated to the leak

### C. Appellees' liability witnesses

Appellees called several witnesses to testify with respect to the fraud claim, relating to appellant's failure to detect the leak prior to February 16, 2006 and alleged concealment of information before and after the leak. We will not summarize that testimony because it is not necessary for the resolution of the issues before us.[8]

### D. Appellant's evidence

Because of the nature of the issues before us, it is unnecessary to review in detail the testimony of the defense witnesses, particularly those who testified about the leak detection equipment at the service station and its maintenance. We will briefly comment on some of the testimony relating generally to health and property issues.

---

8. The witnesses were John R. Greco, a construction manager for appellant; Russel Bowen, an employee of appellant; Harry Janke, an employee of appellant; Andrea Loiero, the franchisee at the gasoline station at the time of the spill; Dean Jerome, an employee of appellant; Butch Mossary, another employee of appellant; David Schanberger, Paul Bettencourt and Jonathan Cignatta.

Gary Krieger, M.D., testified that all people in this country are exposed to carcinogens and mutagens every day, including in food and water that is consumed. That includes MTBE and benzene. He emphasized that the dose is the issue, *i.e.*, mere exposure does not cause cancer. He described the government standards for MTBE and benzene and observed that even the persons with the highest potable well readings, assuming exposure during the entire time period before trial, were exposed at levels well below even the lowest, *i.e.*, most stringent, government standards, such as those in California. He opined that the risk of disease the appellees faced was no different than the risk of disease for the general population.

Ronald Lipman, a real estate appraiser, testified that, in 2007 and 2008, there was a general downturn in the real estate market everywhere. He opined that the effect of the leak on property values ranged from 0% to 15%, depending on the property.[9]

Gregory Martin described the remediation efforts conducted pursuant to a consent order entered into between appellant and MDE. Pursuant to that order, appellant filed a corrective action plan and intends to continue efforts until the remediation goals are met.

Herbert Meade, administrator for the oil control program in MDE, defended the State standard for MTBE as protective of human health. He noted that MTBE is the most frequently found contaminant in ground water in the State. With respect to the properties in these cases, he stated that some needed filter systems and others should have them as a precautionary matter, but that the potable well water is safe to drink. He acknowledged that, because of the lack of human studies, he did not know the long term effects of exposure to MTBE.

---

9. In his opinion, Judge Zarnoch refers to testimony by Mr. Lipman in support of the majority's view that there was legally sufficient evidence to support the property damage verdicts. The testimony was to the effect that some real estate brokers had expressed the view, presumably to Mr. Lipman, that a decline in sales in the area was due to the leak. That testimony is in no way supportive of a conclusion that all properties are worthless; at most it is probative of some diminution in value.

Thomas Maguire discussed the nature of a leak and how gasoline and its contaminants are dispersed, removed, or naturally attenuated. He described the life cycle of a plume as initially expanding, then reaching equilibrium, which occurs when the rate at which the contaminants are dissolving equals the rate of attenuation. He opined that the plume for this leak had stabilized, meaning the residual contaminants were trapped and immobile. He acknowledged there likely was still some residual contamination which, in the future, would be removed as part of the remediation efforts, or would be naturally attenuated.

## IV. Waiver

Appellees contend that appellant waived its right to appeal by agreeing to acquiesce in the jury's verdict for compensatory damages if the jury did not award punitive damages. We agree with the discussion in the section labeled "**DISCUSSION I. Waiver**" of J. Zarnoch's opinion.

## V. Admissibility of Mr. Acks' testimony

Appellant contends that the circuit court erred in admitting the opinion testimony of Mr. Acks because it lacked a sufficient factual basis and did not employ a recognized methodology. We agree with the discussion in the section labeled "**DISCUSSION II. Admissibility of Expert Testimony**" of Judge Zarnoch's opinion.

## VI. The law relating to emotional distress

### A. *Personal injury versus property damage and compensable elements of each*

Appellees sued on several causes of action, claiming essentially the same damages as to each. At trial, they sought to recover damages for the diminution in value of their properties; the loss of use and enjoyment of their properties; intangible negatives such as annoyance, embarrassment, inability to use their yards, noise, dust, unusual traffic, and the like; worry and concern about the loss in value in their properties; emotional distress in the form of fear of cancer or other latent

disease; and the costs of medical monitoring for cancer or other latent disease.[10]

In analyzing the issues in this appeal, and in particular the issues relating to emotional distress, we must distinguish between what is recoverable as damages in an action for personal injury and what is recoverable as damages in an action for property damage. Maryland does not recognize the tort of negligent infliction of emotional distress. In other words, in this State, a person does not owe a duty in tort to exercise care to protect other people from experiencing emotional distress. However, in personal injury actions based on recognized torts, emotional distress damages sometimes are recoverable. For instance, when tortious conduct causes a physical injury, the injured person may recover damages for emotional distress attendant to the physical injury. Also, in some circumstances, emotional distress damages may be recovered for fright or for fear for human health or safety. *See* VI. B.

Generally speaking, emotional distress attendant to property damage is not compensable. Thus, the distress a property owner may experience over injury to his or her property— including the fear of financial difficulty due to a loss in value of the damaged property—is not compensable. *H & R Block, Inc. v. Testerman,* 275 Md. 36, 48–49, 338 A.2d 48 (1975), *abrogated on other grounds by Owens–Illinois v. Zenobia,* 325 Md. 420, 448–49, 601 A.2d 633 (1992) (stating that "Maryland decisions have generally denied compensation for mental anguish resulting from damage to property"); *State, use of Aronoff v. Baltimore Transit Co.,* 197 Md. 528, 539, 80 A.2d 13 (1951) (explaining that "all the authorities seem to hold that a plaintiff cannot recover for injuries resulting from fear or shock at the injury to his personal property[,]" as opposed to injury to the person). An exception to the rule exists when

---

**10.** We note that under Maryland statutory law the economic and noneconomic components of a damage award must be awarded separately, if at all, in an action for personal injury, but not in any other action. *See* Maryland Code (2006 Repl.Vol.), § 11–109 of the Courts and Judicial Proceedings Article.

"the act occasioning the injury to the property is inspired by fraud, malice, or like motives." *Zeigler v. F. Street Corp.*, 248 Md. 223, 226, 235 A.2d 703 (1967) (citations omitted). Given the verdict in favor of appellant on the fraud claim and on punitive damages, the exception does not apply in this case.

When an action is premised on injury to property, damages may be recovered for loss of value and for infringement upon the owner's use and enjoyment of his property. The latter may include compensation for annoyance, embarrassment, and similar intangible negatives. Although damages of that sort implicate human emotions, they are not damages for personal injury; they are damages recoverable as attendant to the inability to use one's property in the same manner as before the damage.

The general prohibition against recovery of damages for emotional distress resulting from injury to property applies not only to claims brought by a property owner in negligence, trespass, and strict liability but also to a claim brought by a property owner in nuisance. Maryland courts have adopted the definition of private nuisance set forth in Section 821D of the Restatement (Second) of Torts: "A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land." *See Rosenblatt v. Exxon*, 335 Md. 58, 79, 642 A.2d 180 (1994); *Echard v. Kraft*, 159 Md.App. 110, 116, 858 A.2d 1018 (2004); and *Exxon v. Yarema*, 69 Md.App. 124, 147, 516 A.2d 990 (1986). Comment (a) to that section explains that, under old English law, an action would lie for interference with possession of property, i.e., trespass, but not for a non-possessory interference with property. The concept of nuisance was developed to secure free enjoyment of property, as well as its possession.

Comment (b) of section 821D explains:

'Interest in use and enjoyment' also comprehends the pleasure, comfort and enjoyment that a person normally derives from the occupancy of land. Freedom from discomfort and annoyance while using land is often as important to a person as freedom from physical interruption with his or freedom

from detrimental change in the physical condition of the land itself. This interest in freedom from annoyance and discomfort in the use of land is to be distinguished from the interest in freedom from emotional distress. (*See* § 46) [11] The latter is purely an interest of personality and receives limited legal protection, whereas the former is essentially an interest in the usability of land and, although it involves an element of personal tastes and sensibilities, it receives much greater legal protection.

In other words, a property owner cannot circumvent the prohibition against recovery of emotional distress damages for injury to property by arguing that fear he or she is experiencing due to injury to property has negatively affected his or her use and enjoyment of the property. *See Hall v. Lovell Regency Homes*, 121 Md.App. 1, 26, 708 A.2d 344 (1998) (holding that the trial court property instructed the jury that it could not award damages for "loss of use and enjoyment" of homeowners' properties where: "[w]hen pared to their essence, the 'loss of use and enjoyment' damages that the homeowners sought were damages for mental distress attendant to their claimed pecuniary injuries"; the trial court ruled that "the homeowners could not recover damages for mental distress"; and "that ruling [was] not challenged on appeal"). Indeed, in Maryland nuisance cases, when recovery for emotional distress was permitted under a "loss of use and enjoyment" theory, the distress arose from fear for human health or safety. *See, e.g., Gorman v. Sabo*, 210 Md. 155, 161, 163, 122 A.2d 475 (1956) (permitting recovery when the defendant intentionally, maliciously, and constantly blared radio music towards a married couple's home, for the wife's "deterioration in physical and nervous condition," and the husband's "irritable and nervous" condition, which resulted in part from watching his wife deteriorate); *Green v. Shoemaker*, 111 Md. 69, 77–80, 73 A. 688 (1909) (allowing recovery for "fright and nervousness" when the defendant's blasting activities over a several

---

**11.** The reference is to the section on intentional infliction of emotional distress.

month period caused rocks to fall on plaintiff's house, putting plaintiff "in continual fear and jeopardy of her life," and causing her "nervous prostration").

Emotional distress damages for perceived and potential harm to human safety only may be recovered if the evidence satisfies causation and physical manifestation requirements. It is recoverable as an injury to the person, not to property; thus the distress must result from the threat to human safety.

In addition, stress attributable to litigation is not compensable. The jury was so instructed when these cases were tried ("emotional distress whether resulting from the testimony they heard or the general rigors of the litigation process is not compensatory"). There was no exception taken to the instruction, and presumably, that issue is not in dispute.

Although some of the evidence in these cases was inadmissible, we are not addressing admissibility of evidence issues because none are before us. What is before us are sufficiency of evidence issues. In that regard, as is clear below, admitted evidence, even if inadmissible if challenged, does not mean the evidence is legally sufficient.

Similarly, while we do not agree with all of the court's instructions to the jury relating to damages, the instructions are not before us because there were no exceptions relevant to the issues. The instructions did not clearly differentiate between negatives attributable to damage to property versus emotional distress, i.e., distress resulting from perceived danger to the person, resulting in physical manifestations. Nevertheless, the instructions drew a distinction between claims for property damage and claims for personal injury. They properly treated emotional distress as a claim of harm to the person. The verdict sheets reflected the property damage claims as "diminution in value" and "medical monitoring" and the personal injury claim as "emotional distress" (the noneconomic portion).

Regardless of whether the jury fully understood the difference between the intangible negatives of a loss of use and enjoyment claim, which properly may be recoverable in a

property damage claim, and emotional distress related to a threat to human safety that produces physical manifestations, which properly may be recoverable in a personal injury claim, we are able to address the sufficiency of evidence issues related to emotional distress for the following reasons. One issue is whether the evidence was legally sufficient to satisfy the exposure requirement, the physical manifestation requirement, and the causation requirement, *i.e.*, whether emotional distress was caused by a perceived threat to human safety occasioned by the leak. The issue of legal sufficiency is not affected by whether the jury considered annoyance, embarrassment, or other intangible negatives as part of the emotional distress claim. The other legal sufficiency issue is whether the evidence was legally sufficient to support the claim for fear of contracting a future latent disease. Again, the issue is not affected by whether the jury considered annoyance, embarrassment, or other intangible negatives as part of the emotional distress claim.

As explained below, appellees who presented legally sufficient evidence of exposure and physical manifestation of emotional distress will be remanded for new trials, but without claims based on fear of future latent disease.

We shall proceed to a discussion of Maryland law as it relates to emotional distress claims generally.

### B. Emotional distress generally—physical manifestation requirement

Recovery may be had for emotional distress arising out of otherwise tortious conduct, as an element of damage, not as an independent tort. *Hamilton v. Ford Motor Credit Co.*, 66 Md.App. 46, 62–63, 502 A.2d 1057 (1986). In other words, as noted above, Maryland does not recognize the tort of negligent infliction of mental distress as distinguished from the tort of intentional infliction of mental distress.

Traditionally, recovery for emotional distress as an element of damage required a physical injury or, in some instances, a physical impact. *Vance v. Vance*, 286 Md. 490, 496–97, 408

A.2d 728 (1979). In *Bowman v. Williams*, 164 Md. 397, 165 A. 182 (1933), the plaintiff claimed emotional distress caused when the defendant's negligently operated truck crashed into the plaintiff's house. Prior to the impact, the plaintiff observed the truck coming towards his house and feared for the safety of his sons, who were in the basement. When the truck crashed through the foundation of the house, the plaintiff's nervous system went into shock, causing him to fall to the floor. He remained bed-ridden for several weeks and was unable to work for six months. He had not been hit by the truck or physically injured by it in some way.

In the plaintiff's negligence action against the truck driver, the Court of Appeals held, nevertheless, that "a plaintiff can sustain an action for damages for nervous shock or injury caused, without physical impact, by fright arising directly from defendant's negligent act or omission, and resulting in some clearly apparent and substantial physical injury, as manifested by an external condition or by symptoms clearly indicative of a resultant pathological, physiological, or mental state." *Id.* at 404, 165 A. 182.

In *Vance, supra,* Muriel Vance, the plaintiff, sought and obtained a decree awarding her alimony and child support after her husband of eighteen years, Dr. Arnold Vance, left her and their two children for another woman. *Id.* at 492, 408 A.2d 728. Dr. Vance immediately filed a motion to strike the decree and annul the marriage on the ground that it was void because Dr. Vance was not divorced from his first wife when he purported to marry Muriel. Although Dr. Vance had believed his divorce was final at the time he married Muriel, he learned nearly a month after the marriage that his divorce decree had become final several weeks after his purported marriage to Muriel. *Id.* Dr. Vance, however, never disclosed this fact to Muriel prior to filing his motion to strike. Thereafter, Muriel sued Dr. Vance, for, *inter alia,* compensatory damages for emotional distress that she claimed to have suffered as a result of Dr. Vance's negligent misrepresentation over their eighteen years of marriage, concerning his marital

status at the time of their ostensible marriage. *Id.* at 492–93, 408 A.2d 728.

Interpreting *Bowman,* the *Vance* Court noted several means by which the requisite "physical injury" resulting from emotional distress may be proved. The first few categories, according to the Court, "pertain to manifestations of a physical injury through evidence of an external condition or by symptoms of a pathological or physiological state." *Id.* at 500, 408 A.2d 728. Importantly, the Court stated that a physical injury can be proven "by evidence indicative of a mental state. . . . In the context of the *Bowman* rule, therefore, the term 'physical' is not used in its ordinary dictionary sense . . . [, but is instead used] to represent that the injury for which recovery is sought is *capable of objective determination.*" *Id.* (emphasis added).

Then, turning to the facts of the case, the *Vance* Court cited evidence that upon learning that her marriage was invalid Muriel (1) went into a state of shock, (2) engaged in spontaneous crying and seemed detached and unaware of her own presence, (3) was unable to function normally, sleep, or socialize, (4) experienced symptoms of an ulcer, and (5) suffered an emotional collapse and depression, which manifested itself through unkept hair, sunken cheeks, and dark eyes. Applying the "capable of objective determination" standard, the Court concluded that Muriel had suffered a compensable injury. Specifically, the court held that the evidence supported a jury finding that Dr. Vance's negligent misrepresentation had caused a "physical" injury to Muriel in the form of an objectively manifested nervous disorder that was sufficient to satisfy the "physical injury" requirement, as adopted in *Bowman.* *Id.*

The Court revisited this issue, in 1993, in *Belcher v. T. Rowe Price Found., Inc.,* 329 Md. 709, 621 A.2d 872, where Carol Belcher, a secretarial employee of the defendant, sought compensation under the Workers' Compensation Act (the "Act") for, *inter alia,* emotional distress she suffered following a construction accident in her workplace. On April 11, 1991, Ms. Belcher was at her desk when a three-ton beam broke

loose from a nearby construction crane and crashed, without warning, through the concrete roof above her head, ultimately landing five feet from her desk. *Id.* at 713, 621 A.2d 872. The Court explained the nature of the accident: "The sound was deafening; it was as if a bomb had exploded. The lights in the office went out; pipes and wires were ripped apart; debris sifted over her and her surroundings; concrete dust went down her throat." *Id.* Despite immediate trauma counseling provided by her employer, Ms. Belcher "suffered sleep disturbances, nightmares, heart palpitations, chest pain, and headaches." *Id.*

The primary issue before the Court in *Belcher* was whether "injury," as used in the Act, encompassed psychological, emotional, or mental injuries, as distinguished from injuries that are purely physiological in nature, and clearly are encompassed within the Act. *Id.* at 719, 621 A.2d 872. To address that issue, the Court set out to determine how Maryland law has treated non-physiological, emotional injuries. In its discussion, the Court cited a number of cases, including *Bowman,* ultimately concluding that the *Vance* holding that damages may be recovered for emotional distress capable of objective determination was the correct legal standard. *Id.* at 733–34, 621 A.2d 872. According to the Court, "the *Vance–Bowman* standard went far to dispel the fear that the right to damages for emotional distress would open the floodgates to feigned claims," *id.* at 734, 621 A.2d 872, a concern shared by courts addressing the compensability *vel non* of emotional distress due to fear of future disease. See VI. C. As the *Belcher* Court stated, "*Vance* adequately answered the troubling basic policy issues surrounding [claims for damages stemming from] negligently inflicted emotional harm by requiring that such harm be capable of objective determination." *Id.* at 735, 621 A.2d 872. As a result, the Court ultimately concluded that Ms. Belcher was entitled to pursue her emotional distress claim under the Act.

More recently, in *Hunt v. Mercy Med. Ctr.,* 121 Md.App. 516, 520, 710 A.2d 362 (1998), this Court had occasion to consider "whether emotional distress from being misdiagnosed

with cancer is compensable within [Maryland's] physical injury rule." In *Hunt,* a patient brought a medical malpractice action before what was then the Maryland Health Claims Arbitration Office, after he was misdiagnosed with prostate cancer and had undergone fifteen unnecessary radiation treatments as a result. *Id.* One of the patient's claims for damages related to his alleged emotional distress regarding whether he had cancer. Prior to the arbitration hearing, the patient died, and Carol Sue Hunt, the personal representative of his estate, was substituted in his place. *Id.* at 520–21, 710 A.2d 362. The arbitration panel found that the health care providers were not liable. *Id.* Soon thereafter, Ms. Hunt filed a complaint in circuit court and the defendants filed motions for summary judgment, which were granted without explanation. *Id.* at 523, 710 A.2d 362.

On appeal to this Court, the defendants argued, *inter alia,* that the patient had not suffered a cognizable physical injury under Maryland law. *Id.* at 523–24, 710 A.2d 362. Citing *Vance,* we disagreed, stating:

A compensable 'physical injury' may be demonstrated simply by evidence of a distressed mental state. Therefore, although we may casually characterize a purported injury as being either physical or emotional in nature . . . , the distinction is merely descriptive and not of legal significance. The doctrinally correct position is that an emotional injury (such as mental anguish or emotional distress) may come within the ambit of the 'physical injury' rule by virtue of its outward manifestations. The only limitation on recovery for an emotional injury, imposed to guard against feigned claims, is that the injury must be 'capable of objective determination.'

*Id.* at 524–25, 710 A.2d 362 (footnotes and citations omitted).

Although we offered no precise definition in *Hunt* of the type or degree of physical manifestation of emotional distress that must be shown, we did state that an emotional injury need not result in a "*clearly apparent* and *substantial* physical injury" to be compensable. *Id.* at 525, n. 4, 710 A.2d 362

(commenting that this language is traceable to *Bowman,* but did not survive *Vance* and, further, that "we have applied the 'capable of objective determination' standard exclusively in our post-*Belcher* cases"). In addition, we discussed three relevant generalizations: (1) "in order for an injury to be capable of objective determination, the evidence must contain more than mere conclusory statements, ... [and] must be detailed enough to give the jury a basis upon which to quantify the injury;" (2) "a claim for emotional injury is less likely to succeed if the victim is the sole source of all evidence of emotional injury;" and (3) "although minor emotional injuries may be less likely to produce the kind of evidence that renders an injury capable of objective determination, that does not mean that an emotional injury must reach a certain threshold level of severity before it becomes compensable," as "[t]here is no severity prong of the *Vance* test." *Id.* at 531, 710 A.2d 362.

Turning to the facts of the *Hunt* case, we evaluated the three sources of the patient's emotional distress. First, the deposition of testimony of Dr. Schirmer, whom the patient visited after learning of the erroneous cancer diagnosis, revealed only that the patient "was emotionally upset and he was very skeptical." *Id.* at 532, 710 A.2d 362. We concluded that that alone did not satisfy the *Vance* test. The second source of evidence was the patient's deposition testimony, during which he provided "short, conclusory statements of his basic emotional state[, which] tended to lack the detail required to render that emotional state capable of objective determination." *Id.* at 533, 710 A.2d 362. For example, the deposition included somewhat generic statements about the patient's emotional state, such as "I'm worried," "I'm concerned," "I'm scared," and "I think about what could have happened or what's going to happen." *Id.* at 533–34, 710 A.2d 362. The patient also described "frustration," "stress," and "aggravation," and stated "I don't sleep at night," and said "I thought I was going to die." *Id.* While these statements were considered deficient, the patient made other more meaningful statements in which he described more specific manifestations of his emotional distress, such as "fatigue, sleeplessness, and

constipation" that prevented him from conducting normal activities *Id.* at 533–34, 710 A.2d 362. It was not necessary for us to decide whether those statements alone would have been sufficient proof because the third source of evidence—Ms. Hunt's testimony before the arbitration panel—proved more forceful. She testified that the patient "was extremely tired and extremely upset," "became more irritable," "didn't walk as much," "couldn't sleep," turned down social invitations, and "had a few bowel problems [and] eating problems." *Id.* at 536–37, 710 A.2d 362. She further stated that the patient was up "every night, walking around" and "was extremely quiet." Together, the patient's deposition testimony and Ms. Hunt's testimony were deemed sufficient to render the patient's emotional injury capable of objective determination. *Id.* at 537, 710 A.2d 362.

## C. *Fear of cancer or other latent disease*

We begin this discussion by observing that Maryland has steadfastly adhered to traditional notions of causation. For example, Maryland has not applied theories of alternative liability, market share liability, concert of action or enterprise liability. *Lee v. Baxter Healthcare Corp.*, 721 F.Supp. 89 (D.Md.1989). In litigation in which a plaintiff claims to have contracted a latent disease as a result of prior exposure to a substance, the plaintiff must establish that the nature and extent of the exposure was a substantial factor in causing the disease. *Eagle–Picher Industries v. Balbos*, 326 Md. 179, 210–11, 604 A.2d 445 (1992) (a plaintiff must show frequency and regularity of exposure); *Reiter v. ACandS, Inc.*, 179 Md.App. 645, 661–662, 947 A.2d 570 (2008) (must be evidence of exposure on a regular basis over an extended period of time). *See also Philip Morris, Inc., v. Angeletti*, 358 Md. 689, 755, 752 A.2d 200 (2000) (in denying class action certification to current and former users of tobacco products, Court stated causation is not subject to general proof; the question is not whether cigarettes are capable of causing a disease; it is whether cigarettes caused a particular plaintiff's disease) (citations omitted).

In *Potter v. Firestone Tire and Rubber Co.*, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993), the most frequently cited fear of future disease case, the Supreme Court of California decided the proper standard to apply in assessing claims for fear of cancer. In *Potter*, a toxic exposure case, four plaintiffs who lived adjacent to a landfill alleged that they were subjected to prolonged exposure to various carcinogens that leaked into their water supply after the defendant allegedly illegally disposed of toxic waste. When their negligence suit against the defendant was filed, none of the plaintiffs had contracted any cancerous or precancerous condition, but each faced an enhanced (although unquantified) risk of contracting cancer in the future as a result of their exposure. The plaintiffs sought damages for, *inter alia*, fear of contracting cancer in the future.

In deciding what standard of proof should be applied in fear of cancer cases, the Supreme Court of California outlined several concerns, including (1) that a low standard of proof could result in a potentially unlimited class of plaintiffs; (2) that allowing recovery by plaintiffs without physical injuries or symptoms likely would harm those plaintiffs with actual and present injuries by reducing the resources of defendants through increased litigation; and (3) that it is important to maintain judicial economy by creating a definite and predictable threshold for recovery that limits the number of complaints. Ultimately, the *Potter* Court held that California would allow recovery in tort for fear of cancer due to toxic exposure if the plaintiff already had contracted a physical injury or illness from the exposure or, if not, if the plaintiff proved (1) exposure to a toxic substance which threatens cancer, and (2) that the "fear stems from a knowledge, corroborated by reliable medical or scientific opinion, that it is *more likely than not* that the plaintiff will develop cancer in the future due to the toxic exposure." *Id.*, 25 Cal.Rptr.2d 550, 863 P.2d at 816. (emphasis added).

A number of states have declined to allow recovery for fear of cancer absent a present physical injury, such as diagnosis of a disease or manifest physical symptoms thereof. *See Brzos-*

*ka v. Olson,* 668 A.2d 1355, 1362 (Del.1995) (citing *Mergenthaler v. Asbestos Corp. of America,* Del.Supr., 480 A.2d 647, 651 (1984)) (noting that "damages for claims of emotional distress or mental anguish (which would include fear of contracting a disease) are recoverable only if the underlying physical injury is shown"); *Capital Holding Corp. v. Bailey,* 873 S.W.2d 187, 195 (Ky.1994) (stating that under Kentucky law, a physical injury is required as "mere ingestion of a toxic substance does not constitute sufficient physical harm upon which to base a claim for damages"; a plaintiff must prove "some harmful result from the exposure, albeit he need not prove he is already suffering from cancer"); *Curran v. Mass. Turnpike Auth.,* 2 Mass. L. Rep. 260, 1994 WL 879685 at *5, 1994 Mass.Super. LEXIS 546 at *15–16 (1994) (stating that "Massachusetts does not allow recovery for emotional distress damages for fear of future injury," and that a plaintiff may only recover for mental anguish and fear of developing cancer in the future when there exists a present physical injury); *Daley v. A.W. Chesterton, Inc.,* 2009 PA Super 71, 971 A.2d 1258, 1264 (2009) (citing *Marinari v. Asbestos Corp.,* 417 Pa.Super. 440, 612 A.2d 1021 (1992), and *Dempsey v. Pacor, Inc.,* 429 Pa.Super. 404, 632 A.2d 919 (1993) for the proposition that Pennsylvania's adoption of the separate disease rule, which allows for plaintiffs to file separate actions for separately diagnosed asbestos-related pathologies, "abolished recovery of damages for fear and increased risk of cancer in cases where cancer had not yet developed"); *Sorenson v. Raymark Indus.,* 51 Wash.App. 954, 756 P.2d 740, 742 (1988) (indicating that Washington state law requires physical injury or disease and evidence of a significant increased risk as a prerequisite for fear of future disease claim); *Temple–Inland Forest Prods. Corp. v. Carter,* 993 S.W.2d 88, 89 (Tex.1999) (stating that Texas law does not permit recovery for fear of asbestos-related disease where plaintiffs are disease and symptom free); *Eagle–Picher Indus., Inc. v. Cox,* 481 So.2d 517, 528–29 (Fla.Dist.Ct.App.1985) (holding that Florida plaintiffs may recover for fear of claims only where they demonstrate both impact and physical injury). When considered in light of the

number of jurisdictions that absent evidence of a present physical disease/injury, wholly refuse to allow recovery for a plaintiff's present fear of contracting a latent disease in the future, the *Potter* standard, which does not require proof of a present physical disease/injury, is more lenient.

Of those jurisdictions that permit recovery of damages for the present fear of contracting a latent disease in the future, absent evidence of a present physical injury, the standards of proof developed by the courts vary. At the most lenient end of the spectrum is *Wetherill v. Univ. of Chicago*, 565 F.Supp. 1553, 1559–60 (1983), in which a federal district court applying Illinois law required evidence only of "a reasonable fear, not a high degree of likelihood, that the feared contingency be likely to occur," along with "a causal link between the fear of future injury and the physical *impact* (as distinct from injury) of defendant's tortious conduct." *Id.; see also In re Moorenovich*, 634 F.Supp. 634 (D.Me.1986) (requiring only proof of causation and that the plaintiff's anxiety be "reasonable"). In *Wetherill*, the court concluded that the plaintiffs' prenatal exposure to DES, by itself, satisfied Illinois's "physical impact" requirement. *Id.* at 1560. Having also decided that the plaintiffs' fear of contracting cancer was reasonable, the court denied the defendant's motion in limine to exclude all cancer-related testimony on the basis that the plaintiffs' anxiety was not compensable under Illinois law.

Louisiana also applies a lenient standard in fear of cancer cases. In *Maurer v. Heyer–Schulte Corp.*, a federal district court applying Louisiana law, stated that in order to recover for fear of cancer in Louisiana, a plaintiff must show that his fear is both reasonable and causally related to the defendant's negligence. 2002 WL 31819160, at *2–3, 2002 U.S. Dist. LEXIS 24259, at *8–9 (E.D.La.2002), CCH Prod. Liab. Rep. P16, 473 (citations omitted). Continuing, the court indicated that in order to demonstrate "reasonableness," a "[p]laintiff need only show that there is any possibility of acquiring a disease, no matter how remote." *Id.* (citations omitted). Despite this standard, the court granted the defendant's summary judgment motion as the defendant demonstrated that

there was no causal link between polyurethane foam-coated breast implants and cancer, and thereby proved that the plaintiff's fear was unreasonable. *Id.* at *3-4, 2002 U.S. Dist. LEXIS 24259 at *12.

A similar standard was applied in *Thomas v. FAG Bearings Corp.*, where the federal district court, applying Missouri law, stated that "a claim for fear of contracting cancer in the future is subject to the same standard of proof as mental anguish," 846 F.Supp. 1400, 1408 (1994) (citing *Bennett v. Mallinckrodt*, 698 S.W.2d 854, 866–67 (Mo.Ct.App.1985)), and requires plaintiffs to prove "that the distress resulting from their fear of cancer is medically diagnosable and sufficiently severe to be medically significant." *Id.* The court defined "medically significant" as a condition that "is severe enough to require medical attention." *Id.* at 1406. Ultimately, the court rejected the plaintiffs' fear of cancer claims, citing the fact that none of the plaintiffs had been treated by a health care professional for their supposed emotional distress until directed to do so by their attorneys shortly before summary judgment motions were filed. *Id.* at 1407.

In *Day v. NLO*, plaintiff workers and visitors at a nuclear weapons plant brought an action against the manufacturer alleging exposure to radiation and claiming emotional distress over their fear of contracting cancer. 851 F.Supp. 869, 874–75 (S.D.Ohio 1994). Applying Ohio law, the federal district court stated that exposure to a "sufficiently high does of radiation" would itself constitute a physical injury. *Id.* at 878. Additionally, even absent such a high degree of exposure, the court stated that plaintiffs can recover for fear of cancer if they can demonstrate "exposure to high degrees of radiation . . . [and] that their apprehensions of developing cancer are reasonable." *Id.* The court, however, did not articulate with specificity any particular factors that would render an apprehension of developing cancer more or less reasonable.

In two cases from the mid–1990s, separate divisions of New York's appellate court set forth similar, but somewhat competing standards. First, in *Doner v. Ed Adams Contracting Inc.*,

the court found unreasonable a plaintiff's claim for fear of cancer based solely upon his exposure to asbestos fibers in the workplace as the plaintiff had suffered no asbestos-related physical injury prior to the action. 208 A.D.2d 1072, 617 N.Y.S.2d 565 (N.Y.App.Div.1994). In discussing the standard for recovery for fear of future disease, the court stated that "negligent infliction of purely mental suffering" is only permitted where there are assurances of the genuineness of the claim, and "only if the alleged emotional distress is reasonable." *Id.* The court further stated that "[m]ental anxiety occasioned by the fear of developing a disease is not considered reasonable unless there is, at the very least, some evidence substantiating both actual exposure to the disease causing agent, and a likelihood of contracting the disease as a result." *Id.* (internal quotations and citations omitted). As there was no physical injury and no medical testimony or other evidence suggesting it was likely that the plaintiff would develop an asbestos-related disease in the future, his alleged fear and accompanying distress were deemed unreasonable.

Less than one year later, a different division of New York's intermediate appellate court discussed New York's standard. In *Wolff v. A–One Oil, Inc.,* 216 A.D.2d 291, 292, 627 N.Y.S.2d 788 (N.Y.App.Div.1995), the court reiterated its requirement that a plaintiff establish exposure to a disease-causing agent. Rather than requiring the plaintiff to demonstrate "a likelihood of contracting the disease," *Doner,* 208 A.D.2d at 1072, 617 N.Y.S.2d 565, however, the court stated that a plaintiff must establish a "rational basis" for his fear of developing the disease. *Wolff,* 216 A.D.2d at 292, 627 N.Y.S.2d 788. The court then noted that "[t]his rational basis has been construed to mean the clinically demonstrable presence of asbestos fibers in the plaintiff's body, or some indication of asbestos-induced disease (i.e. some physical manifestation of asbestos contamination)." *Id.* at 292, 627 N.Y.S.2d 788. Because plaintiffs had not met that test, their fear of cancer claims were dismissed. *Id.*

Of note, New York courts have consistently cited the *Wolff* standard, requiring proof of presence of asbestos fibers in the

plaintiff's body or proof of asbestos-induced disease, in the years following the two cases cited above. *See, e.g., Clearly v. Wallace Oil Co., Inc.,* 55 A.D.3d 773, 775, 865 N.Y.S.2d 663 (N.Y.App.Div.2008) (rejecting plaintiffs' fear claim when there was minimal evidence of exposure and no evidence of physical manifestation of contamination); *DiStefano v. Nabisco, Inc.,* 2 A.D.3d 484, 485, 767 N.Y.S.2d 891 (N.Y.App.Div.2003) (citing *Wolff* standard); *Prato v. Vigliotta,* 253 A.D.2d 746, 748, 677 N.Y.S.2d 386 (N.Y.App.Div.1998) (same).

In *Leaf River Forest Prods., Inc. v. Ferguson,* 662 So.2d 648 (Miss.1995), the Mississippi Supreme Court stated that, in the absence of an illness or substantial proof of exposure and medical evidence of possible or probable future disease, claims for fear of future disease would not be allowed. *Id.* at 658; *see also South Cent. Regional Med. Ctr. v. Pickering,* 749 So.2d 95, 98 (Miss.1999) (same); *Donald v. Amoco Prod. Co.,* 735 So.2d 161, 179 (1999) (same). The plaintiffs in *Ferguson* had asserted that the defendants were producing a toxic byproduct, dioxin, and releasing it into a river that ran past the plaintiffs' homes, nearly one hundred miles away from the defendant's mill, thereby exposing them to an increased risk of developing cancer. The plaintiffs had relied on tests of wildlife in the area to support their fear claims.

Iowa also allows recovery for fear of future disease absent a present physical injury. In *Slaymaker v. Archer–Daniels–Midland Co.,* 540 N.W.2d 459, 460 (Iowa Ct.App.1995), plaintiffs, demolition workers, sued their employer and the owner of a demolished building, alleging injuries resulting from asbestos exposure during the demolition process. None of the plaintiffs produced evidence that they suffered any significant injury as a result of their exposure. Citing *Kosmacek v. Farm Service Co-op. of Persia,* 485 N.W.2d 99, 105 (Iowa App.1992), the court stated that

[t]o recover for fear of future injury, plaintiffs must show (1) they are aware they possess an increased statistical likelihood of physical injury and (2) from that knowledge there exists a reasonable apprehension which manifests itself in mental distress. The emotional distress must be so severe

that a reasonable man or woman must not be expected to endure it.

*Id.* Thus, although the court did not explain how the degree to which the statistical likelihood of physical injury must increase, it required a showing of severe emotional distress, as opposed to more mundane symptoms of emotional distress. Applying its rule to the facts of that case, the court determined that plaintiffs failed to satisfy each factor of the test.

Utah has similarly adopted a standard that requires proof of severe emotional distress. In *Hansen v. Mountain Fuel Supply Co.*, 858 P.2d 970, 975 (Utah 1993), the Supreme Court of Utah concluded that a plaintiff can recover for emotional distress, absent physical injury, resulting from a defendant's negligence, provided that the emotional distress is so severe that "a reasonable person, normally constituted, would be unable to adequately cope with the [resulting] mental stress." *Id.* Further, in those cases "which deal with emotional distress resulting from fear of developing a disease in the future, the fact finder should also consider the likelihood that the disease will actually occur in determining the reasonableness of the fear," as well as the "duration and nature of the exposure to the toxic substance" in order to ensure that courts receive only those cases involving serious emotional distress. *Id.* (citations omitted). The court held that the plaintiffs in that case failed to meet these requirements as a matter of law, as they alleged mere "transitory anxiety and sleeplessness," the types of symptoms and stresses that "do not amount to the type of emotional distress with which a reasonable person, normally constituted, would be unable to cope." *Id.*

Several of the above-cited cases were referenced in *Metro–North Commuter R.R. Co. v. Buckley*, 521 U.S. 424, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997), in which the Supreme Court denied a railroad worker's negligence claim in which he sought damages for emotional distress following his exposure to asbestos. Buckley, who was disease and symptom free at the time, argued that under the Federal Employers' Liability Act ("FELA"), the railroad company, his employer, was liable for

his emotional distress in the form of fear of cancer after having exposed him to asbestos in the workplace during a three-year period in the late 1980s. The Court disagreed. Analyzing the case in light of *CONRAIL v. Gottshall,* 512 U.S. 532, 114 S.Ct. 2396, 129 L.Ed.2d 427 (1994) (adopting the zone of danger test, which limits recovery for emotional injury to those plaintiffs who either sustain a physical impact as a result of the defendant's negligence or are placed in immediate risk of physical impact by that negligence, for use in evaluating claims for negligent infliction of emotional distress), cited a number of state court decisions to support its position, noting that "with only a few exceptions, common law courts have denied recovery to those who, like Buckley, are disease and symptom free." 521 U.S. at 432, 117 S.Ct. 2113 (citing, *inter alia, Mergenthaler, Eagle–Picher, Capital Holding Corp.,* and *Potter*).[12] The Court, much like the *Potter* Court, cited several reasons that militate against an expansive definition of physical impact: (1) the difficulties judges and juries will have in separating valid, important claims from those that are invalid or trivial; (2) the threat of unlimited and unpredictable

---

12. The Court stated:

 But with only a few exceptions, common law courts have denied recovery to those who, like Buckley, are disease and symptom free. *E.g., Burns v. Jaquays Mining Corp.,* 156 Ariz. 375, 752 P.2d 28 (Ct.App.1987), review dism'd, 162 Ariz. 186, 781 P.2d 1373 (1989); *Mergenthaler v. Asbestos Corp. of Am.,* 480 A.2d 647 (Del.1984); *Eagle–Picher Industries, Inc. v. Cox,* 481 So.2d 517 (Fla.App.1985), review den., 492 So.2d 1331 (Fla.1986): *Capital Holding Corp. v. Bailey,* 873 S.W.2d 187 (Ky.1994); *Payton v. Abbott Labs,* 386 Mass. 540, 437 N.E.2d 171 (1982): *Simmons v. Pacor, Inc.,* 543 Pa. 664, 674 A.2d 232 (1996): *Ball v. Joy Technologies, Inc.,* 958 F.2d 36 (C.A.4 1991): *Deleski v. Raymark Industries, Inc.,* 819 F.2d 377 (C.A.3 1987) (Pennsylvania and New Jersey law); *Adams v. Johns–Manville Sales Corp.,* 783 F.2d 589 (C.A.5 1986) (Louisiana law); *Wisniewski v. Johns–Manville Corp.,* 759 F.2d 271 (C.A.3 1985) (Pennsylvania law); *In re Hawaii Federal Asbestos Cases,* 734 F.Supp. 1563 (D.Haw.1990) (Hawaii law); *Amendola v. Kansas City So. R. Co.,* 699 F.Supp. 1401 (W.D.Mo.1988) (FELA); see also *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965 [25 Cal.Rptr.2d 550], 863 P.2d 795 (1993) (in banc) (no recovery for fear of cancer in a negligence action unless plaintiff is "more likely than not" to develop cancer).
 *Id.* at 432–33, 117 S.Ct. 2113.

liability; and (3) the potential for a flood of trivial claims. *Id.* at 433, 117 S.Ct. 2113. In discussing the difficulties associated with separating valid from invalid emotional distress claims, the Court also noted that "contacts, even extensive contacts, with serious carcinogens are common." *Id.* at 434, 117 S.Ct. 2113. In light of that, the Court emphasized the difficulty in determining "whether, or when, a claimed strong emotional reaction to an increased mortality risk ... is reasonable and genuine, rather than overstated...." *Id.* at 435, 117 S.Ct. 2113. Ultimately, as stated, the Court found that these reasons necessitated a holding that a plaintiff, like Buckley, should not be permitted to recover damages for fear of cancer absent disease or physical symptoms.

In 2003, in *Norfolk & Western Ry. v. Ayers,* 538 U.S. 135, 123 S.Ct. 1210, 155 L.Ed.2d 261 (2003), the Supreme Court revisited its holdings in *Gottshall* and *Metro–North.* According to the *Ayers* Court, *Gottshall* and *Metro–North* "describe two categories of claims for emotional distress damages: [s]tand-alone emotional distress claims not provoked by any physical injury, for which recovery is sharply circumscribed by the common law zone-of-danger test; and emotional distress claims brought on by a physical injury, for which pain and suffering recovery is permitted." *Id.* The plaintiff in *Ayers,* unlike the plaintiff in *Metro–North,* suffered from asbestosis, and the case was therefore placed in the latter category, thereby enabling the plaintiff to recover for fear of cancer as an element of his asbestosis-related pain and suffering damages. The plaintiff, like any plaintiff whose claim falls within this category, was required to prove that his alleged fear was genuine and serious, *id.* at 157–58, 123 S.Ct. 1210, a fact that was not properly before the Court (and therefore was assumed by the Court) in light of Norfolk's defense at trial and the scope of review granted by the Court. *See id.* (citing cases for the proposition that general concern for one's future health is insufficient to support recovery for asbestosis-sufferer's fear of developing cancer in the future).

## VII. Application of law of emotional distress to facts of each case

### A. Withdrawn claims and unchallenged claims

Even though Luke and Seth DeKoomen withdrew their claims for emotional distress, the jury awarded them damages for emotional distress. The circuit court erred in denying appellant's motion for JNOV with respect to those claims. We would reverse those judgments and enter judgment in favor of appellant.

In addition, with respect to the emotional distress claims, appellant does not challenge the sufficiency of the evidence to support a finding that the following appellees experienced a physical manifestation of emotional distress that satisfies the *Hunt* rule: Andrea Batton, Sally DePasquale, Hilton Dobb, Yvonne Lanting, Janice Martin, Edward McLewee, Michael Oberlin, Curtis Pfeiffer, Brenda Pfeiffer, Jennifer Quinn, and Lori Vogler. Appellant argues, however, that the awards in favor of these appellees for emotional distress must be reversed, and the claims remanded for a new trial, because their claims for fear of cancer or other latent disease should not have been permitted.

### B. No evidence of actual exposure or probable future exposure

There are 17 properties for which there was no evidence that the potable wells on those properties ever were contaminated by the leak or likely would become contaminated in the future, because of the movement of underground water. Appellees' experts testified that the chance of future contamination for these properties was "low," which they defined as unlikely to occur.

In order to sustain an emotional distress claim, a person has to show some evidence that he or she was exposed to the disease causing substance. We note that, in assessing evidence of actual contamination, only evidence of contamination in potable wells, as distinguished from monitoring wells or a hypothetical ground contamination, is relevant because there

is no evidence that exposure could occur other than through using water from potable wells. There are no air sampling or vapor studies in evidence to show that breathing vapors could cause exposure, even in the case of a potable well with contamination. Nevertheless, if we assume possible exposure in that situation, there is no evidence that exposure could occur absent contamination in a potable well. Absent such contamination, under the evidence in these cases, there can be no ingestion and no skin contact. With respect to possible exposure from breathing vapors, the only exposure by an occupant on any property without any past or likely future contamination is to the ambient air. As noted above, there is no evidence of the presence of chemicals in water vapor in any of appellees' houses, even those using potable well water for bathing. Obviously, potential exposure because there might be ground contamination at some point in the future, albeit not in the well water, is even more remote.

Most of the occupants of the 17 properties with no evidence of present or likely future potable well water contamination dismissed their claims for emotional distress damages, but those who did not received awards notwithstanding the absence of proof of contamination. Those appellees receiving awards are Thomas and Lisa Benney, Bartlett and Patricia Colgan, Elaine Lindsay, Tresia Parks, Walter Merski, Anthony and Valerie Montone, Leon Nickel, and Theresa Nickel. The court erred in not granting appellant's motion for JNOV with respect to those emotional distress claims. We would reverse the judgments and enter judgment in favor of appellant.

The appellees named in this section may also be named in other sections, and in our view, judgments in their favor would be reversed or remanded for other reasons.

The occupants of properties other than the 17 with no exposure include 39 appellees who may have been exposed through ingestion before February 17, 2006 (the subject of Dr. Rudo's testimony quoted above). The remaining occupants' exposure, if any, was from bathing after February 17. Many

of the properties had non-detect readings in that time frame and the rest had only trace amounts of contamination at some point in time. For purposes of the issues before us, we shall assume that a fact finder could find that (1) occupants of properties on which at least trace amounts of MTBE or benzene were found at any time, and (2) occupants of properties which, according to appellees's experts, have a moderate to high chance of future contamination, were or will be exposed, on one or more occasions, to one of the chemicals, at some point in time. We make this assumption without regard to whether a particular appellee uses well water and, if so, for what purpose, and whether the home contains a whole house carbon filtration system.

### C. Emotional distress—no evidence of physical manifestation related to leak, assuming fear of a future disease is compensable

■ The following appellees did not testify, and *no* evidence was admitted to show that they experienced emotional distress: Ricci DePasquale, Jr., Joseph DePasquale, Alicia DePasquale, Wyatt Dobb, David Fritz, Jr., Brendan Fritz, Aidan Fritz, Melodie Heggie, Robert Libertini, Jr., Nicholas Libertini, Michelle Shindledecker, Zachary Vacovsky, Brook Vacovsky, Christopher Vogler, Carli Vogler, and Steven Stelmack. The court erred in denying appellant's motion for JNOV with respect to the emotional distress awards entered in their favor. We would reverse those judgments and enter judgment in favor of appellant.

### D. Emotional distress—minimal evidence and clearly legally insufficient to show physical manifestation related to leak, assuming fear of future disease is compensable

The following appellees were discussed at some point in the testimony, but there was minimal to no evidence of emotional distress: Amtul Baig, Joseph Bateman, Thomas Benney, Lisa Benney, Dennis Berlin, Alexis Blair, Spencer Blair, Allison Carroll, Stephanie Carroll, Jason Carroll, John DePasquale, Madison Dobb, Emily Faber, Alexander Faber, Katherine

Libertini, David Mahoney, Rosemarie Mahoney, Lauren McLewee, Linda Oberlin, Amy Peters, Leslie Rush, Maria Chavez, Evan Tizard, Emma Tizard, Marlena Wittelsberger, and Lauren Wittelsberger. We would reverse those judgments and enter judgment in favor of appellant.

### E. Emotional distress-some evidence of physical manifestation related to leak but legally insufficient, assuming fear of future disease is compensable

There was some evidence of physical manifestation of emotional distress as to the following appellees, but the evidence is legally insufficient because of (1) lack of sufficient physical manifestation, (2) lack of adequate proof that any distress was caused by concern for human safety as a result of the leak, or (3) affirmative proof that the stress was due to concern about property rather than human health/safety, was caused by the loss of use and enjoyment of property on a day to day basis which did not involve a threat to the person, was due to preexisting conditions, or was due to the litigation. In most instances, there was no medical testimony.

Bartlett Colgan (concern about property value, and insufficient physical manifestation caused by leak), Patricia Colgan (insufficient physical manifestation caused by leak), Elaine Lindsay (concern about property value, prior condition, and insufficient physical manifestation caused by leak), Tresia Parks (prior condition and insufficient physical manifestation caused by leak), Walter Merski (concern about property value, prior condition and lack of sufficient physical manifestation caused by leak), Lisa DeKoomen (prior condition and attributed stress symptoms to litigation), Andrea and Veronica Greco (stress related to moving residence, new job, and financial concerns), Linda Berlin (insufficient physical manifestation caused by leak), Gary Flora (insufficient physical manifestation caused by leak), Michael and Susan Cremen (insufficient physical manifestation caused by leak), Robert Peters (insufficient physical manifestation caused by leak), Franz and Delores Wittelsberger (insufficient physical manifestation caused by leak), Michael and Gail Osmeyer

(unrelated conditions), Margaret McDevitt and Christopher Shultz (unrelated conditions), Jeffrey Jenkins and Nicole Ripken (insufficient physical manifestation caused by leak and prior condition), Anthony Tirocchi and Lillian Tirocchi (insufficient physical manifestation caused by leak), Sharon Bateman (insufficient physical manifestation caused by leak), Allan Gottschalk and Barbara Gottschalk (insufficient physical manifestation caused by leak), Robert Babcock (prior condition), Katie Babcock and Audrey Babcock (insufficient physical manifestation caused by leak), John Lanting (insufficient physical manifestation), Anthony Montone and Valerie Montone (insufficient physical manifestation caused by leak), Jeffrey Alban and Marsha Alban (insufficient physical manifestation caused by leak), John Coffay and Gina Coffay (insufficient physical manifestation caused by leak), Mirza Baig and Zain Baig (insufficient physical manifestation caused by leak), John Quinn (financial concerns), William Bieber (prior condition), Robert Twardzik (insufficient physical manifestation caused by leak), David Fritz and Stacy Fritz (insufficient physical manifestation caused by leak), Ricci DePasquale (insufficient physical manifestation caused by leak), Thomas DeBolt and Liza DeBolt (unrelated conditions), Carol Copeland (insufficient physical manifestation caused by leak and unrelated conditions), Christopher Wiedey (insufficient physical manifestation caused by leak), Michael Vogler (insufficient physical manifestation caused by leak), Martin Blair (unrelated conditions), Joyce Blair (insufficient physical manifestation caused by leak), Thomas Carroll (insufficient physical manifestation caused by leak), Alex Schech (prior condition), Andrew Schech (insufficient physical manifestation caused by leak), Michael Schech and Sheryl Schech (unrelated conditions), Carolyn Heggie and Walter Heggie (insufficient physical manifestation caused by leak), David Gregory and Lisa Gregory (unrelated conditions), Frank Mucha and Jennifer Mucha (prior conditions), Terry Martin (insufficient physical manifestation caused by leak), Kenneth Thompson and Mary Thompson (unrelated conditions and insufficient physical manifestation caused by leak), Kurt Va-

covsky (insufficient physical manifestation caused by leak), Jai Dixon and Jane Elkinton (insufficient physical manifestation caused by leak), Mark Alan Lamos and Mary Christine Sinelle–Lamos (insufficient physical manifestation caused by leak), Martin Brady and Cassandra Brady (insufficient physical manifestation caused by leak), Robert Libertini and Suzanne Libertini (insufficient physical manifestation caused by leak), Amy Shimp (insufficient physical manifestation caused by leak), Joseph Barone and Palma Barone (insufficient physical manifestation caused by leak), Herman Hannan and Laverne Hannan (unrelated conditions), Susan Faber (insufficient physical manifestation caused by leak), Joyce Rush (insufficient physical manifestation caused by leak), John Csicsek and Martha Csicsek (insufficient physical manifestation caused by leak), Ronald Diedeman and Joan Diedeman (insufficient physical manifestation caused by leak), Matthew Fox (insufficient physical manifestation caused by leak), James Hourihan and Janet Hourihan (insufficient physical manifestation caused by leak), Thomas Anderson and Stacey Curtiss (insufficient physical manifestation caused by leak), Leon Nickel and Theresa Nickel (insufficient physical manifestation caused by leak), Mae DeDeo (insufficient physical manifestation caused by leak), David and Joyce Albert (insufficient physical manifestation caused by leak), Scott Batton (insufficient physical manifestation), David and Jennifer Cadigan (insufficient physical manifestation), Thomas Howe (insufficient physical manifestation and unrelated condition), Hope Kukucka (insufficient physical manifestation), and Sara Tolle (unrelated condition). We would reverse those judgments and enter judgment in favor of appellant.

### F. Fear of cancer or other latent disease

As noted above, appellees claimed a fear of contracting cancer or other latent disease. They did not claim fright associated with a current condition. *See, e.g., Bowman v. Williams,* 164 Md. at 404, 165 A. 182. The claim was fear of a future condition. The evidence at trial was not legally suffi-

cient evidence to support any appellee's claim for fear of contracting cancer or other latent disease in the future.

Virtually all appellees who testified stated that they were fearful of developing cancer or some other latent disease, or clearly implied that they were experiencing such fear. Based on the law as we have discussed above, none of the judgments for emotional distress can be affirmed. Given our conclusion that the applicable law did not permit a claim for fear of future disease by any appellee, we need not discuss individual claims, as our analysis rests on the proper standard of proof. Nevertheless, we note that, at some point, a person who uses water with "knowledge" of the potential ramification that gives rise to the claimed fear cannot have a "reasonable" basis for fear, even under a reasonable basis standard. We also note that fear that arises two years after the leak as a result of hearing testimony in a courtroom by appellees' experts and which causes an appellee to fear a future disease because of his or her use of water over the preceding two years cannot form the basis for a compensable fear claim against an entity that has no control over the dissemination of that information. Finally, we note that Dr. Rudo's opinion testimony, that exposure caused an increased risk of cancer and cell mutation, was limited to 39 appellees who, according to the evidence, probably were exposed during the period after the leak and prior to February 16, 2006. Nevertheless, we shall treat Dr. Rudo's testimony, viewed as a whole, as expressing the same opinion as to all appellees who, according to appellees' evidence, probably were exposed or probably will be exposed at some point in time, i.e., occupants of all but the 17 properties discussed above.

We conclude that under Maryland law a plaintiff cannot recover for fear of future disease that has a long latency period unless the plaintiff produces evidence that (1) the plaintiff presently has the same or a similar disease, or that symptoms of such a disease are present, or (2) the plaintiff will probably contract the feared disease, and that exposure to a toxic chemical attributable to the defendant is a cause, i.e., a substantial factor in causing that disease. Otherwise there is

no restriction on a claim of fear, which presumably lasts a lifetime. All rational persons fear contracting cancer or some other disease.

Dr. Rudo did not quantify any increased risk of developing cancer or some other latent disease as a consequence of their exposure to MTBE or benzene. He did not testify that any increased risk of contracting such a disease was significant, much less probable. When the air and surroundings contain carcinogens and other possibly harmful substances, and the toxic effect of a substance is determined by a dose response relationship, a mere exposure cannot be enough to sustain a recovery. In this country, virtually everyone is exposed to many different presently known carcinogens on a daily basis, in the ambient air and otherwise, e.g., cigarette smoke and asbestos fibers.[13] We are exposed, on a daily basis, to substances that are known to be human carcinogens, substances that are reasonably anticipated to be human carcinogens, and substances that, based on research, may be classified in the future as possible or known carcinogens. For example, styrene recently was added to the list.[14] A tort recovery based on evidence that someday some substance may be deemed to be harmful is a recovery based on speculation only. In Maryland, recovery of damages in tort always has required proof of probability.

People who pump their own gasoline are exposed to MTBE and benzene, by contact with or by breathing vapors. People who drive many miles and fill their tanks often are more

---

13. Dr. Rudo testified that food, including apples, coffee, bread, peanut butter, and mushrooms, contain carcinogens. He also testified that certain foods contain mutagens, but he did not identify the foods.

14. In 2011, the U.S. Department of Health and Human Services issued its Report on Carcinogens, Twelfth Edition, in which it added styrene, commonly used in cups, packaging, and containers, to the list of substances reasonably anticipated to be human carcinogens. *Id.* at 16. The report lists substances to which a significant number of persons are exposed. The Report contains approximately 50 substances known to be human carcinogens and approximately 175 substances reasonably known to be human carcinogens. *Id.* at 15, 16.

exposed than those who drive less. People who keep gasoline in their homes for use in generators, lawn mowers, or other engines, have greater exposure than those who do not. In order to have a valid tort claim, a claimant must be different from the general population.

Maryland has a well-developed body of tort law involving latent diseases caused by exposures to toxins, especially to asbestos. Appellees assert that, based on Dr. Rudo's opinion that exposure to MTBE likely produced cell changes, they sustained an "injury." Of course, that would not apply to appellees who did not prove exposure. More important, and determinative as to all appellees, under Maryland law, such a cellular change without symptoms of a disease or actual impairment is not a compensable "injury." *E.g., Wright v. Eagle–Picher Ind.,* 80 Md.App. 606, 565 A.2d 377 (1989); *Anchor Packing v. Grimshaw,* 115 Md.App. 134, 692 A.2d 5 (1997); *Owens Corning v. Bauman,* 125 Md.App. 454, 726 A.2d 745 (1999); and *Hollingsworth & Vose v. Connor,* 136 Md.App. 91, 764 A.2d 318 (2000) (pleural plaques or thickening caused by asbestos exposure is not a compensable injury). Notably, any appellee who does not presently meet the standard to sustain an award for emotional distress for present fear of developing cancer or other latent disease or to obtain costs of medical monitoring, but who later develops cancer or other latent disease can recover, if he or she can prove that exposure to a substance attributable to appellant was a substantial factor in producing the injury, *Balbos,* 326 Md. at 210–211, 604 A.2d 445. In that circumstance, limitations would not be a bar, as the limitations period would not begin to run until the cancer or other latent disease developed. *See Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 668, 464 A.2d 1020 (1983).

In our view, a lower standard of proof than actual present symptoms or probability that the cancer or other latent disease will develop, for recovery of fear damages would result in proof of mere exposure being sufficient to support recovery. This would produce an anomalous and illogical result: proof of the low standard of mere exposure would be sufficient to allow

recovery for a plaintiff with no symptoms of disease, but proof of probability of causation, a stricter standard, would be necessary for recovery for a plaintiff actually suffering from cancer or other latent disease. This is because the fear in cases such as these is of a nonspecific future latent disease, and in the case of cancer, a nonspecific cancer. There are countless causes of cancers and latent diseases generally. Appellees do not claim fear of a particular type of cancer or other disease which, based on current knowledge, is closely associated with a particular substance. If there is to be any difference in the standard for proving causation of an existing disease and for proving present fear of contracting a future disease as a result of exposure, the standard should be higher for fear-based claims, not lower, because of the paucity of physical evidence.

Appellees rely on *Faya v. Almaraz*, 329 Md. 435, 620 A.2d 327 (1993), to support their position that emotional distress damages for fear of cancer or other latent disease are recoverable. In *Faya*, several patients sued a surgeon who had performed operations on them. The defendant knew in 1986 that he was infected with HIV, the virus that causes AIDS. He performed operations thereafter, was diagnosed with AIDS in 1990, performed at least one operation thereafter, and died on November 16, 1990. *Id.* at 440–41, 620 A.2d 327. The plaintiffs learned about the defendant's death, and its cause (AIDS), in the newspaper. The plaintiffs filed suit, alleging that the defendant had failed to disclose his health status (HIV positive, and later, suffering from AIDS) prior to their surgeries and that he probably had nicked himself during the surgeries, as often happens, and his blood probably was placed in their bloodstream. *Id.* The plaintiffs were tested for HIV and within a few weeks received results showing they were not infected with that virus. It was undisputed that virtually all people infected with HIV would manifest a positive HIV test within six months of exposure. HIV is an infection—not a latent disease—and AIDS is the end-stage of the infection. The plaintiffs sought damages for emotional distress for fearing they had contracted AIDS. Ultimately, the Court of Ap-

peals held that the plaintiffs could recover damages for emotional distress, for fear of contracting AIDS, for the period of time between when a plaintiff first feared he or she might have contracted AIDS and when he or she received a negative HIV test. *Id.* at 455–56, 459, 620 A.2d 327.

The *Faya* case involved a physical touching by a person infected with HIV. Importantly, the medical knowledge at that time was that most people infected with HIV would progress to AIDS, and die; that HIV was the only cause of AIDS; and that blood to blood was a means to transmit HIV from one person to another. *Id.* at 446, 620 A.2d 327. The cases before us are entirely different from the *Faya* case. As noted, neither HIV nor AIDS is a latent disease; they are various stages of an infection with a virus (HIV). The patients in the *Faya* case were experiencing fear that they had been infected, by blood-to-blood transmission, with what was then a universally deadly virus. In that circumstance, the Court allowed recovery for fear for the brief period of time in which the patients awaited the results of the blood tests for HIV. In the cases before us, the fear for which appellees sought compensation was for developing an unspecified latent disease, at an unspecified time in the future, when there was no likelihood of developing a disease and there was no quantified risk of contracting a disease and no latency period. Presumably, the latency period in these cases was the lifetime of each appellee. *Faya* does not support appellees' contentions.

*Buck v. Brady,* 110 Md. 568, 73 A. 277 (1909), a case not cited by appellees, recognized that a plaintiff could recover for fear of contracting rabies from a dog bite. This, too, involved a virus that caused a specific disease with a known latency period. The case also involved a physical injury, in the traditional sense. Historically, emotional distress associated with a physical injury, as distinguished from physiological manifestations of an emotional injury, has been recoverable. The viral disease (rabies) was treatable before any symptoms appeared.

Thus, we would reverse the judgments in favor of all appellees for emotional distress on the ground that the claim for fear of cancer or other future disease should not have been permitted. With respect to emotional distress judgments of appellees not identified in VII B., C, D., and E., and excluding the withdrawn claims referenced in VII A., we would remand for a new trial, consistent with the law as set forth in this opinion. There are 35 such appellees, as follows: Andrea Batton, Karen Carroll, Olivia Cremen, Michael Davis, Bobbie Davis, Ian Davis, Sally DePasquale, Hilton Dobb, Amy Dobb, Barry Faber, Thomas Facinoli, LaGina Facinoli, Tracey Flora, Paul Ford, Judith Ford, Jodi Howe, Glenn Kukucka, Yvonne Lanting, Janice Martin, Edward McLewee, Barbara McLewee, Michael Oberlin, Curtis Peiffer, Brenda Peiffer, Jennifer Quinn, Gary Rosch, Kim Rosch, Jeffrey Shimp, Steven Tizard, Tracey Tizard, Roger Tolle, Shawnee Twardzik, Cynthia Vacovsky, Lori Vogler, and Christine Wilkinson.

### VIII. Law relating to medical monitoring

In *Philip Morris, Inc. v. Angeletti,* 358 Md. 689, 778–89, 752 A.2d 200 (2000), the Court of Appeals discussed medical monitoring claims but did not decide whether and to what extent they are recognized under Maryland law. The Court stated:

> [T]he Circuit Court concluded that a cause of action for medical monitoring exists in Maryland, accepting "the elements for the maintenance of a medical monitoring claim," id. at 67, based upon the reasoning set out in *In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829 (3rd Cir.1990) (*Paoli I* ), *In re Paoli R.R Yard PCB Litig.,* 35 F.3d 717 (3rd Cir.1994) (*Paoli II* ). and *Hansen v. Mountain Fuel Supply Co.,* 858 P.2d, 970 (Utah 1993). The Circuit Court then determined that the medical monitoring relief sought by the plaintiffs was within the scope of a Rule 2–231(b)(2) class action.
>
> * * *

This Court has never considered whether a demonstrated need for medical monitoring creates a valid cause of action

in Maryland or generates a permissible form of relief under this State's more traditional tort actions, although several courts around the country more than a decade and a half ago began to consider this type of claim and permitted it to proceed. *See, e.g., Friends for All Children, Inc. v. Lockheed Aircraft Corp.,* 241 U.S.App.D.C. 83, 746 F.2d 816 (D.C.Cir.1984); *Askey v. Occidental Chemical Corp.,* 102 A.D.2d 130, 477 N.Y.S.2d 242 (N.Y.App.Div.1984); *Laxton v. Orkin Exterminating Co.,* 639 S.W.2d 431 (Tenn.1982). Over the intervening years, several state appellate courts have followed suit in recognizing medical monitoring as a legitimate cause of action or form of relief under their respective tort law. *See, e.g., Burns v. Jaquays Mining Corp.,* 156 Ariz. 375, 752 P.2d 28 (Ariz.Ct.App.1987); *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965 [25 Cal. Rptr.2d 550], 863 P.2d 795 (Cal.1993); *Ayers v. Township of Jackson,* 106 N.J. 557, 525 A.2d 287 (N.J.1987); *Hansen,* 858 P.2d 970 (Utah 1993). Nonetheless, the embrace of medical monitoring as a viable claim has not been universal. *See, e.g., Metro–North Commuter Railroad Co. v. Buckley,* 521 U.S. 424, 439–440, 117 S.Ct. 2113, 2121–22, 138 L.Ed.2d 560 (1997) (rejecting particular plaintiff's medical monitoring claim because of lack of compensable injury under Federal Employers' Liability Act and because intermediate court's envisioned potential award of medical monitoring to asymptomatic plaintiff in form of lump sum damages went beyond bounds of "evolving common law" as it now stands); *Ball v. Joy Technologies, Inc.,* 958 F.2d 36, 39 (4th Cir.1991) (ruling that medical monitoring is not cognizable claim under tort law of Virginia or West Virginia absent manifestation of physical injury).

Medical monitoring has been defined as "one of a growing number of non-traditional torts that have developed in the common law to compensate plaintiffs who have been exposed to various toxic substances." *Paoli I,* 916 F.2d at 849. See also Recovery of Damages for Expense of Medical Monitoring to Detect or Prevent Future Disease or Condition, 17 A.L.R.5th 327, § 3 (stating that courts have "de-

fined a medical monitoring claim as a claim for the costs of periodic medical examinations to detect latent diseases or disorders caused by a defendant's culpable conduct, the object of which is to facilitate early diagnosis and treatment of diseases or disorders"). In a claim for medical monitoring, the plaintiff seeks to recover only the quantifiable costs of periodic medical examinations necessary to monitor plaintiffs' health and to facilitate early diagnosis and treatment of disease(s) caused by exposure to chemicals, or as in the instant case, tobacco. See *Ayers,* 525 A.2d at 308; see also *Paoli I,* 916 F.2d at 849 and 850. The theory underlying the recognition of this claim is that the diseases or injuries caused by various toxic substances are often latent, leading to "problems when the claims are analyzed under traditional common law tort doctrine because, traditionally, injury needed to be manifest before it could be compensable." *Id.* at 850. Thus, some courts have recognized medical monitoring claims that permit relief even in the absence of present manifestations of physical injury. See *id.* The injury in a medical monitoring case not being a physical one, it is instead construed as "the 'costs of periodic medical examinations necessary to detect the onset of physical harm.'" *Barnes v. American Tobacco Co.,* 161 F.3d 127, 139 (3rd Cir.1998) (quoting *Redland Soccer Club v. Department of the Army,* 548 Pa. 178, 696 A.2d 137, 144 (Pa.1997)); see also *Hansen,* 858 P.2d at 977.

Whether this Court should, as a matter of Maryland common law, recognize medical monitoring, either as a distinct cause of action or allowable form of relief, is a question not easily answered, and one that no doubt will be recurring. In the context of a toxic tort suit involving claims for damages sustained because plaintiffs' well water was contaminated by toxic pollutants, the Supreme Court of New Jersey, noting the difficulty that both law and science experience in attempting to deal with the emerging complexities of industrialized society and the consequent implications for human health, observed:

Our evaluation of the enhanced risk and medical surveillance claims requires that we focus on a critical issue in the management of toxic tort litigation: at what stage in the evolution of a toxic injury should tort law intercede by requiring the responsible party to pay damages?

*Ayers,* 525 A.2d at 298.

We need not resolve this matter today but shall instead leave for the future whether, under Maryland law, plaintiffs could maintain a cause of action or claim to relief to recover the expense of medical surveillance. Whether medical monitoring is a cognizable claim under the tort law of this State is in no way ripe for our consideration at this stage of the litigation: even should this novel tort theory constitute a valid cause of action or form of relief in Maryland, an equitable relief class action should never have been certified on the basis of such a claim under the circumstances of this case.

(Footnotes omitted.).

The Court also noted that

[a] cause of action for medical monitoring differs from the cause of action commonly referred to as "an enhanced risk claim." See Recovery of Damages for Expense of Medical Monitoring to Detect or Prevent Future Disease or Condition, 17 A.L.R.5th 327, § 3 (explaining that "an action for medical monitoring seeks to recover only the quantifiable costs of periodic examinations necessary to detect the onset of physical harm, whereas an enhanced risk claim seeks compensation for the anticipated harm itself, proportionately reduced to reflect the chance that it will not occur"). *See also In re Paoli R.R. Yard PCB Litig.,* 916 F.2d 829, 850 (3rd Cir.1990) (*Paoli I* ); *Ayers v. Jackson,* 106 N.J. 557, 525 A.2d 287, 304 (N.J.1987).

*Id.* at 781 n. 40, 752 A.2d 200.

In the same case, the Court also recognized the distinction between medical monitoring as a claim or as a remedy. It observed:

Moreover, the medical monitoring claim may perhaps more accurately be deemed a remedy rather than a distinct cause of action. See *Potter* [25 Cal.Rptr.2d 550], 863 P.2d at 823 ("Recognition that a defendant's conduct has created the need for future medical monitoring does not create a new tort. It is simply a compensable item of damage when liability is established under traditional tort theories of recovery."); *Cosentino v. Philip Morris Inc.*, No. MID–L–5135–97, slip op. at 23 [1998 WL 34168879] (N.J.Super.Ct. Oct. 22, 1998, recon., Feb. 11, 1999). But see *Arch* [*v. American Tobacco Co.,*] 175 F.R.D. [469 (E.D.Pa.1997) ] at 483–84 n. 11 ("Several states have permitted recovery of damages for medical monitoring as part of the relief. In Pennsylvania, however, medical monitoring is an independent cause of action, not a compensable item of damages." (Citation omitted)); *Redland,* 548 Pa. 178, 696 A.2d 137; *Simmons v. Pacor, Inc.,* 543 Pa. 664, 674 A.2d 232 (Pa. 1996).[15]

*Philip Morris, Inc. v. Angeletti,* 358 Md. at 785–87, 752 A.2d 200. (Footnote 41 in original).

A summary of the law generally, relating to medical monitoring claims, is contained in 17 A.L.R. 5th 327 (1994 and 2008 Supp.).

Where manifestation of harm is latent or not immediately apparent, as is often the case with the consequences of environmental or toxic torts, the traditional tort system has sometimes struggled to achieve the traditional goals of

---

**15.** In *Barnes v. American Tobacco Co.*, 989 F.Supp. 661 (E.D.Pa.1997), the same court that decided *Arch v. American Tobacco Co.*, 175 F.R.D. 469 (E.D.Pa.1997), explained that there is a theoretical and practical distinction between a medical monitoring fund and a medical monitoring claim. The medical monitoring claim is the plaintiffs' actual cause of action; in order to have the right to a remedy, the plaintiffs must first establish that they have satisfied the seven elements of a medical monitoring fund. In contrast, the medical monitoring fund is the actual relief that will be awarded if the plaintiffs succeed in establishing the claim. The difference between the medical monitoring claim and the medical monitoring fund is highlighted by the fact that plaintiffs ... can prevail on their medical monitoring claim and request monetary damages in lieu of their fund. 989 F.Supp. at 667 n. 6.

compensation, deterrence, and rehabilitative justice. To help achieve these goals in this context, the tort common law has recognized a cause of action for a future medical testing to facilitate early detection of diseases caused by toxic substances.

"Medical monitoring," as this cause of action has come to be known, has been defined as an action seeking to recover the quantifiable costs of periodic future medical examinations to detect the onset of physical harm (§ 3), as distinguished from an enhanced risk claim which seeks compensation for the anticipated harm itself or for increased apprehension of such harm.

By allowing the recovery of medical monitoring costs, the courts satisfy a number of sound policy concerns including: (1) public health interest in encouraging and fostering access to early medical testing for those exposed to hazardous substances; (2) possible economic savings realized by the early detection and treatment of the disease; (3) deterrents of polluters; and (4) elemental justice (§ 7).

As to the concern of some that recognition of medical monitoring claims will open the floodgates to a multitude of lawsuits in that the general public is regularly exposed to all sorts of unhealthy contaminants in the environment, it has been noted that recognition of medical monitoring claims does not dispense with the burden that plaintiffs prove that medical monitoring is reasonably certain to be required; that is, plaintiffs may recover "medical monitoring" costs only if the evidence establishes the necessity, as a direct consequence of the exposure in issue, for a specific monitoring beyond that which an individual should pursue as a matter of general good sense and foresight. More specifically, it has been held that a medical monitoring cause of action must be established by proving that: (1) plaintiff was significantly exposed to a proven hazardous substance through the negligent actions of the defendant; (2) as a proximate result of such exposure, plaintiff suffered a significantly increased risk of contracting a serious latent disease; (3) that increased risk made periodic diagnostic medical

examinations reasonably necessary; and (4) monitoring and testing procedures existed which made the early detection and treatment of the disease possible and beneficial (§ 6). Once a medical monitoring cause of action has been recognized, issues of the matter of payment arise. In this regard, it has been held that medical monitoring costs are not "recovery costs" under the Comprehensive Environmental Response, Compensation and Liability Act (CERCLA), 42 U.S.C.A. § 9607, popularly known as the Superfund Act (§ 10), that a court-administered fund for these costs is preferable to a lump-sum payment (§ 9), and that class action certification issues will often be involved if only to properly identify those who will share in the cost award (§ 8).

Procedural concerns raised by future medical monitoring claims include the form of pleading, single cause of action preclusion rules, various aspects of admissibility of evidence by expert witnesses, and the possible pooling of the medical data acquired by medical monitoring tests (§ 2[b] ).

Although there is some authority that a present physical injury is required in order to sustain a medical monitoring claim (§ 4[a] ), and although the Pennsylvania cases differ in this regard (§ 4[c] ), the more representative view is that a medical monitoring claim may be established or supportable in the absence of any present physical injury (§ 4[b] ), and certainly in the absence of any need for a concurrent pleading relating to such injury (§ 5).

While it has been recently stated that the "circumstances that spawn [medical monitoring] cases keep expanding," and while there is dictum that future medical monitoring costs might be allowed in the context of injuries from an automobile accident (§ 12), the much more common application of medical monitoring awards is in the field of environmental or toxic torts (§§ 11–18), with medical monitoring claims having been specifically recognized or upheld where the latent manifestation of diseases which the monitoring is designed to identify and detect arising from such varied agencies and contexts as asbestos (§ 11[a] ), insecticides

such as termiticides (§ 14), landfill toxins (§ 15), petroleum products (§ 17), radioactive emissions (§ 18), groundwater contamination (§ 13[a]), and such organic chemicals as PCBs (§ 16[a]).

However, it is also to be pointed out that some medical monitoring claims have also been denied or rejected in cases involving asbestos (§ 11[b]), groundwater contamination (§ 13[b]), and PCBs (§ 16[b]), with a federal court, sitting in diversity, expressing its reluctance to create a "nontraditional" state common-law cause of action for medical monitoring where state courts and/or state legislatures have not yet acted.

\* \* \*

Counsel's manner of pleading a medical monitoring cause of action has received attention by courts in several jurisdictions. Thus it was held by a Federal District Court, sitting in diversity and applying Colorado law, that where plaintiff sought medical monitoring and surveillance services "in the form of injunctive relief," the injunctive relief prayer stated a valid claim as a request for a court-administered fund. And a Pennsylvania trial court held that a claim for the creation of a fund to pay for future medical examinations was in essence a claim for damages which could not be transformed into an equitable action by asking for an injunction that ordered the payment of money. Also as to manner of pleading, it is to be noted that a New York trial court denied summary judgment on a public nuisance claim where the court found that plaintiff employees had sufficiently alleged peculiar injuries beyond that of the general public in that the employees sought continued medical monitoring.

In addition to pleading matters, counsel involved with a medical monitoring claim, whether presenting the claim or defending against it, can reasonably foresee that expert medical witnesses will be involved. Indeed, it has been recognized that a medical monitoring claim is "ultimately dependent" on reliable expert testimony. Thus it has been held that medical evidence relating to an increased risk of

cancer resulting from alleged exposure to pump oil was relevant to the issue of recovery of costs for medical monitoring, with the court, finding that the probative value of this evidence was not outweighed by the danger of any unfair prejudice, denying a motion to exclude this medical evidence by two expert witnesses, one an MD and one a PhD.

The experts, as one case typifies, may run the gamut from the anticipated medical doctor to a toxicologist to a geohydrologist. And the experts can be expected to testify on such issues as: (1) plaintiff was significantly exposed to a proven hazardous substance through the negligent actions of the defendant; (2) as a proximate result of exposure, plaintiff suffered a significantly increased risk of contracting a serious latent disease; (3) that increased risk makes periodic diagnostic medical examinations reasonably necessary; and (4) monitoring and testing procedures exist which make the early detection and treatment of the disease possible and beneficial. Indeed, where plaintiffs requested a trial court ruling on the admissibility of medical expert opinion evidence as to the "need" for periodic future medical monitoring, it was held that such evidence was admissible, as was defendants' evidence of other experts stating a contrary opinion, the court concluding that it was for the jury to decide whether it was more probable than not that the plaintiffs should submit to such future medical monitoring.

Yet another matter of practical concern to counsel considering the presentation of a medical monitoring claim is the so-called "single-action claim-preclusion" rule under which a plaintiff who secured a medical monitoring cost award might be foreclosed from recovering damages in a second suit filed when the disease actually developed, years or perhaps decades after the initial exposure, on the ground that a cause of action cannot be "split" It has been suggested that an "acceptable solution" to this problem may be simply holding that the single-action claim-preclusion rule does not apply "in these types of circumstances." It has also been suggest-

ed that this could be a matter for possible state or even federal legislative action.

And finally, counsel presenting a medical monitoring claim should be aware that relief cognizable in such an action may include pooling the results of the data derived from the medical monitoring examinations of individuals, such pooling of data having been recognized as a "reasonable complement" to any testing to assure the early detection of a latent disease.

(Footnotes omitted.). 17 A.L.R.5th 327, 2–3

Many cases are summarized in the Annotation, and we will not duplicate those summaries here. Some courts that recognize a form of medical monitoring as a claim or remedy do so only if there is a physical injury. In *Paz and Harris v. Brush Engineered Materials. Inc.*, 949 So.2d 1 (Miss.2007), the Supreme Court of Mississippi summarized the split in authority. In *Paz*, the court addressed a certified question of Mississippi law from the United States Court of Appeals for the Fifth Circuit. Class action plaintiffs had sued various defendants, seeking medical monitoring costs, as a result of alleged exposure to beryllium caused by defendants' negligence. *Id.* at 2. In holding that Mississippi did not recognize a claim for medical monitoring costs without present physical injury, the court stated:

> In support of their contention that the majority of states recognize medical monitoring actions, plaintiffs cite seven states as having actually recognized the cause of action [16]

16. *See Burns v. Jaquays Mining Corp.*, 156 Ariz. 375, 752 P.2d 28, 33–34 (Ariz.Ct.App.1987) (holding that awards of surveillance costs to monitor the effects of hazardous chemical exposure are allowed in the absence of physical injury); *Potter v. Firestone Tire & Rubber Co.*, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795, 822–23 (Cal.1993) (en banc) (same); *Petito v. A.H. Robins*, 750 So.2d 103, 106–07 (Fla.Ct.App.2000) (same); *Ayers v. Township of Jackson*, 106 N.J. 557, 525 A.2d 287, 314 (N.J. 1987) (same); *Redland Soccer Club, Inc. v. Dep't of the Army*, 548 Pa. 178, 696 A.2d 137, 145 (Pa.1997) (same); *Hansen v. Mountain Fuel Supply*, 858 P.2d 970, 979–81 (Utah 1993) (Same); *Bower v. Westinghouse*, 206 W.Va. 133, 522 S.E.2d 424, 429–30 (W.Va.1999) (same).

and five as having predicted such a cause of action.[17] Defendants counter with seventeen cases illustrative of the refusal of various states to recognize a medical monitoring cause of action.[18] This is obviously an issue of divided authority among our sister states.

*Id.* at 6. (Footnotes 3, 4, and 5 in original.).

In our view, in order to prove entitlement to some form of medical monitoring relief, a plaintiff should have to prove a

---

17. *See, e.g., In re Paoli R.R. Yard PCB Litig.*, 916 F.2d 829, 852 (3d Cir.1990) (concluding that the Pennsylvania Supreme Court would recognize a medical monitoring action without a showing of physical injury); *Martin v. Shell*, 180 F.Supp.2d 313, 323 (D.Conn.2002) (noting a citation by Connecticut Supreme Court indicating that it would uphold a medical monitoring action without requiring physical injury); *Carey v. Kerr–McGee Chem. Corp.*, 999 F.Supp. 1109, 1119 (N.D.Ill. 1998) (concluding that the Illinois Supreme Court would uphold a claim for medical monitoring without requiring plaintiffs to show actual, present injury); *Bocook v. Ashland Oil, Inc.*, 819 F.Supp. 530, 537–38 (S.D.W.Va.1993) (concluding that Kentucky law would recognize a medical monitoring action without requiring injury); *Cook v. Rockwell Int'l Corp.*, 755 F.Supp. 1468, 1476–77 (D.Colo.1991) (concluding that the Colorado Supreme Court would probably recognize a medical monitoring cause of action without requiring physical injury).

18. *See Parker v. Brush Wellman, Inc.*, 377 F.Supp.2d 1290, 1296, 1302 (N.D.Ga.2005) (concluding that the Georgia Supreme Court does not recognize a medical monitoring action without the showing of an injury); *Jones v. Brush Wellman Inc.*, No. 1:00 CV 0777, 2000 WL 33727733, *8, 2000 U.S. Dist. LEXIS 21897, *23 (N.D.Ohio Sept. 13, 2000) (concluding that Tennessee law does not recognize a medical monitoring action absent a present injury); *Hinton v. Monsanto Co.*, 813 So.2d 827, 830–32 (Ala.2001) (holding that Alabama law does not recognize a medical monitoring action absent a present injury); *Wood v. Wyeth–Ayerst Labs.*, 82 S.W.3d 849, 852–56 (Ky.2002) (holding that Kentucky law does not recognize a medical monitoring cause of action absent present injury); *Henry v. Dow Chem. Co.*, 473 Mich. 63, 701 N.W.2d 684, 686 (Mich.2005) (holding that Michigan law does not recognize a medical monitoring action absent present injury); *Badillo v. American Brands, Inc.*, 117 Nev. 34, 16 P.3d 435, 440–41 (Nev.2001) (holding that Nevada law does not recognize a medical monitoring cause of action absent a present injury); *Lowe v. Philip Morris USA, Inc.*, 142 P.3d 1079, 207 Or.App. 532, 556–57 (Or.Ct.App.2006) (holding that Oregon law does not permit recovery for a medical monitoring action without physical injury). See also *Trimble v. Asarco Inc.*, 232 F.3d 946, 962–63 (8th Cir.2000) (rejecting medical monitoring claim absent present injury on the basis that Nebraska does not recognize such an action); *Ball v. Joy Technologies, Inc.*, 958 F.2d 36, 39 (4th

physical injury, symptoms of a disease, or a probability of contracting a disease in the future, because of the exposure. Otherwise, the nature and extent of medical monitoring is no greater than that which should be undertaken by the general population. There is no evidence in these cases of physical injury, *see* VII. F., disease, or symptoms of a disease. In addition, even if a physical manifestation of emotional distress were deemed sufficient to satisfy the injury requirement, the evidence was legally insufficient as to all but 35 appellees. *See* VII. E.

Moreover, assuming there is no requirement of physical injury, and utilizing the test used by the circuit court in these cases, the evidence is legally insufficient to support medical monitoring recovery in all these cases because there is no evidence that appellees have a significantly increased risk of contracting cancer or other latent disease as a result of any exposure to MTBE or benzene as a result of the leak. The evidence is that, at most, as compared to the general population, the exposures were not quantifiedly different from exposure to carcinogens generally, and MTBE specifically, that all human beings experience. As noted earlier, all people's exposures vary, by virtue of having different living habits.

---

Cir.1991) (holding that West Virginia does not recognize recovery of medical monitoring costs absent physical injury); *Duncan v. Northwest Airlines, Inc.,* 203 F.R.D. 601, 607–09 (W.D.Wash.2001) (concluding that it would be contrary to Washington law to recognize a medical monitoring action absent accompanying present injury); *Thompson v. Am. Tobacco Co., Inc.,* 189 F.R.D. 544, 552 (D.Minn.1999) (declining to recognize a medical monitoring action); *Thomas v. FAG Bearings Corp.,* 846 F.Supp. 1400, 1410 (W.D.Mo.1994) (inferring that Missouri law would not recognize a medical monitoring action absent proof of damages in the form of an injury); *Carroll v. Litton Sys. Inc.,* No. B–C–88–253, 1990 WL 312969, at 51–52, 1990 U.S. Dist. LEXIS 16833, at *149–50 (W.D.N.C. Oct. 29, 1990) (concluding that the Supreme Court of North Carolina would not recognize a medical monitoring action); *Purjet v. Hess Oil Virgin Islands Corp.,* 1986 WL 1200, 1986 U.S. Dist. LEXIS 15677, 22 V.I. 147, 153–54 (D.V.I. Jan. 8, 1986) (holding that to recognize a medical monitoring action would be contrary to the law governing the Virgin Islands); *Mergenthaler v. Asbestos Corp. of Am.,* 480 A.2d 647, 651 (Del.1984) (holding that Delaware law does not recognize a medical monitoring cause of action without a present injury).

If some form of action or remedy for medical monitoring is recognized, it should be limited. In our view, the alternative that best achieves the goal of monitoring is that a court, in the exercise of its equitable powers, can establish a fund, when justified by the evidence, to be administered by a trustee, at the expense of the defendant. See discussion in *Metro–North Commuter R.R. v. Buckley*, 521 U.S. 424, 432, 444, 117 S.Ct. 2113, 138 L.Ed.2d 560 (1997) (a railroad worker negligently exposed to asbestos, without a disease or symptoms of a disease, could not recover for emotional distress under the Federal Employers Liability Act (FELA), 45 U.S.C. § 51, *et seq.*, and could not recover for medical monitoring costs). Indeed, the equitable remedy fund approach is the only alternative that ensures that the objectives of medical monitoring will be achieved, by ensuring that the funds will be used for their intended purpose.

In *Petito and Stubbs v. A.H. Robins Company*, 750 So.2d 103 (Fla.App.1999), the Court of Appeal of Florida held that Florida recognizes a cause of action for medical monitoring without a requirement of proof of physical injuries or symptoms. The plaintiffs sued manufacturers and sellers of weight loss products (Fen–Phen), alleging that ingestion of the products had "placed them at a substantially increased risk of developing serious cardiac and circulatory ailments. . . ." *Id.* at 104. Stating that it agreed with the Supreme Court of New Jersey's decision in *Ayers v. Township of Jackson*, 106 N.J. 557, 525 A.2d 287 (1987), the Florida court held that the trial court could use its equitable powers to create a fund for medical monitoring purposes if the plaintiffs proved:

(1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and

(7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

*Id.* at 106. (Quoting *Barnes v. The American Tobacco Co.,* 161 F.3d 127, 138–39 (3rd.Cir.1998), in turn quoting *Redland Soccer Club, Inc. v. Dep't of the Army,* 548 Pa. 178, 696 A.2d 137, 145–46 (1997)). The court went on to say that, if the trial court decided that a fund was appropriate, it should:

1. Appoint a plan administrator.

2. With the administrator's advice, approve an advisory panel of persons qualified and knowledgeable in the field to do the following:

a) establish a plan where only persons who consumed the medication, or in appropriate cases were exposed to the hazardous substance, may participate;

A minimal showing should be the name of the prescribing physician or the dispensing pharmacy or the equivalent. The monitoring contemplated is not a reason for curious persons to receive free medical examinations.

b) establish the minimal area(s) of diagnostic tests or procedures to be performed (including the number as well as the duration of the procedures);

c) select a list of highly knowledgeable, skilled, competent, and neutral and detached examining physicians to perform the tests, both for the metropolitan areas as well as the regional areas throughout the state.

3. Establish a notification process generally sufficient to bring the opportunity for monitoring to the attention of persons who have used the medication.

4. Establish a time frame for those eligible to obtain the monitoring.

5. Implement procedures whereby the monitoring physicians submit their reports and findings, together with the statement of their charges, directly to the plan administrator who shall promptly pay the reasonable amount of their claims. The parties shall have full access to such reports

and the reports will be made public except for the names of the examinees, which shall remain confidential.

*Id.* at 107.

The procedures governing a medical monitoring fund must be tailored to fit the facts in a given case. Even though the procedures recommended by the *Petito* court are fact-specific to that case, they provide a guideline for medical monitoring generally and, at the same time, illustrate why medical monitoring relief is not appropriate on the facts of the cases before us, where the claim is monitoring for latent diseases with a very long latency period, *i.e.*, the lifetime of each appellee. If a monitoring fund is to be ordered, it should be ordered only in situations in which the claimed monitoring is for a period of time and the evidence demonstrates a level of exposure that would, at the very least, establish a greatly enhanced risk of disease that would manifest itself within that period of time. A medical monitoring fund is not appropriate to fund the cost of preventive health care, relating to an unspecified number of latent diseases, over a lifetime.

### IX. Application of law of medical monitoring to facts of each case

#### A. No evidence of actual exposure or probable future exposure

■ To recover for medical monitoring, assuming recovery is otherwise available, see discussion below, a person must make a threshold showing of exposure to the offending substance. The following occupants of the 17 properties referenced in VII B. received medical monitoring awards: George Badders, Robert Barnett, Thomas Benney, Lisa Benney, Jessica Benney, Chelsea Benney, Louis Lindsey, Robert Butler, Margaret Butler, Bartlett Colgan, Patricia Colgan, Patrick Colgan, Zachary Colgan, Carol Copeland, Martin McHugh, Brian Cormier, Karen Healey, Frank Fulco, Kathleen Fulco, Michelle Fulco, Erica Fulco, John Fulco, Alexandra Fulco, Rachel Fulco, Devin Fulco, Claude Gollihue, Janet Gollihue, Leon Nickel, Theresa Nickel, Brian Nickel, Kevin Nickel,

Eliza Tamberino, Joseph Tamberino, Austin Tamberino, Elaine Lindsay, Tresia Parks, Walter Merski, Valerie Montone, Anthony Montone, Samuel Montone, Naomi Scudder, Michael Oberlin, Linda Oberlin, Joy Oberlin, JoAnn Pertee, Joyce Pertee, Brandan Pertee, and Gregory Pertee. Nancy Simms, and Christopher Simms. The court erred in denying appellant's motion JNOV with respect to those medical monitoring claims. We would reverse those judgments and enter judgment in favor of appellant.

### B. No evidence of physical manifestation

With respect to the judgments in favor of the appellees identified in VII C, D., and E. we would reverse and enter judgment in favor of appellant.

### C. All medical monitoring judgments

We would reverse all judgments for medical monitoring in favor of all appellees because of lack of proof of a probable disease and because damages are not available as a tort remedy, and enter judgment in favor of appellant.

## X. Law relating to property damage

### A. Owner testimony as to value of contaminated property

When market value is the appropriate test to determine property damages (*see* X. B.), landowners are presumed qualified to testify as to value of their own land. *Hall v. Lovell*, 121 Md.App. 1, 19–20, 708 A.2d 344 (1998) ("One having sufficient knowledge on the subject and acquainted with the land in question may be permitted to express an opinion as to the value of land, even though he is not an expert or specially qualified by training and experience to value land.") (internal quotations and citations omitted); *Baltimore City v. Schreiber*, 243 Md. 546, 553, 221 A.2d 663 (1966) ("In condemnation cases, a property owner is presumably qualified to testify as to his opinion of the value of the land to be condemned."). That rule is predicated on the rationale that "merely by virtue of ownership, [the landowner] may be presumed to have suffi-

cient knowledge of the price paid, the rents or other income received, and the possibilities of the land for use." *Schreiber*, 243 Md. at 553, 221 A.2d 663 (citations omitted).

In *Brannon v. State Roads Comm'n*, the Court of Appeals stated that, at least in cases of partial condemnation, a land-owner testifying as to the value of his property is "not required to show or even possess an understanding of valuation in condemnation cases[,]" and is "not required to give any explanation of his testimony[.]" 305 Md. 793, 802, 506 A.2d 634 (1986). Indeed, "his estimate (without explanation) is, in itself, unobjectionable no matter how unreasonable that estimate may be." *Id.* However, as we later explained in *Hall*, it is implicit in the rule permitting a landowner to testify about the value of his or her land that the landowner "must have some knowledge of land values in the neighborhood of that which he is asked to value ... otherwise his valuation would not be a reasoned opinion but a mere conjecture or guess." [19]

---

**19.** In *Hall*, several homeowners sued the builder of their new homes for "negligence, negligent misrepresentation, breach of implied warranties, breach of express warranty, fraud, breach of contract, and violation of the CPA" after experiencing water and drainage problems with their properties. 121 Md.App. at 6–7, 708 A.2d 344. Water accumulated in the plaintiffs' homes, causing mold and fungi to grow, and preventing the plaintiffs from finishing their basements and using their property as they had planned. *Id.* One homeowner, Mr. Harcum, testified as follows in response to the question "[d]o you know what the market value of your home is?":

> I'm not sure how to answer that right now. I know that I would not feel comfortable selling [my] house at market value, which is in the $220,000 to $230,000 range.

*Id.* at 8, 708 A.2d 344. When asked the basis for that valuation, he stated, "[j]ust my general knowledge of what houses like mine tend to sell for when they're up for sale." *Id.* at 8–9, 708 A.2d 344. Later, Mr. Harcum testified that "[i]n a condition where everything's fine, I think I said that I would guess my house is around $220,000.00 to $230,000.00." On appeal, we deemed Mr. Harcum's testimony specu-lative and thus legally insufficient, reasoning as follows:

> There was no evidence from Mr. Harcum of any extrinsic source showing that Mr. Harcum was familiar with or had any knowledge about non-defective properties in the neighborhood that were similar to his property and, further, that he was informed about sales of any such properties and the sums for which the properties had been sold.

*Id.* at 20, 708 A.2d 344.

121 Md.App. at 20, 708 A.2d 344. That requirement is based on the principle that "the opinion or conclusion of an expert or lay witness is of no greater probative value than that warranted by the soundness of his underlying reasons and facts." *Id.* (quoting *Anderson v. Sawyer,* 23 Md.App. 612, 618, 329 A.2d 716 (1974)); *see also U.S. v. Sowards,* 370 F.2d 87, 92 (10th Cir.1966) (concluding that, to be admissible, owner testimony "must be founded upon substantial data, not mere conjecture, speculation or unwarranted assumption" and "must have a rational foundation"); *Carmel Energy, Inc. v. Fritter,* 827 S.W.2d 780, 783 (Mo.Ct.App.W.D.1992) (finding that an owner's testimony was based on insufficient evidence and lacked probative value, and noting that "[j]udicial liberality in permitting an owner to testify as to his opinion of the amount of the loss does not allow an unrestricted right to engage in guesswork").

Further, the owner's valuation must be based on *market value*—not some other value. *See, e.g., Sowards,* 370 F.2d at 92 ("[T]he owner's qualification to testify does not change the 'market value' concept and permit him to substitute a 'value to me' standard for the accepted rule...."); *Porras v. Craig,* 675 S.W.2d 503, 504–505 (Tex.1984) ("In order for a property owner to qualify as a witness regarding the damages to his property, his testimony must show that it refers to market, rather than intrinsic or some other value of the property[,]" a requirement that is usually "met by asking the witness if he is familiar with the market value of his property.").

Accordingly, if an owner's testimony reveals that his or her valuation is not based on market value, the testimony lacks probative value and is irrelevant. *See, e.g., Cofflin v. State,* 230 Md. 139, 142, 186 A.2d 216 (1962) ("[I]f it is demonstrated that the owner possesses no knowledge whatever of the market price and condition of the article in question, his testimony may be inadmissible."); *Barber v. State,* 23 Md.App. 655, 656–57, 329 A.2d 760 (1974) ("Although the law is well established that an owner is presumed to know the market value of his possessions and is permitted to give his opinion thereon, when the record shows that he does not in fact know the market

value, his opinion, even though perhaps in some cases admissible, is not alone sufficient to establish value."); *see also U.S. v. 10,031.98 Acres of Land in Las Animas Cty., Colo.*, 850 F.2d 634, 637 (10th Cir.1988) ("[A] landowner's testimony as to the value of his property is not always sufficient testimony on which a verdict can be based. There must be a basis for the landowner's valuation, and when the landowner's own testimony shows that his valuation has no probative value, the district court may determine that the landowner's testimony alone is insufficient to support a jury verdict.").

An owner's valuation that is based on the owner's belief that he or she "could not morally sell the property," or that "no one would buy the property" is not a valuation based on market value. Under Maryland Code (2010 Repl.Vol.), § 12–105 of the Real Property Article ("R.P."), fair market value, defined in the context of condemnations but generally used, is as follows:

> The fair market value of property in a condemnation proceeding is the price as of the valuation date for the highest and best use of the property which a *vendor, willing but not obligated to sell,* would accept for the property, and which a *purchaser, willing but not obligated to buy,* would pay. . . .

(Emphasis added). The concept of market value assumes a willing buyer and seller. Thus, an owner's valuation of property that is based on either the owner's refusal to sell or a buyer's unwillingness to buy is not probative of market value. *See Exxon v. Yarema,* 69 Md.App. 124, 152, 516 A.2d 990 (1986) (explaining that an owner cannot recover for diminution in value from a "psychological factor" because prospective buyers would be reluctant to purchase). *But see Waste Disposal Center, Inc. v. Larson,* 74 S.W.3d 578, 583–84 (Tex. App.2002) (considering as evidence of market value an owner's testimony that her property was worth zero because nobody would buy it as is, and because she would not want to sell the property and give another family the problems she had with it).

Finally, in cases of environmental contamination of land, landowner testimony alone is not sufficient evidence of diminution in value. Rather, expert testimony should accompany the landowner testimony. This is because a landowner is not opining as to market value but rather is opining as to the effect of the contamination of the landowner's property. Only experts are competent to testify as to the effect of contamination (as opposed to other factors, like the ups and downs of the real estate market) on the property's value. The effect of the contamination is beyond a lay witness's realm of knowledge. *See Lakewood Eng'g and Mfg. Co., Inc. v. Quinn*, 91 Md.App. 375, 390, 604 A.2d 535 (1992) (indicating that, while an owner was well qualified to render an opinion as to the fair market value of some of his items, including "food, kitchen utensils, clothing, and children's stuffed animals," he was not qualified to opine as to "the cost of repairs to his home and other costs which were not within his realm of knowledge"); *See also Cunningham v. Masterwear Corp.*, 569 F.3d 673, 676 (7th Cir.2009) (concluding that, even if a landowner knew his property value at time x and x + y, he "could not offer a responsible opinion about the *cause* of a change in the value of his property[,]" and stating that "plaintiffs needed evidence by a real estate agent or real estate appraiser to establish the effect of the contamination on the value of their property"); *Hous. Auth. v. Suydam Investors*, 355 N.J.Super. 530, 810 A.2d 1137, 1149–50 (App.Div.2002), *aff'd in part and rev'd in part on other grounds*, 177 N.J. 2, 826 A.2d 673 (2003) ("[I]f a property cannot be put to any productive use without a cleanup, the costs of that cleanup could have a profound effect upon value. Consequently, the effect of environmental contamination upon a property's value must be determined on the basis of expert appraisal evidence.").[20] *But see Martin v.*

---

**20.** *See also Player v. Motiva Enters., LLC,* 240 Fed.Appx. 513 (3d Cir.2007). In *Player,* plaintiff property owners claimed that the defendant was responsible for the discharge of hazardous substances that contaminated the plaintiffs' drinking water. *Id.* at 515. The trial court excluded the plaintiffs' primary proof of damages—testimony by the plaintiffs' damages expert (a licensed appraiser)—and granted summary

*Shell Oil Co.*, 180 F.Supp.2d 313, 322 (2002) (concluding, where plaintiffs claimed that oil from the defendant's underground storage tank contaminated their drinking water, that expert testimony was unnecessary "because, as the owners, the plaintiffs may testify about the effect of different factors on their own property values and other property damage").

With respect to those property owners who testified as to the impact of the leak on the value of their property-from their perspective as owner-the evidence may have been relevant to the intangible portion of their property damage claim (loss of use and enjoyment), but it had no probative value with respect to the tangible diminution in value claim. The fact that evidence is admissible, or admitted without objection, does not make it legally sufficient. Otherwise, no motion for judgment could ever be granted once evidence is introduced.

### B. Diminution in market value as a measure of property damage

#### 1. Permanent vs. temporary property damage under Maryland law

"When a private defendant's tortious conduct has permanently harmed property, the proper measure of damages is the difference between the fair market value of the property before the injury and after the injury[21] 'together with such loss as ... sustained, if any, in the usable value of the property....' " *Hall,* 121 Md.App. at 24, 708 A.2d 344 (quoting *Havre de Grace v. Maxa,* 177 Md. 168, 9 A.2d 235 (1939)).

---

judgment on the basis that the plaintiffs failed to present sufficient evidence of property damage. *Id.* at 516–17. On appeal, the Third Circuit affirmed, concluding that the plaintiffs' alternative evidence, which included one property owner's testimony that a potential buyer reneged on his offer to buy her property when he learned about the contamination, "[did] not demonstrate that her home declined in value." *Id.* at 518, 522.

**21.** This measure of damages is commonly referred to as "diminution in value."

Indeed, diminution in property value is *only* appropriate as a measure of damage if injury to property is permanent.[22] *See Goldstein v. Potomac Elec. Power Co.*, 285 Md. 673, 682, 404 A.2d 1064 (1979) ("Under Maryland law, permanent damages, past, present and prospective, for diminution in the market value of land caused by a nuisance can only be recovered if the nuisance is permanent."). That legal principle is based on the assumption that injury to the land will continue indefinitely and that the only fair measure of damages is permanent reduction in market value. *See id.* (explaining in the context of nuisances that the rule prohibiting diminution in value absent permanent injury "is predicated on the assumption that the nuisance will continue into the indefinite future, that it will continue to cause injury to the land, and that the only appropriate measure of damages is permanent reduction in the market value of the property resulting from the nuisance"); *see also* 22 Am.Jur.2d. § 260 ("Permanent damages are given on the theory that the cause of injury is fixed and that the property will always remain subject to that injury."). It thus makes sense that diminution in market value is recoverable in cases of Fifth Amendment takings,[23] as a permanent property injury is easily analogized to a permanent taking of property.

Conversely, in an action to recover damages for *temporary* injury to land, the difference between the market value of plaintiff's land before injury and its value afterwards is not the

---

**22.** As an aside, the distinction between permanent and temporary nuisances is relevant not only in determining the appropriate measure of damages, but also in determining whether the statute of limitations bars an action for property damage.

**23.** Where the government takes an entire tract of property, "[t]he damages to be awarded for the taking of land is its fair market value." R.P. § 12–104(a). Similarly, where the government takes only part of a tract, the landowner is entitled to either "the difference between the fair market value of the entire tract before the taking and the fair market value of what is left thereafter[,]" *Brannon*, 305 Md. at 799, 506 A.2d 634 (citing *Big Pool v. State Roads Comm'n*, 245 Md. 108, 113, 225 A.2d 283 (1967)), or "the actual value of the part taken plus any severance or resulting damages to the remaining land by reason of the taking and of future use by the plaintiff of the part taken." *Id.* (citing R.P. § 12–104(b)).

test. *Carroll Springs Distilling Co. v. Schnepfe,* 111 Md. 420, 429, 74 A. 828 (1909) (deeming the lower court's admission of evidence as to the value of property before and after injury erroneous, as the nuisance complained of was a mere temporary one); *see also Baltimore B.R. Co. v. Sattler,* 102 Md. 595, 62 A. 1125 (1906) ("In order to prove the extent of loss on sales, or rental the plaintiff may be permitted to prove the market value of his property before and after the injury complained of, as that would be the best, and perhaps the most satisfactory way to enable the jury to judge of the testimony upon a claim for such damages; or such evidence may be receivable to prove the serious nature, or character of the wrong complained of, although to introduce such evidence in a case of temporary depreciation in the value of property, when no loss of sales or rental is shown, would tend to complicate the case, and confuse the issue."). Rather, the appropriate measures of damages in cases of temporary injury to land are as follows.

"In an action alleging a temporary *nuisance,* the plaintiff may recover damages for the decrease in the value of the use or rental of his property and for the substantial invasion of normal and comfortable enjoyment of [his] property, including the illness of a household member brought about by the nuisance." *Hall,* 121 Md.App. at 23, 708 A.2d 344 (emphasis added) (internal quotations and citations omitted); *see also Yarema,* 69 Md.App. at 133, 516 A.2d 990; *Gorman v. Sabo,* 210 Md. 155, 162, 122 A.2d 475 (1956) ("Where there is a non-trespassory invasion of rights in real property occupied by the owner as [sic] a home, consisting of a temporary private nuisance, the measure of damages is the diminution in the value of the use of the property as a home" including "sickness or ill health of those in the home caused by the nuisance."). In addition to loss of the use of property, a victim of a temporary private nuisance may recover, in some instances, "the cost of defensive improvements made to the plaintiff's property in order to avoid or overcome the nuisance." Richard J. Gilbert and Paul T. Gilbert, *Maryland Tort Law Handbook,* § 18.4, at 229 (3d ed.2000).

Similarly, "[i]n an action for *trespass* or *negligence* in which the defendant's conduct has caused temporary harm to real property, damages may be awarded for the cost of restoring the property to its previous state and for the value of the lost use of the property during the repair period." *Hall,* 121 Md.App. at 24, 708 A.2d 344 (emphasis added). Notably, however, if restoration is impractical or the cost of restoration is disproportionate to the diminution in value of the land, damages are measured by the difference in the land before and after the harm, unless the owner has a personal reason for restoring the property. *Id.* at 24 n. 9, 708 A.2d 344 (citing *Superior Constr. Co. v. Elmo,* 204 Md. 1, 9, 102 A.2d 739 (1954)).

The important question thus becomes: what is the difference between permanent and temporary property damage? Maryland cases broaching this issue are scant, but those that exist address the issue in the context of nuisances. In *Moy v. Bell,* we stated that "the difference between a permanent and a temporary nuisance is that a temporary one can be abated, while a permanent nuisance will be presumed by its character and circumstance to continue indefinitely." 46 Md.App. 364, 371, 416 A.2d 289 (1980). In *Goldstein,* the Court of Appeals explained that a nuisance can be abated "by either discontinuing the offending activity or eliminating the nuisance element." 285 Md. at 678, 404 A.2d 1064. Maryland courts have recognized that the line between a temporary and a permanent nuisance is not easy to draw, as abatability per se can be a close question. *Id.* at 678, 404 A.2d 1064.[24]

Nevertheless, there is one consistent principle running through Maryland private nuisance case law that may provide guidance: in determining whether a nuisance is permanent or temporary, the crucial inquiry is "not the *possibility* of abatement but rather its *likelihood.*" *Moy,* 46 Md.App. at 371, 416

---

**24.** The distinction between permanent and temporary nuisance may be further complicated because, "depending on the facts of the particular case, the manifestation of the permanency of the nuisance may not be simultaneous with the onset of the nuisance." *Goldstein,* 285 Md. at 688, 404 A.2d 1064.

A.2d 289 (emphasis added). In other words, the more likely the nuisance is to be abated, the more likely a court is to deem it temporary. It appears that several factors affect the likelihood of abatement.

First, and most relevant for our purposes, the likelihood of abatement increases when a defendant has entered into an agreement with a regulatory agency to mitigate the nuisance. In *Goldstein*, the Court of Appeals addressed the distinction between permanent and temporary nuisances in answering a statute of limitations question on certification from the United States Court of Appeals for the Fourth Circuit. 285 Md. at 675, 682–83, 404 A.2d 1064. The Court accepted, without deciding, that a nuisance caused by an electric power company's emanation of air, water, and noise pollution from a station that began operation in 1964 was permanent. *Id.* at 683, 404 A.2d 1064. The Court accepted that fact because it was implicit in the certified question, and because the defendant electric company had acknowledged the fact "solely for the purpose of determining whether the action [was] barred by the Maryland three-year statute of limitations." *Id.* Nevertheless, the Court made a point of noting that "the nuisance here alleged may not be of permanent duration, but may be abated," reasoning that in 1978 the defendant had entered into a consent decree with the Maryland State Department of Health and Mental Hygiene ("DHMH") whereby the defendant "agreed to operate its . . . facility in full compliance with Maryland air pollution requirements by 1981 and to take immediate interim steps toward achieving that result." *Id.*

This Court followed a similar line of reasoning in *Hoffman v. United Iron & Metal Co., Inc.*, 108 Md.App. 117, 671 A.2d 55 (1996). There, a high-volume scrap metal processing and automobile shredding facility was bothering nearby residential landowners. *Id.* at 127, 671 A.2d 55. Complaints about the facility began in 1939 and continued on. *Id.* The landowners claimed that by-products (smoke, soot, dust and "fluff") covered their cars, porches, windows, and laundry. *Id.* at 127, 671 A.2d 55. In 1987, a DHMH inspector sampled dust from a landowner's car and found that it contained 5,079 parts per

million of lead. *Id.* at 128, 671 A.2d 55. Landowners tested their soil in 1994 and discovered "elevated" levels of lead. *Id.* Among other things, landowners claimed that the facility's operations had damaged the structure of their homes, cracked their windows and pipes, caused excessive noise, and generally prevented them from enjoying their property. *Id.* at 128–30, 671 A.2d 55. One owner alleged that the frequent explosions aggravated his post-traumatic stress disorder (that landowner was the only one to allege personal injury). *Id.* at 129 & n. 4, 671 A.2d 55. Over the years, the MDE issued the facility many notices of violation. *Id.* at 130, 671 A.2d 55. Finally, the facility and MDE entered into a consent order that was designed to bring the facility into compliance with state air pollution laws. *Id.* Among other things, the facility agreed "to install a wet shredder, which would eliminate air and water emissions and help 'dampen' the effects of sporadic explosions." *Id.* at 130–31, 671 A.2d 55.

Starting in 1993, neighbors sued the facility in nuisance, negligence, trespass, and strict liability, asserting that the facility's operations "constituted at least four different types of nuisances: lead contamination of [their] property, periodic explosions, emissions of air pollutants, such as smoke and 'fluff,' and excessive noise." *Id.* at 125, 133, 671 A.2d 55. The facility moved for summary judgment and the court granted the motion on all counts, ruling, among other things, that the facility "was operating a permanent nuisance; therefore [the plaintiffs'] nuisance claims were barred by the statute of limitations." *Id.* at 131, 143, 671 A.2d 55. On appeal, we reversed, concluding that the facility's a consent order with MDE constituted "evidence upon which a jury could reasonably find that the nuisance was abatable." *Id.* at 144–45, 671 A.2d 55.

A second factor affecting the likelihood of abatement is the likelihood that the government—independently of any agreement with the defendant—will abate the problem. For example, in casting doubt upon the presumed permanency of the nuisance in *Goldstein*, the Court of Appeals noted that, consent order aside, "the nuisance alleged by [the plaintiffs], if it

exists, is subject to abatement through the injunctive process by [DHMH] and the Public Service Commission." 285 Md. at 683, 404 A.2d 1064. This Court followed a similar line of thought in *Moy,* 46 Md.App. at 371–73, 416 A.2d 289. There, we rejected a plaintiff's argument that defendant landowners' excavation of their lots, which flooded the plaintiff's lot, constituted a mere temporary nuisance. *Id.* at 368, 373–74, 416 A.2d 289. The plaintiff had argued that the nuisance was temporary because, *inter alia,* it could be "enjoined by a court" or "abated by the county with storm water drains." *Id.* at 371, 416 A.2d 289. In rejecting plaintiff's reliance on injunctive relief, we reasoned that:

> In addition to her own recognition of the unlikelihood of obtaining injunctive relief because of its unenforceability, . . . [i]t would appear in the absence of evidence in the case of some solution other than reexcavating to its former dishlike surface, injunctive relief would have been denied even if a nuisance was found to exist.

*Id.* at 372–73, 416 A.2d 289. As for the plaintiff's reliance on the possibility that the county would install storm drains, we noted that:

> [T]here was no evidence whatsoever that the county was considering storm drains of any type, let alone something that would alleviate [plaintiff's] problem, only that the possibility existed that [t]he county could do so. The possibility of abatement by public authority without evidence thereof would hardly suffice by her standard of review.

*Id.* at 371, 416 A.2d 289.

Third, when a nuisance is caused by the operation of a public utility, the likelihood of abatement decreases. *See Hoffman,* 108 Md.App. at 143–44, 671 A.2d 55 ("The clearest case of a permanent nuisance is one in which the offending condition is maintained as a necessary part of the operation of a public utility because such conditions are usually of indefinite nature."). This may be because courts are less likely to enjoin the operations of a public utility. *See Goldstein,* 285 Md. at 689, 404 A.2d 1064 ("Because of the quasi-public nature

of the [electric power] facility, the likelihood that the operation would be enjoined upon the suit of a private party was extremely remote at best. . . ."). Thus, this factor may be viewed as a subset of the second factor discussed above. If the converse is true, property damage caused by facilities that are not necessary for the operation of public utilities are at least more likely to be deemed temporary.

In at least one Maryland case, pollution was deemed a temporary nuisance, with no discussion of the likelihood of its abatement. In *Carroll Springs Distilling Co.,* an alcohol distillery company purchased property adjoining the plaintiff's. 111 Md. at 429, 74 A. 828. After acquiring the property, the distillery company erected two seventy-five-foot high smoke stacks on top of its building, at a location thirty-four feet from the plaintiff's property. *Id.* The distillery also built a large slope tank, and dug a sizeable pit for collecting runoff directly next to the plaintiff's house. *Id.* at 428–28, 74 A. 828. The evidence showed that the distillery emitted "smoke and other vapors and noxious matter which spread and . . . settled upon and were deposited upon the soil and surface of such land[;]" that the slope tank emitted foul odors; and that the "accumulation of water in the pit passed through and into the cellar of the plaintiff's dwelling and thereby caused it to become damp and unfit for habitation." *Id.* at 427, 74 A. 828. The Court of Appeals deemed the pollution "a temporary, or abatable private nuisance." [25] *Id.* at 428, 74 A. 828. Thus, the Court concluded that the measure of damages was the annoyance and loss caused up to the time that suit was brought— not the difference between the value of the plaintiff's property before and after the nuisance. *See id.* at 433, 74 A. 828 ("Being an action for temporary nuisance, the damages recoverable ought to have been confined to such as may have

---

**25.** The Court concluded that the trial court's admission of "evidence as to the value of the property before and after the injury complained of" was erroneous, but noted that the error was harmless because the trial court "subsequently instructed the jury that there could be no recovery for permanent injury or permanent diminution in the value of the plaintiff's property." 111 Md. at 429, 74 A. 828.

accrued down to the institution of the suit, subject to such abatement under the rules stated as the jury may have found the plaintiff might have avoided by reasonable effort and expense.").

### 2. *Permanent vs. temporary property injury in other jurisdictions*

A review of decisions in other jurisdictions reveals even more detailed considerations that courts make in determining whether property damage (specifically, contamination of groundwater) is permanent or temporary. As laid out below, those courts seem to focus on the following: (1) whether the contamination will abate naturally on its own, putting the plaintiff's property back to its pre-contaminated state; (2) whether the property can be restored to its pre-contaminated condition by the expenditure of labor or money; (3) how long it will take to abate the pollution; and (4) the amount of pollution. In terms of the third factor, courts have noted that the term "permanent" does not mean "forever," but refers to an indefinite or unpredictable amount of time. Some courts have been more specific regarding length of time, noting, for example, that "a lifetime" of pollution, or pollution for "a great length of time" or for "many years" amounts to permanency. Other courts have been even more specific, suggesting that a pollutant is permanent if its odor remains for five or six years, or if it would take five years to reduce by one half plus an additional five years to reduce by one half again. With respect to the fourth factor (the amount of pollution), other courts have found permanency where sixty gallons of pure gasoline were found in a well and, despite numerous cleanings, traces of gasoline continued to be found in the wells five years later; and where a well was found to be polluted by the leakage of one hundred or more gallons of fuel oil. By contrast, other courts have deemed pollution temporary where the volume of material running from the defendants' operation to the plaintiffs' land was very modest. The cases discussing those factors are described below. In cases where courts deemed the property damage permanent, the court awarded

damages based on the difference in market value before and after injury.

In *Berry v. Shell Petroleum Co.*, the Supreme Court of Kansas rejected the defendant oil company's argument that damage to a plaintiff's water well was only temporary where water from the company's saltwater pipeline had seeped into the well. 140 Kan. 94, 33 P.2d 953 (1934). The court reasoned as follows:

> This court has held that proof that damage to real estate would continue for an indefinite time was sufficient to support a judgment for permanent damages. The evidence in this case was that the water in plaintiff's well had been sweet and wholesome and fit for drinking purposes, and that since the salt water had been allowed to flow into the canal it has become salty, has an oily scum and is altogether unfit for use for any purpose whatever. This court is not prepared to say that when the substrata has once become saturated with salt from an oil well the water moving through it will cleanse it so that the water in the well will become pure again. The evidence on this point is too vague. We doubt if anybody knows.

*Id.* at 960 (citations omitted).

In *Atkinson v. Herington Cattle Co.*, the Supreme Court of Kansas revisited the question of permanent versus temporary property damage, this time holding that evidence was sufficient to support the lower court's award of permanent damages for injury to a dairy farmer's property where cattle feeding operations discharged contaminants into a creek upstream from the dairy farm and the contaminants percolated into the dairy farm's water well. 200 Kan. 298, 436 P.2d 816 (1968). The court emphasized an expert geologist's testimony that "it would take five years to reduce by one-half the nitrate content in the [plaintiff's] well and five years more to again reduce it one-half if the stream flow would cease immediately in [the creek]." The geologist also testified that it would not be feasible to drill another well. *Id.* at 824.

In *Danciger Oil & Refining Co. v. Donahey,* where salt water and oil field refuse permanently damaged the plaintiff's well, the Supreme Court of Oklahoma upheld a jury's finding that damage to the plaintiff's water well was permanent, reasoning as follows:

> The lower court properly instructed the jury that if a nuisance or damage can be abated by the expenditure of labor or money, it is not permanent. Under the facts heretofore detailed, there was substantial evidence justifying the jury in finding permanent pollution of the water well. Defendant's oil well was brought in 1942 and was still a producing well at the time of the trial in 1948. Evidence was produced sustaining the contention that oil field waste and salt water pollution does not clear up for many years, even after production ceases. The chemical analyses of the water taken from the well by both parties disclose a comparable salt water content. No evidence was introduced to show that the injury to the water well can be abated by the expenditure of labor or money. Defendant did request permission to pump out the well and plaintiff advised defendant they could pump it out as many times as they wished to, and that if the water stayed good for six months or a year he would consider it. No effort was made to restore the well by pumping. Whether the injury was temporary or permanent was an issue properly submitted to the jury under appropriate instructions. The word "permanent" in a legal sense is not equivalent to perpetual, or unending, or unchangeable. Permanency, in a legal acceptation of the term, does not mean forever—indefinitely long is sufficient.

205 Okla. 390, 238 P.2d 308, 312 (1951).

In *Cities Service Oil Co. v. Merritt* the Supreme Court of Oklahoma heard a similar case, this time upholding a judgment awarding damages based on diminution in value of property to a landowner whose water wells were polluted by salt water from oil and gas operations. 332 P.2d 677 (Okla. 1958). The court considered the damage permanent because

> [t]he expert evidence was that the subterranean strata were permanently polluted and could not be corrected within a

reasonable period of time by any reasonable expenditure of money. The expert testified that from an engineering and geological standpoint when a water well becomes polluted from the salt water polluted strata that there is nothing that you can do to eliminate it for at least a lifetime.

*Id.* at 685.

In *Schlichtkrull v. Mellon–Pollock Oil Co.,* the Supreme Court of Pennsylvania affirmed damages based on diminution in value of property where salt water from a company's oil operation polluted a plaintiff's water well. 301 Pa. 553, 152 A. 829 (1930). The pollution in that case was permanent because, although the company claimed it would plug its oil well,

[t]here was ... no offer to show that the result of [plugging the oil well] would be to restore the property to its former condition, nor to prove that the plugging would prevent the continued rise of the salt water in the uncased hole, thus preventing its coming in contact with the fresh, which passed through the intervening land to the well, or, if so, the length of time that would be required to accomplish this result. The proposed testimony, indicating a purpose to close the oil boring in the near future, was insufficient.

*Id.* at 831.

In *Sinclair Refining Co. v. Bennett,* the court, applying Tennessee law, held that diminution in value was the appropriate test where a plaintiff's two water wells were polluted by gasoline that escaped from the defendant's tanks. 123 F.2d 884, 885 (6th Cir.1941). In 1934, the plaintiff discovered gasoline in both wells in such quantities as to render them unusable and despite numerous cleanings, traces of gasoline continued to be found in the wells up to the date of the trial in August, 1939, and they have remained useless for drinking, cooking and other purposes, except the roughest needs.... The pollution was so complete in 1934 that 60 gallons of pure gasoline were drawn from the deeper well.

*Id.* The court stated:

In view of the uncontradicted testimony that known gasoline-contaminated wells had not cleared for many years and

> that [plaintiff's] own wells had not cleared of gasoline odor after five or six years, we think the injury, if not absolutely permanent, was irremediable except after the lapse of an unpredictable period of time and that therefore the instruction of damages was not erroneous.

*Id.* at 886–87.

In *Bean v. Sears, Roebuck & Co.,* the Supreme Court of Vermont held that diminution in value was a proper measure of damages where a leak of fuel oil, which occurred because the defendant improperly installed a furnace, polluted the only source of water for the plaintiff's farm. 129 Vt. 278, 276 A.2d 613, 614–16 (1971). The plaintiff's "well was found to be polluted by the leakage of one hundred or more gallons of fuel oil." *Id.* at 615. The defendant argued that the damage was merely temporary and that the appropriate measure of damage should be the cost of restoration of the property to its former condition. *Id.* at 616. More specifically, the defendant argued that "the pollution of the well was repairable by use of a filtering device which it had made available to the plaintiffs for a year after the water supply became polluted." *Id.* The plaintiffs tried the device, but then declined to repurchase it, choosing instead to bring water to the farm by jugs. *Id.* The court rejected the defendant's argument, noting that, although the taste of the water improved with the filtering device, the presence of kerosene was clearly indicated after the filter was disconnected, and "there was no obligation on the part of the plaintiffs to revert to a temporary expedient suggested by the defendant to its advantage which failed to cure the harm which the defendant had brought upon them." *Id.* The court also noted that

> there is evidence from the state geologist that the damaging effect of the oil pollutant cannot be precisely fixed, but that it will remain for a great length of time. He pointed out that the movement of the water in itself is not sufficient to

clear out the pollutants; natural purification could take a great many years.

*Id.* at 616.

## XI. Application of property damage law to facts of each case

### A. *Withdrawn claims and unchallenged claims*

Andrea and Veronica Greco withdrew their claim for property damage/diminution in value. The jury, nevertheless, awarded them property damage equal to the full pre-leak value of their property. The circuit court erred in denying appellant's motion for JNOV with respect to that claim. We would reverse that judgment and enter judgment in favor of appellant.

Appellant does not challenge on appeal the property damage/diminution in value awards entered in favor of Martin Brady, John Csicsek, and Ian Murray. We would affirm those judgments.

### B. *Properties with owner testimony that property was worthless*

The view of the majority of this Court is that owners of 26 properties testified that the property owned by the person testifying had no value. We count 11 properties whose owners testified that their property was worthless or the equivalent of the concept of worthlessness. They are the Howe, Flora, Peters, Jenkins, Batton, Babcock, Tizard, Baig, Carroll, Schech, and Hannan properties. We count another 12 properties, at most, whose owners testified in a manner that the majority equates to zero value. Those owners questioned their property's value, saying they would not sell or that no sane person would buy, without actually stating that the property was worthless. The reasons given were that (1) no sane person would buy the property, (2) the person testifying would not buy it if they did not live there and were looking for a house, and (3) the person testifying would not sell it either because the testifying person did not want to move or as a

matter of conscience and good morals would refuse to sell it to anyone.

Preliminarily, we note that the testimony related only to the testifying owner's property. If the testimony has any probative value, it applies only with respect to those properties about which the owners testified. In other words, an owner's testimony as to the value of that owner's property has no probative value as to other properties.

We conclude, however, that the testimony has no probative value, not even as to the properties which were the subject of the testimony. The measure of damages used below was tied to market value of the properties. Market value has a definite meaning in the valuation context. None of the testifying owners purported to do an analysis or even express an opinion as to market value given a hypothetical willing buyer and seller, as opposed to merely expressing their own personal opinion. An expression of personal opinion not keyed to market value has no probative value. See X.A. That is particularly true when the opinion is based on the testifying individual's conscience. While the evidence may have been admissible to shoe state of mind relevant to the nuisance claim, it was not evidence of value.

Judge Zarnoch identifies two appellees as real estate agents or brokers. One of them, Gary Flora, was a real estate agent who testified that he would not sell his property because of conscience. He did not testify as to market value. The other appellee, Carolyn Heggie, did not testify that her property was worthless. Moreover, no appellee testified as an expert, and none were questioned as to training or experience so as to accredit a lay opinion. Judge Zarnoch relies on the evidence of "stigma" in the community, but as discussed in this opinion, there was no evidence of a permanent stigma and no expert testimony that any temporary stigma caused a zero value. We acknowledge the testimony by Kenneth Thompson that "the town idiot, if we had one, would know that you can't sell a house in Jacksonville." We assume the reference was a variant of the more commonly used slang expression, "Village

idiot," referring to a well known unintelligent person in the community. In our view, the evidence has no probative value.

### C. All properties

Aside from the testimony by certain owners discussed in the preceding section, there was absolutely no evidence that any of the properties in these cases were worthless. As discussed above, appellees's expert testified that the properties had value and expressed his opinion about the extent of diminution in value. In addition, there was evidence that some of the appellees' properties sold after the leak, and a substantial number of other properties in the area sold after the leak, all at substantial prices. Consequently, there simply was no evidence that the properties were worthless, in terms of market value.

In ruling on appellant's motion, the circuit court erred by not conducting an individualized review of the judgments and granting new trials. Consequently, we would reverse the property damage judgments and remand all cases for a new trial, except those in which JNOV was granted or is unchallenged.

The retrial would include cases in which judgments for property damages were entered even though there was no evidence of actual or likely contamination. Evidence of actual contamination is not required to maintain a loss of value of use and enjoyment claim. Here, unlike in *Yarema*, 69 Md.App. at 152, 516 A.2d 990, there was no evidence of governmental restrictions on the use of water, making home improvements, or on sale of the properties. Nevertheless, to the extent a homeowner proves loss of value of use and enjoyment as described above, and specific to the property, the homeowner is entitled to compensation.

### XII. Law applicable to new trials

In VII. B., we discussed the law applicable to emotional distress claims, without fear of future disease. In our view, that law is applicable on remand.

With respect to property damage, the law's objective, as it is in all compensatory actions, is to make the claimant whole. In these cases, the evidence adduced by the appellees was that a leak, such as the one in question, has a life cycle with decreasing negative impact over time. Although there was evidence that there can be a residual effect from a leak, there was no such evidence in these cases. The evidence was that appellant entered into a consent decree with MDE, and remediation efforts were ongoing, with stated goals. There was evidence that natural attenuation is occurring. There was absolutely no evidence that the negative impact on property values has continued and will continue into the future. Indeed, there was no evidence at all as to future values.

We have set forth the law, in various jurisdictions, applicable to property damage. *See* X.B. We conclude that, based on the evidence in these cases, the appropriate measure of damages is the amount necessary to compensate for the decrease in value of the use and enjoyment of the property, (or decrease in rental value of the property if applicable), based on current impact on value and probable future impact on value, determined by consideration of all of the evidence. In our view, on remand, the jury should be so instructed. The jury's assessment should be individualized so as to take into account a property owner's current desire to sell, or current need to sell, assuming such evidence. This is in accord with the general rule that compensatory damages are to compensate for actual loss, and that damages are determined by past losses and probable future losses.

## XIII. Appendix

Appellee Hilton Dobb resides with his wife, Amy, and their two children, Madison, age 5, and Wyatt, age 2.[26] The Dobbs bought their house in Jacksonville because the area was rural, but close to Towson, and generally was regarded as "the place

---

26. We will address the appellees in the order in which they testified at trial. The ages of the children, unless otherwise noted, are as of the time of trial.

to be." Mr. Dobb stated he never anticipated a gasoline leak because he relied on appellant to have systems to protect against leaks. He learned about the leak when he saw it reported on the news. He purchased bottled water, starting that evening. Appellant supplied the Dobb family with bottled water. Mr. Dobb had a POET[27] carbon filtration system installed at his expense in October/November 2007.

There are 4 monitoring wells on the Dobb's property. The property was part of a construction area, and play was limited for the children. Trucks were an impediment to travel. Piping was trenched on the property to discharge treated water as part of the remediation effort. Both of the chemicals in question were found in the Dobb's potable well. Appellant tests the well monthly. According to Mr. Dobb, the community is generally known as a "contaminated" community. Guests at the Dobb's house frequently ask questions and joke about the leak.

With respect to property value, the following exchange occurred:

Q. Hypothetically if I was to tell you that the Plaintiffs' expert in this case would testify that the value of your property has been significantly impacted and that the diminution to your property is in the range of 60 percent diminution as a property owner and as a resident in this community and as a homeowner, would you agree with that?

\* \* \*

The Witness: Again, I'm not a professional, but as a property owner, I would tell you that I can't imagine who would buy a house that has four monitoring wells on the property that have all been positive for contamination and a drinking well that has had MTBE and benzene in it, cancer causing materials. What family would want to buy that house?

---

**27.** The acronym stands for a whole house point of entry treatment system.

Mr. Dobb did not drink the well water after learning of the leak but did use it for bathing. The first positive test for MTBE in the Dobb's well was on August 6, 2007, at .076 ppb, and the second positive test was on October 2, 2007. Fourteen later tests were non-detect. The Dobb's well tested positive for benzene on March 4, 2008, at 0.42 ppb, and again on May 6, 2008, at 0.15 ppb. This was followed by four non-detects.

Mr. Dobb testified that he was "fearful" that he or his wife or children would contract cancer or some other disease as a result of exposure to the chemicals. That fear was not lessened by the fact that the last several tests detected no chemicals. Mr. Dobb stated he experienced "a great deal of stress," "a lot of anxiety," "a lot of sleeplessness," and "a lack of ability to focus on his business." He went to his general practitioner and to Dr. Malik, and continued treatment. He was prescribed Lexapro and Rosarum, which helped.

Mr. Dobb described his concern for his children. He stated that the 5 year old is "scared" because "the water is poisonous."

Ms. Dobb testified that, because of the remediation activities, their children were limited in playing outside. She said she has cried at times, and she complained of "nervousness," "anxiety," being "scared" of a disease, and being "angry." She saw Dr. Malik but did not pursue treatment.

Mr. and Ms. Dobb are subject to the Stipulation.[28] Dr. Malik noted, with respect to Mr. Dobb, an "anxiety disorder" and recommended treatment. With respect to Ms. Dobb, he noted "depression (single episode)," and recommended treatment. The children did not see Dr. Malik, and they did not testify.

---

28. Dr. Malik defined "depression" as a form of "mood disorder," defined "generalized anxiety disorder" as worrying "excessively," and defined "post traumatic stress disorder" as "the experience people have after going through any significant trauma which is beyond human control and that can threaten their safety or life."

Walter Paul Merski testified that he bought his house because it was in a highly desirable area and in reliance on his belief that there would be no gasoline leak. Originally, his wife and two stepchildren were plaintiffs. They dismissed their claims, after the marriage fell apart, and his wife and stepchildren moved out of the home.

Mr. Merski's potable well was tested 7 times with no detection of chemicals. In April, 2006, Mr. Merski, age 66, was diagnosed with prostate cancer which he attributed to exposure to Agent Orange during the Vietnam War. He had surgery and was cancer free at the time of trial. Mr. Merski testified that he was drinking his well water at the time of trial but was afraid that his well might become contaminated in the future, and he was fearful of "getting cancer again." Appellees' expert testified that Mr. Merski's property was unlikely to become contaminated. Nevertheless, Mr. Merski stated that his fear had increased as a result of hearing the testimony at trial.

Mr. Merski testified that he had

a lot of anxiety; worried about my financial future; worried about my health; at times not being to sleep, get a full rest at night; not being able to concentrate at work; worried about, again, financial situations and now health concerns.

As to sleeplessness,

Q. Okay. The sleeplessness, approximately how often do you have difficulty sleeping?

A. That's a little difficult to say. I find myself waking up at about 3, 4 o'clock in the morning and just lying in bed rolling and tossing.

Q. And is that related to the financial impact that potentially this case may have if you try to sell your home?

A. It is certainly a whole lot of anxiety as a result of that. I mentioned earlier I had my life savings put into this house. It was going to be my investment for the future. Now, it is not looking very promising.

Mr. Merski saw Dr. Malik on one occasion and, after that, saw his personal physician. He acknowledged problems associated with his prostate cancer and the breakup of his marriage.

With respect to the value of Mr. Merski's property, the following is relevant.

Q. And from what you have experienced in this case and what you have seen after the leak in question in this case, do you still believe that this particular area of Baltimore County is highly desirable?

A. Right now, it does not appear real estate is moving at all, especially anywhere in the area near the Exxon gasoline station.

Q. As homeowner and resident in the community, do you believe that the value of your property has been impacted by the gasoline leak in this case?

A. Oh, yes. I believe that the value of my property has gone down significantly. There are two building lots in my development that the current owners just cannot sell the properties because of the market conditions in the area as a result of the Exxon gas leak.

* * *

Q. Now, hypothetically, if your expert was to testify that as a result of the leak in this case and as a result of the stigma associated with this area and the potential impact of contamination on your property, the value of your home has decreased approximately 30 percent, would you agree with that hypothetical question?

A. It may be more than 30 percent, depending on whether or not my well gets contaminated.

Q. Well, without taking into consideration contamination.

A. I would agree with that 30 percent diminution in value.

Q. Just so we are clear, if your well becomes contaminated in the future, then you would believe it would be more than 30 percent, is that correct?

A. That is correct.

Q. Okay. We talked about stigma. We talked about public perception. Is there any other reason why you believe the value of your home has decreased in value as a result of the leak in this case?

A. Not that I am aware of.

On cross-examination, Mr. Merski acknowledged that, in 2008, in their divorce proceeding, he and his wife valued their property at $1,002,500.

Mr. Merski did not install a POET system. He had no remediation equipment on his property, and there was no interference with the use of his property.

Mr. Merski was subject to the Stipulation. At trial, Dr. Malik did not discuss Mr. Merski.

Paul David Ford resides with his wife, Judith. He is a real estate agent, but he did not testify as an expert. He installed a carbon filter system in his home in 2007. He understood that MTBE had been found in his potable well, along with PCE (tetrachloroethylene), which is not found in gasoline. He knew that PCE is a carcinogen, and its presence was one of the reasons he installed a carbon filter system, although he made no inquiry as to the effect of PCE until January 2008. There were no remediation activities on his property. With respect to remediation generally, construction activities had subsided substantially by August or September, 2006; thereafter monitoring activities continued.

Mr. Ford had psychological issues before the leak for which he was treated with therapy and medications. He testified to feeling "angry," "anxiousness," "sleeplessness," and having headaches more often after the leak. He saw Dr. Malik once. He was not subject to the Stipulation. At trial, Dr. Malik testified that Mr. Ford was suffering from depression.

In April, 2007, the Fords received an equity line of credit, which they used to make improvements on their house. Mr. Ford stated there was a stigma to the neighborhood as a result of the leak and that he thought his house had lost value:

again, I don't think at this point I can sell my house at all. I am sure there is a value that someone will pay for it, but, again, as a real estate agent, if I brought a buyer in, the first thing you ask for when you write a contract, you call it the disclosure. As soon as that came across and I disclosed the well was contaminated, I would tell my buyers to walk away. As an agent, I wouldn't even entertain writing a contract.

Judith Ford testified that she was impatient, and experienced headaches. She saw Dr. Malik and continued treatment with a therapist. She stated that the litigation made her anxious. She had received therapy and medications before 2006. The Fords had gone to marriage counseling before 2006.

Ms. Ford was subject to the Stipulation. At trial, Dr. Malik testified that Ms. Ford suffered from preexisting depression which was made worse by the leak, and she had post traumatic stress disorder, as a result of the leak.

Lisa DeKoomen resides with her two children, Luke, age 11, and Seth, age 10.[29] The witness described herself as committed to "organic and chemical free living." She had a radon detection system and a carbon filter system put in her house after moving in. Generally, she used bottled water before the leak and used it more after the leak, specifically, for cooking.

---

29. As noted earlier, the questioning of many of the appellees followed the same pattern. At the beginning of this section of the opinion, we summarized the testimony generally. In some instances, with respect to emotional distress, an appellee described his or her observations of another person in the same household. When duplicative of other testimony, we will not summarize such references in an effort not to further lengthen this already long opinion.

Much of the direct examinations of the appellees was in the form of overtly leading questions, without objection. Often, therefore, what is presented in this opinion as "testimony," in quotation marks, is taken from the question, not the answer.

Ms. DeKoomen stated that she had been recently divorced from her husband.

With respect to property value, the following occurred:

Q. You think that the value [of your property] has gone down significantly after the spill?

A. Well, I am not sure how you can assess that, but basically I would not buy it right now. Nobody in their right mind would buy it.

When Ms. DeKoomen and her husband separated in March 2003, she was told she needed to see a psychologist. She did, but did not like him.

Ms. DeKoomen testified that she had a "fear of future carcinogens that could affect my children." She described panic attacks, headaches, and sleeplessness, which she attributed to the litigation and, more specifically, to having her depositions taken during the litigation.

Ms. DeKoomen saw Dr. Malik on one occasion. She was subject to the Stipulation. At trial, Dr. Malik testified that Ms. DeKoomen was diagnosed with depression prior to the leak. As a result of health and financial concerns stemming from the leak, she was suffering from an "anxiety disorder." He recommended continuing with psychotherapy.

Ms. DeKoomen refinanced her house in 2007. In February 2007, the house appraised for an amount in the range of $760,000 to $800,000.

Ms. DeKoomen's children did not see Dr. Malik and did not testify.

Jodi Howe testified that she lives with her husband, Thomas, and their two children, Corrine, age 15, and Grant, age 12. After learning of the leak, the family stopped using well water for drinking and cooking. They did not purchase a carbon filter system. Ms. Howe stated that she was "concerned" about chemicals found in her well, which included chloromethane, carbon disulfide, and chloroform, none of which were connected with the leak. There were no remediation activities on the Howe property.

With respect to the value of the Howe property, the following exchange is relevant:

Q. Do you believe that your property value has been impacted by this leak?

A. Absolutely, I believe it has.

Q. And what is the basis of that belief, of that opinion?

A. Basis of that opinion would be the comments that are consistently made to you, no matter where you go, regarding the area and the spill in the area and I can't imagine anyone in their mind would buy my house. Why in the world would you buy a home in that area and, I guess I put myself in their shoes and say, if I had my choice of two homes that are for sale, I'm not going near Jacksonville and buying a house near there.

Q. You have talked about how you have heard from other people, you know, comments, I believe you said it was embarrassing at times?

A. Yes, it is.

Q. Do you believe there is a stigma now associated with this community, this area in Baltimore County?

A. Well, I'm sure. Jacksonville on at least two occasions has been addressed to me as the Love Canal of Baltimore County.

Q. If I was to tell you that hypothetically, your expert was going to testify that as a result of the contamination and stigma attached to your property, the diminution of devaluation is approximately 60 percent, would you think that was a fair number, fair and reasonable number?

A. No, I think a hundred percent is the correct number. I cannot imagine why anyone would buy a home in this area.

Ms. Howe testified that she was fearful that she or a member of her family would contract a disease as a result of the leak, and that her fear produced stress, feelings of guilt, and anxiety. She also testified that the decrease in value of her property had caused stress, frustration, anxiety, sleeplessness, and crying. Ms. Howe's father was diagnosed with

lymphoma shortly before trial, unrelated to the leak. That added to the fear of future disease. She went to her personal physician, who prescribed a sleep aid, and to Dr. Malik on one occasion.

Ms. Howe stated her children were "upset," "embarrassed," and afraid that they would have to move to another location.

Thomas Howe testified that he shared his wife's opinion concerning the negative impact of the leak on property values. He explained "there is a significantly negative stigma regarding our area and all of the initial news reports and so forth." He said he was "very fearful" of future disease. When asked why, he responded:

> Well, what I had known about MTBE and its ill health effects were a definite concern for us even just after the leak occurred. Hearing Doctor Rudow [sic], I believe was his name, discuss the information and so forth, it has probably even heightened my concern about the small levels, the even minor exposure and how that can truly and adversely affect you and your health.

With respect to distress, Mr. Howe stated that he experienced a

> tremendous amount of sleeplessness, concern for my family, immense concern, are we, have we done the right thing with regard to staying put? I would say that I'm probably far more irritable than I have ever been in my past. I think that it seems to be in line with the events that have occurred, trying to maintain a level of steadiness for my wife and children to make sure that they feel safe and feel comfortable, attempted to shoulder a tremendous amount of the burden. Hopefully, I have done well.

The witness consulted his primary care physician once or twice and Dr. Malik once.

With respect to their children, Mr. Howe stated that his son has

> filled up at the prospect of having to move, of being on the receiving end of reminders about water usage and, you

know, you have got to remember to use bottled water when brushing your teeth, you can't forget, and that has certainly gotten to him to the point where, you know, he will fill up over it because it's a source of contention between the four of us.

By Mr. Howe's observation, his daughter had a "sense of embarrassment."

Mr. and Ms. Howe were subject to the Stipulation. With respect to Mr. Howe, Dr. Malik noted "acute anxiety reaction, adjustment reaction with mixed emotional features" and did not recommend treatment. With respect to Ms. Howe, Dr. Malik noted "adjustment reaction with mixed emotional features" and did not recommend treatment. The children did not see Dr. Malik and did not testify.

Andrea Greco testified that, prior to June 2006, he lived in Jacksonville with his wife, Veronica, and their four children, Luca, age 11, Alexa, age 9, Marco, age 8, and Matteo, age 4. Mr. Greco obtained a job in Texas before the leak, and thereafter, he commuted. In June 2006, the family moved. Mr. Greco's employer purchased his home and in August 2009 sold it for an amount in excess of its pre-leak value.[30]

At the time of trial, Mr. Greco's house had not been re-sold, and because the employer had not refinanced it, Mr. Greco was still on the mortgage. He testified that, even though his employer was paying the mortgage, he was experiencing a lot of stress because of his liability on the mortgage and because he was in a new environment. He also was concerned about the family's health. He explained that his reaction to stressful situations is "my neck starts hurting. And also, I have acid reflux that manifests itself in pain, especially during the night." He did not consult a doctor.

---

**30.** The employer had not sold the home as of the time of trial. In its brief, appellant noted that the subsequent sale is reported on the Department of Assessments and Taxation website, capable of judicial notice.

Prior to the leak, Mr. Greco used bottled water, but other family members used faucet water. The family used bottled water for everything after becoming aware of the leak. Based on his belief that he was exposed to chemicals after the leak but before he learned about it, Mr. Greco stated that

[t]he fear is that the effects could manifest themselves over time. So we haven't seen the end of it, or even the beginning of it necessarily. Hopefully not. But that's certainly a fear for future potential.

Mr. Greco stated that

[f]or me, personally, it was sleeplessness. I was, you know, very stressed at work. I had, again, acid reflux situations. My neck was hurting. My head was hurting. I wouldn't sleep at night. I lost weight. Those were mainly it.

Mr. Greco observed that his wife was not sleeping at night, because she would call him during the night. Also, she "would get cold sores or skin manifestations of stress" and was "losing weight." When he came home on weekends, his wife was "extremely tired, extremely depressed, in terms of her— her outlook of life at that point."

Mr. Greco stated that their children knew "what was happening" and were "affected by it." He described his daughter Alexa as "almost the police girl of the other kids," telling someone if a child washed his hands with tap water.

Veronica Greco stated that she had a "fear of the unknown." She explained

that because there haven't been any studies done in human beings, we may be the first study, in Jacksonville. And, you know, when—the things you do read about, small lab animals, well a 1–year–old is about the size of a small lab animal, and the tests are conclusive in those situations.

So that is my fear, that are we equivalent to the lab animals, and are we at risk? Are we gonna show up with cancer one day, or other ailments?

Ms. Greco stated that between January and June 2006, she "wasn't sleeping . . . and just trying to get through the day,

like a walking zombie." She also was experiencing the stress of moving and of her husband being absent. Since moving, "it's different," but

> when, you know, you wake up in the middle of the night sort of with all of those normal worries going through your head just of life, that absolutely is one of the worries that still plays out in my head.

None of the Grecos saw Dr. Malik. The children did not testify.

Linda Berlin resides with her husband, Dennis. She testified that no chemicals had been detected in her well but water is not static and tests are only good on the day tested. She feared contamination in the future, and drank only bottled water.

Ms. Berlin stated that the value of her home had been affected, and she believed there was a stigma attached to it.

With respect to emotional distress, the following exchange occurred.

Q. I wanted you to give a description of your emotional well-being since this gasoline spill.

A. Concerned. Upset at Exxon. Water. Sale of property. Health is always on my mind. Concerned about the future. Annoyed by the fact I have to keep buying bottled water. Fear over the fact that I'm eventually more than likely going to have a contaminated or detect well, and I may even have—have substances in there now that I just don't know about.

It's basically a fearful state of existence since this happened. Just fear, plain, simple fear. Fear of not knowing what's gonna happen. Fear of not knowing who's gonna be affected. Fear of the whole neighborhood being destroyed. Fear of the town being destroyed. You're in a constant state of not knowing. There's no security whatsoever. Uncomfortable.

Q. And do you have a fear of your possible exposure to contaminants during that 37-day period—

A. Sure.

Q. —while you were drinking the water?

A. Sure. Yeah. Initially I didn't think about it. But the more I think about it, sure. 37 days, who knows what was in the ground?

For something to happen over 37 days, now all of a sudden somebody says something, made me even think last night while lying in bed, my gosh, I've been there since '97. Exxon only said 26,000 gallons because it's pretty big. You can't hide a 26,000-gallon leak. What if there had been a 4,000-gallon leak in 1999 that I don't know about? Or '97 that I don't know about? Who knows. I have no idea.

Q. Mrs. Berlin, you expressed that you have a lot of stress, a lot of fear, fear of the unknown, fear of future disease possibly?

A. Sure.

Q. Okay. Do you ever have any physical manifestations of those emotions, like headache?

A. I can cry. Okay? If I talk to somebody about the situation, I'll cry. Because it's a very sad situation. That's it. It's simply sad.

The whole environment, the whole neighborhood, the whole town, the people. It's sad, and it's annoying because there's a lot of lack of concern about the human element here. It's all business, no concern about the people.

No warning. No knock on the door. No letters. No phone calls. Dear resident letters, you're on, you're cut off. You get water, you don't get water. That's it.

Q. What, if anything, do you do to cope with your anxiety or your stress?

A. I pray.

Q. Have you sought any help from any physicians—

A. No.

Q. —or any mental health care—

A. No.

Q. —providers?

Dennis Berlin testified as follows with respect to the impact on his property:

Q. Let me ask you this, do you believe that the value of your home has diminished since this gasoline spill?

A. I don't see how anybody could purchase the house in a remediation site. I don't see how it is even possible to invite someone to come in to to [sic] look at a house and, with all seriousness, invite—have them consider having their family live in an active remediation site.

Q. Now, our experts are claiming that the diminished value is approximately 60 percent for the plaintiffs' homes. Would you agree with that approximation?

A. No.

A. I don't see how anybody could purchase any home in our area right now.

Q. Do you believe that there is a stigma attached to your community regarding the spill?

A. Without question.

As to emotional distress, Mr. Berlin testified:

Q. Okay. Do you have any fear of your health being jeopardized?

A. I think that is legitimate. I think that is legitimate. And the answer is yes. I don't have a strong fear but I have an ever present and credible sense of concern. Let me put it that way.

Q. Has this spill caused you any stress or anxiety?

A. Yeah, I have been really angry.

Q. Angry?

A. I have been very angry.

Q. Has that stress and anxiety, anger manifested itself in any physical way?

A. I take a lot more walks. Try and stay away from talking about the subject too much. I didn't want to come into the courtroom before my appearance because I didn't want to get upset over what I hear. Believe me, I get very upset over what I hear but I don't want to hear those

things. I want Exxon to be pro-active. I want them to step forward and take care of those families that they put in harms way.

Mr. and Ms. Berlin did not see Dr. Malik.

Elaine Lindsay, a 64 year old retiree, resides with Tresia Parks. Ms. Lindsay stated that she used well water prior to the leak, but afterward used bottled water for drinking. She was not very concerned because no chemicals were detected on her property. After listening to the testimony at trial, however, she became more concerned. In opening statements, she "found [out] that there's a possibility that the contaminated water could hurt your skin. That started freaking me out." She experienced "anger," "helplessness," "anxiety," and "depression." She slept whenever possible, "ten to twelve hours." Some of those concerns relate to uncertainty as to "long-term care" and financial matters. Ms. Lindsey was being treated for depression prior to the leak; she believed the effects of the leak "exacerbated" her depression.

Tresia Parks stated that she had post traumatic stress disorder prior to the leak. After the leak, she experienced "anxiety" and "depression," that were different from her prior condition. She experienced "anger" and had trouble sleeping after the leak.

Ms. Lindsey and Ms. Parks did not see Dr. Malik.

Thomas Benney resides with his wife, Lisa, and their two children, Jessica, age 20, and Chelsea, age 17. No chemicals were detected in their well. Appellees' expert testified that contamination of their property in the future is unlikely. With respect to property value, the following occurred:

Q. As a result of the Jacksonville gasoline leak, has your property decreased in value?

A. Absolutely.

Q. Why do you say that?

A. Well, because, if you have to market a property and identify it as being six-tenths of a mile from a remediation site that's going to be ongoing for the next ten to 15 years,

as a salesperson or as a realtor, that's got to be a difficult position to put them in to sell the darn thing. I just believe knowing that I have to live with that, how I would feel about considering buying a house in that situation.

Q. Remediation activities. Is that any factor in the value of your home?

A. It absolutely is. Yes.

Q. And is the fear of your well becoming contaminated, is that something that a potential buyer would consider you believe?

A. Well, I believe it would have to be disclosed. So I would believe that a person should have to have some logical fear, if they're going to bring their family and their selves to live in that home.

Mr. Benney stated that he might want to sell his property at some point and he had a fear of declining property value. He also had a fear of potential exposure to chemicals but stated he was not making any claim for fear of future disease. Neither he nor his family members consulted a doctor. Mr. Benney testified that no one in his family "had suffered any medical, psychological, emotional or psychiatric condition that [he] would attribute to the leak."

Lisa Benney testified as follows.

Q. As a result of this gasoline leak, can you tell me what fears you have?

A. I fear that we could be exposed to MTBE and have serious health risks.

Q. Do you also have a fear that the value of your property can go down as a result of this gasoline leak?

A. Very much so.

Q. Regarding your children, do you have a fear that they may be exposed to contaminants or gasoline as a result of this gasoline leak?

A. I do.

None of the Benneys saw Dr. Malik. The children did not testify.

Tracey Flora resides with her husband, Gary, and their three children, Megan, age 20, Matthew, age 17, and Brad, age 13. The Flora residence was in a group of six with the highest potable well readings of MTBE. Prior to the leak the Flora family ordinarily did not drink the well water. After learning of the leak, they stopped drinking it altogether.

As to property value, the following testimony by Ms. Flora is relevant:

Q. Okay. Do you feel that the value of your home has diminished because of the spill?

A. I personally feel it's worthless because of the spill, I mean, not just diminished, I just, I can't imagine why anybody in their right mind would pay anything for my house that has consistently for, what was it, 900 days, or something, been testing with contamination. It just, it makes no sense to be-would be worth anything.

\* \* \*

Q. -you-you, you don't think you could get the fair value for [your house], is that right?

A. Well, we, we weren't really planning on, on selling it. But we feel that we don't have any kind of an option there at all. And I, to me it's not just about the diminishment of, of property; it's about the fact that I personally believe that I couldn't, in any good conscience, sell it to anybody knowing what I know about our well. And I, I just couldn't do it.

Ms. Flora described "fear" and "worry" about the uncertainty of what might happen in the future "with one of my kids." She described "helplessness," "worry," "sleeplessness," "headaches," for which she takes Advil, and a fear of future disease. She saw Dr. Malik on one occasion. She was subject to the Stipulation. Dr. Malik noted "anxiety disorder" and recommended treatment.

Gary Flora, a real estate agent, testified as a lay witness that, in his opinion, "there is no value to the house with it being contaminated with MTBE in our well." Later, he stated:

What we're saying is with the contamination in our well, and especially both of us being licensed real estate persons, we would have to disclose the contamination in our well. So how in good conscience could we sell it to someone with the contamination levels we have in our well. So, therefore, yeah, it's, it's worthless.

Q. Because you don't think anybody would buy it, or you just, you don't think it would be right to offer it for sale it?

A. Wouldn't be right to do that.

The Floras obtained home equity loans or refinancings on three occasions after the leak, in December 2006, and March 2007, and April, 2007, in the amounts of $301,600, $525,000, and $187,000, respectively. Mr. Flora explained that "nobody in their right mind" would pay the amount of the appraisals of their property that supported their loans/refinancings and may have been made without knowledge of the leak. The appraisals were "just simply paper running around."

Mr. Flora stated he and his wife cried together over the spill, he lost sleep, and the whole family was "worried." He and the three children did not see Dr. Malik. The children did not testify.

Edward McLewee resides with his wife, Barbara, and daughter, Lauren, age 21. The McLewee property is in the strike zone and has monitoring wells and piping located on it. With respect to the value of his home, Mr. McLewee testified as follows:

Q. Do you believe that the value of your home has been negatively impacted or affected by the gas leak in 2006 and resultant remediation activities?

A. Yes, I do.

Q. Can you tell the Ladies and Gentlemen of the jury why you believe it has been affected?

A. I can't see how anybody given a choice would buy my house. I wouldn't buy it today. I am not sure anybody here would buy my house if there were choices elsewhere.

Q. You understand the Plaintiffs have hired experts to address the amount of diminution in the value of your property?

A. Yes.

Q. If you were buying in this area, would you personally purchase your property knowing it was contaminated?

A. No, I would not.

Q. Do you have an opinion in this case regarding the value of the property?

A. I don't have an opinion of the dollar value of my property, but like I said, I can't see why anybody would want to buy it. I would think if there were a hundred people in the market for a house in that area, I would think 98 percent of them wouldn't even consider it.

Q. What about the perception of others? How do you think this leak has affected the perception of others regarding the community of Jacksonville?

A. I think that there is a tremendous stigma on our community now that it is the area where there was an Exxon leak.

Mr. McLewee testified that, because MTBE and benzene were detected in the monitoring wells on his property, he feared that the contaminants would get into his potable well. He also stated that he recently had learned that bathing in contaminated water could result in contaminants getting into the body. When asked about the effect, on an emotional level, of learning that, he responded:

Well, it's the fear. We talked about the fear of what it may be doing to my health. You know, I am very angry that this has been allowed to happen with all the technology and resources available that how this has happened, I am very angry about that. I am afraid for my future as far as the value of my property goes. It's our primary investment and it's taken away all the options we had. If we wanted to down size or do anything at all, I feel like those options have been eliminated. I feel like I have been bullied and just feel like my options have been taken away.

The witness saw his personal physician on several occasions because of difficulty sleeping. The physician prescribed a medication, and later a milder medication, which helped considerably. The witness also stated it was hard to concentrate at work. He saw Dr. Malik once and an associate in his office 4 or 5 times. That doctor prescribed a generic form of Zoloft.

Mr. McLewee testified that Lauren was "very concerned about the effect it might have on her health." Mr. McLewee also stated that Lauren "wasn't comfortable living there" because she could not sunbathe and "[w]henever there were men in the area, she wouldn't go outside."

Barbara McLewee, a real estate agent, testified

Q. As a real estate agent, do you believe the value of your home has been affected by this leak?

A. Definitely.

Q. Do you understand that you have an expert in this case?

A. Pardon me?

Q. Do you understand you have an expert regarding the valuation of your property?

A. Yes.

Q. Hypothetically, if I were to tell you as a result of contamination and everything that's been done to your property, your expert would testify the value of your property has been reduced by 60 percent as a result of this leak, would you agree with that?

A. I don't know 60, but we definitely would be worth half of what it used to be worth.

Ms. McLewee also stated that the leak affected property values in the community generally and opined they "have decreased 50 thousand, some of them a hundred thousand less than what they were originally sold for."

Ms. McLewee suffered from "migraines" prior to the leak and continued to have migraines after the leak, explaining "[t]hey get worse, when I am in a stressful situation." She also had acid reflux which worsened in the last year because

she was "constantly thinking about [the leak] and worried about how it's affected my husband." She had difficulty sleeping, and because she was "predisposed to cancer genetically" and "knowing this has that chance of causing cancer in some form, it just upset me." She saw Dr. Malik on one occasion.

Mr. and Ms. McLewee were subject to the Stipulation. With respect to Mr. McLewee, Dr. Malik noted "mood disorder, marital difficulties" and recommended treatment. With respect to Ms. McLewee, he noted "depression (single episode), marital issues" and recommended treatment. Lauren did not see Dr. Malik, and she did not testify.

Susan Cremen resides with her husband, Michael, and their daughter, Olivia, age 12. Ms. Cremen testified:

Q. And I understand you are not a real estate person but how do you feel your home has been impacted by the spill and this contamination on your property?

A. Well, it's an absolute stigma in the area about real estate in the area. The way I look at it is, common sense would tell you, if you are going to go out and buy a house and you buy a house on the high end, I mean, an $800,000 home or $700,000 home or whatever, you have options. If I were to walk into a house and find out there was a potential of carcinogenics being in my water, I would probably just say, no, thank you, I have got other options. If somebody said to me, Oh, I will give it to you for 200 thousand less or 300 thousand less, I would say, no, thank you, my house is worth more than that. So I can't imagine anybody buying it for whatever the amount of money. So, when somebody says to me, what is your house worth? I say, I have no idea. Your house is only worth what somebody is willing to pay for it. That's what it's worth.

Ms. Cremen is a cancer survivor and is monitored annually for reoccurrence. She is "fearful of future health effects" as a result of any exposure to contaminants. She has difficulty sleeping and is a "lot more short-tempered," and "jittery." Ms. Cremen did not consult with Dr. Malik.

Ms. Cremen testified that Olivia pulled out her hair and chewed on her fingers, while sitting in class in school; had "nasty stomach aches"; and for some period of time was "terrified to take a shower." Olivia consulted Dr. Malik, and she was subject to the Stipulation. Dr. Malik noted "mood disorder, anxiety disorder, attention deficit disorder," noted a preexisting condition and preexisting treatment, and recommended treatment. Olivia did not testify.

Mr. Cremen described

[e]xtreme sleeplessness. I mean, I wake up so many times during the night. There was a time before this when my head hit the pillow, you could set a clock, ten seconds later, I was asleep. It's not that way anymore. So by that I wake up, I'm tired. I work, I drive 60 miles to work, I work ten hours, I come home. I have no energy. So, I mean, it's affected me, yes.

He did not consult with Dr. Malik.

Robert Peters resides with his wife, Elizabeth, and son, James, age 3. Mr. Peters testified that the community had a stigma, and he was embarrassed by it. When asked for his opinion as to the value of his home, he replied:

Absolutely it's affected. How much, I have no idea. I mean, to me, it's almost worthless at this point because I don't know how to pass the liabilities on to anybody. Forevermore to worry about somebody coming after me and suing me for passing title on a home, if I ever sell it, that I'm going to pass a title that's fraudulent because of the gas spill, and what am I going to take on as a liability? So this home will forever be attached to me.

Mr. Peters stated he was worried about potential health effects, and as a result lost sleep, and he experienced the "everyday stress of what's going on, the anxiety that's been occurring."

Elizabeth Peters testified that she was

very fearful for me, my husband, and little James. Cause from what I know, MTBE poses significant health risk and

that potentially for human carcinogen. So yes, in the future, I don't know what's going to happen. I'm very fearful for us. And especially for James.

She stated that she and her husband "physically . . . cope well."

Mr. and Ms. Peters each saw Dr. Malik on one occasion. They were subject to the Stipulation. Dr. Malik diagnosed Mr. Peters with "adjustment reaction" and Ms. Peters with "adjustment reaction with mixed emotional feature." Dr. Malik noted that Mr. Peters had a pre-existing condition with pre-existing treatment. He did not recommend treatment for either of them. James did not see a physician and did not testify.

David Albert resides with his wife, Joyce, and their two children, Meghan, age 15, and Brian, age 12. He testified that the remediation impacted his property, explaining

[w]ell, I believe it-just on the interaction that I used to have with a co-worker, co-worker asked me they were looking— considering purchasing a residence, and they wanted to know if this, you know, particularly asking me if this area of Manor Road was being impacted by the spill, and I told them really not to my knowledge. And they commented on to me on how do I feel about the value of my house rapidly declining.

Mr. Albert expressed concern about the possible health effects of being exposed to MTBE by showering. He described "sleeplessness," "anxiety," and having "put on a considerable amount of weight." He attributed some stress to concern for his employment and other financial considerations.

Joyce Albert testified that she experienced a "great deal of . . . sleeplessness" in the beginning but it subsided when she and her husband stopped talking about moving. She still loses sleep, however, which she attributes to the leak. She stated that she worries about the future health effect on her family.

As to property value, Ms. Albert testified that the value of their home had "lessened" and that "morally and ethically, I don't know that I could sell my home to someone because I wouldn't want to endanger another family." She added that she could not imagine that they would get what they needed to get in price, if they sold, and the children did not want to move in any event.

Mr. and Mrs. Albert each saw Dr. Malik and did not seek treatment. They were not subject to the Stipulation. At trial, Dr. Malik testified that Ms. Albert had "acute post traumatic stress disorder" which resolved, but at the time of the examination, she had "generalized anxiety disorder" that caused by the leak. Dr. Malik diagnosed Mr. Albert with "mood disorder and anxiety disorder." [31] He suggested that both Mr. and Ms. Albert consider psychotherapy.

The children did not see Dr. Malik, and they did not testify.

Franz Wittelsberger resides with his wife, Delores, two of their four children, Marlena, age 26, and Lauren, age 25, and his mother and father. It is unclear whether his parents lived with him at the time of the leak or moved in later.

Mr. Wittelsberger testified that the events caused "anxiety," loss of sleep "off and on," and "a sense of malaise generally, you know, a feeling of depression." He saw his family doctor who prescribed a sleep medication. He expressed a fear of health consequences in the future for himself and his family. He stated that his wife had difficulty sleeping. He further testified that his children were worried because of the workmen in the area and that they had a "general concern" about "cancer."

Ms. Wittelsberger stated that she had experienced a lot of anger, and that she had seen Dr. Malik on one occasion. She was not subject to the Stipulation. Dr. Malik did not testify about her at trial.

---

31. "Mood disorder" was defined as a condition in which a person has significant mood symptoms that do not meet the threshold for depression.

The children did not see Dr. Malik, and they did not testify.

Glenn Kukucka resided in the house in question with his ex-wife and their children from 1987 until on or about 2000. Thereafter, he married Hope but their effort to blend families failed. Hope moved out of the house in December, 2005 and returned in December, 2007. She moved out again in August, 2008. Mr. Kukucka's son, Brendan, age 15, lived with him.

Mr. Kukucka testified that he believed the value of his property had decreased because of the leak as a result of a stigma attached to the community. He added, "[a]nd I wouldn't buy that house now. I—even if the well wasn't contaminated, the fact that the proximity and the volume of the spill is—it's mind-boggling."

With respect to emotional distress, the following exchange occurred:

Q. Mr. Kukucka, let's talk about how this whole catastrophe has affected you emotionally.

I understand that you're going through the separation and so forth, but can you explain to the jury the impact that all of this has had on you? And then we'll talk about the impact it's had on your family.

A. Okay. In the very beginning I started experiencing just sleeplessness and anxiety, worrying about what's gonna happen. I was very distrustful of Exxon because they misled us from the very beginning. So I didn't know whether to believe what they were saying or not. So I worried about that. I was losing sleep over that.

I'm a civil servant. I'm not an engineer. I'm not a lawyer. I'm not a doctor. I have all my money invested in my house, and I'm very concerned about that. I planned on using some of the equity in my house, if I need to, for my son's education. I don't know if there's gonna be enough equity there now.

I would say approximately six months ago I started experiencing, like, tremblings in my stomach at night that would actually wake me up, and I also was noticing a weakness in my legs. Now, I'm supposed to be this big fire

captain. Nothin's supposed to hurt me or bother me, so I keep that kind of stuff to myself.

Well, it progressively got worse, and during that period of worsening is when Hope, my current wife and I, we separated. Well, that separation I think was the straw that broke the camel's back, and that completely debilitated me to the point where I could not work. I was out of work from September 15th until October 31st.

And since then I've only really been back to work one day, but that's just because of the way my schedule is.

Mr. Kukucka saw his family doctor in the beginning, but he stated his symptoms were not severe enough to treat. He saw Dr. Malik on 4 or 5 occasions and, as of the time of trial, intended to return. He took medications for anxiety. He expressed concern about the future because of his understanding that the contaminants can cause cancer and "[affect] your DNA."

On cross-examination, Mr. Kukucka stated that when he went to his family physician and also when he went to Dr. Malik, he told them he was experiencing anxiety as a result of the breakup of his marriage, his finances, the fact that his father was suffering from Alzheimer's disease, and because of contaminants in his well. Those contaminants included methylene chloride, a carcinogen not found in gasoline.

Mr. Kukucka was not subject to the Stipulation. At trial, Dr. Malik testified that Mr. Kukucka suffered from anxiety disorder.

Hope Kukucka testified as follows.

Q. We heard from your husband that you've experienced headaches and neck pain and so forth from the anxiety, from the stress of the gasoline spill?

A. I'm not sure that the neck pain was from that. I think I was so nervous about today I did not sleep well last night. I definitely have a lot of neck pain today, but I have had headaches, and I have to say that, since I'm gone living at Sugar Tree, I did get some relief from my headaches.

Q. So you're not attributing everything to the gasoline spill, but you're certainly contending that you have experienced some stress and anxiety relating to the spill, correct?

A. More than definitely.

Ms. Kukucka saw Dr. Malik on one occasion. She was not subject to the Stipulation. At trial, Dr. Malik testified that the Kukuckas had marriage counseling and Ms. Kukucka had depression prior to the leak. He diagnosed anxiety disorder as a result of the leak.

Brendan saw Dr. Malik on one occasion. He was not subject to the Stipulation. Dr. Malik did not testify about him at trial. Brendan did not testify.

Michael Osmeyer resides with his wife, Gail, and their two children, Andrew, age 20, and Sarah, age 18. Mr. Osmeyer testified that, while he did not intend to sell, he believed they could not get "full-price" for their house if they attempted to sell. He stated that the "whole feeling of the neighborhood and being a special place has changed." It is now considered a "waste dump." He worried about loss of value and whether it would affect his retirement. He also worried about future health effects of exposure to MTBE and "just not knowing how this thing is going to end." Mr. Osmeyer described loss of sleep but stated "it isn't worth going to a psychiatrist." He did not see Dr. Malik.

Gail Osmeyer expressed worry about the future for her and her family. She stated she was "stressed," had "anxiety," had "trouble sleeping," and had "occasional headaches." She did not consult a mental health care provider. She acknowledged that her father died relatively recently, and she was coping with the resultant stress. She added:

> Loss of a parent, loss of anyone you love in your life is a stress that all of us experience. It's a difficult one. It's unavoidable. This stress is different. It hits me every time I take a shower. Every time I think abut my neighborhood. Every time I cook a meal for my family. Every time I walk around my neighborhood and encounter those monitoring

wells in the street that used not to have them. It's different and I can separate it.

The children did not see Dr. Malik, and they did not testify.

Margaret McDevirt resides with her husband, Christopher Shultz. In the time period before and after the leak, she attempted to get pregnant through in vitro fertilization. She became pregnant in early 2006 but lost the pregnancy in July. She and her husband then pursued adoption. She testified that the time period was "really rough" and she sought counseling because of the loss. She was prescribed Zoloft by her family physician. She did not attribute any of the above to the leak. In August 2007, Ms. McDevirt gave birth to two daughters.

Ms. McDevirt stated that, as a result of the leak, she experienced "stress and anxiety and worry," "anger," and "loses sleep." There are "many unknowns," including future health effects. Ms. McDevirt saw Dr. Malik on one occasion. She was subject to the Stipulation. Dr. Malik noted that she had an "anxiety reaction," had pre-existing treatment, and he did not recommend any treatment.

Christopher Shultz testified that he worried about "[h]ealth effects, what it meant to us as far as our health, but also what it meant to the value of our property and our future financially." He stated that, after the birth of their children, he worried about their health and being able financially to provide for their education. He stated that if he believed staying in the house presented a significant health risk, he would leave, but observed that it is "kind of hypothetical at this point." Mr. Shultz saw Dr. Malik on one occasion. He was subject to the Stipulation. Dr. Malik noted that Mr. Shultz had "anxiety," and did not recommend treatment.

Jeffrey Jenkins resides with his wife, Nicole Ripken, and their daughter, Milly Jenkins, age 5. When asked for his opinion as to the value of their home, Mr. Jenkins replied:

I mean, our property is worth what someone is willing to pay for it. Personally, I think it is worthless. Somebody else might think it is worth something else. But from my

perspective there is a limited amount of fools out there that will pay money for a property that is completely surrounded by, you know, positive test results for gas and that-just a limited amount ... just a limited amount of fools out there that will pay for a property like that.

He added that he did not intend to move because it was the "perfect location," he could not do so financially, and it is "where [he] wants to be."

Mr. Jenkins stated that he had "sleepless nights" and "anxiety" but "sleeplessness ... [is] the only thing that has affected me." He stated that he worried about his family because no one knows what is going to happen in the future, and medical opinions change over time. He did not consult any health care providers.

The child did not see Dr. Malik, and she did not testify.

Nicole Ripken, when asked how the fact that the neighborhood had been contaminated affected her, replied:

It is extremely upsetting to me. It has caused a lot of stress and anxiety, some sleeplessness, like my husband, some—when I get upset, I tend to get nauseous. So some nausea. Kind of on a lot of different levels. I mean, the health issue is the [sic] is the Number one issue, the health of my daughter, you know, long-term, our health. There is the financial piece that we put all of our money into this house and we feel like we have lost what we put in.

Ms. Ripken stated that she was seeing a therapist prior to the leak, having started in April 2001, for "some anxiety and mild depression," and she continued to see her as a "sort of maintenance." She discussed the leak with her. She did not consult with Dr. Malik.

Anthony Tirocchi resides with his wife, Lillian. With respect to the effect of the leak on the value of his property, he stated that anybody "that has good common sense would [not] buy a piece of property under the circumstances and how close we are to the Exxon station." He added that he would not purchase it under the circumstances.

Mr. Tirocchi stated that he had "trouble sleeping at night," which "common sense" told him is related to the leak. He was concerned about financial implications. He was experiencing "stomach pains" prior to the leak and went to a doctor who did not find a cause. He had pains after the leak, which he attributed to "stress." He expressed concern about the "uncertainty" and the "unknowns." He did not see any physicians for emotional distress.

Lillian Tirocchi experienced "sleeplessness, . . . related to this case," in part, and "anxiety," "stress," and fear for the future, as to property value and health. She did not consult Dr. Malik.

Joseph Bateman resides with his wife, Sharon, and their two children, Jill, age 11, and Paul, age 9. He opined that there is a "large stigma" associated with Jacksonville that has adversely affected the value of his house. He expressed concern about his family, both financially and for their health, the latter based on the "uncertainty of the science." He did not consult with Dr. Malik.

Sharon Bateman expressed concern about their children, long term, and about a decrease in property value. She stated that "sometimes I lose sleep, or my stomach is hurt, churned or whatever." Approximately 3 weeks prior to her testimony, she "had a horrible horrible migraine where I was in bed and couldn't move or blink my eyes or anything." Her family was very concerned. It is unclear whether she attributed the migraine to the leak or whether she was describing a general concern for herself and her family. She did not consult with Dr. Malik.

The children did not see Dr. Malik, and they did not testify.

Scott Batton resides with his wife, Andrea, and their two children, Taylor, age 17, and Maggie or Maria, age 13. He testified that he believed his home had been devalued and explained, "I think at this point my house is not marketable at all. I would, certainly wouldn't buy a house if I had a well like that." The Batton property was appraised every July, for some period of time before the leak, and every July after the

leak, in connection with loans Mr. Batton obtained every year for his business. In July 2006, the property appraised at $635,000. In July 2007, it appraised at $660,000.

Mr. Batton stated that he is "always anxious," and he and his wife bicker a lot. He also stated that he normally got up in the morning at 4:30 or 5 because of his business, and he had trouble getting to sleep at night. He saw Dr. Malik on one occasion, who did not recommend treatment. He was not subject to the Stipulation. At trial, Dr. Malik testified that Mr. Batton had "adjustment reaction with anxious and depressed mood."

Andrea Batton testified that she was "terrified" for the health of her children and because of financial concerns. She experienced "physiologic symptoms of anxiety, irritability, back pain, neck pain, symptoms of stress." For a long time prior to the leak, she was treated successfully for an "obsessive compulsive disorder." The leak triggered a "setback." She became "completely debilitated," and was in treatment.

Ms. Batton saw Dr. Malik on July 13, 2007. She was not subject to the Stipulation. Dr. Malik testified that her prior obsessive compulsive disorder was exacerbated by the leak and its effects and that she also had post traumatic stress symptoms related to her fears.

The children did not see Dr. Malik, and they did not testify.

Barbara Gottschalk resides with her husband, Allen, and their children, Laura, age 19, and Chelsea, age 17. Lindsey, age 21, was in college. Ms. Gottschalk expressed "concerns about the long term health benefit—I mean, health risk to being exposed to MTBE or any other gasoline products in the water. I don't think anybody really knows, that concerns me." She experienced "difficulty sleeping. Worrying about, you know, the health risks. Worrying about being in a house that may not ever sell." She stated:

> I'm sitting here rubbing my neck. I mean, my neck—I got about four hours sleep last night wondering about how this was going to go and basically woke up with a big spasm in my neck. So that's happened before many times.

Ms. Gottschalk opined that her home had substantially decreased in value. She explained, "I know a home is only worth what someone is willing to pay for it. I think an educated consumer, if they knew, would never buy my property." She stated that they increased a line of credit on their home in April 2008, and that it appraised for $670,000.

She did not consult Dr. Malik.

Dr. Gottschalk expressed the view that "we probably could sell [our house] but the "real concern" is whether "[we] could get the value that we would need to move elsewhere...." He expressed general concern about uncertainty in the future. He stated:

> I mean, mostly just concern about, you know, the, you know, financial things and, you know, you lay in bed at night and, you know, windows are open, particularly that first spring, you hear the remediation stuff go on, and it's sort of a constant reminder.

He did not consult with Dr. Malik.

The children did not see Dr. Malik, and they did not testify.

Michael Oberlin resides with his wife, Linda, and their daughter, Joy, age 18. In addition to their house, they own a vacant lot. Mr. Oberlin stated that he believed his property had decreased in value because neighbors had MTBE in their potable wells, and he had a fear of future contamination of his well. In April 2006, the Oberlins refinanced. Initially, their home appraised for $660,000, and it later it was decreased to $530,000. He "assume[d] it was because [he lives] in a contaminated neighborhood." He refinanced because he was afraid he could not sell the house in the future, and explained, "[o]bviously I can sell it, but I don't want to sell it for a bargain price. So, I dug in to hang on."

Mr. Oberlin stated he was "extremely worried" about his financial situation, had "become depressed," lacked sleep, and was angry and sad. He saw Dr. Malik on 3 occasions, who prescribed medication for depression and sleeplessness and recommended he see a psychotherapist. He did so on 3

occasions, but then stopped. He was not subject to the Stipulation. Dr. Malik testified that Mr. Oberlin suffered from "depression" as a result of the leak, in part related to his financial concerns.

Linda Oberlin testified as follows:

Q. How has the gasoline leak affected you in an emotional way?

A. I would have to say that I have fear and I am worried about, first of all, the future of possible contamination of our well. Secondly, the fear that financially we won't be able to sell either the building lot or our property, should we choose or desire to move. Just the value of the property.

Probably my primary emotional impact is seeing what this has done to my husband. It has turned a very optimistic, fun person into a sad, pretty pessimistic man. It has been very sad to me. We have been married a long time.

Ms. Oberlin and Joy did not see Dr. Malik. Joy did not testify.

Robert Babcock resides with his two daughters, Katie, age 26, and Audrey, age 22. At or about the time of the leak, Mr. Babcock started a residential and commercial lending business, operating out of his home. He testified that, after the leak, no one wanted to work for him because of his location. "Because of the situation at my house, I always believed that petroleum products cause cancer," he took a job in China in January 2007, overseeing "opening some waste energy power plants in several cities." From January to August 2007, he traveled back and forth to China.

Mr. Babcock testified that the value of his home had been affected, stating:

I really believe my house is worthless. It is a four bedroom house with an in ground pool on an acre and a quarter of property. I wouldn't sell it to anyone. I think the house should be demolished and the property condemned. I think it is worthless.

In May 2006, Mr. Babcock applied for a loan and represented that his property had a value of $575,000. In September 2006, in connection with the loan, it appraised at $550,000.

Mr. Babcock believed that MTBE causes cancer and he was concerned about adverse health effects as well as financial concerns. He experienced "sleepless nights," lack of focus, and fear of cancer. He sought treatment in January, 2007, from a social worker. He explained:

> I felt trapped and, you know, I was irritable around the house, snapping at the girls, and I was financially very worried on where I was headed. You know, I felt like I needed somebody that I could trust who could be objective with what was going on with me and kind of help me in my decision-making process going forward.

The social worker suggested Mr. Babcock see a psychiatrist, and he did so on 3 or 4 occasions. The psychiatrist prescribed medications for anxiety and sleeplessness. Mr. Babcock was under the care of a psychiatrist at some time prior to 2006.

Mr. Babcock stated that Audrey was in and out of the house before the leak. He shared custody with his ex-spouse. Audrey did not live in the house at all for about 6 months after the leak, apparently in connection with going to college. He stated that Audrey was "concerned" and had migraine headaches.

He did not see Dr. Malik.

Audrey Babcock testified that she had "anxiety and obsessive compulsive disorder" prior to the leak, but that her "anxiety has increased a lot." Sometimes she could not sleep, and her anxiety gave her "stomachaches." She expressed concern about a future disease. She did not see Dr. Malik.

Katie Babcock testified that she left the family home in November 2006, to go to school, and returned in the summer of 2008. She expressed concern about a future disease. She testified that migraine headaches she experienced before the leak increased after she returned home. She described being "stressed out, fearful, [and] sad." She did not see Dr. Malik.

Tracey Tizard resides with her husband, Steven, and their two children, Evan, age 15, and Emma, age 13. Their property was subject to substantial remediation activities. When asked about the effect of the on the value of their home, Ms. Tizard replied:

> My opinion, as of the present time, my house has no value. I–I–I–can't imagine—I can't imagine selling that house to somebody else and having them live there without them knowing what I know. I–I–couldn't morally do that. I couldn't let someone else live in my house
>
> \* \* \*
>
> I'm sure you could find somebody to buy this house. It's a beautiful neighborhood. It makes me really sad that somebody else would live in that house and not know there [sic] been leaking in this property.

Ms. Tizard stated she was "terrified" with fear as to the future. She experienced inability to sleep. She saw a family physician and later Dr. Malik. Both prescribed medications for sleep. She stopped seeing Dr. Malik or anyone in his office in the fall of 2007.

Ms. Tizard was subject to the Stipulation. Dr. Malik diagnosed here with "depression (first episode)" and recommended treatment.

Steven Tizard testified that he went to his primary care physician because of "problems sleeping." Later, he saw Dr. Malik and, after that, an associate in his office. Mr. Tizard managed and/or was the franchisee of a 7–11 store and, prior to the leak, had agreed to franchise another store. When he heard of the leak, he thought he was "dead financially" because he could not back out of the agreement and there was "no way [he] was selling a house with 26,000 gallons of gas in [his] back yard." Mr. Tizard was subject to the stipulation and was diagnosed with "depression (first episode)."

Emma was also subject to the stipulation. She saw Dr. Malik, who stated "no conclusion" as to diagnosis but recommended treatment. Emma did not testify. Evan did not see Dr. Malik and did not testify.

Yvonne Lanting resides with her husband, John. She testified that in 1998 she was diagnosed with "anxiety disorder and panic attacks" but was "very well maintained with . . . medication for several years." She had learned to deal with her panic attacks. She looked to John as her "rock," but after the leak, she saw "fear" in his eyes. She saw a psychiatrist more frequently, had panic attacks, had stress-related acne, and "sleeplessness." She saw a dermatologist for the acne. She described a panic attack as:

> I can't breathe. I hyperventilate. I start to shake. I lose all color. And I become immobilized, so I really can't leave my house, pretty much, which had happened in the past when this all first occurred.

When asked if she was fearful of long term health effects, Ms. Lanting replied:

> Fearful is an understatement. I mean, I–I know that MTBEs are dangerous. I don't know to what extent yet. I don't believe the experts know to what extent the MTBEs will-I believe that eventually they will find that they are very, very detrimental to our health. And the only-you know, I'm a kind of person that I have to think things through and I have to think about why do I feel that way about MTBEs?

> And when I think back at different things that have transpired in my lifetime, when I think abut the use of thalidomide that they used on pregnant women for, you know, nausea, and then they found out the consequences of that.

> I look at the consequences of lead paint, that at one point in time it was perfectly safe to have lead paint in your home. Now you can't buy a home that has lead paint or you have to disclose the fact that you have lead paint in your home.

> MTBE is going to be the next problem that comes up, and I think it's because—that's why this case is so important to not only the people in Jacksonville. I think it should be important to everyone that lives near a gas station,

because it is the next thing that's going to be a problem for con-for human welfare.

She later explained that she believed it is only a matter of time before MTBE is determined to be a human carcinogen.

Ms. Lanting saw Dr. Malik on one occasion. She was not subject to the Stipulation. At trial, Dr. Malik testified that she had preexisting "depression" which was exacerbated and, as a result of the leak, had "anxiety disorder" and "post traumatic stress disorder." He recommended medication and "some psychotherapy."

Ms. Lanting stated that her property was "devalued" in her eyes because she could not "possibly see somebody else looking at that house and—and seeing it as—as having any value, if that makes sense."

John Lanting testified that he developed rosacea after the leak, and one of the causes was stress. He also described "muscle aches" and "some sleeplessness." He saw Dr. Malik on one occasion. He was not subject to the Stipulation. At trial, Dr. Malik testified that Mr. Lanting had "anxiety disorder" but was coping adequately. Dr. Malik did not recommend treatment.

Valerie Montone resides with her husband, Anthony, and their son Samuel, age 12. "Almost three years ago," their daughter, Naomi, age, 28, also resided with them.

Ms. Montone testified that, in her opinion, her home had lost value, based on "common sense," and because it was not a "sought after community to raise your children and to live in as it had been."

Ms. Montone's property showed no evidence of contamination, but she expressed concern that it might become contaminated and that it might have been contaminated and she did not know it. She stated that she gets "panic attacks. I have restless, sleepless nights, and I have nightmares, . . . night terrors, . . . and headaches." She suffered from migraine headaches prior to the leak but distinguished those from the tension headaches she experienced after the leak.

After the leak, Ms. Montone saw a psychologist but stopped treatment because it was "making things worse." She saw Dr. Malik on one occasion. She was not subject to the Stipulation. Dr. Malik did not testify about Ms. Montone.

Mr. Montone did not testify. Ms. Montone testified that her husband was affected by the leak, stating that he "gets upset stomachs a lot" and daily headaches. Mr. Montone saw Dr. Malik. Mr. Montone was not subject to the Stipulation. At trial, Dr. Malik testified that Mr. Montone suffered from "major depression" as a result of the issues with his home and business. He had "chest pains, worry, anxiety, tension, constant preoccupation, thinking about finances, family future and the next source of income." Dr. Malik recommended medication and psychotherapy.

Samuel and Naomi did not see Dr. Malik, and they did not testify.

Gary Rosch resides with his wife, Kim. There were substantial remediation activities on their property. Because Mr. Rosch worked out of his home, he saw the activity on a daily basis. He "was emotionally drained from the whole situation." He "had nightmares about it" and "his stomach was in knots." He saw Dr. Malik and an associate in Dr. Malik's office on several occasions for "anxiety." At the time of trial, he was visiting his primary care physician periodically and taking medications for "depression."

Mr. Rosch testified that he has a twin brother who was diagnosed with "Parkinson's" three years ago. Mr. Rosch expressed concern that the disease was a result of "environmental factors" because his twin had worked in a gas station through high school and college. Thus, Mr. Rosch was concerned "whether all the petroleum and the MTBE around me could trigger Parkinson's in me."

Mr. Rosch was subject to the Stipulation. Dr. Malik noted "mood disorder, depression, anxiety disorder," noted a pre-

existing condition and pre-existing treatment, and recommended treatment.

Kim Rosch, when asked about her "concerns," stated:

Well, I've had—I'm not a good sleeper. But since this event, it just made my sleeping habits worse than ever. I would get up in the middle of the night I couldn't hardly go back to sleep. I've had headaches, I had stomach aches, I have tremendous anxiety. And it's affected my work because I'm a school teacher and I devote, you know, a lot of time and energy into my job. I love what I do. I'm very dedicated, as my husband stated.

Ms. Rosch saw Dr. Malik and was treated in his office. She also saw her personal physician. They prescribed medications for sleeping and depression. She is subject to the Stipulation. Dr. Malik noted "anxiety disorder with adjustment reaction with anxiety and insomnia" and recommended treatment.

Ms. Rosch testified that she believed her home had diminished in value.

Roger Tolle resides with his wife, Sara. Mr. Tolle testified that he believed the value of his property had gone down because of the remediation activities in the area.

With respect to emotional distress, he stated that he

felt angry, frustrated, irritable at times to the point that I have cried. Stress, constantly the situation has been on my mind to and from work at times. The fact that every day you have got to pick up a bottle of water instead of drawing it from the tap. You have to deal with people coming in and out, the fact that there is the fear of cancer that is in the background.

My mother passed away from the disease about ten years ago. She had a seven year battle with it.

Mr. Tolle stated that he was distraught due to his mother's death, and that the events associated with the leak had exacerbated his fears. He also experienced anger, "a number of sleepless nights," and a "number of headaches." Mr. Tolle saw Dr. Malik and received therapy in his office. He is not

subject to the Stipulation. At trial, Dr. Malik testified that Mr. Tolle had "anxiety disorder" as a result of the leak, and recommended psychotherapy.

Ms. Tolle did not testify. Mr. Tolle stated that his wife "felt scared," "frustrated," had "headaches" at times, "had some acid reflux," and "felt trapped" because she could not get out of the house as much as she would have liked. Ms. Tolle was in a car accident on April 19, 2006, which caused substantial physical injuries and emotional distress. When asked to distinguish that from distress caused by the leak, he stated that his wife "feels trapped" because she cannot walk as much as she would like, she has to use bottled water for cooking, "people have shunned her," and she is concerned about him. She was also fearful of contamination.

Ms. Tolle saw Dr. Malik on one occasion. She was not subject to the Stipulation. At trial, Dr. Malik testified that she had "generalized anxiety disorder and depression."

Jeffrey Alban resides with his wife, Marsha, and their daughter, Rebekah, age 16. He stated his belief that his property value had diminished because they had contamination in their potable well.

Mr. Alban expressed fear of future disease because "any chemical that's used in gasoline for product combustion that is considered flammable, that's a carcinogen." He worried about his family's future health and also about their financial situation. The following testimony was elicited:

Q. Now, has that stress manifested physically in any way?

A. For me, I would say that other than stressing out about and being frustrated over the whole situation, a lot of times I'll wake up in the middle of the night because the dog needs to be let out or—and I'm downstairs, I'm watching TV, I fall asleep. I get up and I have to go upstairs to bed, and you think about those things. And when you think about those things and the stress and, you know, what's going to happen in the long-term to our health and financial situation, you can't get back to sleep. You just sit there and

you think about it. And what can you do? And how is it going to affect us long-term?

Mr. Alban saw Dr. Malik on one occasion. He was subject to the Stipulation. Dr. Malik noted "anxiety disorder—not otherwise specified" and did not recommend treatment.

When asked about his daughter, Mr. Alban described "frustration" and "aggravation."

Marsha Alban testified that the leak caused "stress and anxiety" because it changed their way of living. She described frustration and anxiety and stated that she cried at times because she could not get to the boxes of water stacked up in the garage.

Ms. Alban saw Dr. Malik on one occasion. She was subject to the Stipulation. Dr. Malik noted "anxiety disorder—not otherwise specified" and did not recommend treatment. Rebekah did not see Dr. Malik, and she did not testify.

John Coffay resides with his wife, Gina, and their triplets, Cole, Patrick, and Wallace, age 11. Mr. Coffay, a real estate appraiser, testified that his property value had been affected, and explained that he "couldn't give a cash equivalency to it, but clearly in a negative fashion," because of the contamination.

Mr. Coffay stated that he had issues with sleeping prior to the leak, and it "comes and goes with problems." He did not see Dr. Malik.

Gina Coffay expressed concern about the health of her family and stated that she goes to therapy regularly. She confirmed her husband's testimony that they disagreed about moving; he wanted to stay, and she wanted to move. She did not see Dr. Malik.

The children did not see Dr. Malik, and they did not testify.

Amtul Baig resides with his wife, Mirza, and their son, Zain, age 25. Dr. Baig's property was substantially impacted by remediation activities, including monitoring wells. He expressed the view that the value of his property was "absolute-

ly negative, zero" because "no person of their right mind" would buy his house "when there are 19 wells in there."

When asked how the ordeal had affected him, Dr. Baig replied:

It—it has been a very long road, as far as I'm concerned, myself. Along with my family. We often talked about it. What is going to happen in the future? Is one day all of a sudden we're going to discover that our well water is also contaminated?

In the beginning, when all the noises and the disturbance was going on around our house, we, all of us, we were emotionally disturbed. We [sic] sleepless nights, the whole house used to shake, the windows used to shake. Once that all that was finished, then after that, even that worry still continued and we all the time talk about. As I explained to you before, even when I go to wash my hands to the tap water, the thought immediately comes to my mind that, Oh, my goodness. This water might be contaminated.

Dr. Baig also expressed concerns, financially, because he felt his property was worthless. He stated that his wife questioned whether their health would be affected in the future, but that both of them came from a culture where "you tough it out." He stated that, in the beginning, his son could not sleep because of the noise, but "he's a young man and busy with his studying and other things, so not very often he talks about it."

Dr. Baig, his wife, and their son, all saw Dr. Malik. Dr. Baig did not think they needed treatment or medication, and they "did not have any physical problem." They were subject to the Stipulation. Dr. Malik noted "anxiety disorder-not otherwise specified" as to both Dr. and Ms. Baig, and noted "adjustment disorder with anxiety" as to Zain.

Ms. Baig and Zain did not testify.

John Quinn resides with his wife, Jennifer, and their son, Reilly, age 2. He testified that he might have difficulty selling their house, if they wanted to, and it probably is "not worth

what it was." He questioned "[w]ho would want to buy a house that's contaminated for—you know, for top dollar, the amount that anybody would hope to get for their house?" He also questioned whether he would "want to pass a house off to somebody with contaminants." Mr. Quinn expressed concerns about future health but emphasized his financial concerns, particularly because his wife had a complicated pregnancy and delivery, which "kind of put [him] over the edge a little bit." He described "panic attacks" and "major anxiety" and noted their biggest investment had become a burden. Initially, he had trouble sleeping, but that improved over time.

Mr. Quinn saw Dr. Malik and an associate in his office on a couple of occasions. Mr. Quinn was prescribed medication for anxiety, which he used on occasion. Mr. Quinn was not subject to the Stipulation. Dr. Malik did not testify about him.

Jennifer Quinn was pregnant at the time of trial. She stated that she felt trapped in her home and was concerned about future health. She got migraine headaches prior to the leak, but got them more often after the leak, and also had sleeping issues. She saw Dr. Malik or someone in his office. She was not prescribed medication.

Ms. Quinn was not subject to the Stipulation. At trial, Dr. Malik testified that she had "acute post traumatic stress disorder, which [he] felt was resolved by the time she came to [him], but she had persistent chronic anxiety as a result of that." He explained that the latter was due to fear of the future with respect to her family.

The record indicates that Reilly saw Dr. Malik, but he was either an infant or unborn at the time of the leak.

William Bieber, age 81, lives alone. He has a life estate in his property, with the remainder to his children. With respect to property value, he expressed the view that "people are not really interested in buying houses because of the gas spill."

Mr. Bieber testified that he understands that MTBE causes cancer. He was concerned because he has "Barrett's esopha-

gus which is a precancerous condition" and MTBE may have "caused some additional damage to the esophagus." Mr. Bieber also has a heart condition that he does not attribute to the leak. His doctors recommended triple bypass surgery, but he does not intend to have it. He gets "stomach aches, headaches, had trouble sleeping," and "has lost interest in doing things." He saw his personal psychiatrist, who prescribed medication, which he had also taken at some point prior to the spill. He did not see Dr. Malik.

Shawnee Twardzik resides with her husband, Robert, and at one time, their youngest daughter, Laurie, age 26. With respect to property value, Ms. Twardzik testified that, because of a stigma, the values in the neighborhood had been affected.

Ms. Twardzik stated that she feared developing cancer or other disease in the future, explaining that "anything that changes your cellular structure or your genes or genetics and lowers your immune system" is cause for concern. She had experienced emotional problems prior to the leak. She stated:

> my mother is diagnosed as clinically depressed, so my whole life I've had problems with that. I went to my primary care provider in 2002, and I—we were—I had a physical, and I told her that I just wasn't doing that wonderful.

Her doctor prescribed medication, which Ms. Twardzik took for 4 years. After the leak, she experienced "heartbreak, sadness, anger. Just a sense of un-not well-being, anxiousness, nervousness." She had a lot of "sleeplessness" and "anxiety attacks periodically," "lots of headaches," and she gets "extremely nauseous." She thinks about the well-being of her family and she feels "trapped," but she did not want to move.

Ms. Twardzik saw Dr. Malik who suggested therapy. She went to her primary care physician, who gave her medication and recommended a therapist. She saw the therapist 4 times. Ms. Twardzik was not subject to the Stipulation. At trial, Dr. Malik testified that Ms. Twardzik's preexisting depression was exacerbated and she had an "anxiety disorder" as a result of the leak.

Ms. Twardzik described her daughter as "upset" but not as upset as she.

Robert Twardzik testified that their property value had "definitely dropped." The drop in value caused "anxiety." He testified that he had had several skin cancers in the past, and was fearful of reoccurrence as a result of the leak. He explained that he did not know what the prior cancers had done to his immune system and "anything that adds to it, I'm, I'm fearful of." He experienced trouble falling asleep on occasion. He saw Dr. Malik once. He was not subject to the Stipulation. At trial, Dr. Malik testified that Mr. Twardzik had an "adjustment reaction," and did not recommend treatment.

Laurie did not see Dr. Malik, and she did not testify.

David Fritz resides with his wife, Stacy, and their children, David, Jr., age 12, Brendan, age 10, and Aidan, age 6. Mr. Fritz, a commercial real estate broker, stated that he believed his property had diminished in value. He experienced a "sense of anxiety, frustration, anger, a number of nights we would wake up and, you know, we were sleepless...."

Mr. Fritz saw Dr. Malik on one occasion. Mr. Fritz was subject to the Stipulation. Dr. Malik noted "adjustment reaction with mixed emotional features," and he did not recommend treatment.

Stacy Fritz described future health concerns which produced "anxiety and stress," particularly about the unknown. She saw Dr. Malik on one occasion. She recently ran a marathon, and running and other working out served as a coping mechanism. She stated that when she feels stress, it "manifests itself in sleepless." She has a history of heart palpitations. The sleeplessness and heart palpitations "wax and wane."

Ms. Fritz saw Dr. Malik but did not return because she has "the tools presently that I am using to manage." She is subject to the Stipulation. Dr. Malik noted "anxiety disorder" and recommended treatment.

With respect to their children, Ms. Fritz stated that they had to adjust to using bottled water and to limited opportunity to play outside. The children did not see Dr. Malik, and they did not testify.

Ricci DePasquale resides with his wife, Sally, and sons Ricci Jr., age 20, Joseph, age 18, Alicia, age 10, and John, age 8. At the time of trial, Ricci, Jr. and Joey were attending college.

Mr. DePasquale stated that his property was "greatly devalued" and added, "[i]t's not even the question of the value. How could I had even want [sic] to pass this on to somebody else?" He could not sleep at times because he believed his property value had gone down, and he wondered whether he was doing the right thing by staying in the house. He was "fearful" that his wife and children might develop cancer or some other disease. He stated his belief that "we are the test rats for MTBE that, you know, we'll be the case study that in 20 years following how the people in this area have been exposed to this amount of leakage and what this could possibly do to people." He did not see Dr. Malik. He saw his family physician "for different ailments" and was given medication for sleeping.

When asked about the effect on his children, Mr. DePasquale stated that the youngest child refuses to move with the family to another location.

Sally DePasquale testified that their property value had been "negatively affected" by the leak. She and her husband disagreed as to whether to move. Because of financial and health concerns, she struggled to "keep it together." She testified:

> I think because of my children and it is something that as a Mom you want to be able to control their safety. You want to be able to control their health, what they eat, what they drink. We don't do soda in our house. Low junk food. I am not a health nut by any stretch of the imagination.... [B]ut when you can't control something as simple as the water and their showers, it is just not good for me....

I think the fact that I don't have the control really frustrates me.

Ms. DePasquale believes a safe level of exposure to MTBE is "baloney." She went to her personal physician and takes medication. She also sees a therapist. She becomes openly emotional at least weekly, that can happen daily,

depending on what statements my children say, depending on how much research I do on the internet, depending on if I have been online looking at houses and find something that would be good and then we go through that whole upheaval to move or not to move.

Ms. DePasquale experienced headaches, neck and shoulder pain for which she was treated by a chiropractor, sleeplessness, and fever blisters from stress.

When asked about her children, she stated that John "has a lot of anxiety because every time we talk about moving [, he] gets really, really stressed out to the point that he cries because he does not want to leave his house." She described Alisha as "frustrated." The older boys "understand it and they obviously understand to [not] drink the water."

Ms. DePasquale and the children did not see Dr. Malik.

Thomas DeBolt resides with his wife, Liza, and their daughter, Kristin, age 3. They had another child by the time of trial.

Mr. DeBolt stated the neighborhood has a stigma which adversely affected their property. He thought about moving but

[y]ou know, it would be a great option to move. We have talked about it a lot. Even over the monetary factors that are involved, potentially losing a lot of money and the things we have made in it, I think it is more of a conscience. I don't think we can look at the sale of our property to another family and put them in the same position that we are in right now. I don't think it would be fair. Ethically I don't think my wife and I could handle doing that.

In July 2006, the DeBolt property appraised for $792,386 by a lender as part of a renewal or extension of a home equity line of credit.

Mr. DeBolt described his concerns about his and his family's future health. He had "sleepless nights" but acknowledged that he had sleeping problems before his children were born and in connection with having young children. He went to his personal physician and took medication for sleeping on occasion. He and his wife have been seeing a family counselor to deal with "stresses" they have been dealing with for years. The leak added stresses, and the counselor is helping to deal with all of them.

Mr. DeBolt saw Dr. Malik on one occasion. Mr. DeBolt was subject to the Stipulation. Dr. Malik noted "anxiety disorder-not otherwise specified" and recommended treatment.

Liza DeBolt testified that she and her husband discussed moving but, "[w]e kept coming back we can't go because we can't put anyone else in this situation."

Ms. DeBolt stated that their daughter had a hearing loss problem not attributable to the leak. She and her husband see a counselor for that and all other stress related issues. She expressed concern about the future health of her family and, specifically, the possibility of cancer.

Ms. DeBolt saw Dr. Malik on one occasion. She was subject to the Stipulation. Dr. Malik noted "adjustment reaction with anticipatory anxiety" and did not recommend treatment.

Kristin did not see Dr. Malik and did not testify.

Carol Copeland resides with her son, Martin McHugh, age 21, who was in college at the time of trial. Prior to trial, Dr. Copeland, a medical doctor working at Sinai Hospital, was offered a position in another state. She stated that she did not put her house on the market but she spoke to a friend who is a real estate agent and "felt fairly discouraged." She believed the value of her home had diminished.

Dr. Copeland's potable well never tested positive but she expressed fear for the unknown, including possible future contamination. She had "difficulty sleeping for about the first six months after the spill" and again after the trial started. She has consulted a psychiatric nurse since 1992 or 1993 "when [she's] had stressful situations in [her] life." That included marriage difficulties ending in two divorces. Prior to the leak, her last visit to the counselor was in 2002 or 2003. Dr. Copeland saw the counselor during the summer of 2006 when she was having trouble sleeping. She stated that the leak had curtailed her social life.

Dr. Copeland saw Dr. Malik on one occasion. She was not subject to the Stipulation. Dr. Malik did not testify about her at trial.

Martin McHugh did not see Dr. Malik, and he did not testify.

Christopher Wiedey resides with his fiancee, Christine Wilkinson, who moved into the house in January 2006. For some period of time after the leak, Steven Stelmack, a good friend of Mr. Wiedey's, rented a room in the house. He moved out prior to trial.

Mr. Wiedey expressed the belief that his house had been devalued. He did not consider selling it

cause I know that, you know, if I was full out positions around—I wanted to, you know, buy my house or something like that, knowing what's wrong with it, I wouldn't go anywhere near it. I'd go somewhere else in a heart beat. Why would I buy into that kind of trouble?

Mr. Wiedey stated that, prior to the leak, he went through a divorce and saw a counselor. He had "started to get things going again." After the spill, he experienced "headaches, . . . abdominal pain to acid reflux, sleeplessness, found it very difficult to sleep for he first few months." He acknowledged sleep difficulties prior to the spill, which he attributed to his ex-wife. After the spill, he attributed is sleeping difficulty to the uncertainty of what was going to happen, in terms of health and finances. He had heartburn before the spill, but

more often after the spill. He saw a doctor and obtained medications for sleeping and for heart burn.

Mr. Wiedey did not see Dr. Malik.

Ms. Wilkinson did not testify.

Mr. Wiedey testified, with respect to Ms. Wilkinson:

> She's been experiencing a lot of stuff too. She's been experiencing a lot of the same thing that I have but I think she's also been getting it a little worse also. She's been having chronic headaches due to stress. Now, I know it mixes in with everything of job, life, and everything of that nature. But I'm sure that, you know, this contributes to it. . . . But, you know, she's also had the sleeplessness and the anxiety, and you know, basically says making her live a living hell.

Ms. Wilkinson saw Dr. Malik. She was subject to the Stipulation. Dr. Malik noted "depression" and recommended treatment.

Mr. Stelmack did not see Dr. Malik, and he did not testify.

Lori Vogler resides with her husband, Michael, and their son, Christopher, age 25, and daughter, Carli, age 24. Carli moved out in September 2006, after she graduated from college, and Christopher moved out in January 2007.

Ms. Vogler opined that their home had diminished in value because of the "stigma." When asked if she and her husband would ever "consider buying a piece of property that was contaminated with MTBE," she replied "[n]o way. Absolutely not."

Ms. Vogler stated that she was never a "terrific sleeper," but her sleeping problems became worse after the leak. She "grinds" her teeth, which produced mouth ulcers. She gained weight because of the distress. She had skin and eye problems which she did not necessarily attribute to the leak. She saw her personal physician for anxiety and was prescribed medication. She expressed a fear of cancer. She saw Dr. Malik on one occasion. She was subject to the Stipulation.

Dr. Malik noted "anxiety disorder-not otherwise specified" and did not recommend treatment.

Ms. Vogler testified that her husband was affected by the diminished value of their property. He had gotten "quieter," and was grinding his teeth. He was having "stomach issues" at the time of trial which, in Ms. Vogler's opinion, may have been related to stress.

With respect to the children, she stated that they worry about "mom" but do not say too much. Christopher and Carli did not see Dr. Malik, and they did not testify.

It appears that Michael Vogler testified, but we have not been able to locate his testimony in the record extract. Appellant's brief refers to testimony that Mr. Vogler always ground his teeth, but that that problem worsened after the leak, and that he experienced stomach problems after the leak.

Mr. Vogler saw Dr. Malik on one occasion. He was subject to the Stipulation. Dr. Malik noted "anxiety disorder-not otherwise specified" and did not recommend treatment.

Martin Blair resides with his wife, Joyce, and their daughter, Alexis, age 18, and son, Spencer, age 9. Alexis was in college at the time of trial.

Mr. Blair testified that he believed his home had diminished in value and stated that

> I also take kind of a moral stand on that.

> I—I am not comfortable in my home right now. I could not in good conscience sell my home to a willing buyer who thinks they're getting a great deal on a beautiful home and have them live with the same stress, the same worry that we live with right now.

Mr. Blair suffered from "chest pain" and he "loses sleep." He described the chest pain as loss of breath and attributed it to anxiety. The chest pain and the loss of sleep had improved. He stated that he exhibited symptoms in connection with testifying in this case. He was also stressed by the death of his brother and his father's heart problems. He expressed

fear about the future health of his family. He stated that the leak affected his daily life, relationships, and job.

Mr. Blair saw someone in Dr. Malik's office on one occasion. He was subject to the Stipulation. Dr. Malik noted "anxiety disorder—not otherwise specified" and did not recommend treatment.

Ms. Blair testified that she was "fearful" for her future health and that of her family. She did not sleep well, and she had a "rash that comes and goes all over me, on my trunk, my hands, my legs and stress, I believe, aggravates it." Ms. Blair saw Dr. Malik on one occasion. She was subject to the Stipulation. Dr. Malik noted "anxiety disorder—not otherwise specified" and did not recommend treatment.

Alexis and Spencer saw Dr. Malik, and they were subject to the Stipulation. As to Alexis, Dr. Malik noted "acute anxiety reaction," and as to Spencer, he noted "anxiety reaction." He did not recommend treatment. Alexis and Spencer did not testify.

Patricia Colgan resides with her husband, Bartlett, and their sons, Patrick, age 18, and Zachary, age 18. She stated that her home had gone down in value because of the leak, and that caused emotional distress. She had more difficulty sleeping than before, has "nightmares," and worried about effects on health. She testified that her husband did not sleep well. She explained that he worried about finances and that the reduction in value of their property was very stressful.

When asked about their children, Ms. Colgan stated "[t]hey asked some questions at the beginning." She added that now that they have been accepted into college, and because the Colgans have not figured out the finances to enable them to attend, they are affected by the leak.

None of the Colgans saw Dr. Malik. Mr. Colgan, Patrick, and Zachary did not testify.

Curtis Pfeiffer resides with his wife, Brenda. He testified that his home decreased in value because of the "stigma."

Mr. Pfeiffer expressed concern about health effects and financial effects of the leak. He felt that he failed his wife because he cannot "fix this." He experienced "worry, anxiety, ... depression, discouragement, ... sleepless nights," and "nightmares." The nightmares were about poisoned water. The effects of the leak affected his sexual life.

Mr. Pfeiffer saw Dr. Malik in 2007, and a second time in September 2008. On the latter visit, Dr. Malik gave him a prescription for sleeping, but Mr. Pfeiffer took Tylenol P.M., "and that seemed to take care of [his] needs at that time and at the present time."

Mr. Pfeiffer was not subject to the Stipulation. At trial, Dr. Malik testified that Mr. Pfeiffer had an "adjustment reaction with anxious features" because he was worried about health and finances.

Brenda Pfeiffer stated she was "devastated" because of many fears, including cancer, as a result of the leak. She experienced "high anxiety" because of the "fear of the unknown." Ms. Pfeiffer described "headaches," problems with her eyes, "GI reflux," and "sleepless nights." She took Tylenol P.M. to sleep. She saw Dr. Malik on at least 6 occasions, who told her she needed medication for anxiety and depression. Ms. Pfeiffer was not subject to the Stipulation. At trial, Dr. Malik testified that she suffered from "depression" and was being treated with medication and psychotherapy.

Tom Carroll resides with his wife, Karen, and their children, Allison, age 12, Stephanie, age 9, and Jason, age 7. Mr. Carroll testified that they had not looked into selling their home because they "have a great home, a great neighborhood, and it's extremely hard to replace." He stated,

more significantly, because it's in our view impossible to sell it. I would never transfer the issues that we have to any other family with children. Our neighbor's home is for sale, it's right next to us. For two and half years, well over two years. It's a five bedroom home just like hours [sic]. It's almost exactly like it, and no one has even, it won't sell. So—

Mr. Carroll opined that his house had "decreased to the value of no value." He added that he would not look for a house with contamination at any price.

Mr. Carroll expressed concern about future health effects, including cancer. He stated that he experienced stress prior to the leak and at one time consulted a psychiatrist who prescribed medication. After the leak, he experienced nausea, "pressure" in his chest, nervousness, and "sleeplessness." He saw someone in Dr. Malik's office on one occasion and saw another health care provider 6 or 7 times. He was not prescribed medication.

Mr. Carroll was not subject to the Stipulation. Dr. Malik did not testify about him at trial.

Karen Carroll expressed fear about developing cancer. She felt "anxious," experienced "sleepless nights," nausea, and "nightmares." She had emotional problems before 2006 because of various issues, including issues with commuting and with the children. She sought medical attention and was prescribed medication. She stated that "this is different" because she feels like she has no control over it, and will not feel better until she leaves the house.

Ms. Carroll saw Dr. Malik once and a social worker 5 or 6 times. She was not subject to the Stipulation. Dr. Malik testified, however, that someone like Ms. Carroll, a "constant worrier," was more prone to emotional distress. He diagnosed her with "depression, generalized anxiety disorder, and post traumatic stress disorder."

With respect to the children, Mr. Carroll testified that they were very aware of the need not to use well water, were protective of others, and did not permit them to use it. Ms. Carroll's testimony was similar, and both emphasized the inconvenience in having to use bottled water, particularly when the children had friends visiting. The children did not see Dr. Malik, and they did not testify.

At the time of the leak, Sheryl Schech resided with her husband, Michael, and their children, Alex, age 15, and An-

drea,[32] age 13. The parties were in marriage counseling prior to and after the leak. They separated in 2008, and Ms. Schech moved out of the house. She stated that the effects of the leak added stress. She experienced anxiousness, "problems sleeping," and worrying about what was going to happen.

Ms. Schech saw Dr. Malik on one occasion. She was subject to the Stipulation. Dr. Malik noted "adjustment reaction" and did not recommend treatment.

Michael Schech testified that his house "is worth nothing to me right now" because "I wouldn't buy a house like that in a development like that." He testified he slept less after the leak because of added stress. He did not attribute the parties' separation to the leak.

Mr. Schech saw Dr. Malik on one occasion. He was subject to the Stipulation. Dr. Malik noted "acute anxiety reaction" and did not recommend treatment.

With respect to the children, Ms. Schech stated that they were "concerned about the changes [they] had to make in the house on a daily basis." Both children saw Dr. Malik on one occasion. They were subject to the Stipulation. With respect to Andrea, Dr. Malik noted "adjustment reaction," and with respect to Alex, he noted "adjustment disorder with anxiety, attention deficit with hyperactivity disorder." He recommended treatment for Alex but not Andrea. Neither testified.

Carolyn Heggie owned 20 acres with 3 houses and outbuildings. She and her family live in one house and rent the other two houses. She resides with her son, Walter, his wife, Melodie, and three grandchildren, Joshua, age 21, Emily, age 12, and Sarah, age 9.

Ms. Heggie, a real estate broker, opined that her property had declined in value because it is "stigmatized." She had no plans to move. She expressed concern financially and because of future health concerns, including cancer, especially as to the

---

32. The name sometimes appears as "Andrew"

grandchildren. She described loss of sleep. She did not see a doctor.

Ms. Heggie testified that Walter experienced "stomach problems." He went for various tests which were negative. Ms. Heggie concluded the stomach problems were caused by "this situation."

None of the Heggies saw Dr. Malik. Ms. Heggie was the only member of the family to testify.

Lisa Gregory resided with her husband, David, and their children, Clifford, age 17, and Amanda, age 12. Because of marital difficulties not attributable to the leak, Ms. Gregory moved out of the house in February 2006. The Gregorys put their house up for sale in September, 2006. It did not sell, and they took it off the market after a year. Ms. Gregory was convinced that the house was not going to sell "at or near market value." [33]

The inability to sell the house caused "stress and anxiety" which manifested in "high blood pressure," "dizzy spells," nervousness, "sleeplessness," nausea, and "backaches." Ms. Gregory saw her primary care physician and a therapist. She was prescribed medications for high blood pressure, anxiety, and sleeplessness.

Ms. Gregory did not see Dr. Malik.

David Gregory testified that in the spring and summer of 2006, he saw his primary care doctor and a psychologist because of issues related to the divorce and because of exposure to MTBE. He was prescribed medication.

In April or May 2008, Mr. Gregory moved out of the house in Jacksonville and moved in with his girlfriend. The inability to sell the home caused "sleeplessness," and tightness of muscles. He received therapy for the latter which helped.

---

**33.** According to appellant, the State Department of Assessments and Taxation website reflects that the home was the subject of foreclosure and sold for $585,000.

He has been treated for high blood pressure since May 2008. He expressed concern about future health effects.

Mr. Gregory, Clifford, and Amanda did not see Dr. Malik. Clifford and Amanda did not testify.

Frank John Mucha resides with his wife, Jennifer, and their two children, Alexandra, age 6, and Erin, age 4. He opined that his house had diminished in value. Based on that and the contamination, he stated that it made him "sick to [his] stomach," but he had similar issues prior to the leak. He did not see Dr. Malik.

Jennifer Mucha testified that she had experienced depression prior to the leak, starting at "post partum," and had taken medication. When asked whether she believed "two small children and a home that was contaminated" exacerbated her depression, she replied:

> Well, as I have gotten older, things that are very stressful and things that are very overwhelming, I have a much harder time dealing with them. It is basically another thorn in my side that I have to deal with. It is very difficult for me.

She and the children did not see Dr. Malik.

Janice Martin resides with her husband, Terry, and their sons Brian, age 18, and Justin, age 15. Ms. Martin testified that, if they sold their house, they would take a loss because they could not cover the mortgage.

Prior to the leak, Ms. Martin was treated for anxiety. After the leak, she experienced "fear because of financial and health issues," "headaches," "nightmares," "anxiety," and "sleeplessness." She saw her family physician and a psychologist. She was prescribed medication, but stopped taking it shortly before trial.

She did not see Dr. Malik.

Terry Martin testified that he was worried about contracting cancer in the future. He stated that he got "more headaches than [he] used to and at times had trouble concentrating." He was diagnosed with "anxiety" in 2004 associated

with chest pains. He has been taking mediation since then. He stated that, since the leak, his anxiety is at a "different level." He further explained that it its "more of in the—in the mind . . . . it's more emotional."

He did not see Dr. Malik.

With respect to the children, Ms. Martin testified that, since the fall of 2007, Brian had been having headaches which she attributed to stress. She described Justin as a "worrier." Neither child saw Dr. Malik, and neither testified.

David Cadigan resides with his wife, Jennifer, and their two children, Connor, age 6, and Dylan, age 4. Mr. Cadigan testified that he believed there was a "stigma" in the neighborhood, and had heard negative comments at least once a week. He testified that, in March 2007 his home was appraised, in connection with a financing transaction, for $690,000.

Mr. Cadigan expressed fear of the unknown and, specifically, fear of cancer. He described "embarrassment," "major sleep deprivation," "headaches," weight gain, and lack of motivation and energy. He saw Dr. Malik on one occasion. He was subject to the Stipulation. Dr. Malik noted "anxiety disorder—not otherwise specified" and recommended treatment. Mr. Cadigan did not pursue treatment.

Jennifer Cadigan stated she would not "feel right" selling her house to someone else. She expressed fear of future disease, such as cancer. She did not "sleep well" and took over-the-counter sleep aids. She was "distressed," "anxious," "scared," "sad" and cried a lot.

She saw Dr. Malik on one occasion. She was subject to the Stipulation. Dr. Malik noted "acute anxiety, reaction and anxiety disorder-not otherwise specified" and did not recommend treatment.

Connor and Dylan did not see Dr. Malik, and they did not testify.

Kenneth Thompson resides with his wife, Maria Chavez, his children, Victor, age 18, Emmett, age 16, and Mr. Thompson's

mother, Mary. Mr. Thompson owned another lot on which he was building a house.

He testified that "the town idiot, if we had one in Jacksonville, would know that you can't sell a house in Jacksonville."

He stated that he had "a lot of health issues," and "one of those is probably going to take [him] out before the MTBE gets around to it."

Mary Thompson, age 81, the owner of the property, testified that she planned to move into a retirement home but her house "isn't salable" because "no one would want to buy it."

Mr. Thompson, Maria Chavez, Mary Thompson, Victor, and Emmett did not see Dr. Malik, and they did not seek medical attention. Maria Chavez, Victor, and Emmett did not testify.

Thomas Facinoli resides with his wife, LaGina, and their two sons, Travis, age 21, and Theo, age 19, who moved out in August of 2007 to attend college.

Mr. Facinoli believed that the value of his house had been negatively affected, and it would be impossible to sell it for that reason and also because of the "ethical reasons." He added, "I don't know how you could put a dollar value on the property and the house." In December 2006, Mr. Facinoli's house was appraised for $680,000 in connection with a refinancing.

Mr. Facinoli stated that he had been sleeping in the basement since early 2006 because of marital difficulties, which he attributed to the leak. He stated that he felt "hopeless," could not sleep, got headaches, and worried about his family getting cancer. He saw someone in Dr. Malik's office and received 8 to 10 therapy sessions.

He was subject to the Stipulation. Dr. Malik noted "adjustment reaction" and recommended treatment.

LaGina Facinoli expressed fear of the unknown. She agreed her marital difficulties were attributable to the leak. She stated that she has "nightmares," knots in her stomach, and she grinds her teeth. She stated that she could not eat or sleep. She stated she was "emotionally a wreck." She saw

Dr. Malik on one occasion. She was subject to the Stipulation. Dr. Malik noted "adjustment reaction" and did not recommend treatment.

Theo and Travis did not see Dr. Malik and did not testify.

Kurt Vacovsky resides with his wife, Cynthia, and their two children, Zachary, age 18, and Brooke, age 16. At the time of trial, Zachary was away in college. Mr. Vacovsky stated that he would not sell his home to a family with children and that he could not sell it for what he thinks it is worth.

Mr. Vacovsky expressed fear of the unknown. He started having headaches a year after the leak, and his blood pressure was "creeping up," which he attributed to the leak. He had difficulty sleeping and had a "gallbladder issue."

Mr. Vacovsky saw Dr. Malik on one occasion. He was subject to the Stipulation. Dr. Malik noted "adjustment reaction" and did not recommend treatment.

Cynthia Vacovsky testified that she was fearful of cancer. She experienced "anxiety" and "sleeplessness." She saw Dr. Malik on one occasion, who recommended she return, but she did not. She was subject to the Stipulation. Dr. Malik noted "adjustment disorder with mixed emotional features."

Zachary and Brooke did not see Dr. Malik, and they did not testify. Mr. Vacovsky testified that they saw what was going on. He described Zachary as an "emotional kid" who probably didn't handle it as well, and Brooke as "oblivious to it."

Jane Elkinton resides with her husband, Jai Dixon. She expressed "huge" concern for her health and that of her husband. She believed there was no safe level of exposure explaining:

> [A]nd I think that there will be a day when we will look back at [the 20 ppb level] and we will basically laugh at it in the way we laugh today about the old early 1950s duck-and-cover advertisements by the U.S. government telling people how too avoid-or protect yourself in the case of a nuclear explosion.

She experienced neck and back pain and had an "irrational need for exercise, desperate need." She explained:

I have sought out the exercise. I'm extremely angry at having to do this very, very hard work on a daily, hourly basis. When you try to go to sleep and, bam, it hits you in the face, you're stuck, sister, deal with it, and try to get back to sleep on that one. So I've—I've worked very hard at getting exercise.

She also used needlework to stabilize her. She did not see Dr. Malik.

Jai Dixon testified that he was "extremely upset and angry and experienced 'muscle tension.'" He did not see Dr. Malik or any other health care provider.

Mark Alan Lamos resides with his wife, Mary Christine Lamos–Sinelli, and in early 2006, their daughters, Elizabeth, age 28 or 29, and Jennifer, age 25. The daughters moved out of the house on or about the end of 2006.

Dr. Lamos did not expressly opine as to the value of his house, but stated, "I would think that any reasonable person would be very concerned about whether or not they should be moving into that house."

Dr. Lamos expressed concern as to whether, at some later point in time, exposure would be found to be harmful. He had experienced "insomnia." He did not see Dr. Malik.

Ms. Lamos also expressed concern about future health effects, and what new analysis will show in 20 years. She felt "sad" about the destruction of the community, and that she cannot get it back. "In the beginning," she had a "lot of sleepless nights." She did not see Dr. Malik.

Elizabeth and Jennifer did not testify, and they did not see Dr. Malik.

Cassandra Brady testified that, at the time of the leak, she resided with her husband, Martin, and their two sons, Matthew, age 13, and Joshua, age 11. After the leak, they placed their house on the market for $689,000, received two offers within a week, and sold it for $679,500 in May 2007. The

closing documents disclosed the leak. There were monitoring wells on the property, when the sale took place.

Ms. Brady expressed concern about the risk of cancer in the future. She also stated:

> In the beginning, the whole-helplessness, it was just a feeling of dread. You had an incredible weight on your body because you were not in control of the situation. It seemed like there was no way out. My husband and I couldn't sleep. We-we would go to bed and then we would lie there and talk for hours and hours. You cannot get it out of your mind. It is obsessive. That's the only thing you can discuss. We—if you do fall asleep, it is a restless sleep. At that time you wake up early.

Martin Brady testified that he experienced "sleeplessness ... through the early days especially," and loss of focus on work.

None of the Bradys saw Dr. Malik. Matthew and Joshua did not testify.

Robert Libertini resides with his wife, Suzanne, and their children, Robert, Jr., age 20, Katherine, age 18, and Nicholas, age 15. At the time of trial, the two oldest were in college. The Libertini property was substantially impacted by remediation efforts. The Libertinis entered into an access agreement with appellant in exchange for compensation. Mr. Libertini testified at length with respect to those efforts, including a description of structures on his property, noise, stadium lighting, and the presence of workmen.

Mr. Libertini believed his property had been adversely impacted, stating that he could not "imagine any person" buying it. He expressed fear about the unknown. He stated:

> Physically, emotionally, financially, I would say it's been overwhelming and over consuming the loss of my ability to control my future right now, the questions of what I've exposed my family to by agreeing to this—agreeing to allow all these monitoring wells on the property and the levels of

MTBE and benzene that's underneath the ground, underneath our house.

Mr. Libertini experienced loss of sleep and "stress headaches." He saw Dr. Malik on one occasion and someone in his office on another occasion. He stated that he relieved his stress by running and working out. He was subject to the Stipulation. Dr. Malik noted "mood disorder-not otherwise specified" and did not recommend treatment.

Suzanne Libertini stated that she feared the unknown. "Early on" she "tried to keep things . . . at bay," but during the 8 to 10 months before trial she had "some sleepless nights." She stated she lost about 10 pounds during the 3 months before trial and had "some headaches."

Ms. Libertini saw Dr. Malik on one occasion. She was subject to the Stipulation. Dr. Malik noted "adjustment reaction" and did not recommend treatment.

With respect to the children, Mr. Libertini testified that Robert, Jr. was "worried about mom and dad's finances," Katherine was "embarrassed to have a guy come over," and "frightened" because of strangers on the property, and Nicholas could not play in the yard.

None of the children saw Dr. Malik, and none testified.

Amy Shimp and her husband, Jeffrey, contracted to build a house in Jacksonville in late 2005. They moved into the new house on July 17, 2006. They resided with their daughter, Katherine, age 18, until she went to college, and their son, Colin, age 11.

When asked how she felt about the effects of the leak, Ms. Shimp stated that

> throughout this whole period and continuing, like throwing up, just sick. Tired. Stressed out. Taking sleeping pills since. I haven't slept a whole night without them. I grind my teeth . . . . feel sick.

She stated that she has always been predisposed to grinding her teeth when stressed, but now she has been prescribed a night guard. Because of difficulty sleeping, she sleeps by

herself. She attributed some of her difficulty to rotator cuff surgery. She also expressed fear of cancer and of the unknown.

She saw Dr. Malik on one occasion. She was subject to the Stipulation. Dr. Malik did not testify about her at trial.

Jeffrey Shimp described "stress," "anger," "anxiety," "difficulty sleeping," and trouble with "concentrating." He saw Dr. Malik and was still being treated by him at the time of trial.

He was not subject to the Stipulation. Dr. Malik did not testify about him at trial.

Katherine and Colin did not see Dr. Malik and did not testify.

David Mahoney resided with his wife, Rose Marie, and their children, Mary Kathleen, age 10, and Kelly, age 6. Mr. Mahoney expressed concern about possible exposure to MTBE and stated that is "a regular worry."

Ms. Mahoney stated she would like to move, but they could not do it financially. She was asked how the spill and the fact that they installed a carbon filtration system "maybe too late, made her feel." She replied, "we are all very upset about it."

None of the Mahoneys saw Dr. Malik. The children did not testify.

Palma Barone resides with her husband, Joseph, and their four children, Alexander, age 19, Devin, age 17, Miranda, age 12, and Sophia, age 10. Ms. Barone stated the leak caused "a lot of stress and tension." She mentioned it to her primary care doctor and complained of "crying jags," "bouts of insomnia," nausea, and headaches. She suffered from those ailments from time to time prior to the spill, but stated "it's a little bit different this time." She was concerned about future health effects. She did not see Dr. Malik.

Joseph Barone testified that, in 2007, the Barones attempted to sell their house for $1,375,000. At some point in 2007, the house was appraised at $1,600,000. In January, 2008, the Barones lowered the listing price to $1,279,000. Later, it was lowered to $849,000. The house was not sold.

Mr. Barone stated that he had weight gain and insomnia because of financial and future health concerns.

None of the Barones saw Dr. Malik. The children did not testify.

Herman Hannan resides with his wife, Laverne. Mr. Hannan stated that he had "always been healthy, never had any serious problems other than knee replacements and stuff like that." In November 2007, Mr. Hannan had "six melanoma surgeries." He did not attribute those to the leak. Four days before trial in these cases, Mr. Hannan was diagnosed with "lymphoma, Stage 2, large cell, effusive B cell lymphoma." He was receiving chemotherapy at the time of trial. He stated that his doctors had not related the cancer to the leak. He added:

I don't know that it's caused by that, but I don't know, and that's the fear. It's the fear.

I lay there at night and I say, who the hell's next? My wife? My grandchildren? Tizards' kids? The woman who was here the other day who's now pregnant? Who the hell's next?

Mr. Hannan saw a psychiatrist 6 or 7 times. He takes an antidepressant medication. He experienced loss of sleep and lack of concentration. He did not see Dr. Malik.

Laverne Hannan was in a serious auto accident in June 2006. She underwent an extensive hospitalization, seven surgeries, and was wheelchair bound for a year and a half. She had residual effects at the time of trial.

Ms. Hannan expressed the view that their property had "no value" because "no one would want to buy it." At a later point in her testimony, she stated that she and her husband intend to sell the house after the litigation is over, but had not put it up for sale because "it would be a lesson in futility."

Ms. Hannan expressed fear with respect to future health effects because of the unknown. After the leak and before her accident, she was "stressed out about it," gained weight, and her "biggest manifestation was irritability." She saw an acu-

puncturist for some back pains, and "[she] also use[d] him then to work on weight control, and he also worked on the issue of stress that I was undergoing." The accident "took away all [her] freedom." She saw several doctors and no longer had time for the acupuncturist. A doctor prescribed an antidepressant medication. Ms. Hannan also had a great deal of guilt because she felt responsible for the fact that her daughter, Jodi Howe, and her family moved into the community.[34]

Mr. and Ms. Hannan did not see Dr. Malik.

Barry Faber resides with his wife, Susan, and their children, Emily, age 16, and Alexander, age 13. With respect to the effect of the leak on his property, the following exchange occurred.

Q. And how do you feel as far as the effect of the leak and the contamination in your well on the value of your property?

A. You know, I can't imagine anybody buying my house. That—it's—I mean, I wouldn't say—I know some people— you know,—I wouldn't say it's gone to zero. And if I said to somebody here, you can have my house for $10, I assume somebody would buy my house for $10. And, you know, at some level obviously above $10 they would still.

But I can't really imagine buying a house, one of the houses on—you know, they referred to it as the strike line that has 70–plus well tests, every single one of them being MTBE, I don't understand why anybody would ever buy that house at any price.

So the answer to your question is, I—I would assume the value of my house has gone down just a huge amount.

Mr. Faber expressed fear of future disease. He felt "sadness," "a feeling of a weight," "lack of concentration," "sleeplessness," "and lack of enjoyment in the home." He saw Dr. Malik in mid–2007 and later saw a counselor. He went to the counselor once a month until February 2008. When the

---

34. The Howes are appellees.

counselor "went out on medical leave," Mr. Faber did not see anyone. The counselor returned shortly before trial, and Mr. Faber resumed seeing her. He stated that he was "feeling better about it now."

Mr. Faber was subject to the Stipulation. Dr. Malik noted "generalized anxiety disorder" and recommended treatment.

Ms. Faber testified that she experienced "sleeplessness," and "anxiety". She saw Dr. Malik on one occasion. She was subject to the Stipulation. Dr. Malik noted "anxiety disorder—not otherwise specified" and did not recommend treatment.

With respect to the children, Ms. Faber stated that their daughter asked if she is going to be okay, "so it's definitely in their mind and I think they do worry that this may cause some-some problem for them later on." The children did not see Dr. Malik, and they did not testify.

Joyce Rush resides with her husband, Leslie. Ms. Rush, a real estate agent, testified that everyone was familiar with the Jacksonville area and the effects of the leak. She explained, "everything was all over the papers and it was on the news. And everyone knows about it." She stated that she believed the value of her property had been "negatively impacted" to a "significant" extent. Her employer, Long & Foster, developed an addendum which served as a disclosure to be used with sales in the Jacksonville area.

Ms. Rush expressed fear of cancer and of the unknown, which became worse after listening to the testimony in court. She had difficulty sleeping, had "anxiety attacks," and "continuous stress." She stated "I feel like I'm going to cry a lot." She said she had had two anxiety attacks prior to 2006, while in California. She did not know what caused them. She testified that she saw Dr. Malik on one occasion. The Stipulation concerning Dr. Malik's expected testimony does not reflect that visit, however. Ms. Rush also saw an acupuncturist three times.

Ms. Rush stated that her husband was upset and frustrated. Mr. Rush did not see Dr. Malik, and did not testify.

John Csicsek resided with his wife, Martha. In 2005, the Csicseks entered into a contract to purchase a condominium in Baltimore because they had decided to downsize after their children were grown and on their own. After the leak, they placed their home on the market "listed appropriately for the-the current Exxon spill situation." Mr. Csicsek testified that he was certain the house would not sell. It sold promptly for $767,000. They moved out of the house in May 2007.

Mr. Csicsek expressed fear as to future health effects and experienced "stress and anxiety" because of his fear and because of the financial stress prior to the sale of their house. Mr. Csicsek saw Dr. Malik on one occasion. He was subject to the Stipulation. Dr. Malik noted "adjustment reaction with anxiety" and did not recommend treatment.

Martha Csicsek testified that she experienced "stress" and "lack of sleep." She also expressed concern for the future, explaining that she had recently had some health issues that made her "wonder."

Ms. Csicsek saw Dr. Malik on one occasion. She was subject to the Stipulation. Dr. Malik noted "adjustment reaction with anxiety features" and did not recommend treatment.

Ronald Diedeman resides with his wife, Joan. He questioned whether anyone would buy his house and also stated that he had an "obligation to remain in the neighborhood because he had a moral obligation not impose the threat of cancer on anyone else." He concluded his property was "worthless."

Mr. Diedeman described a feeling of "helplessness," fear of cancer, and "stress." He emphasized fear of the unknown and when exposure to MTBE will be found to cause cancer. He also emphasized that his wife had had cancer several years before the leak, and had recovered, but that added to the fear.

Mr. Diedeman did not see Dr. Malik.

Joan Diedeman testified that the value of their property had gone down. She stated that she had breast cancer in 1991,

had chemotherapy, and was "violently ill." She expressed fear of the unknown, including cancer. She stated that she had pain in her shoulder from stress. She took muscle relaxants, prescribed by her family doctor. She took Tylenol P.M. and stated she is okay when she is not in the courtroom. She did not see Dr. Malik.

Matthew Fox testified that he resided with Michele Shindledecker until May, 2007. At that time, Mr. Fox bought her interest in the property, and she moved out. In late 2006 and early 2007, the property appraised for $325,000 in connection with financing and the purchase of Ms. Shindledecker's interest. The pre-leak value was $323,000. Mr. Fox opined that the value of his home had decreased and that he was concerned about the financial toll.

Because of the level of MTBE in Mr. Fox's potable well, the MDE installed a POET system, and the level dropped. In July 2008, the level increased again, and in September 2008, appellant installed a new system. Mr. Fox stated that he did not experience emotional distress until September, 2008, when, because of difficulty with the POET system, he had trouble sleeping. He did not see Dr. Malik.

Mr. Fox stated that he did not know if Ms. Shindledecker had ever sought counseling or complained about any physical problems. Ms. Shindledecker did not testify. She did not see Dr. Malik.

James Hourihan resides with his wife, Janet, and two of their sons, Ryan, age 23, and Christopher, age 21. Mr. Hourihan testified that, in his opinion, their property had been negatively impacted based on the "stigma" and the fact that the leak "was well known everywhere in this area."

Mr. Hourihan stated that he was "very fearful," particularly of the unknown. He experienced "anger to frustration, depression." His biggest problem "was being able to sleep at night," but his concentration level was also affected.

Mr. Hourihan stated that he watched his wife get "very upset by this." She had stomach issues related to stress.

None of the Hourihans saw Dr. Malik. Only Mr. Hourihan testified; the others did not.

Stacey Curtiss resides with her husband, Thomas Anderson, and their children, Shelby Foit, age 14, and James Anderson, age 2. Ms. Curtis was pregnant at the time of the leak and was experiencing "pregnancy-related issues." Her potable well tested positive for significant amount of MTBE, and that "turned [her] world upside down." She stated that most of her stress came from the unknown, mentioning cancer in particular, because it was "throughout [her] family." She testified that their comfort level in relying on their filtering system decreased as a result of hearing the testimony at trial, and they resumed using bottled water.

Ms. Curtiss described "anxiety attacks and insomnia," including chest constriction, and "lack of sleep." Her main concern was whether she had harmed the unborn baby during the time she drank the well water and bathed in it.

Ms. Curtiss saw Dr. Malik, apparently on one occasion. She was subject to the Stipulation. Dr. Malik noted "generalized anxiety disorder" and did not recommend treatment.

Mr. Anderson testified that he was afraid to put the house on the market because he did not know why anyone would want to buy it, and "it could sit there." With respect to manifestation of distress, he stated that he experienced "sleeplessness."

Mr. Anderson saw Dr. Malik, apparently on one occasion. He was subject to the Stipulation. Dr. Malik noted "anxiety disorder, mood disorder-not otherwise specified," noted a preexisting condition and preexisting treatment, and recommended treatment.

Ms. Curtis testified that Shelby was afraid to walk home alone when she got off of the school bus, because of all of the workmen and equipment. She stated that Shelby's level of "worry [and] anxiety increased throughout this whole thing."

The children did not see Dr. Malik. They did not testify.

Leon Nickel resides with his wife, Theresa, and their two sons, Brian, age 16, and Kevin, age 12. He testified that he believed his property value had decreased because of the fear of possible future contamination and the "stigma."

No contamination was ever found in the Nickel family's well. Appellees' expert, Mr. Rudo, testified that the Nickel property had a low possibility of future contamination. With respect to distress, the following occurred, on direct examination (without objection):

Q. Can you explain to the members of the jury-well, let me ask you this question first. Your well is, has not been identified with contamination. Hypothetically, in the future, if it were to become contaminated would you become fearful of future disease?

A. Absolutely.

Q. And is there anything, in particular, or any reason, in particular, why you would become fearful of future disease?

A. Well, if it's contaminated with benzene, or MTBE or both, one causes cancer; the one is, is a known possible, possible carcinogen. And even taking showers and, and transdermal contact could cause cancer down the road, or other sicknesses. So we'd be very fearful, fearful of that.

In addition to his testimony about fear of future fear, Mr. Nickel expressed concern about the financial effects of the leak and fear of future contamination. He said he had difficulty sleeping.

Ms. Nickel testified that she was concerned about future health risks, including cancer. She experienced "sleeplessness," and "stomach problems," which she attributed to stress. She stated she had had an ultrasound done to make sure she did not have ovarian cancer and had had a colonoscopy done to make sure she did not have colon cancer. She explained that her mother is a breast cancer survivor and her father was in the advanced stages of prostate cancer.

None of the Nickels saw Dr. Malik. Brian and Kevin did not testify.

Michael Davis resides with his wife, Bobbie, and their son, Ian, age 16. He opined that his property had diminished in value. He was depressed and stressed-out because of the loss of value and enjoyment of his property and also because of the fear of future health effects.

Ms. Davis testified that the financial fear caused her stress. She experienced anxiety before the leak, had it under control, and experienced it again after the leak. She described symptoms as including rapid heart beat, "almost" a numbness in her fingers, a feeling of inability to get a deep breath, and a "fear … you can't swallow." She stated that her "greatest fear is death" and "some of it stems back to life experiences that [she] had in the past." This situation is "different" because she cannot fix it. She also explained that her father had died young from cancer, and she was concerned about exposure to chemicals.

Ian did not testify. Mr. Davis testified that Ian "had some anxiety issues, you know, prior to the spill. And this really exasperated [sic] the, those issues. It, I, I, there constant panic attacks, are constant anxiety attacks." He explained that Ian's "biggest fear is he's going to die." On one occasion, after he cut his hand, he put a plastic bag over it because he did not want to get water into the cut. Ms. Davis testified that Ian's anxiety was not limited to the effects of the leak but it has caused "us to be unable to keep it stable and keep him under control as much as we would like."

Mr. Davis, Ms. Davis, and Ian each saw Dr. Malik on one occasion. They were subject to the Stipulation. With respect to Mr. Davis, Dr. Malik noted "generalized anxiety disorder" and recommended treatment; Mr. Davis did not seek treatment, however. For Ms. Davis, Dr. Malik noted "adjustment disorder with mixed anxiety and depressed mood," noted a preexisting condition and preexisting treatment, but did not recommend treatment. With respect to Ian, Dr. Malik noted "generalized anxiety disorder" and preexisting treatment, and did not recommend treatment.

Mae DeDeo moved out of her house and into a condominium shortly after the leak because she was afraid of the water. She did not attempt to sell her house because "you wouldn't even know what to ask for, because nobody's going to want it," and because she would be morally uncomfortable selling it, because "you don't do anything to hurt a child."

She expressed fear of cancer. She experienced sleeplessness. She saw Dr. Malik on one occasion. She was subject to the Stipulation. Dr. Malik noted "adjustment reaction" and did not recommend treatment.

Judge MICHELLE D. HOTTEN has authorized me to state that she joins in this opinion in its entirety. Judges DEBORAH S. EYLER, KATHRYN GRILL GRAEFF, and SHIRLEY M. WATTS join in this opinion in part, as explained in their opinions.

GRAEFF, J., concurring.

I concur in the judgment set forth in the per curiam opinion. I join Judge Zarnoch's opinion, in part, and Judge James Eyler's opinion, in part.

I join Parts I and II of Judge Zarnoch's opinion, which: (1) reject appellees' argument that Exxon waived its right to challenge the compensatory damages awarded; and (2) uphold the admission of the testimony of appellees' expert witness, Kenneth Acks.

With respect to the issue whether there was sufficient evidence to uphold the jury's verdict regarding diminution of the value of appellees' properties, I agree with much of Judge James Eyler's analysis regarding the appropriate method of proving diminution of a property's value. I agree with Judge Zarnoch's opinion, however, that the evidence admitted here, without objection, was sufficient to support the jury's verdict that all of the appellees' properties are worthless.

I agree with Judge Eyler's opinion that, in cases involving the effect of environmental contamination on the value of property, the owner of the property generally does not have

sufficient expertise to testify regarding the effect of environmental contamination on the property's value. *See Hous. Auth. of City of New Brunswick v. Suydam Investors LLC,* 355 N.J.Super. 530, 810 A.2d 1137, 1150 (App.Div.2002) ("[T]he effect of environmental contamination upon a property's value must be determined on the basis of expert appraisal evidence."), *aff'd in part rev'd in part on other grounds,* 177 N.J. 2, 826 A.2d 673 (2003). Here, however, many of the homeowners testified, without objection, that their homes were worthless as a result of the spill, and Exxon does not argue on appeal that the court erred in admitting this evidence.[1] Rather, it argues that the evidence of value presented was insufficient to support the jury's verdict that the property of every appellee was worthless.

As Judge Zarnoch points out, in reviewing whether the evidence supports a verdict, an appellate court reviews all of the unobjected to evidence admitted at trial. As the Court of Appeals has explained:

> "If the evidence is received without objection, it becomes part of the evidence in the case, and is usable as proof to the extent of whatever rational persuasive power it may have. The fact that it was inadmissible does not prevent its use as proof so far as it has probative value. Such incompetent evidence, unobjected to, may be relied on in argument, and alone or in part may support a verdict or finding. This principle is almost universally accepted, and it applies to any ground of incompetency under the exclusionary rules."

*Old v. Cooney Detective Agency,* 215 Md. 517, 526, 138 A.2d 889 (1958) (quoting McCormick, Handbook of the Law of Evidence § 54 at 126 (1st ed.1954)). *Accord Robinson v. State,* 17 Md.App. 451, 462–63, 302 A.2d 659 (1973).

Thus, to the extent that homeowners testified, without objection, that their homes were worthless, this evidence was

---

1. Exxon does note in a footnote that "a number of courts have required expert testimony to support claims of diminution in value based on environmental contamination," but it does not argue that the court erred in admitting the lay opinion testimony.

"usable [by the jury] as proof to the extent of whatever rational persuasive power" it had. *Old,* 215 Md. at 526, 138 A.2d 889.[2] The jury obviously was persuaded by this unobjected to testimony, and it was sufficient to support the jury's verdict that the plaintiffs' homes retained no value after the spill. I agree with Judge Zarnoch's opinion that the property awards for the plaintiffs who "either explicitly or implicitly" testified that their homes were worthless should be affirmed.

With respect to the other homes, the decision is more difficult. Clearly, there was evidence of diminution of value after the leak. The appellees' expert, Mr. Acks, testified to the decreased value of each home pursuant to a formula based on the current presence of contamination or the risk of future contamination. Judge Zarnoch lists other evidence showing a diminution of value of the property in the area. Diminution of value, however, does not equate to zero value.

As Exxon argues, there was evidence weighing against a finding that each of the appellees' homes, even those with property that has not suffered any contamination, is worthless and cannot be sold for any price. The Court of Appeals has made clear, however, that it is "not the province of an appellate court to express an opinion regarding the weight of the evidence when reviewing a judgment on a jury verdict." *Owens–Corning Fiberglas Corp. v. Garrett,* 343 Md. 500, 521, 682 A.2d 1143 (1996). Rather, our job is to determine if there is some evidence, however slight, viewed in the light most favorable to the plaintiff, that is sufficient to support the jury's verdict in favor of the plaintiff. *Houston v. Safeway Stores,* 346 Md. 503, 521, 697 A.2d 851 (1997).

Here, as noted in Judge Zarnoch's opinion, in addition to the testimony of some homeowners that their houses were worthless after the leak, there was testimony regarding the inability to sell homes in the neighborhood. That evidence, to

---

2. It may be that Exxon had a tactical reason for not objecting to the lay testimony regarding value of the property. Regardless of the reason, it is part of the record on appeal that we review in determining the sufficiency of the jury's verdict.

the extent it came in without objection, along with the other evidence outlined in Judge Zarnoch's opinion, was sufficient to support the jury's view that none of the appellees' homes could be sold, and it supported the jury's verdict that all of the homes were worthless. I join Judge Zarnoch's opinion affirming all of the judgments regarding damages for diminution of property value.

With respect to Part IV of Judge Zarnoch's opinion, addressing emotional distress and fear of cancer, I join that opinion to the extent that it holds that Maryland law permits recovery for emotional distress related to a reasonable fear of cancer, and that the fear is reasonable if there is a substantial and medically verifiable possibility of contracting the disease. Additionally, however, there must be evidence of exposure to a toxic substance. *See Leaf River Forest Prods. v. Ferguson,* 662 So.2d 648, 650 (Miss.1995) (claim for fear of future disease allowed only if there is a showing of illness or substantial proof of exposure and medical evidence of possible or probable future disease); *Hansen v. Mountain Fuel Supply Co.,* 858 P.2d 970, 975 (Utah 1993) (in determining reasonableness of fear of developing disease, factfinder should consider likelihood that the disease will actually occur as well as the "duration and nature of the exposure to the toxic substance").

 I respectfully disagree with the conclusion in Judge Zarnoch's opinion that the jury instruction in this case sufficiently conveyed that standard to the jury. The jury was instructed:

A Plaintiff may also recover non-economic damages for fear of contracting a particular disease such as cancer. To recover for such fear, however, the Plaintiff must demonstrate that the fear genuinely exists and that his or her fear of contracting the disease in question is objectively reasonable.

There can be no compensation for fear and anxiety that is objectively unreasonable. To be objectively reasonable, it is not enough that a ... Plaintiff's fear be genuine and sincere. There must be reliable medical or scientific evi-

dence that it is *more likely than not that the substance can cause cancer.*

(Emphasis added).

This instruction did not advise the jury that it must find that there was proof of exposure as to each plaintiff, or that it must determine, with respect to each plaintiff, whether there was a substantial, medically verifiable possibility that each plaintiff would contract cancer. Thus, the jury could have found, pursuant to the instruction given, that it was more likely than not that the chemicals involved here could cause cancer, and therefore, plaintiffs could recover for damages for fear of contracting cancer, even if, given the circumstances of a particular plaintiff's exposure, it was unlikely that person would contract cancer. Accordingly, the instruction did not fairly cover the applicable law. In my opinion, the judgments regarding damages for emotional distress should be reversed on this ground.

Exxon contends, however, that most of the appellees are not entitled to a new trial because they failed to present sufficient evidence of compensable emotional distress. With the exception of 11 appellees, who Exxon concedes presented sufficient evidence of physical manifestations of emotional distress,[3] Exxon argues that the trial court erred in denying its motion for judgment notwithstanding the verdict. Exxon contends that the award in favor of these other appellees should be reversed without retrial because appellees failed to present "sufficient evidence of their prior emotional state or the physical manifestations of their alleged distress to render that distress capable of objective determination."

In Maryland, as discussed in more detail in the opinions of Judge Zarnoch and Judge Eyler, emotional distress is a compensable injury if it has outward manifestations such that the injury is "capable of objective determination." *Hunt v.*

---

3. These appellees include: Andrea Batton, Sally DePasquale, Hilton Dobb, Yvonne Lanting, Janice Martin, Edward McLewee, Michael Oberlin, Curtis Pfeiffer, Brenda Pfeiffer, Jennifer Quinn and Lori Vogler.

*Mercy Med. Ctr.,* 121 Md.App. 516, 531, 710 A.2d 362 (1998). This Court has explained that, "in order for an injury to be capable of objective determination, the evidence must contain more than mere conclusory statements." *Id.* The Court of Appeals has stated that an injury capable of objective determination includes "such things as depression, inability to work or perform routine household chores, loss of appetite, insomnia, nightmares, loss of weight, extreme nervousness and irritability, withdrawal from socialization, fainting, chest pains, headaches, and upset stomachs." *Hoffman v. Stamper,* 385 Md. 1, 34–35, 867 A.2d 276 (2005).

In *Hunt,* this Court held that evidence consisting of mere statements that a plaintiff was emotionally upset was not sufficient to demonstrate an emotional injury because it gave no useful information to the jury to set a level of damages. *Hunt,* 121 Md.App. at 532, 710 A.2d 362. The Court held, however, that evidence of the plaintiff's sleeplessness, combined with testimony about problems with fatigue, constipation, and mood change, gave the jury information necessary to quantify the level of damages attributable to the plaintiff's mental injury. *Id.* at 534–38, 710 A.2d 362.

Here, many of the appellees testified to an inability to sleep, nightmares, depression, headaches or other physical manifestations of emotional distress following the injury. That is not true, however, of each appellee that was awarded damages for emotional distress.

In Part VII of Judge Eyler's opinion, he categorizes appellees by level of proof regarding emotional distress. In Part VII A–D, he identifies the following categories of appellees, for whom the judgments for emotional distress should be reversed: (A) those who withdrew their claims for emotional distress; (B) those for whom there was no evidence of actual exposure or probable future exposure to contamination; (C) those who presented no evidence that they experienced emotional distress; and (D) those with minimal, but legally insufficient, evidence of emotional distress. I agree with Judge

Eyler's opinion that the judgments for emotional distress in favor of these appellees should be reversed.

With respect to the other appellees, however, I agree with Judge Zarnoch's opinion that sufficient evidence was introduced to permit a verdict of damages for emotional distress. These appellees are entitled to a new trial on damages for emotional distress, with a proper jury instruction regarding the fear of cancer claim.

With respect to medical monitoring, I join Part V of Judge Zarnoch's opinion to the extent that it states that Maryland permits a plaintiff to recover damages for medical monitoring. I also agree with the test set forth in Judge Zarnoch's opinion, that medical monitoring damages are permissible if: (1) the plaintiff shows significant exposure; (2) to a substance proven hazardous to humans; (3) because of the defendant's negligence; (4) resulting in the plaintiff having a significant increase in risk, compared to the general population, of developing a serious latent disease; (5) for which there are medical tests making early detection possible; and (6) the tests are not medically necessary for the general population, but are medically necessary for the plaintiff due to the increased risk.

I respectfully disagree, however, that the evidence here met that standard. There was no evidence that appellees have a "significantly increased risk" of contracting cancer or other serious latent disease as a result of exposure to any substance due to the leak. I agree with Judge Eyler's opinion that the judgments for medical monitoring should be reversed.

WATTS, J., concurring.

I concur, in part, with Judge Robert A. Zarnoch's opinion and, in part, with Judge James R. Eyler's opinion.

### Property Value

As to the issue of whether there was sufficient evidence to uphold the jury's verdict that all of appellees' properties were worthless or could not be sold, I would affirm the jury's award of property damages to those homeowners who "either explic-

itly or implicitly" testified that they believed their homes retained no market value for the reasons stated below.

I agree with Judge Zarnoch's assessment that twenty-six homeowners "either explicitly or implicitly" testified that they believed their homes retained absolutely no market value. Thirty-nine property owners testified that their homes had diminished in value by an unspecified amount, but did not go as far as to claim worthlessness. Eight remaining homeowners testified as to a generalized belief in the diminished value of their properties, such as expressing a fear of not being able to sell. An additional fifteen homeowners did not testify at all.

Maryland courts have held in the context of condemnation proceedings that an owner of real property is permitted to give opinion testimony as to the value of the owner's land. In *Brannon v. State Rds. Comm'n of State Highway Admin.*, 305 Md. 793, 801–02, 506 A.2d 634 (1986) (quoting *Mayor & City Council of Baltimore v. Schreiber*, 243 Md. 546, 553, 221 A.2d 663 (1966)), the Court of Appeals explained:

> Unlike an expert witness, the owner of the property is presumptively competent to express his opinion of its value. This presumption is based upon the owner's familiarity with the land, that merely by virtue of his ownership . . . he may be presumed to have sufficient knowledge of the price paid, the rents or other income received, and the possibilities of the land for use, [so as] to have a reasonably good idea of what it is worth.

(Alterations in original) (quotations omitted).

Maryland courts have applied the same standard to personal property. *See, e.g., Pennsylvania Threshermen & Farmers' Mut. Casualty Ins. Co. v. Messenger*, 181 Md. 295, 302, 29 A.2d 653 (1943) ("It is a general rule of evidence, quite liberally applied by the courts of this country, that anyone familiar with the value of property is competent to testify as to its value. . . . It is accordingly held that the owner of any article, whether or not he is generally familiar with the values of such articles, is ordinarily presumed to have such a familiar-

ity with it as to qualify him to testify concerning his estimate of its worth."); *Bresnan v. Weaver*, 151 Md. 375, 378–79, 135 A. 584 (1926) ("It is not required that the owner of articles of personal property in common use should be an expert. In such cases it is a question of the weight of the testimony.")[1]

As such, the testimony of a homeowner as to the value of his or her property is admissible in Maryland and can form a sufficient basis for a jury to award property damages. *See Shelton v. State*, 198 Md. 405, 411–12, 84 A.2d 76 (1951) ("In order to meet the test of legal sufficiency in any civil or criminal case . . . the evidence must either show directly the fact to be proved or support a rational inference of the fact. In a civil case the fact must be shown or the inference supported by a preponderance of probability, or an opposite preponderance must be overcome.")(internal citation omitted).

In *Hall v. Lovell Regency Homes Ltd. Pshp.*, 121 Md.App. 1, 19–20, 708 A.2d 344. *cert. denied*, 350 Md. 487, 713 A.2d 980 (1998), we concluded that a homeowner's testimony regarding the fair market value of the property was a "guess" and "[i]n the absence of competent foundation evidence for his opinion, the trial court did not abuse its discretion in ruling that the homeowner's testimony "was speculative and thus legally in-

---

1. Courts in other jurisdictions have held that the owner valuation opinion rule applies to real property in a tort context. *See, e.g., Nelson v. Metropolitan Utils. Dist.*, 249 Neb. 956, 547 N.W.2d 133, 136 (1996) ("[A]n owner who is shown to be familiar with the value of his land shall be qualified to estimate the value of such land for the use to which it is then being put, without additional foundation." (Citation omitted)); *Smith v. Padgett*, 32 Ohio St.3d 344, 513 N.E.2d 737, 740 (1987) ("The owner of real estate is assumed to possess sufficient acquaintance with it to estimate the value of the property, and his estimate is therefore received *although his knowledge on the subject is not such as would qualify him to testify if he were not the owner.*" (Emphasis in original) (citation omitted)); *Pocatello Auto Color Inc. v. Akzo Coatings, Inc.*, 127 Idaho 41, 896 P.2d 949, 951 (1995): ("[T]he owner of property is a competent witness concerning its value." (Citations omitted)); *Gregath v. Bates*, 359 So.2d 404, 407 (Ala.Civ.App.1978) ("[A]n owner of real property may testify to the value of such property without other qualifications. This rule is premised on the basis that the fact of ownership renders the owner competent to testify to such value." (citation omitted)).

sufficient to support [the homeowners'] damages claim." In *Hall*, four couples, who purchased newly-constructed houses in the Kingsbrook Development in Frederick County, experienced water and drainage problems with their properties. 121 Md.App. at 5, 708 A.2d 344. As a result, the homeowners brought suit against the "builder of their houses and its general partners, alleging violations of the Maryland Consumer Protection Act, Maryland Code, (1990 Repl.Vol., 1997 Cum. Supp.), §§ 13–301 through 13–501 of the Commercial Law Article (the "CPA"), and asserting claims in contract, warranty, and tort." *Id.* At trial only one of the homeowners, Richard Harcum, testified as to the fair market value of the property. *Id.* at 19 n. 7, 708 A.2d 344. The homeowners appealed arguing that the trial court erred in finding that Harcum's testimony "was speculative and thus legally insufficient to support their damages claim." *Id.* at 19, 708 A.2d 344. This Court affirmed the trial court ruling, concluding that:

> We note that the comment by Mr. Harcum that the homeowners contend was competent evidence of the present fair market values of their properties without defects was not elicited in response to a question on that topic. Rather, it was a side remark given in answer to the question whether he knew the present fair market value of his house with its defects. When Mr. Harcum was asked the basis for his observation that the "market value" of "a comparable house" without defects "is around $220,000.00 to $230,000.00," he cited only his "general knowledge of what houses like mine tend to sell for," **which he characterized as a "guess."** There was no evidence from Mr. Harcum or from any extrinsic source showing that Mr. Harcum was familiar with or had any knowledge about non-defective properties in the neighborhood that were similar to his property and, further, that he was informed about sales of any such properties and the sums for which the properties had been sold. (In fact, Mr. Harcum's testimony that the approximate value he would assign to a "house" like his "in a condition where everything's fine" was not expressed in terms of a comparable property in that neighborhood.) In

the absence of competent foundation evidence for his opinion, the trial court did not abuse its discretion in ruling that Mr. Harcum's testimony was just as he described it: a "guess."

*Id.* at 20, 708 A.2d 344 (emphasis added). In *Hall,* we relied on the Court of Appeals's statement in *Webster v. Archer,* 176 Md. 245, 256–57, 4 A.2d 434 (1939) (quoting *Mayor, etc., of Baltimore v. Smith & Schwarz Brick Co.,* 80 Md. 458, 472, 31 A. 423 (1895)), that:

> [O]ne 'having sufficient knowledge on the subject and acquainted with the land in question' may be permitted to express an opinion as to the value of land, even though he is not an expert or specially qualified by training and experience to value land. But it is implicit in that rule that it must appear that even such a witness **must have some knowledge of land values in the neighborhood of that which he is asked to value** ... otherwise his valuation would not be a reasoned opinion but a mere conjecture or guess.

(Emphasis added). It is clear that if a homeowner expresses an opinion as to the value of his property and provides "competent foundation evidence" for his opinion, the testimony is admissible and, in my view, can be sufficient to support an award of property damages. I would permit homeowners in cases of alleged environmental contamination to render an opinion as to the value of their property, and allow the jury to determine the weight to be given such testimony.

In this case, the homeowners knew the location of their homes in the neighborhood, their property's relationship or proximity to the leak, the nature of any testing completed on their property and nearby properties, and whether any remediation efforts were undertaken on their property or in their neighborhoods. As such, there was ample foundation for the homeowners to testify and have the belief that the homes were worthless or that no one was willing to buy them. It was within the purview of the jury to assess the weight to be given to the plaintiffs' testimony as to the value of their properties,

and the jury clearly found this evidence to be sufficient to determine that the property had no fair market value. I would find the unobjected to testimony of the homeowners in this case sufficient to affirm the property damages judgment as to those homeowners.

As to the homeowners who did not testify directly to the value of their homes, did not testify at all, or testified that their property suffered some diminution in value, but the jury nonetheless found the properties to be worthless, I agree with Judge Zarnoch that, "viewed in a light 'most favorable to the plaintiff[s'] case,' " the combination of expert and lay testimony, admitted without objection at trial, provided a sufficient basis for the jury's verdict.

### Fear of Cancer

I concur with Judge Eyler that in order to recover for fear of cancer, a plaintiff must demonstrate "actual present symptoms or probability that the cancer or other latent disease will develop." Although not directly determining the standard for reasonable fear of cancer, in *Pierce v. Johns–Manville Sales Corp.*, 296 Md. 656, 658, 464 A.2d 1020 (1983), the Court of Appeals addressed whether a person should be barred from recovery for the harm resulting from lung cancer caused by asbestos exposure, where the person previously developed asbestosis, and no tort recovery was sought for the harm resulting from asbestosis. The Court of Appeals explained that "[t]he rationale underlying statutes of limitation supports the conclusion that having never sought tort recovery for the harm resulting from asbestosis, recovery for the harm resulting from lung cancer should not be barred and that, therefore, a cause of action accrued at the time that Pierce knew or reasonably should have known of the existence of lung cancer." *Id.* at 665, 464 A.2d 1020. The Court of Appeals explained that:

> In Maryland, recovery of damages based on future consequences of an injury may be had only if such consequences are reasonably probable or reasonably certain. Such damages cannot be recovered if future consequences are "mere

possibilities." Probability exists when there is more evidence in favor of a proposition than against it (a greater than 50% chance that a future consequence will occur). Mere possibility exists when the evidence is anything less. *Davidson v. Miller*, 276 Md. 54, 62, 344 A.2d 422, 427–28 (1975).

*Id.* at 666, 464 A.2d 1020.

Courts of other jurisdictions directly addressing the standard for reasonable fear of cancer have concluded that the standard is "reasonably probable" or "more likely than not." The Supreme Court of California in *Potter v. Firestone Tire and Rubber Co.*, 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993), held that California would allow recovery in tort for fear of cancer due to toxic exposure if the plaintiff already had contracted a physical injury or illness from the exposure or, if not, if the plaintiff proved (1) exposure to a toxic substance which threatens cancer and (2) that the "fear stems from a knowledge, corroborated by reliable medical or scientific opinion, that it is **more likely than not** that the plaintiff will develop the cancer in the future due to the toxic exposure." *Id.*, 25 Cal.Rptr.2d 550, 863 P.2d at 816 (emphasis added).

The Court of Appeals of Colorado in *Boryla v. Pash*, 937 P.2d 813, 816–17 (Colo.App.1996), *rev'd on other grounds, Boryla v. Pash*, 960 P.2d 123 (Colo.1998) held that:

Traditionally, claims for increased risk of cancer damages proximately caused by a defendant's negligence have not been allowed unless there is sufficient evidence that occurrence of the future disease is **reasonably probable.**

The rationale for this standard when such damage claims are involved is that permitting recovery of increased risk of cancer damages should not be based upon speculation. Otherwise, recovery would violate the general precept that an injury must be shown with reasonable certainty and not be left to conjecture. Likewise, in Colorado, damages for prospective and anticipated consequences are only recoverable when there is a "reasonable certainty" that a future injury will arise.

(Citations omitted) (emphasis added). Under the above case law, fear of cancer that is not probable is generally not compensable. Recovery for fear of cancer is based on knowledge that the cancer is probable, *i.e.,* more likely than not. *Potter,* 25 Cal.Rptr.2d 550, 863 P.2d at 811–12.

In my view, Maryland law permits recovery for emotional distress related to a reasonable fear of cancer, and that fear is reasonable where plaintiffs prove: (1) exposure to a toxic substance which threatens cancer and (2) that the "fear stems from a knowledge, corroborated by reliable medical or scientific opinion, that it is **more likely than not** that the plaintiff will develop the cancer in the future due to the toxic exposure." *Id.,* 25 Cal.Rptr.2d 550, 863 P.2d at 816 (emphasis added).

As noted by Judge Kathryn Grill Graeff, in Part VII of Judge Eyler's opinion, he groups appellees by what evidence those appellees presented at trial regarding emotional distress. In Part VII A–D, he identifies the following groups of appellees: (A) withdrawn claims and unchallenged claims; (B) no evidence of actual exposure or probable future exposure; (C) no evidence of physical manifestation related to the leak; and (D) minimal evidence and clearly legally insufficient to show physical manifestation related to the leak. I agree with Judge Eyler's opinion that the judgments for emotional distress in favor of these appellees should be reversed.

In group E, Judge Eyler describes appellees who presented "some evidence of physical manifestation related to leak but legally insufficient, assuming fear of future disease is compensable." Although I agree with Judge Eyler that the judgments in favor of appellees in groups A–D be reversed, for the reasons set forth by Judge Graeff,[2] I believe that the appellees in group E—having demonstrated some evidence of physical

---

**2.** As Judge Graeff observed, the jury instruction given by the trial judge included the advisement that "there must be reliable medical or scientific evidence that it is more likely than not that the substance can cause cancer." Although the instruction contained the appropriate "more

manifestation related to the leak—are entitled to a new trial on damages for emotional distress with a proper jury instruction regarding the reasonable fear of cancer claim. As such, I would grant appellees contained within group E of Judge's Eyler's opinion a new trial on damages for emotional distress with a proper jury instruction regarding the reasonable fear of cancer claim, embodying the "more likely than not" standard.

### Medical Monitoring

On the issue of medical monitoring, the District Court of Appeals of Florida in *Petito & Stubbs v. A.H. Robins Co., Inc. & Zenith Goldline Pharm., Inc.,* 750 So.2d 103 (Fla.Dist.Ct. App.1999), *review denied,* 780 So.2d 912 (Fla.2001), concurring with the Supreme Court of New Jersey's decision in *Ayers v. Twp. of Jackson,* 106 N.J. 557, 525 A.2d 287 (1987), held that for medical monitoring purposes plaintiffs must prove the following elements:

(1) exposure greater than normal background levels; (2) to a proven hazardous substance; (3) caused by the defendant's negligence; (4) as a proximate result of the exposure, plaintiff has a significantly increased risk of contracting a serious latent disease; (5) a monitoring procedure exists that makes the early detection of the disease possible; (6) the prescribed monitoring regime is different from that normally recommended in the absence of the exposure; and (7) the prescribed monitoring regime is reasonably necessary according to contemporary scientific principles.

750 So.2d at 106–07 (quoting *Barnes v. Am. Tobacco Co.,* 161 F.3d 127, 138–39 (3rd Cir.1998), in turn quoting *Redland Soccer Club. Inc. v. Dep't of the Army & Dep't of Defense,* 548 Pa. 178, 696 A.2d 137, 145–46 (1997)). This test is similar to the standard recently discussed by the Fourth Circuit in *Rhodes v. E.I. du Pont de Nemours & Co.,* 636 F.3d 88 (4th Cir.2011), *cert. denied,* —— U.S. ——, 132 S.Ct. 499, 181

---

likely than not" standard, the instruction as worded allowed the jury to award damages because the substance could cause cancer without considering whether the individual plaintiffs were more likely than not to develop cancer based on the circumstances of their exposure.

L.Ed.2d 347 (2011), clarifying the Supreme Court of West
Virginia's holding in *Bower*, 522 S.E.2d 424:[3]

> Instead, the *Bower* decision recognized an independent tort
> claim for medical monitoring, which permits a plaintiff to
> recover the costs of diagnostic testing for diseases that may
> develop in the future as a result of a defendant's conduct.
> *Bower*, 522 S.E.2d at 431. The "injury" required to prove a
> medical monitoring claim is a "significantly increased risk of
> contracting a particular disease relative to what would be
> the case in the absence of exposure." *Id.* at 433.

636 F.3d at 98.

In Maryland, there is currently no independent tort cause of
action for medical monitoring or a test established for recog-

---

**3.** In *Bower v. Westinghouse Elec. Corp.*, 206 W.Va. 133, 522 S.E.2d 424,
431–33 (1999), the West Virginia Supreme Court of Appeals stated that:

> [A] plaintiff asserting a claim for medical monitoring costs is not
> required to prove present physical harm resulting from tortious
> exposure to toxic substances.
>
> Nor is the plaintiff required to demonstrate the probable likelihood
> that a serious disease will result from the exposure. As the Third
> Circuit indicated in *Paoli I*, "the appropriate inquiry is not whether it
> is reasonably probable that plaintiffs will suffer [physical] harm in the
> future, but rather whether medical monitoring is, to a reasonable
> degree of medical certainty, necessary in order to diagnose properly
> the warning signs of disease." 916 F.2d at 851. *See also* 2 Dan B.
> Dobbs, *Law of Remedies* § 8.1(3), at 380 n. 30 (2d ed.1993) ("diagno-
> sis expenses—medical monitoring—may be both reasonable and rea-
> sonably certain to occur in the future, even if the disease it is
> intended to diagnose is not reasonably certain to occur").
>
> . . .
>
> With the significant divergence of eliminating the requirement that
> diagnostic monitoring must be tied to the existence of a proven
> treatment protocol, we substantially adopt the *Paoli* test. Thus, in
> order to sustain a claim for medical monitoring expenses under West
> Virginia law, the plaintiff must prove that (1) he or she has been
> significantly exposed; (2) to a proven hazardous substance; (3)
> through the tortious conduct of the defendant; (4) as a proximate
> result of the exposure, plaintiff has suffered an increased risk of
> contracting a serious latent disease relative to the general population;
> (5) the increased risk of disease makes it reasonably necessary for the
> plaintiff to undergo periodic diagnostic medical examinations differ-
> ent from what would be prescribed in the absence of the exposure;
> and (6) monitoring procedures exist that make the early detection of
> a disease possible.

nizing medical monitoring as an allowable form of relief. *Philip Morris, Inc. v. Angeletti,* 358 Md. 689, 779–80, 752 A.2d 200 (2000) ("[The Court of Appeals] has never considered whether a demonstrated need for medical monitoring creates a valid cause of action in Maryland or generates a permissible form of relief under this State's more traditional tort actions[.]").

The record reflects that the circuit court in this case gave a jury instruction consistent with the standard set forth above, that recovery of damages for medical monitoring requires "a significant increased risk" of developing cancer. That being said, I agree with Judge Eyler that in this case:

[A]ssuming there is no requirement of physical injury, and utilizing the test used by the circuit court in these cases, the evidence is legally insufficient to support medical monitoring recovery in all these cases because there is no evidence that appellees have a significantly increased risk of contracting cancer or other latent disease as a result of any exposure to MTBE or benzene as a result of the leak.

I agree that the judgment as to medical monitoring should be reversed.

As to the remaining issue raised by appellants, I agree with the discussion in the section labeled "Waiver" in Judge Zarnoch's Proposed Opinion.

EYLER, DEBORAH S., J., concurring in part and dissenting in part.

This case is not about Exxon's liability for the gasoline spill at Four Corners in Jacksonville. Exxon admitted liability.[1] It is about what damages the plaintiffs who sued Exxon may recover, based on the law and the evidence.

Error by the trial court led to two baffling awards of money damages. First, every plaintiff property resident was award-

---

1. As explained in the opinions by Judge Zarnoch and Judge James Eyler, Exxon did not admit liability for fraud, and the jury found in Exxon's favor on that count.

ed money damages for the fear of someday getting cancer from the 2006 gasoline leak (that is, from the chemicals MTBE and benzene, which were permitted by law to be in the gasoline) **even though** there was no evidence that any resident experienced physical harm from an exposure to the chemicals and **even though** there was no evidence that any plaintiff is likely to develop cancer from exposure to the chemicals.[2] Second, every plaintiff property owner was awarded money damages for the full value of his/her property before the gasoline leak **even though** the properties are habitable, some have sold post-leak for more than their pre-leak values, and (except for those who sold their properties) all but one plaintiff remain living in their properties.

Many of the plaintiffs in this case were entitled to money damages, perhaps substantial, for damage to their property and for the interference they experienced, and may continue to experience, with their use and enjoyment of their property, including damages for the emotional turmoil suffered in connection with that disruption. However, recovery of money damages for "fear of disease" in the absence of proof of any present injury from a toxic exposure is not permitted in Maryland, nor is there any cogent rationale to expand tort liability in this state to allow such recovery. Maryland law also does not allow recovery for the total loss of a property that still has value and indeed is habitable; in fact, that is evident by the bind in which the trial judge was caught when certain plaintiff property owners who had been awarded the full pre-leak values of their houses, on the theory that the houses were worth nothing, sold the houses for substantial sums of money. The judge by necessity—as to do anything

---

**2.** It is important to emphasize that the analysis presented here regarding the fear of cancer damages applies to plaintiffs who presented some evidence of exposure to MTBE or benzene. As explained in Judge James Eyler's opinion, evidence of exposure is essential. Without it, there is no "fear" case at all. So, my references to "plaintiffs" in this analysis do not include those with no evidence of exposure. Interestingly, no plaintiff in the entire case underwent any testing to show that he or she had benzene or MTBE in his or her body as a result of the leak.

else would have been utterly irrational—eliminated the awards when the houses later were sold. This shows the absurdity of the awards to begin with. If they are upheld, and the plaintiff property owners sell their houses—be that the day after the litigation ends or years later (or even if their houses are inherited upon their deaths)—they will have been paid twice for the same property.

The awards for fear of cancer and for complete loss of all value of the properties are simply untenable, as they are contrary to established tort law and sound public policy. Unfortunately, the mode by which the cases were tried—in what amounted to a class action, when no class was certified and when the cases most certainly would not have qualified for class certification—undoubtedly contributed to these bizarre damages awards.

### *Fear of Cancer*

The most favorable evidence for the plaintiffs on the issue of fear of cancer was not favorable at all. It showed 1) that none of them had experienced any physical illness or disease as a result of their exposure to benzene or MTBE in their potable well water; and 2) that it was possible (not probable) that some day in the future they would develop certain types of cancer as a result of such exposure. It was upon this evidence that all of the plaintiffs, including those who did not testify *and even those who did not make claims for fear of cancer,* were awarded damages for the emotional distress of fearing they will contract cancer in the future. This is not the proper legal threshold of proof to support awards of compensatory damages for fear of cancer.

The Maryland law that has developed over thirty years in the asbestos toxic tort context provides the guiding tort principles for recovery of fear damages in this case. Those cases make clear that: 1) damages for tortious exposure to a toxic substance only will be awarded to a plaintiff who has suffered physical harm from the toxin—which means more than mere exposure to it and more than cellular changes brought about by such exposure, *see Owens Corning v. Bau-*

*man,* 125 Md.App. 454, 482, 726 A.2d 745, *cert. denied,* 354 Md. 572, 731 A.2d 970 (1999); *Anchor Packing Co. v. Grimshaw,* 115 Md.App. 134, 158–59, 692 A.2d 5 (1997) (citing RESTATEMENT (SECOND) OF TORTS § 7(2) cmt.b (1965)) (" 'Harm' implies a loss or detriment to a person, and not a mere change or alteration in some physical person, object, or thing."); and 2) damages for developing cancer in the future due to exposure to a toxic substance are not recoverable in tort absent proof of a probability (not a possibility) that the cancer will develop, *see Pierce v. Johns–Manville Sales Corp.,* 296 Md. 656, 666, 464 A.2d 1020 (1983); *Lohrmann v. Pittsburgh Corning Corp.,* 782 F.2d 1156, 1160 (4th Cir.1986) (applying Maryland law).

In *Lohrmann,* the Fourth Circuit Court of Appeals made clear that the trial court acted properly by restricting any reference by the plaintiffs to their fear of developing cancer in the future, because there was no evidence comporting with Maryland law to show that it was more likely than not that any given plaintiff would develop cancer in the future as a result of the toxic exposure. The *Lohrmann* holding has been a standard in Maryland tort law for decades and applies with equal force when the toxic substance is, as alleged here, MTBE or benzene.

The *Lohrmann* holding is mirrored in the seminal opinion by the California Supreme Court in *Potter v. Firestone Tire & Rubber Co.,* 6 Cal.4th 965, 25 Cal.Rptr.2d 550, 863 P.2d 795 (1993), which, like this case, involved a toxic chemical spill onto the plaintiffs' land. There, as here, the plaintiffs sought to recover damages for their fear that they someday would contract cancer due to the gasoline spill. The court held that to recover damages for fear of cancer based upon exposure to a known or suspected carcinogen, a plaintiff must prove **either present injury or disease caused by the exposure,** *i.e.,* physical symptoms brought about by the carcinogen itself, **or that it is more likely than not that the exposure to the toxin will cause the plaintiff to develop the feared cancer in the future.** *Id.* at 997, 25 Cal.Rptr.2d 550, 863 P.2d 795. Observing the obvious fact that *all* people are afraid of getting

cancer, the court explained that damages should not be awarded for a fear of cancer that is unreasonable. It classified as "unreasonable fear" "those cases where the feared cancer is at best only remotely possible." It reasoned that those "unreasonable fear" cases can be avoided by "requir[ing] a showing of the actual likelihood of the feared cancer to establish its significance." *Id.* at 990, 25 Cal.Rptr.2d 550, 863 P.2d 795. Thus, as did the court in *Lohrmann*, the *Potter* court rejected the notion that, in the absence of present harm from the toxin, the fear of possibly developing cancer in the future due to the exposure is not reasonable and therefore is not compensable.

The *Potter* court offered several well-reasoned explanations of why allowing damages awards for fear of the possibility, instead of the probability, of contracting cancer in the future does not make sense. A "possibility" standard creates a virtually limitless class of people who can sue to recover emotional distress fear of cancer claims, which, inevitably, will produce an unwarranted cost borne by the public. Not only will it produce an unwarranted cost, it "may work to the detriment of those who sustain actual physical injury and those who ultimately develop cancer as a result of toxic exposure." *Id.* at 993, 25 Cal.Rptr.2d 550, 863 P.2d 795. In a world of limited resources (both realistically and practically), why would tort law compensate people experiencing unreasonable fear at the expense of compensating people who actually sustain injuries in the future? As the *Potter* court put it, in the comparable context of potential liability for prescribing medicines later found to carry a risk of cancer, "for every patient who might actually develop cancer because of a particular drug, there could be hundreds or thousands of patients who might allege they were negligently prescribed the drug" and that they feared developing cancer in the future. *Id.* at 992, 25 Cal.Rptr.2d 550, 863 P.2d 795. Only a "probability" or "reasonableness" standard, which the court equated, would provide a "predictable threshold for recovery to permit consistent application from case to case." *Id.* at 993, 25 Cal.Rptr.2d 550, 863 P.2d 795. A lesser standard—allowing recovery for the fear of only the possibility of contracting cancer—would

hinder the development of products, especially pharmaceuticals, rendering their pricing out of reach to people who need them. The court acknowledged that some people may experience a genuine fear of developing cancer from exposure to a toxin, even though the fear is based on a possibility and is not reasonable; however, "it is sometimes necessary to 'limit the class of potential plaintiffs if emotional injury absent physical harm is to continue to be a recoverable item of damages in a negligence action.'" *Id.* at 993, 25 Cal.Rptr.2d 550, 863 P.2d 795 (quoting *Thing v. La Chusa,* 48 Cal.3d 644, 666, 257 Cal.Rptr. 865, 771 P.2d 814 (1989)).

In reaching a contrary conclusion, Judge Zarnoch's opinion relies primarily upon *Faya v. Almaraz,* 329 Md. 435, 620 A.2d 327 (1993), and *Wetherill v. Univ. of Chi.,* 565 F.Supp. 1553 (N.D.Ill.1983). Neither case is supportive.

*Faya* was not a product liability or premises liability case alleging exposure to a toxic substance. It was a medical malpractice case in which the plaintiffs, a small subgroup of former patients of a surgeon who died of AIDS, alleged that they had been exposed to HIV—the virus that causes AIDS—during their surgeries, and were fearful that they had contracted HIV from him and would die of AIDS, which is the deadly end-stage of HIV infection. Their primary claim, for lack of informed consent, was that, had they been told of the surgeon's health status, they would not have allowed him to operate on them and would not have been in a position to have their own bodily fluids exposed to his HIV-infected blood during their surgeries. Their claims were dismissed by the circuit court for failure to state a claim, upon a ruling that the facts alleged could not show a compensable injury.

The Court of Appeals reversed, holding that the plaintiffs could recover damages, for a limited period of time, for the fear that they *had contracted* HIV from the doctor during their surgeries, and therefore would develop AIDS. The period in which they could recover damages for fear of AIDS started when they learned that the doctor had had AIDS (which for all of them was when his cause of death was

reported in the newspaper) and ended when they received a test result showing that they were HIV-negative, *i.e.*, that they were not infected with the virus that causes AIDS. The Court reasoned that, for that period of time (which was about six weeks), the plaintiffs reasonably feared that they had been exposed to and therefore *had contracted* HIV, and thus reasonably feared that they would develop and die of AIDS.[3]

The *Faya* case and this case have virtually nothing in common. The limited "fear" claim the Court of Appeals held the *Faya* plaintiffs could pursue is not akin to the sweeping fear of cancer claim in this case. The causal relationship between HIV and AIDS is well established, and was well established in the late 1980s and early 1990s, when the events in the *Faya* case took place. In fact, there is really no question about causation, because only one, very specific, disease is involved. HIV is an infectious disease agent. HIV infection is itself a disease, with AIDS as its end-stage. Thus, the fear the plaintiffs were experiencing was that they *already had contracted a disease* that would progress and eventually kill them. The state of medical knowledge and treatment at that time was that HIV infection was not treatable and therefore inevitably would lead to the end-stage condition known as AIDS, which was fatal. (Treatment developments during the 20 years since the *Faya* case was decided have made HIV infection a manageable, chronic disease that does not inevitably lead to development of AIDS and death.) So, the fear of disease for which recovery was permitted under *Faya* was for *a contagious and ultimately 100% fatal infection the plaintiffs believed they already had contracted.*

By clear contrast, in this case, there was not even evidence that exposure to the substances in question more likely than not would cause the feared disease (cancer)—let alone that there was an absolute certainty of causation, as there was (before the more recent treatment developments) between

---

3. Now, two decades later, there are rapid HIV tests, which can produce results in 20 minutes. *See* http://www.aids.gov/hiv–aids–basics/hiv–aids–101/overview/testing/.

HIV infection and AIDS.[4] The scientifically established 100% cause and effect relationship between HIV and the then-fatal end-stage condition of AIDS underlay the Court's decision in *Faya* to allow compensatory damages for "fear" in that context, for the period before contraction of the disease was ruled out. By contrast, the fear claim in this case did not concern whether the plaintiffs already had contracted a disease (cancer) that could be deadly. It concerned whether, sometime in the future, they might contract cancer, even though there was no evidence on a more likely than not standard of any causal connection between the toxin and the disease.[5]

*Wetherill v. University of Chicago, supra,* is deceptive in its holding and should not form the basis for a conclusion that damages for present fear of cancer are recoverable in the absence of evidence showing either a present physical injury from exposure to the toxic substance in question or the probability that the exposure will cause cancer in the future. In that case, daughters of women who had taken a morning sickness drug during pregnancy filed suit against the drug manufacturer and sought damages for fear that they would develop cancer in the future from their exposure to the drug *in utero.* The opinion is a ruling on a motion by the drug manufacturer to exclude certain evidence, including "cancer-related testimony." The court denied the motion, stating that damages for fear of cancer could be recovered against the drug manufacturer in the absence of a present physical injury and even though it was not "reasonabl[y] certain" that the cancer would develop in the future. 565 F.Supp. at 1559–61.

In a paragraph that veers back and forth between a "high degree of likelihood" standard, *i.e.,* something greater than a probability, and "a likelihood [of future cancer being] relatively low," which plainly is the opposite, the *Wetherill* court cites

---

4. Again, this is for plaintiffs who had some evidence of exposure at all. For those without some evidence of exposure, there is no viable claim to begin with.

5. And, as is clear from the *Bauman* and *Grimshaw* cases, there was no evidence of any present harm to any plaintiff.

four cases to support its ruling. *Id.* The cases all are inapposite: not one of them recognizes or provides any support for the concept that recovery for fear of cancer can be had in the absence either of present disease or injury caused by the defendant's tortious exposure conduct or of the probability of developing cancer in the future due to that conduct.

Indeed, in all four cases the plaintiff suffered a present and actual physical injury caused by the defendant's conduct. In *Murphy v. Penn Fruit Co.*, 274 Pa.Super. 427, 430–31, 418 A.2d 480 (1980), the pregnant plaintiff who, upon being stabbed in her breast, heart, and lung, suffered a heart attack and went into labor while in the defendant's parking lot, was permitted to recover damages for "anxiety neurosis," including fear of suffering another heart attack, cancer, or an early death. In *Heider v. Employers Mut. Liab. Ins. Co. of Wis.*, 231 So.2d 438, 441–42 (La.Ct.App.1970), the plaintiff suffered a concussion in an automobile accident caused by the defendant and was taken to a hospital where EEGs suggested that she was suffering from epilepsy; she was permitted to recover emotional distress damages for fear of developing epilepsy in the future. In *Ferrara v. Galluchio*, 5 N.Y.2d 16, 18–20, 176 N.Y.S.2d 996, 152 N.E.2d 249 (1958), when the plaintiff had contracted radiodermatitis, a skin injury caused by overexposure to radiation, she was allowed to recover emotional distress damages for the fear that she would develop cancer from the overexposure of her skin (which the defendant had caused). Finally, in *Baylor v. Tyrrell*, 177 Neb. 812, 813–16, 131 N.W.2d 393 (1964), *overruled in part on other grounds by Larsen v. First Bank*, 245 Neb. 950, 959, 515 N.W.2d 804 (1994), the plaintiff was struck by a car driven by the defendant, sustaining numerous bodily injuries, including a fractured hip that required extensive surgery, resulting in one leg being shorter than the other. He was told by his surgeon that the hip surgery might not be successful, in which case he would suffer deterioration of the hip bone. The evidence at trial was that the plaintiff's hip already had deteriorated and was in a progressive state of deterioration. A jury awarded

him damages, including for the anxiety he was experiencing about the future deterioration of his hip.

It is hard to fathom the *Wetherill* court's holding that recovery for fear of cancer can be had in the absence of a present physical injury or the probability of future injury given that in each of the four cases the court relied upon the plaintiff had suffered a present physical injury, caused by the defendant's tortious act. The emotional distress damages in these four cases were tied to the progression of injuries and diseases the plaintiffs already had sustained, not to the fear of possibly developing a disease in the absence of any physical harm. Our Court should not be swayed by an opinion that offers a holding unsupported by the very cases it cites as authority.

A cogent explanation for the perplexing holding in *Wetherill,* and for any proposition that recovery can be had for fear of a disease in the absence of proof of present physical injury or that the feared disease probably will develop, is offered by James A. Henderson, Jr., and Aaron D. Twerski, in their article, *Asbestos Litigation Gone Mad: Exposure–Based Recovery for Increased Risk, Mental Distress, and Medical Monitoring,* 53 S.C. L.Rev. 815 (2002).[6] The authors, who explain that their observations are relevant not only to asbestos toxic tort cases but also to other cases based on exposure to toxins (and discuss *Potter* at length), point out that there was a time when plaintiffs in toxic tort exposure cases who had not developed symptoms, or who had developed one toxin-related disease (such as asbestosis) but not another (such as lung cancer), were caught in a bind by the "single-action rule," an established tort doctrine requiring plaintiffs to bring one suit, and only one suit, for all injuries allegedly caused by a defendant's tortious conduct. These asbestos-exposed plaintiffs could sue for one disease allegedly caused by their exposure (asbestosis) but, by the time they developed another

---

6. Henderson and Twerski were the Reporters for the RESTATEMENT (THIRD) OF PRODUCTS LIABILITY.

disease allegedly caused by their exposure (lung cancer), the statute of limitations would have expired on their claim.

Starting in the early 1980s, many courts—now a majority—discarded the single-action rule in toxic exposure cases. Our Court of Appeals did so in 1983 in *Pierce v. Johns–Manville*, 296 Md. at 667–68, 464 A.2d 1020, holding that the plaintiff's claim against asbestos manufacturers for lung cancer was not time-barred, even though he had developed asbestosis from the same asbestos exposure years earlier. The Court reasoned that the plaintiff's cause of action against the asbestos manufacturers for lung cancer did not accrue until he was diagnosed with lung cancer. As Henderson and Twerski explain in their article, before courts became "enlightened" and discarded the single-action rule in toxic exposure cases, "some courts developed stopgap causes of action to allow asbestos plaintiffs to escape the single-action rule dilemma." 53 S.C. L. rev. at 821. For example, in situations where there was not sufficient evidence to show that the plaintiff probably would develop the feared disease in the future, some courts would permit recovery for an increased risk of contracting the disease and/or for pre-injury fear, *i.e.*, the present fear of contracting the disease in the future. The authors explain:

> Thus, some courts took the position that recovery for increased risk could be predicated on proof of less than reasonable medical probability that the plaintiff would actually develop cancer. At the same time, a number of courts recognized a cause of action on behalf of asymptomatic plaintiffs for mental distress arising from the fear that they would develop cancer in the future. Unlike the increased-risk claim in which damages are based directly on the risk of developing cancer in the future, the mental distress claim avoids dealing with the reasonable medical probability standard, since the cause of action is based on a plaintiff's currently existing fear of future injury.

*Id.* at 821–22 (citations omitted).

The authors go on to observe that, now, in jurisdictions (such as Maryland) in which the single-action rule has been abandoned in toxic tort cases, these "stopgap" claims, which

do not comport with the firmly established probability standard of proof of damages in tort, no longer serve a purpose. Sequential causes of action may be brought, eliminating the risk that a plaintiff's cause of action based upon a disease that developed years after the exposure at issue will be time-barred. In the context of asbestos claims, for example, "the successful prosecution of one action will not bar plaintiffs from bringing a later action if they develop a more serious asbestos-related disease. Thus, a plaintiff who has contracted asbestosis can sue immediately to recover damages for the ills associated with that disease. If ten or fifteen years later he contracts mesothelioma, he may bring a new action for damages caused by that virulent form of cancer." *Id.* at 822 (citations omitted).

As noted, in this case, there was no evidence that any plaintiff had suffered a physical injury as a result of exposure to MTBE or benzene.[7] There was evidence from the appellees' expert witnesses that it is *possible* that they may develop various cancers in the future from their exposures. Because Maryland, like the vast majority of jurisdictions, has done away with the single-action rule in toxic tort actions of this sort, for any appellee who in fact contracts cancer in the future, the statute of limitations will not begin to run until the disease is contracted. That person can sue at that time, without the bar of limitations, and will bear the burden of proving, as in any tort case, that Exxon's negligence more likely than not caused his or her cancer. If such proof is presented and accepted by a trier-of-fact, Exxon will be responsible for damages for the cancer caused as a result of the exposure and for attendant emotional distress (and for wrongful death liability, if death results).

There is no toxic tort (or any tort) case in Maryland that permits recovery of damages for the present fear of contracting cancer when the plaintiff has not suffered a present physical injury. Moreover, there is no Maryland case in which

---

7. Again, for plaintiffs with no proof of exposure, no cause of action lies to begin with.

a plaintiff has been permitted to recover damages for the present fear of contracting cancer in the future in the absence of proof that it is more likely than not that cancer will develop. Because sequential causes of action may be pursued, there is no rational basis to extend Maryland law to allow recovery for the present fear of contracting cancer in the future in the absence of a present physical injury caused by the toxin or the probability that the feared cancer will develop.

Those appellees in this case who had some evidence of exposure to MTBE or benzene did not present any proof that they had sustained present physical injuries that were caused by those chemicals. Indeed, the evidence on that score was not lacking simply in terms of standard of proof; it was altogether lacking. As noted, there was no evidence of any chemically-caused present physical injury by any plaintiff. There was no evidence that any of the plaintiffs sought to undergo testing to see if these substances in fact are present in their bodies. And, in the light most favorable to the appellees, their own expert did not and could not testify that it was more likely than not that any of the exposed plaintiffs would contract cancer in the future as a consequence of the exposure. Accordingly, the fear of cancer damages award are unsupported by the law or the evidence and must be vacated.

### Property Damage

The property damage verdict in this case is unsupported by any probative evidence and is, frankly, nonsensical. The plaintiffs' expert testified that *none* of the 88 houses were worth zero as a result of the leak. Yet, the jury awarded every household the full pre-leak appraised value of their homes. Thus, an owner whose house was worth $700,000 before the gasoline leak was awarded $700,000; and so forth for every household. These damages awards had to be premised upon a finding by the jury that the plaintiffs had no houses in which to live, as if the houses had been leveled by a tornado.[8] The evidence was to the contrary, however.

---

8. Even then, the land would have value, as any needed remediation cost was Exxon's responsibility.

Given the compensatory purpose of damages in tort actions (other than punitive damages, which were not awarded here), it is untenable for the plaintiff homeowners to have their houses and also have an award of damages equal to having no house at all. The properties cannot be uninhabitable if they are habitable, which the evidence showed they are. Moreover, the properties cannot have a zero value based upon any cost of remediation, as none of the property owners has an obligation to pay for remediation. As noted, Exxon alone is required to pay for remediation.

In the legal world of compensatory damages, in which the objective is to return the plaintiff to the position he or she would have been in had the tortious conduct not occurred, the only circumstance that could justify the property damage award in this case would be if each and every house is worth absolutely **nothing**. Quite aside from the obvious fact that the houses are being occupied, and the inconsistent-with-zero-value fact, which led to a remittitur, that several houses have sold, there was no probative evidence in the trial of this case that could support a rational finding that the houses all are worth nothing. Put bluntly, that finding was completely irrational.

Judge Zarnoch and Judge Watts opine that, regardless of the plaintiffs' own expert witness evidence, which did not support a finding of zero values, the testimony of some of the homeowners that their properties were worthless was in and of itself sufficient evidence to support the verdicts awarding full pre-leak values. The opinion by Judge James Eyler well explains why expert witness testimony is necessary to prove that a leak of gasoline onto a property caused a reduction in the value of the property. Judge Watts opines that the lay testimony of some homeowners that their properties are worth nothing is sufficient to support the verdicts in favor of all homeowners because the testimony was not objected to.[9]

---

9. *Hall v. Lovell Regency Homes, Ltd. Partnership,* 121 Md.App. 1, 708 A.2d 344, *cert. denied,* 350 Md. 487, 713 A.2d 980 (1998), is inapposite to the property damage claim in the case at bar. *Hall* primarily was a

In Judge Graeff's opinion, she agrees with Judge James Eyler that expert witness testimony was needed to prove reduction in property values in these cases. She reasons, however, that the property damage awards should be affirmed on the ground that there was no objection to the lay opinions of the homeowners, and therefore we should analyze the sufficiency of the property damage evidence by including the lay testimony. Judge Zarnoch's opinion likewise emphasizes

breach of contract action by a small group of owners of new houses against their builder. The homeowners alleged that improper construction had caused their houses to have water and excessive moisture in their basements, cracks in the basement walls, and puddled water in the lawns, all of which prevented them from finishing their basements and building decks or fences. The alleged damage to the homes was not a matter of contamination of the properties by an outside source but of defective performance of the construction contracts. The homeowners all still occupied their houses. At trial, they called an expert witness who testified that their houses all had fair market values of zero. One homeowner attempted to testify about the value of his house—not saying that it was worth zero—but his testimony was stricken because, as he acknowledged, it was just a guess. We affirmed the court's ruling that the plaintiffs could not recover any more than nominal damages because their evidence, including their expert witness's zero value opinion—did not satisfy the loss of benefit of the bargain or any other contract damage recovery theory.

The only line of Maryland cases in which property owners have been permitted to express opinions about the values of their properties have been condemnation cases. Those cases are inapposite as they do not involve any issue of decrease in value of properties due to damage allegedly caused by the conduct of a tortfeasor. On the contrary, those cases by their nature present situations in which public authorities are taking homeowners' properties and the question for the trier-of-fact is the amount of money the homeowners should be paid in compensation for that taking. Homeowners in those situations are presumed to know the values of the properties for taking purposes; their presumed knowledge has nothing to do with harm caused to the properties by third parties; and because damages for lost value are not at issue, the homeowners are not in a position to create their own damages by saying that their homes are worth nothing or, in testimony that is subjective and does not therefore establish fair market value at all, that they simply would not sell their properties, on moral grounds.

Neither *Hall* nor the condemnation cases provide support for the notion that the property owners in the case at bar could themselves testify probatively about the alleged decrease in the values of their properties due to the negligence of Exxon. Only expert witnesses could so testify; and, as I have explained, the sole expert witness for the homeowners did *not* testify that the properties were worth zero.

the failure to object, stating that, due to the absence of an objection to the lay testimony, it can form the basis for a reasonable finding that the properties were worth nothing.

The absence of an objection is meaningless to the analysis of this issue, however. In determining the sufficiency of the evidence to support the property damage award, it does not matter one whit that the lay testimony by certain homeowners about the values of their properties (and other properties) was admitted without objection. The central sufficiency question on property damage was whether the evidence was legally sufficient to support a reasonable finding that the homes all were worth nothing. As in any case, evidence to support a finding must be probative of it. **Evidence that otherwise is not probative does not become probative merely because it was not objected to.**

The language in *Old v. Cooney Detective Agency*, 215 Md. 517, 526, 138 A.2d 889 (1958), quoted by Judge Zarnoch (and also by Judge Graeff), that inadmissible evidence, not objected to, can support the sufficiency of a jury's verdict says as much. The quotation from *Old* actually is a quotation of part of section 54 of *McCormick on Evidence.* The quoted material includes the following line: "The fact that [evidence received without objection] was inadmissible does not prevent its use as proof **so far as it has probative value.**" *Old* (quoting *McCormick,* § 54). (Emphasis added.) Section 54 of *McCormick* goes on to elaborate on that point, distinguishing the use for sufficiency purposes of incompetent but probative evidence that is not objected to from the use for the same purpose of non-probative evidence that is not objected to:

> **Relevancy and probative worth, however, stand on a different footing. If the evidence has no probative force or insufficient probative value to sustain the proposition for which it is offered, the want of objection adds nothing to its worth; and the evidence will not support a finding. It is still irrelevant or insufficient.**

*McCormick,* § 54, at 277–78 (6th ed.2006). (Emphasis added.) Thus, probative evidence that should not be admitted because

it is incompetent for any one of a host of reasons (for example, hearsay not within an exception to the rule against hearsay, or evidence that is unduly prejudicial even though relevant), but nevertheless is admitted because there was no objection, will be considered in determining whether the evidence at trial was sufficient to support a particular finding. On the contrary, evidence that is not probative and also is not competent, so that a proper objection to it would have been sustained, **does not take on probative value merely because there was no objection to it.** It remains what it was to begin with: evidence that is not probative, and therefore cannot be considered in deciding whether the evidence was sufficient to support a particular finding.

This is precisely the situation regarding the lay testimony by some of the homeowners about their property values (and the property values in the neighborhood). That testimony was not probative on the issue of property value post-leak. Only expert witness testimony (which was properly admitted into evidence) was probative of that issue. The expert witness testimony, viewed most favorably to the appellees, could not support a reasonable finding that the houses were worth nothing, and therefore could not support the jury's finding of zero value. The lay testimony, colorful as some of it was, was not probative. Objection or not, the fact that a homeowner thinks that no one will buy a house in Jacksonville cannot and does not prove that the houses have no value.[10]

There was no probative evidence adduced in this case to support the jury's finding that the houses all were worth

---

10. If the holding of this Court comports with this completely non-probative testimony, one has to assume that there will be some fortunate beneficiaries. The homeowners who testified that their properties, in which they still live, are worth nothing, especially those whose opinions rested on moral grounds, would of course be willing to give their houses away for nothing, and use the property damage award given to them by the jury for the purpose the jury must have had in mind: to buy a house somewhere else. Surely they could not countenance accepting a damages award compensating them fully for a zero value house and then accepting money for that same house. So, we should expect to see the houses given away for free to any people willing to take them (and pay the property taxes on them).

nothing. Accordingly, as a matter of law, that damages award must be vacated.